No. 23-15259

Iɴ Tʜᴇ

# United States Court of Appeals for the Ninth Circuit

———————————

Wᴇsᴛᴇʀɴ Wᴀᴛᴇʀsʜᴇᴅs Pʀᴏᴊᴇᴄᴛ; Wɪʟᴅʟᴀɴᴅs Dᴇғᴇɴsᴇ; Gʀᴇᴀᴛ Bᴀsɪɴ Rᴇsᴏᴜʀᴄᴇ Wᴀᴛᴄʜ; and Bᴀsɪɴ ᴀɴᴅ Rᴀɴɢᴇ Wᴀᴛᴄʜ;
*Plaintiffs–Appellants*,

Bᴀʀᴛᴇʟʟ Rᴀɴᴄʜ LLC ᴀɴᴅ Eᴅᴡᴀʀᴅ Bᴀʀᴛᴇʟʟ;
*Plaintiffs*,

Rᴇɴᴏ-Sᴘᴀʀᴋs Iɴᴅɪᴀɴ Cᴏʟᴏɴʏ; Bᴜʀɴs Pᴀɪᴜᴛᴇ Tʀɪʙᴇ;
*Plaintiffs–Intervenors*,

v.

Esᴛᴇʀ M. McCᴜʟʟᴏᴜɢʜ; Bᴜʀᴇᴀᴜ ᴏғ Lᴀɴᴅ Mᴀɴᴀɢᴇᴍᴇɴᴛ; and U.S. Dᴇᴘᴀʀᴛᴍᴇɴᴛ ᴏғ ᴛʜᴇ Iɴᴛᴇʀɪᴏʀ;
*Defendants–Appellees*,

Lɪᴛʜɪᴜᴍ Nᴇᴠᴀᴅᴀ Cᴏʀᴘᴏʀᴀᴛɪᴏɴ;
*Defendant–Intervenor–Appellee*.

———————————

On Appeal from the United States District Court
for the District of Nevada, No. 3:21-cv-00080-MMD-CLB
Chief District Judge Miranda M. Du

———————————

## LITHIUM NEVADA CORPORATION'S RESPONSE TO EMERGENCY MOTIONS FOR INJUNCTION PENDING APPEAL

———————————

Laura K. Granier                    Andrew C. Lillie

Jessica Coberly

HOLLAND & HART LLP

5441 Kietzke Lane, 2nd Floor

Reno, NV 89511

Telephone: (775) 327-3000

Mark D. Gibson

HOLLAND & HART LLP

555 17th Street, Suite 3200

Denver, CO 80202

Telephone: (303) 295-8000

*Attorneys for Defendant–Intervenor–Appellee Lithium Nevada Corporation*

## CONFERRAL STATEMENT

The parties have conferred and Appellants agree that Lithium Nevada may use up to 10,000 words in this response. Lithium Nevada confirms that this response contains 10,288 words.

## INTRODUCTION

Appellants seek to further delay the Thacker Pass mine, disregarding our country's need for the lithium critical to combat climate change, ensure national security, and mitigate America's dependence on an increasingly aggressive foreign country.

After more than a decade's work on baseline environmental studies[1] and, then an additional two-year delay to move the Project to avoid high-quality sage grouse habitat, in 2020, BLM started the NEPA process for the Project. In 2021, BLM approved the Project through a record of decision ("ROD") supported by a final environmental impact statement ("EIS"), which Appellants challenged, arguing that BLM violated the Federal Land Policy and Management Act ("FLPMA") and the National Environmental Policy Act ("NEPA").

On February 6, the district court rejected all of their challenges—save one. The court determined that BLM committed a single infraction under FLPMA and pursuant to this Court's recent decision in *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 33 F.4th 1202 (9th Cir. 2022) ("*Rosemont*"),because BLM did not determine whether Lithium Nevada had discovered valuable minerals underlying 1,300 acres ("Site") slated for placement of waste rock and tailings generated from the development of the mining claims in the pit area. But, unlike in *Rosemont*, the

---

[1] *See* SER813 (water data collection began in 2011); SER747 (baseline surveys for sage-grouse began in 2011).

record here shows extensive lithium mineralization throughout the Project area—including the Site. Based on that evidence and its finding of no other errors in BLM's review, the court remanded without vacating the ROD, because there was a serious possibility that BLM would fix its narrow error. The court devoted the remainder of its 49-page order to scrutinizing, and ultimately rejecting, all of Appellants' other arguments.

Because the court remanded without vacatur, the ROD is in effect and construction can finally commence. Appellants sought to halt construction first through an unsuccessful motion for injunction pending appeal below, which the court rejected because Appellants failed to show (1) a likelihood of success on appeal, (2) that delayed construction would not harm Lithium Nevada, and (3) that an injunction pending appeal would serve the public interest. Appellants now ask this Court for an injunction pending appeal ("Motion"). That request also should be denied.

*First*, Appellants have failed to show they are likely to succeed on the merits. The district court acted well within its discretion in remanding without vacatur because it correctly found that there is at least a serious possibility that BLM will substantiate its decision on remand. The record supports the court's finding that there is a serious possibility that BLM will determine that Lithium Nevada has discovered valuable minerals underlying the Site. Even if BLM determines that Lithium Nevada has not discovered valuable minerals under the Site, however, it can still authorize

Lithium Nevada's use of the Site for waste rock and tailings conditioned on Lithium Nevada locating mill sites for such use. It is undisputed that waste-rock storage is a lawful use of mill sites, which can be located on lands that are inadequately mineralized to support mining claims. The entire thrust of Appellants' *Rosemont* argument is that BLM's error led it to wrongfully exempt the Project from the governing resource-management plan ("RMP"). But that is simply incorrect: here, BLM applied the RMP and required mitigation that will lead to a net conservation gain for sage-grouse habitat. Appellants' remaining FLPMA and NEPA arguments similarly lack any likelihood of success on the merits—arguments that the district court thoroughly reviewed and rejected.

*Second*, Appellants incorrectly argue the environmental and aesthetic harms they fear count as "irreparable harms" that automatically entitle them to an injunction. That is not the law. Nor have Appellants carried their burden to show that the harms they raise are both certain to occur and sufficiently grave to warrant the extraordinary relief they seek.

*Third*, Appellants do not dispute that an injunction pending appeal would impose severe harms on Lithium Nevada. The delay would frustrate Lithium Nevada's $150-million preconstruction investments. It would delay annual revenues from the Project estimated to be around $1.5 billion. And the delay could jeopardize additional Project funding.

*Fourth*, Appellants have failed to show an injunction is in the public interest. To the contrary, the delay they seek would thwart the public interest in tackling climate change—every day of delay equates to losing lithium production that would support about 4,100 electric vehicles per day;[2] enhance Nevada's local economy; create over 1,300 jobs; generate almost $7 billion in federal, state, and local taxes; and curb the country's reliance on questionable foreign lithium sources.

Bartell Ranch LLC and Edward Bartell (collectively "BRL") also seek to enjoin construction. The court denied BRL's claims except to the extent BRL joined in EN-GOs' *Rosemont* claim, and denied BRL's request for vacatur. The court also denied BRL's subsequent emergency motion for an injunction pending appeal. BRL's novel theory presents an impermissible interpretation of the Mining Law that would prohibit *any* ancillary use even where it's undisputed a valuable mineral deposit has been discovered. Notwithstanding BRL's acknowledgment that the mining claims in the Project's mine-pit area are valid and can be developed, BRL argues that no ancillary use of other lands is permissible – whether for a road, a water line, or other processing facilities obviously necessary to develop the conceded valid mining claims. This absurd interpretation would frustrate the purpose of the Mining Law of 1872 by interfering with development of domestic minerals, and ignores the *Rosemont* decision and the Code of Federal Regulations, both of which authorize non-

---

[2] Dkt. 10, Ex. 1 ¶ 17.

mineralized lands to be used to support a mining project: mill sites under 43 C.F.R. §3832.34 or, "reasonably incident" uses under 43 C.F.R. § 3715. BRL failed to show a likelihood of success and failed to satisfy the other three requirements for injunctive relief, particularly on the water infrastructure which will be removed or reclaimed and, thus, there's no *Rosemont* "permanence" issue.

Finally, Appellants could have briefed vacatur during summary judgment but substantively failed to do so. BRL requested vacatur but provided no analysis, SER4846, and ENGO Appellants simply argued vacatur was the default remedy. SER4756. Although Lithium Nevada argued that vacatur is an equitable issue and provided detailed explanations as to why vacatur was unwarranted, ER176–78, Appellants did not substantively engage with that analysis and simply repeated on reply that vacatur is presumed. ECF 264 at 40. Appellants then raised entirely new arguments about vacatur for the first time after the case closed, in their emergency motions for injunction. Crucially, Appellants all failed below to brief the elements to justify an injunction, SER4968, SER176, SER5085, and no party requested an injunction at the summary-judgment hearing, waiting instead to do so after the case concluded. Tr. Appellants should not now be allowed to supplement their briefing post-decision to raise new arguments for vacatur and an injunction when they had the opportunity to do so below and focused their briefing elsewhere.

Therefore, Appellants' Motion should be denied.

# ARGUMENT

Whether to grant the Motions[3] "is committed to the exercise of judicial discretion." *Doe v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). Appellants must show that "the circumstances justify an exercise of that discretion" in their favor, *Nken v. Holder*, 556 U.S. 418, 433–34 (2009), based on four factors: (1) whether Appellants made a strong showing that they are likely to succeed on the merits of their appeals; (2) whether Appellants will be irreparably injured without an injunction pending appeal; (3) whether an injunction would substantially injure other parties; and (4) whether an injunction would be in the public interest. *See id.* at 426. Appellants have failed to show any of these factors favor granting an injunction pending appeal.

## I. Plaintiffs have not made a strong showing that they are likely to succeed on the merits of their appeal.

ENGO Appellants mischaracterize the court's treatment of their claims on summary judgment, asserting the court held that "BLM unlawfully approved the Project." Motion at 5. The reality is—as the district court plainly stated in its Merits Order—that the court denied all of Appellants' claims save one piece of one claim

---

[3] As the district court found, Plaintiffs do not seek to maintain the status quo. They seek to change it. ER4. The status quo is an effective ROD authorized by BLM and upheld by the district court authorizing Lithium Nevada to begin construction. Appellants ask this Court to prevent that. Dkt. 10. The standard for such a "mandatory injunction" that will disrupt the status quo is "doubly demanding." *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017).

related to the Site. Other than that, the court, in a thorough order, upheld BLM's approval of the Project. *See* ER234, ER240.

Appellants argue the court's conclusion that BLM failed to determine Lithium Nevada's rights under the Mining Law to use the Site required vacatur. They also contend that they are likely to succeed on their other claims—every one of which the court rejected. Both contentions fail.

## A. Appellants have not made a strong showing that the court erred in remanding without vacatur.

Appellants are unlikely to succeed on their remand-without-vacatur argument. In deciding whether to remand without vacatur, courts "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed."[4] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Under this balancing test, a court acts within its discretion to remand without vacatur when there is a serious possibility the agency will be able to reach the same decision on remand. *Id.* This Court reviews a decision such a decision only

---

[4] Applying this balancing test, the district court did not abuse its discretion in striking the balance in favor of remand without vacatur, in part, because the disruptive consequences of even a temporary delay would be severe for Lithium Nevada, the local communities near the Project, and national and global interests. *See infra* pp. ___.

for abuse of discretion. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010).

Here, the court acted within its discretion because, as it found, "there is *at least* a serious possibility" that BLM will substantiate its decision on remand. ER215 (emphasis added), and, the disruptive consequences of an interim change would be severe for Lithi-um Nevada and the public. That is so for at least three reasons.

**1. There is a serious possibility that BLM will substantiate its decision on remand because the record shows widespread mineralization throughout the Project area.**

As the district court found, unlike in *Rosemont*, the administrative record here shows widespread lithium mineralization throughout the Project area—including underlying the Site. ER215. This evidence led the court to find that there is *at least* a serious possibility that on remand, BLM will determine that Lithium Nevada has discovered valuable minerals underlying the Site: that will substantiate Lithium Nevada's right to use those acres for waste rock and tailings. ER8. And if BLM determines adequate mineralization exists to support that use of the mining claims, BLM will ratify its prior decision. *Id.*

Appellants try to dictate BLM's process on remand, arguing that the claim-validity examination, which BLM has only applied for patents, claims contests, trespassers, and evaluating proposed mines on lands withdrawn from mineral entry,

must be applied here.[5] The "hundred years of precedent" that Appellants reference relate entirely to other narrow situations. In contrast, this case involves a common FLPMA permitting review where there is an acknowledged valuable mineral deposit being developed.[6] Appellants ask the Court to dictate the processes and procedures that BLM must follow in evaluating whether Lithium Nevada has discovered adequate minerals to substantiate ancillary uses on the Site. This Court need not—and should not—dictate BLM's processes and procedures. Instead, as in *Rosemont*, 33 F.4th at 1210, the Court should leave it to BLM to determine the appropriate approach. *Rosemont*, 33 F.4th at 1224 (holding it would be premature to opine on agency's interpretation of its regulations when  agency has not yet interpreted and

---

[5] Although Appellants portray this as their "primary legal claim, as their lengthy "other claims section" indicates, Appellants brought many claims below, and their shift to highlighting *Rosemont* happened only after losing every other argument. *See* ER29–75 (complaint alleging almost 50 pages of arguments under FLPMA and NEPA).

[6] Appellants' cited cases on validity determinations address different contexts and are inapposite. *Chrisman v. Miller*, 197 U.S. 313, 323 (1905) (addressing "controversy [that] is between two mineral claimants"); *United States v. Coleman*, 390 U.S. 599, 600–01 (1968) (claim patent application). *Waskey v. Hammer*, 223 U.S. 85, 91 (1912) (adjudicating a dispute between overlapping mining claims); *Lombardo Turquoise Mining & Milling v. Hemanes*, 430 F. Supp. 429, 443 (D. Nev. 1977) (adjudicating a quiet title action); *Converse v. Udall*, 399 F.2d 616, 619 (9th Cir. 1968) (claim patent application); *Ideal Basic Indus., Inc. v. Morton*, 542 F.2d 1364 (9th Cir. 1976) (same); *United States v. Springer*, 491 F.2d 239 (9th Cir. 1974) (same); *U.S. v. Pittsburg Pacific, Co.*, 84 Interior Dec. 282 (IBLA 1977) (same).

applied them: "Unless and until the Service decides on remand that Part 228A regulations are applicable to Rosemont's proposed occupancy of invalid mining claims with its waste rock, and unless and until the Service construes those regulations to permit such occupancy, any ruling by our court on these questions is premature."). Moreover, as Appellants acknowledged in briefing below, *Rosemont* did not require the formal claim-validity examination required in other contexts, but instead noted that "an agency need only develop a factual basis on which it could form an opinion on surface rights," SER4729–30– a very different standard than Appellants now argue. *See id.* at 1229 (citing district court's identified requirement for mining-claim review, which this Court did not disturb on appeal). It is for BLM to implement the Mining Law and determine what processes should apply. *See Grand Canyon Tr. v. Provencio*, 26 F.4th 815, 827 (9th Cir. 2022). *Rosemont* and the district court both recognized this and Appellants' efforts to have this Court prematurely decide this issue in the abstract, and before BLM's review, should be rejected.

Moreover, in *Rosemont* this Court declined to decide BLM's processes and whether a formal claims-validity determination is required for ancillary use of mining claims. That is because on *that* record, it was irrelevant: the undisputed evidence was that the claims at issue lacked any mineralization. 33 F.4th at 1222. That is not this case. As the district court recognized, here, there *is* evidence of widespread

mineralization throughout the Project area which, as *Rosemont* recognized, puts any claim validity review solely within BLM's jurisdiction.

Moreover, Appellants' arguments about the record lacking information on mineral-extraction and -marketing costs is irrelevant. Mot. at 10–11. Because the record contains no information about those costs, Appellants argue that the court's conclusion—that there is a serious possibility that underlying valuable minerals exist—was speculative. But, as the court recognized when it rejected this argument, "there need not be certainty of sufficient mineralization in the waste dump and mine tailings land—**there must only be a serious possibility**." ER7 (emphasis added). Because the record shows that extensive mineralization exists throughout the Project area,[7] even without extraction and marketability data, the district court acted within its

---

[7] One of the geological reports that mineralization is "laterally extensive throughout the caldera". Lithium Nevada demonstrated significant evidence of mineralization throughout the record. As the FEIS states, "[t]he clay within the Project area contains "mineralization of up to 9,000 parts per million (ppm), and the former up to 4,000 ppm," and the rocks drilled "contain anomalously high lithium contents (greater than 100ppm)." SER737; SER1038. Lithium Nevada identified numerous other geologic analyses throughout the record and over time that all consistently reiterated the high mineralization within the Project area. *See* ER144–46. This information demonstrated to the court that there was a "serious possibility" that the claims underlying the mine pit, waste-rock and tailings dumps, and the remainder of the claims within the Project area would support Lithium Nevada's use under the Mining Law after BLM's review. ER215–16.

discretion in finding at least a serious possibility that valuable minerals underlie the Site. *Id.*

Appellants contend that BLM must make its claim-review determination on remand based on the *current* administrative record. Mot. at 10–12. And argue that will be impossible without extraction or marketing cost information. But this argument rests on a faulty premise: BLM's claim-review determination on remand is not limited to the *current* record (and the district court implicitly rejected that contention). *See* ER7. Appellants cite no authority to the contrary. Instead, they assert that both BLM and Lithium Nevada agreed that BLM is limited to the current record on remand. Not true. Neither BLM nor Lithium Nevada has stated that BLM must conduct its claim review on remand using only the existing record. Plus, the premise contradicts the purpose of remand: to allow the agency to take any steps necessary to review the narrow issue and explain its decision.

Appellants also argue that the court's serious-possibility determination is wrong because of two pieces of evidence they mischaracterize as suggesting that valuable mineral deposits do underlie the Site. Appellants cite a pre-feasibility study that, they say, suggests that lithium mineralization does not extend to the Site. Mot. at 11.[8]

---

[8] Lithium Nevada specifically addressed the ENGO Appellants' misunderstanding of the 2018 Pre-Feasibility Study in its Reply below and explained how the definition of "mineralization" used in that report is more limited under Securities law. SER5062–63. The report itself demonstrates this difference as it identifies for

They also contend that Lithium Nevada's willingness to bury the Site under waste rock implies that no underlying valuable minerals exist. Mot. at 12. But the court considered this, and still found, based on voluminous record evidence, *see* Merits Order at 11,[9] that there is at least a serious possibility that valuable minerals underlie the Site. *Id.* at 11–12. This finding despite Appellants' meager conflicting evidence does not amount to clear error or an abuse of discretion. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013) (court abuses its discretion only if its ruling rests on clearly erroneous assessment of evidence).

### 2. There is a serious possibility BLM will substantiate its decision on remand even if BLM finds inadequate mineralization on the Site.

Even if BLM finds inadequate mineralization underlying the Site for mining claims, BLM could still lawfully authorize use of the Site for waste rock. As this Court recognized in *Rosemont*, the "Mining Law allows the owner of a valid mining claim on land containing valuable minerals to obtain possessory rights to other land

---

investment purposes the specific areas of "mineralization" under Securities Law but acknowledges "continuous high grade subhorizontal … lithium across the project area." SER5063. Plaintiffs could have addressed this at hearing, where the court directed the parties to address the potential impact of *Rosemont*, but Plaintiffs did not.

[9] The record shows, e.g., that lithium clay "comprises 40 to 90 percent" of the sedimentary section under the entire caldera lake beneath the Project, an area that includes the 1,300-acre waste-rock site. SER5209, SER736.

for use as a 'mill site.'" 33 F.4th at 1210. "[L]and under a mill site need not contain valuable minerals," and under BLM regulations, valid mill-site uses include waste-rock storage and "'any other use that is reasonably incident to mine development and operation.'" *Id.* "[A]lthough the Mining Law limits individual mill sites to five acres, current regulations, unchallenged in this suit, allow owners of mining claims to stake multiple mill sites if 'reasonably necessary' for their mining operations." *Id.*[10] Appellants did not challenge BLM's mill-site regulation here and Appellants themselves argue the need for waste-rock storage for mining operations.[11] So, it is undisputed that even if BLM found inadequate mineralization to support mining

---

[10] Some of the same Appellants here unsuccessfully challenged this mill-site regulation before in the District of Columbia. *Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 494–95 (D.D.C. 2020), *appeal docketed*, No. 20-5382 (D.C. Cir. Dec. 30, 2020) (holding that 43 C.F.R. § 3832.32 is a reasonable construction of Section 42 of the Mining Law because Section 42 is silent as to the number of mill sites that can be located per claim and BLM's regulation is a "permissible construction" of the mill-site provision that is thoroughly justified by "drawing on the statutory text, Supreme Court precedent, [BLM's] view of the congressional policy behind the Mining Law, and longstanding BLM practice").

[11] As *Rosemont* recognized, mill sites are an alternative valid right under the Mining Law. Appellants don't argue Lithium Nevada is prohibited from exploring the mining claims that will site the waste-rock storage, given the mineralization of those lands; development of those minerals is allowed. Because this will be the first mine in this newly identified Lithium District, there is significant potential for future development, including underground mines. This is consistent with the development history of several Nevada mining districts which started as open-pit and evolved into underground mining. Placement of waste rock on the surface does not preclude future underground mining under the waste rocks or upon relocating the material.

claims on the Site, BLM still could authorize the same use—storage of waste rock—conditioned on Lithium Nevada's locating mill sites on those acres.[12]

Thus, on remand, even if BLM found mineralization inadequate to support ancillary use on the mining claims at the Site, there would be no different outcome because BLM could authorize the same use conditioned on Lithium Nevada's location of mill sites. And no one disputes Lithium Nevada's right to place waste rock and tailings on mill sites, as the *Rosemont* decision confirms.[13]

---

[12] *Rosemont* did not address the question here: whether the agency could cure the error by conditioning use of the land for waste rock and tailings on the company locating mill sites for that use. In this appeal, by contrast, one issue is whether there is a serious possibility that BLM will substantiate its decision on remand which BLM could do by authorizing the use of the Site conditioned on location of mill-site claims if BLM finds inadequate mineralization on any of the mining claims underlying the Site. There's nothing speculative about BLM's ability to condition authorization on remand to Lithium Nevada locating mill-sites or Lithium Nevada's ability to locate mill sites as needed on any lands BLM determines to be nonmineral in character (which under BLM's regulations at 43 C.F.R. §3830.5 means they are inadequately mineralized to support mining claims).

[13] Appellants may argue that Lithium Nevada cannot use mill sites on lands with mineralization. But BLM's regulations make clear that mineralization either is adequate to support a "discovery" of a valuable mineral deposit or, if not, they are not mineral in character and can be used as mill sites. 43 C.F.R. §3830.5. Appellants' suggestion that there could be some instance where there is *no* right to use lands for waste rock storage would result in an absurdity and frustration of Congress's explicit purpose to facilitate and encourage development of domestic minerals. A fundamental purpose of the Mining Law is to encourage "[t]he development of economically

**3.  There is a serious possibility BLM will substantiate its decision on remand because, in all events, the Project will adhere to the RMP.**

Appellants contend that BLM's failure to determine if Lithium Nevada had discovered valuable minerals under the Site led BLM to erroneously "exempt" the Project from the sage-grouse RMP and, as a result, BLM did not apply certain sage-grouse conservation requirements to the Project. Mot. at 1, 7. This fails for several reasons. *First*, Appellants never identify any supposed violation of the RMP tied to the waste-rock storage-area use. Because they concede the validity of Lithium Nevada's mining claims in the pit area, they also concede certain RMP requirements do apply to those claims and the development of the minerals on those claims. They also fail to identify which RMP requirements supposedly were violated with respect to the Site as compared to those that relate to the development of the discovered valuable minerals. *Second*, Appellants ignore that BLM explained in the RMP EIS

---

sound and stable domestic mining ... industries, and the orderly, and economic development of domestic mineral resources, reserves … to help assure satisfaction of industrial, security and environmental needs." *Krueger v. Morton*, 539 F.2d 235, 240 n.14 (D.C. Cir. 1976) (quoting 30 U.S.C. § 21a (1970)). The Supreme Court instructs that "[w]e should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) (rejecting interpretation that would "thwart the stated goals" of the statute). The Court cannot read the Mining Law in a way that would defeat this congressional purpose—which clearly would be the case if there were no place to store waste rock or overburden that must be removed to uncover the valuable minerals that Plaintiffs here concede Lithium Nevada has discovered.

that its "[s]tipulations do not apply to locatable mineral development" unless the subject lands "are withdrawn from mineral entry." ER140 ("development of locatable mineral deposits are nondiscretionary actions allowed under the General Mining Law of 1872 on all BLM administered"). Therefore, the very RMPs Appellants claim BLM somehow violated are clear about their limited application to locatable mineral projects such as this one, meaning they don't apply here. Appellants' argument that they somehow apply to certain lands within the Project area is unsupported. The lands here are not withdrawn and Appellants do not here challenge the RMP.

*Finally*, Appellants overlook a critical fact: BLM *did* adhere to the RMP requirements, and Lithium Nevada has agreed to do so, resulting in a net conservation gain to sage-grouse habitat in the area. *See* SER5108–09; SER5148–49; SER5157. This is another reason why there's *at least* a serious possibility that BLM will be able to substantiate its decision on remand, and another reason why remand without vacatur was proper.

### 4. The court did not abuse its discretion in determining that the seriousness of BLM's error did not compel vacatur.

Appellants contend that their remand-without-vacatur argument is likely to succeed because the court did not give sufficient weight to the seriousness of BLM's error. This too lacks merit on several counts.

*First*, Appellants argue that the *Rosemont* error infected BLM's analysis of the entire Project. Mot. at 12. Plaintiffs never raised this argument in their merits briefing below where they focused the *Rosemont* issue solely on the Site. ECF 264 at 4. It is therefore waived. The court emphasized that "BLM substantially complied with the applicable legal requirements here, which supported the Court's decision to remand without vacatur." ER6; *accord* ER8. *Third*, the district court held BLM's failure to undertake an inquiry into mineralization under the Site did not "infect[] the entire ROD with error." ER7. Rather, because "there is evidence in the record of lithium mineralization such that BLM may be able to fix its error on remand" *id.* (citing ER215–16, ER251–52), the court held: "there need not be a certainty of sufficient mineralization in the waste dump and mine tailings land—there must only be a 'serious possibility,' … and the [c]ourt found just such a serious possibility." ER7 (citing ER215–16). Plus, as the court explained, "the ROD approved two different plans of operations, and the Court only found that BLM erred as to the portion of the ROD approving the mining plan of operations that covered the waste dump and mine tailings land." ER7.

Additionally, Appellants argue that, based on the vacatur in *Rosemont*, where the court found the Forest Service's assumption of mining-claim validity "tainted" the entire Project, vacatur is required here. But the *Rosemont* facts were different, and here, Appellants tied the *Rosemont* error solely to the alleged sage-grouse RMP

"exemption" – they never argued this error affected any other environmental analysis of the Project. Conversely, the *Rosemont* plaintiffs argued the error impacted multiple issues that the agency determined "improperly limited its choice of alternatives [under its NEPA analysis], [improperly limiting] mitigation measures, and [in many instances improperly limiting its] ability to deny or restrict project activities" due to the agency assuming Mining Law rights. *Save the Scenic Santa Ritas v. USFS*, Case No. 4:17-cv-00576-RCC (Nov. 27, 2017), ECF 1 ¶145 (case consolidated under *Rosemont*). The *Rosemont* Court correspondingly applied the claim-validity issue to that entire project. Any such comparison here is inapplicable.[14] And the *Rosemont* Court did not reach the issue squarely before this Court—whether it is essentially harmless error in any event because nonmineral lands can be for mill sites for waste-rock storage and other ancillary uses because they don't change the environmental analysis for the Project. 33 F.4th at 1221–22.[15]

*Second*, Appellants argue BLM's error was serious because it contradicted the Mining Law. Mot. at 9. Again, the court soundly rejected that argument. That BLM

---

[14] Plaintiffs now argue a formal claim validity examination, using Appellants' preferred process, be required, but *Rosemont* did not order any particular validity determination process. 33 F.4th at 1229 (citing district court's ruling having faulted the Forest Service for failing to develop "a 'factual basis upon which [it] could form an opinion' as to the validity of Rosemont's unpatented claims," (citation omitted) which this Court did not disturb on appeal).

[15] *See generally CBD v. USFWS*, Case No. 19-17585, ECF 24; ECF 27.

had a duty to determine if Lithium Nevada has a discovery at the Site arose after this Court's *Rosemont* decision—a decision issued a year *after* BLM issued the ROD. Given this timing, the court acted within its discretion in concluding that "it would be inequitable to remand with vacatur based on *Rosemont* because BLM was following longstanding regulations when it decided not to evaluate claim validity and *Rosemont* was not even published until after the merits briefing began in this case." ER6.

To be sure, some courts measure the seriousness of an agency's error by assessing how egregiously the error contravenes the purposes of the statutes in question. *See, e.g.*, *Or. Nat. Desert Assoc. v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017). BLM's longstanding practice before this case hardly contravened statutory purpose. Congress has declared for decades that it is national policy to facilitate and encourage private development of domestic minerals. *See, e.g.*, 30 U.S.C. § 21(a) (codifying the Mining and Minerals Policy Act of 1970). Congress has reaffirmed that policy many times. *See, e.g.*, 30 U.S.C. § 1602(7), (8) (codifying December 2020 amendments to National Materials and Minerals Policy, Research and Development Act of 1980). And most recently, for critical minerals—including Lithium—Congress charged executive agencies with finding permitting efficiencies because permitting delays are hindering development of domestic minerals. *See* 30 U.S.C. § 1607 (codifying provisions from the Infrastructure Investment and Jobs Act of

2021). BLM's historical practice did not contravene these congressional purposes and national policies; it aligned with them.

### 5. The court did not abuse its discretion in determining that environmental harm did not compel vacatur.

Appellants erroneously argue that this Court has set a per se rule that vacatur is mandatory on remand where there is environmental harm. To the contrary, this Court has clarified that risk of environmental harm is only one factor for the court to consider. *NRDC v. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022). It's not a determinative factor. This Court and others consistently allow remand without vacatur even when doing so will lead to environmental or other harms. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993 (9th Cir. 2012); '*Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1102 (9th Cir. 2006); *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022); *Backcountry Against Dumps v. Perry*, 2017 U.S. Dist. LEXIS 139090, at *4, *15–16 (S.D. Cal. Aug. 29, 2017).

### B. Appellants have not made a strong showing that they are likely to succeed on their other arguments on appeal.

Appellants argue they are likely to succeed on every other argument they raised—and lost—on summary judgment. But the district court thoroughly and persuasively rejected all those arguments. The court rejected the argument that BLM violated FPLMA based on alleged undue and unnecessary degradation of sage-

grouse habitat, local groundwater, and air quality. ER220–23. And the court rejected Appellants' NEPA arguments based on air-quality standards; alleged failures to adequately analyze (a) baseline wildlife conditions for sage-grouse, pronghorn, and springsnails; (b) impacts on wildlife and cumulative effects on wildlife; and (c) mitigation measures about groundwater and wildlife impacts; and an alleged failure to adequately analyze baseline water resources. The district court's comprehensive and persuasive reasoning, set out in a 49-page order in which the court set out its analysis in painstaking detail, demonstrates that Appellants' other arguments on appeal are unlikely to succeed.

### 1. BLM prevented unnecessary and undue degradation under FLPMA.[16]

Appellants argue BLM's failure to apply 2015 ARMP sage-grouse protection standards and allowed unnecessary and undue degradation ("UUD"). Mot. at 14. Appellants ignore that the Project achieves an overall net conservation gain for sage-grouse habitat through Lithium Nevada's funding of habitat enhancement credits under the State of Nevada's Conservation Credit System ("CCS"), which were calculated based on extensive surveying of 49,000 acres in the Project area. SER27.

---

[16] Appellants concede that mineralization exists in the Project's mine pit, SER4990, and where Lithium Nevada establishes valid mining claims it is undisputed the RMP requirements regarding sage grouse are inapplicable. As discussed above, BLM applied those requirements anyway.

BLM's application of this net-conservation-gain requirement ensures the mitigation provided through the CCS will provide a "net benefit" for the sage-grouse habitat, addressing direct and indirect effects. SER552; ER112. Moreover, as the district court observed, the protections for sage-grouse in the RMP are more protective than required to prevent UUD. ER221. Under FLPMA, "BLM's regulations only require Lithium Nevada to 'prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations,' and "[s]age grouse are not listed as a threatened or endangered species." *Id.* (citing 43 C.F.R. § 3809.420(b)(7),"

Appellants argue that BLM did not ensure that "the Project will meet state water and air quality standards." Mot. at 14–15. But the Project's environmental-protection measures go beyond complying with the Nevada Department of Environmental Protection's ("NDEP") requirement to "maintain water quality," incorporating standards required under a State Water Pollution Control Permit ("WPCP"), and monitoring and adaptive-management-mitigation measures. ER173. BLM carefully reviewed the water quality data before approving the FEIS, and additionally required "[t]wo additional fate and transport sensitivity models … to ad-dress potential [antimony] scenarios." TPEIS-1406 AR104230. And Lithium Nevada will minimize or eliminate groundwater impairment through strategies determined with BLM and NDEP concurrence. Furthermore, all of these measures will be monitored by a

technical advisory group of BLM staff and related federal, state, and local officials that regularly monitor water quality and quantity. ER115. The court reasonably found that because of this and the fact that Appellants do "not identify any federal water quality standards that the Project violates," they failed to demonstrate the Project causes UUD to groundwater.

Similarly, Appellants misstate that the air scrubber is "yet-to-be-determined." Lithium Nevada clearly repeatedly identified that the FEIS explained "[s]ince completing the [Impact Analysis Report], Lithium Nevada concluded that the tail gas scrubber will utilize a sodium sulfate scrubbing solution containing sodium hydroxide." SER3012 ("Air Quality Impact Analysis was completed based on guidance and specifications from a sulfuric acid plant manufacturer, which included manufacturer guaranteed emission levels."). Furthermore, the FEIS demonstrates these standards would be achieved because the Project must receive a minor-source air permit from NDEP before construction can begin—and a prerequisite of permit issuance is an environmental evaluation, including modeling, that demonstrates the controls will ensure air quality standards are met. NAC 445B.308. Because Appellants additionally consistently fail to "identif[y] a federal or state air quality standard that the Project violates, and BLM's own applicable regulations require compliance with federal and state air quality standards," ER222–23, this Court is unlikely to overturn the district court's determination that the Project does not cause UUD to air quality.

## 2. BLM complied with NEPA.

### a. BLM analyzed cumulative effects.

The district court compared the cumulative analysis in the Project's FEIS to the more sparse analyses in Appellants' cited cases and reasonably determined that here "BLM provided more thorough analysis." ER229. The FEIS in lists relevant past, present, and reasonably foreseeable future actions, along with the nature and individual acreage of those actions, where such acreages are known. ER163; ER 164 (addressing the Oregon project). The FEIS notes specific types of disturbance and the potential impact on different resources.[17] BLM therefore reasonably selected both geographic areas and took a "hard look" at the cumulative impacts. *Great Basin Res. Watch*, 844 F.3d at 1106. The district court concluded "BLM provided pages of analysis of the cumulative impacts of the Project on various resources supported by data," and it is not likely this reasoning will be overturned on appeal. ER230.

---

[17] ER643–44 (quantifying current air pollution and examining RFFA projects impact by analyzing emissions data about pollutant concentrations from existing sources, with projections about RFFA actions air quality impacts based on economic and population growth projections, regulatory requirements, and the potential for wildfires); ER636–37 (identifying disturbance attributable to "sand and gravel mining operations" in conjunction with utility and energy development" would result in impacts to vegetation and wetland resources, detailing possible impacts)

### b. BLM analyzed both baseline conditions and effects on wildlife and air quality.

Appellants argue that the baselines for pronghorn and sage grouse were generalized and cursory, but omit that the concerns highlighted were addressed in the FEIS. They argue, for example, that the pronghorn analysis is a "single sentence," Mot. at 18, but the FEIS discloses the habitats and seasonal pronghorn ranges affected by the project, contextualizes the winter range affected by the Project in comparison to the applicable hunt unit, and identifies that two pronghorn movement corridors exist within the Project area. ER157. NDOW itself— the agency they quote as concerned—specifically acknowledged that BLM incorporated "its previous comments regarding …pronghorn, and their habitats within and adjacent to the project." SER3144. This explanation "that the Project will have an adverse impact on local pronghorn" with accompanying analysis is a "sufficient … baseline for pronghorn," ER227–28, and it is unlikely the Court will overturn the district court's analysis of this argument.

Similarly, the baseline for sage grouse was robust and specific. The FEIS discusses in detail the Project's impacts to sage grouse, SER559–60, including identifying nearby leks, the quality of the sage grouse habitat within and around the Project area, the amount of existing disturbance in the population management unit

("PMU"),[18] and the current status of the sage grouse population in the PMU. ER156. Appellants' willful blindness explains the district court's observation that "Plaintiffs statement [on summary judgment] that 'there are no details about sage-grouse use of the area' in the FEIS is simply inaccurate," and the "baseline surveys … conducted for sage grouse" in Appendix G make it unlikely the Court will overturn the district court's conclusion that the FEIS sufficiently describes the sage grouse baseline. ER227.

BLM also directly responded to the NDOW comments regarding the impact of groundwater pumping on wildlife and revised the FEIS accordingly. ER158. Furthermore, the FEIS explains that "[i]mplementation of [the mitigation plan] would likely reduce or minimize potential impacts to water dependent resources." SER3034. The effects Appellants reference are those "[e]ffects would be concurrently reclaimed." *Id.* at AR067777. Appellants cannot "broad[ly] generaliz[e]" that BLM failed to look at impacts to groundwater given these specific analyses, Mot. at 19, and it is unlikely this Court will overturn the district court's conclusion that BLM provided "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the Project. ER223–24.

---

[18] Plaintiffs' overwrought claims of harm to aesthetics in the area are belied by the fact that significant drilling under prior authorizations already occurred within the Project area, SER 4602 (depicting hundreds of drill holes in and around the current Project area), and extensive digging and trenching to assess over 50,000 pounds of material pursuant to prior authorizations. TPEIS-0384 at AR-046576.

Finally, BLM clearly analyzed and understood impacts to air quality. Plaintiffs' cherry-picking of BLM statements *prior to preparation of the DEIS*, (Mot. at 19), ER225, mischaracterizes the comprehensive nature of BLM's review and ignores the extensive analysis of the Project's air impacts. As discussed, BLM ensured the Project identified the tail gas scrubber technology, which itself was subject to "manufacture guaranteed emissions levels," SER3012, that BLM was entitled to rely on to estimate emissions from the sulfuric acid plant and model air quality impacts because an agency is "afforded deference in choosing its scientific method for modeling data." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1080 (9th Cir. 2011). This Court will likely agree with the district court that BLM's review of the Project's modeled effects to air quality and requirement that the Project meet state and Federal air quality standards constituted a "hard look" at those impacts.

### c. BLM analyzed mitigation measures and their effectiveness.

Appellants repeat their baseless claim that BLM approved the Project without a mitigation plan. Mot. at 20. Like many other arguments, this is answered by a citation to the record: "contrary to Environmental Plaintiffs' argument, the FEIS does contain a groundwater quality monitoring and mitigation plan[,] (TPEIS-0384 at AR-045572-76; see also TPEIS-0711 (Appendix P).)," The proposed groundwater monitoring network will provide an early warning system for drawdowns that may occur beginning in 2035. SER532–33. The monitoring and mitigation plan may

- 29 -

evolve over time in response to data collection and in coordination with the Water Resources Technical Advisory Group organized and managed by BLM. SER532; ER103 ("BLM [will have] periodic opportunities to reevaluate the analysis of potential impacts during and after implementation."). BLM specifically analyzed the effectiveness of appropriate mitigation measures, explaining ""[t]he adaptive management approach ...is appropriate for the project in light of ...acknowledged uncertainties associated with groundwater model predictions, [and will] allow for the early implementation of appropriate mitigation measures," SER2953; including "active groundwater extraction and treatment." SER4749.

## C. BRL has not shown a likelihood to succeed on its *Rosemont* extension.

BRL argues that it is likely that this Court will disagree with the district court and extend *Rosemont* beyond even the district court's approach—so there is a likelihood of success on the merits of its claim that *Rosemont* should be extended to land underlying water and power-transmission lines. The district court properly rejected this argument, holding that "arguing for a further extension of law is not logically compatible with a strong likelihood of success on the merits—because Rancher Plaintiffs do not, and cannot, point to any precedent supporting their argument—especially when it is not yet even clear whether the Ninth Circuit will agree with the way the Court extended *Rosemont* in this case." ER9–10. Novel arguments with "no precedent of success on the merits … [of the] claim weigh[] strongly against the

Court granting a preliminary injunction—which must be supported by a finding of a strong likelihood of success on the merits—on such a claim." *Acad. of Motion Picture Arts & Scis. v. Network Sols., Inc.*, 989 F. Supp. 1276, 1279 (C.D. Cal. 1997); *Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 863 (9th Cir. 2022) ("No injunction can issue based on only a plausible claim.").

BRL also overlooks that BLM reasonably authorized the pipelines and transmission line under 43 C.F.R. § 3715.[19] BRL concedes that "the proposed location of

---

[19] BRL, like the ENGO Appellants, focused on the waste-rock and tailings dumps when urging the district court to extend *Rosemont* to apply to BLM's regulations. Only in its summary-judgment reply did BRL argue obliquely that some "lithium processing facilities, CTFS, and associated infrastructure, including water and power transmission lines" were on invalid mining claims. SER4965. In no way does that sentence make the argument that BRL now raises: that even temporary occupation under different regulations than those referenced in *Rosemont* are foreclosed by *Rosemont*. BRL thus waived this argument because it did not clearly articulate it in its briefs (which were almost entirely focused on other issues), and only cogently raised it for the first time at the summary-judgment hearing. And even at oral argument, the substance of BRL's argument was simply that "vacatur would be essential here because … there are no valid mineral right claims" under the planned transmission line." SER Tr. at 7, *see id.* at 6–8. A "single-sentence argument made during oral argument did not sufficiently raise to the … court the argument" and "waive[s] th[e] argument." *Mortg. Store v. Field (In re Mortg. Store)*, No. 12-00653 JMS/KSC, 2013 U.S. Dist. LEXIS 54825, at *28 (D. Haw. Apr. 16, 2013); *see BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 825 (9th Cir. 2000) (determining "parties cannot raise new issues on appeal to secure a reversal of the lower court's summary judgment determination"). That BRL waived this argument below, and thus cannot

the mine pit is within an area of known mineralization." SER4765. Therefore, given that Lithium Nevada chose to place the lithium mine pit, after years of exploration, on mineralized claims, the activities and structures "reasonably incident" to the mine pit that "[c]onstitute substantially regular work" and are "reasonably calculated to lead to the … beneficiation of minerals" are permitted under 43 C.F.R. § 3715.2. The water line and powerline are "reasonably incident" to the mine pit and will be used to "develop" the mine, and the "procurement of supplies" like water and power constitutes "[s]ubstantially regular work" that will lead to the beneficiation of the mine pit. 43 C.F.R. § 3715.0-5. This regulation applies when "proposed use" is "reasonably incident" to the mine pit and also includes "occupancy." 43 C.F.R. § 3715.1. "[O]ccupancy" under 43 C.F.R. § 3715.0-5 "may encompass the construction, presence, or maintenance of temporary or permanent structures, such as transmission lines." *Howard Sadlier*, 2011 IBLA Disp. Orders LEXIS 42, *7 (Sept. 8, 2011). And where sufficient mining operations exist, the "level of activity" necessary to "me[e]t the requirements of 43 CFR 3715.2" includes "water impoundments and delivery" like the water line and powerline in this case. *Terry Hankins*, 162 IBLA 198, 216–17 (July 22, 2004). BLM therefore "approv[ed]" the transmission line, pipeline, and

---

press it before this Court, is an independent reason why BRL has failed to show a likelihood of success on the merits.

related "reasonably incident" activities "under the applicable regulatory sections within subparts … 3715."  ER103.

## II.  Appellants failed to show they will be irreparably harmed without injunctive relief.

Appellants characterize alleged harms that could result from the Project as a whole—over its 41-year lifespan. They do not—as they must for purposes of their motion—limit those potential injuries to what might occur during the few months leading up to July 2023 when optional replies are due under this Court's briefing schedule.  Nor do Appellants show irreparable harm specific to the Site usage.

Appellants argue environmental injury is automatically irreparable. Mot. at 4. But an injunction is not a matter of right, even if irreparable injury might otherwise result. *Nken*, 556 U.S. at 434.  This Court has rejected Appellants' argument that "any potential environmental injury automatically merits an injunction." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).

To qualify as irreparable harm, the injury must be "both certain and great." *San Diego Bev. & Kup v. United States*, 997 F. Supp 1343, 1347 (S.D. Cal. 1998). Appellants' alleged harms are neither—so they fail.

As the court explained, Appellants failed to identify irreparable harm based on activities planned for the Site.[20] ER9. Appellants thus fail to show "immediate threatened injury" to those areas that would give rise to emergency relief. *Id.* (citing *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).

Because the court thoroughly analyzed Appellants' arguments below, and carefully constructed its Merits Order and its IPA Order to address every issue, it also addressed Appellants' arguments that "generalized harm" would result from remand without vacatur. The court emphasized that it considered the "totality of the environmental issues discussed in the Merits Order," and ruled that "the Court does not find that the irreparable harm prong of the analysis weighs heavily in the [Appellants'] favor." ER10.

As to the certainty prong, Appellants rely on alleged impacts to sage-grouse habitat generally but ignore that the Project-area habitat is not high quality as originally projected in the 2015 RMP's modeled mapping; ignore the unrebutted record evidence that "the majority of high suitability winter habitat is located northwest of the Project area" where it overlaps with the mine pit," SER30, *compare* SER34 (Fig. 13) *with* SER704; and explicitly acknowledge that Lithium Nevada's rights under

---

[20] That failure is all the more glaring because Lithium Nevada raised in briefing and at the hearing below Appellants' failure to identify any harm arising from activities at the Site. Arguments not opposed are deemed conceded. *Greenawalt v. Ricketts*, 943 F.2d 1020, (9th Cir. 1991).

the Mining Law to the concededly valid claims under the mine pit exempted it from the RMP's sage-grouse protections. ECF 264 at 12 n.5 ("WWP's evidence … which shows that the 'known zone of Li [lithium] mineralization' is in the pit"). Also, as Lithium Nevada pointed out before the district court, Appellants rely on Terry Crawforth's declaration that is vague and addresses potential harm that either is mitigated or unavoidable in an area that they concede is subject to Lithium Nevada's Mining Law rights.[21] Mr. Crawforth's claim the Project will "remove" an ecosystem in the Montana Mountains is wrong – Lithium Nevada spent two years and millions to relocate the mine outside of the Montana Mountains to avoid high quality sage grouse habitat.[22] Other than that, Appellants' "harm" argument focuses on a specific pit area that Appellants admit is not subject to the RMP. Appellants failed to identify any other areas impacted by alleged RMP "violation" or specifically located in the Site at issue. And, as explained above, the Project actually achieves a net conservation gain for sage-grouse habitat through Lithium Nevada's funding of habitat-enhancement credits under the CCS.

---

[21] Appellants' emphasis on the high-quality winter habitat within the Project area, Mot. at 14; *id.* Ex. 1 at ¶¶ 15–16, 20–21, 25–31, 34, focuses on the specific pit area that Plaintiffs admit is not subject to the RMP and Appellants otherwise fail to identify any other areas impacted by alleged RMP "violation" or specifically located in the waste-storage area at issue.

[22] Lithium Nevada conducted additional exploration to move the Project to "substantially lower" quality sage grouse habitat. SER406.

Significantly, Appellants ignore that Lithium Nevada designed the Project and created its mitigation plan to conform with the RMP's sage-grouse goals, objectives, and requirements, and that Lithium Nevada responded to, addressed, and identified the mitigation for all of the exact harms that Appellants allege. *See* SER 5219–20. In fact, under the Project's reclamation plan, "residual effects to wildlife habitat would include the permanent loss of less than five acres." SER5223. As Lithium Nevada explained below and during the merits briefing, the record shows that the Project will be concurrently reclaimed as areas are mined, so impacts to Appellants' alleged aesthetic and vegetation harms will be mitigated. SER5220–21.

BRL similarly alleges environmental interests in sage-grouse and Lahontan cut-throat trout, but neither is in "imminent danger" from implementation of the mine plan. *See* BRL Mot. at 11. As Lithium Nevada has explained, sage-grouse habitat in the mine area is marginal with most high-suitability winter habitat located northwest of the Project. And like ENGO Appellants, BRL ignores that the Project's mitigation plan was designed in conformance with the RMP to address potential harms to sage-grouse habitat.[23] As to trout, the Project is not projected to affect Lahontan cutthroat

---

[23] Bartell also claims that the water pipeline and power-transmission lines will pass through a sage-grouse lek. BRL Mot. at 11. But the FEIS very clearly states that there are only four known leks in the Project vicinity, all of which are north of the Project area and not near the proposed water pipeline or power-transmission lines. SER549, SER559. The areas depicted in EIS Figure 4.5-10 as "unknown" have not been confirmed to support either an active or inactive lek.

trout habitat in Crowley and Pole Creeks (SER554). FWS and BLM both anticipate the Project will not have impacts for the life of project but monitoring as implemented safeguards to predict trends and allow ongoing assurances. And even if groundwater drawdowns from mining did extend that far, those effects would not occur for many years, far beyond the timeframe for appellate review. In other words, BRL provides no evidence that alleged environmental harms to sage-grouse and trout are either great or certain to occur during the pendency of appeal. In the absence of imminent irreparable harm, none of the Appellants are entitled to extraordinary relief.

### III. Appellants have failed to show that an injunction pending appeal would not substantially injure other parties.

Contrary to Appellants' assertion, the third element in the context of a motion for an injunction pending appeal does not ask where the balance of equities lies. *See* Mot. at 21. Instead, the third element asks whether an injunction pending appeal will substantially injure other parties interested in the proceeding. *Sierra Club*, 929 F.3d at 687. The district court correctly concluded that this factor weighs against Appellants because "[f]urther delay of the project will harm Lithium Nevada." ER11. It determined that this element "at least very slightly favors denying" an injunction pending appeal. *Id.*

- 37 -

There is no basis for this Court to reach a different conclusion, because the evidence supports the district court's finding that delay will harm Lithium Nevada. The economic cost of delay is not a few thousand or tens of thousands of dollars; delaying the Project means delaying "annual revenue of the project … expected to be approximately $1.5 billion" and doing so "could jeopardized Project financing, including both the second tranche of funding from GM ($330M) and the DOE funding, ultimately putting the Project at risk or making its construction and operation far more costly." SER5242–43. At a minimum, "Lithium Nevada has [already] invested over $150 million in pre-construction permitting, equipment acquisition, securing contractors, and other expenses." SER5242. Courts remand without vacatur for much less—and those discretionary decisions have been upheld. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021); *Gulf Restoration Network*, 47 F.4th at 804; *Cal. Cmtys. Against Toxics*, 688 F.3d at 994; *Backcountry Against Dumps*, 2017 U.S. Dist. LEXIS 139090, at *15–16.[24]

---

[24] BRL argues that an injunction pending appeal would not harm Lithium Nevada, because Lithium Nevada allegedly does not yet have funding needed to begin construction. BRL Mot. at 10–11. That is inaccurate. All the necessary equipment is ready, and Lithium Nevada has funding secured to begin construction, so any delay imperils that funding and wastes funds expended to ready personnel and equipment.

**IV. Appellants have failed to show that an injunction pending appeal would be in the public interest.**

As the district court noted, "if saving a snail warrants judicial restraint, so does saving the power supply." ER11 (quoting *California Communities Against Toxics v. U.S. E.PA.*, 688 F.3d 989, 994 (9th Cir. 20212).

> …there is, if nothing else, a tension between the macro environmental benefit that could result from the Project and the micro (relatively speaking) environmental harm that will likely flow from the Merits Order unenjoined.

ER11. In fact, that "macro environmental benefit" is quantifiable: every single day the mine is prevented from producing lithium, the lost production is the equivalent of preventing production of about 4,100 electric vehicles each day. Lithium Nevada's Motion for Briefing Schedule at 12, ECF No. 10-1. Battery storage is "vital to combatting climate change and very lithium dependent." ECF 65- Ex. 6, Lowry ¶14. Global lithium demand is forecasted to triple by 2025 and to outstrip supply as electrification of the transportation sector intensifies. The current U.S. demand for lithium is approximately 18,000 tons per year of lithium carbonate equivalent ("tpa LCE"). By 2025, the U.S. is forecasted to require approximately 100,000 tpa LCE, increasing to about 350,000 tpa LCE by 2030. This demand increased even more with President Biden's Executive Order on August 5, 2021, aimed at making half of all new vehicles sold in the U.S. electric by 2030. And right now, the vast majority of lithium used in the U.S. comes from or through China.

Thacker Pass is the only project positioned to help meet our country's demand. The U.S. currently produces less than 5,000 tpa LCE from just one facility. At a proposed capacity of 66,000 tons per year LCE at full buildout, the Project will become a cornerstone of the U.S. lithium supply. There are no other U.S. alternatives to Thacker Pass that provide the scale, grade, or timeline to production required to keep pace with electrification of the transportation sector and reduction of carbon, in addition to providing the lithium products required by the military for national security. ECF 65 Ex. 7 ¶¶21-26; Ex. 6, Lowry Dec. ¶¶11, 13-14, 15-18. Put another way, Appellants have failed to show an injunction pending appeal would serve the public interest through environmental benefits – particularly given those benefits come from the Project itself.

Appellants have failed to show that an injunction pending appeal would serve local public interests. And it is hard to see how they could. The Project's operation will add "$650 million … to the local economy" of Nevada, the Project's construction will employ over 1,300 people (including Fort McDermitt Tribal members), and ultimately net "$6.7 billion in Federal, state, and local taxes." SER5245

Appellants have also failed to show that an injunction pending appeal would serve broader national interests. Every day that the United States continues to rely on China for lithium is another day of reliance on an increasingly aggressive neighbor for a mineral critical to U.S. "manufacturing sectors, medicine, and national

defense systems." SER5235. Because China could cut off the U.S.'s supply of lithium needed for national security and to combat continuing climate-change impacts, President Biden's Supply Chain Disruption Task Force concluded that the U.S. must "invest immediately in scaling up a secure, diversified supply chain for high-capacity batteries." SER5240; *see also* SER5235 (noting that "lithium is 'essential' to US. economic security and 'critical' to national security"); 30 U.S.C. §§ 1602, 1621a noting Congress's emphasis on the need for a "stable supply of [critical minerals] necessary to maintain national security"). Were the Project to be stayed for any period, the country's ability to address national-security threats would be critically delayed. As Lithium Nevada has explained, the record shows that the Project directly supports local, state, and national objectives to engage the local community in job-skill development, to provide substantial community benefits to the Fort McDermitt Tribe, to decrease the effects of climate change, and to protect national security. Lithium Nevada Emergency Response at 26. The Project will produce lithium that will aid the country's war on climate change, positively impact the global environment, and further our country's energy usage, national security, and the economy within the community around the mine and in the State of Nevada. *See Id.* SER5250 (shipping lithium from China to the U.S. increases $CO_2$ emissions and implicates questionable labor practices).

Simply put, Appellants have failed to show that an injunction pending appeal would serve environmental, local, national, and global public interests. That failure is another reason to deny Appellants' motion.

## V.    If the Court were to enter an injunction pending appeal, it should require Appellants to post a reasonable bond.

Were the Court to award Appellants an injunction pending appeal, it should require Appellants to post a bond, because Lithium Nevada would suffer substantial damages from delay. Those damages would include, but not be limited to, Lithium Nevada's recent, significant capital expenditures to obtain equipment and contractors to start the Project. SER5254–43.

Any bond should be more than nominal. Appellants allege that they would lose their ability to prosecute this appeal if the Court required a significant bond. To be sure, the Court may waive the bond requirement or impose a nominal bond if requiring a higher bond "would effectively deny access to judicial review." *Cal. ex. rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985). But that is not this case. Tax information suggests that Appellants can post a reasonable bond.[25] And BRL is not a nonprofit; it's an economic entity interested in

---

[25] In 2020, Western Watersheds Project, Inc. had total revenue of $1.3 million, and expenses of $1.1 million, with a net income of $200,000 and other assets of almost $600,000. *See* ProPublica Nonprofit Explorer, *available at* https://bit.ly/3Ze5auf.

preserving its business endeavor. Thus, if the Court were to enjoin construction pending appeal, the Court should require Appellants to post a bond sufficient to cover $150 million in damages to Lithium Nevada.

## CONCLUSION

The Court should deny Appellants' motion for an injunction pending appeal.

Date: February 28, 2023.                    HOLLAND & HART LLP

*/s/ Laura K. Granier*
Laura K. Granier

*Attorney for Defendant–Intervenor–Appellee Lithium Nevada Corporation*

- 43 -