**No. 23-15259**

**(Consolidated with No. 23-15261, No. 23-15262)**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

BARTELL RANCH, LLC, and EDWARD BARTELL,

*Plaintiffs-Appellants*,

v.

ESTER M. MCCULLOUGH, Winnemucca District Manager, Bureau of Land Management, and; BUREAU OF LAND MANAGEMENT,

*Defendants-Appellees*,

and

LITHIUM NEVADA CORP.,

*Intervenor-Defendant-Appellee*.

On Appeal from the
United States District Court for the
District of Nevada No. 3:21-cv-00080-MMD-CLB
(District Judge Miranda M. Du)

**PLAINTIFF-APPELLANTS' OPENING BRIEF**

DOMINIC M. CAROLLO (Or. Bar. No. 093057)
dcarollo@carollolegal.com
Carollo Law Group LLC
Mail:   P.O. Box 2456
Roseburg, OR 97470
Office: 2315 Old Highway 99 South
Roseburg, OR 97471
Ph: (541) 957-5900

O. KENT MAHER (Nev. Bar No. 316)
kent@winnemuccalaw.com
PO Box 130
33 W Fourth Street
Winnemucca, Nevada 89446
Ph: (775) 623-5277

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants Bartell Ranch, LLC have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

# LIST OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BLM | United States Bureau of Land Management |
| CTFS | Clay Tailings Filter Stack |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| GHMA | General Habitat Management Area |
| GPM | Gallons Per Minute |
| LCT | Lahontan Cutthroat Trout |
| LNC | Lithium Nevada Corporation |
| NEPA | National Environmental Policy Act |
| ONDA | Oregon Natural Desert Association |
| PHMA | Priority Habitat Management Area |
| PoO | Plan of Operation |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| SP | Spring |
| SRK | SRK Consulting Inc. |
| VRM | Visual Resource Management |

## TABLE OF CONTENTS

**STATEMENT OF JURISDICTION**......................................................................1

**ISSUES PRESENTED**......................................................................................2

**STATEMENT OF THE CASE**...........................................................................3

**STATEMENT OF RELEVANT FACTS**.............................................................5

   I.   Collection of Water Resources Data for the Mine. ...............................5

   II.  BLM's Review and Approval of the Thacker Pass Plan of Operations...........8

   III. Testimony of NEPA Contractor Tyler Cluff. ..................................11

**LEGAL BACKGROUND**................................................................................12

   I.   APA ...................................................................................................12

   II.  NEPA ................................................................................................13

   III. FLPMA ...........................................................................................15

**SUMMARY OF THE ARGUMENT**................................................................16

**STANDARD OF REVIEW**.............................................................................17

**ARGUMENT**.................................................................................................18

   I.   The FEIS's Water Resources Baseline is Arbitrary and Capricious.............18

    A.  The Baseline is Inconsistent with Data and Surveys in the Record...........18

      1.   The FEIS Misrepresents the Springs Baseline. .......................................19

      2.   The FEIS Misrepresents the Groundwater Baseline. ..............................28

    B.  BLM Failed to Ensure the Accuracy and Scientific Integrity of the Baseline..................................................................................................30

      1.   BLM Failed to Ensure Accuracy of Contractor Work Product. .............31

      2.   BLM Ignored Clear Evidence of Trespass in the Collection of Data. .....34

      3.   BLM Failed to Ensure Piteau Followed Required Protocols..................38

    C.  Reliance on Unspecified and Undisclosed Mitigation Without an Accurate Baseline Violates NEPA...................................................................42

    D.  BLM's Failure to Produce Environmental Records Violated NEPA. ........44

II.   The District Court Abused Its Discretion by Not Admitting Non-Record Evidence that Further Confirms that the Water Resources Baseline is Arbitrary and Capricious. ...................................................................45

    A.  Post-ROD Documents are not Categorically Barred in APA Cases...........45

    B.  Admissions of Errors in the NEPA Process Satisfy the *Lands Council* Factors.................................................................................49

III. Degradation of Sage Grouse Habitat and Visual Resources on Lands Covered Merely by Unverified Mining Claims Violates FLPMA.......................51

    A.  *Rosemont* Extends to LNC's Water and Power Lines. ...............................54

    B.  Improper Occupancy of Mining Claims Causes Unlawful Degradation of Sage Grouse Habitat and Visual Resources. .....................................................57

IV. The Court Should Vacate the ROD. ..............................................................59

**CONCLUSION** ............................................................................................**60**

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Marten*,
   585 F. Supp. 3d 1252 (D. Mont. 2021). ....................................... 46, 47

*All. for the Wild Rockies v. U.S. Forest Serv.*,
   907 F.3d 1105 (9th Cir. 2018). ...............................................13

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993).................................................59

*AWARE v. Colorado Dep't of Transp.*,
   153 F.3d 1122 (10th Cir. 1998 ................................................35

*Barrows v. Hickel*,
   447 F.2d 80 (9th Cir. 1971) ..................................................55

*Bohmker v. Oregon*,
   903 F.3d 1029 (9th Cir. 2018). ...............................................52

*Bundorf v. Jewell*,
   142 F. Supp. 3d 1138 (D. Nev.), ........................................... 47, 50

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*,
   889 F.3d 584 (9th Cir. 2018). ............................................ 13, 46

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   341 F.3d 961 (9th Cir. 2003) .................................................44

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004). ........................................... 14, 30

*Conservation Nw. v. Rey*,
   674 F. Supp. 2d 1232 (W.D. Wash. 2009). .................................. 14, 47

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
   581 F.3d 1063 (9th Cir. 2009). ..............................................15

*Ctr. for Biological Diversity v. U.S. Forest Svc.*,
   349 F.3d 1157 (9th Cir.2003) ................................................14

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*,

No. 214CV00226APGVCF, 2017 WL 3667700 (D. Nev. Aug. 23, 2017) .........52

*Ctr. For Biological Diversity v. United States Fish & Wildlife Serv.*,
   33 F.4th 1202 (9th Cir. 2022) ........................................................ 4, 15, 53, 54, 55

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
   441 F. Supp. 3d 843 (D. Ariz. 2020)…………………………...…...……..19

*Ctr. for Food Safety v. Perdue*,
   No. 20-CV-00256-JSW, 2022 WL 4793438 (N.D. Cal. Sept. 30, 2022) ...........47

*Davis v. Nelson*,
   329 F.2d 840 (9th Cir. 1964) ................................................................55

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ................................................................42

*Friends of Earth v. Hintz*,
   800 F.2d 822 (9th Cir.1986). ...................................................... 14, 31

*Gardner v. U.S. Bureau of Land Mgmt.*,
   638 F.3d 1217 (9th Cir. 2011). ................................................................52

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
   844 F.3d 1095 (9th Cir. 2016) ...................................................... 23, 27

*Hunters v. Marten*,
   470 F. Supp. 3d 1151 (D. Mont. 2020). ...............................................47

*Idaho Sporting Congress v. Rittenhouse*,
   305 F.3d 957 (9th Cir.2002) ................................................................42

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
   468 F.3d 549 (9th Cir. 2006). ...........................................................17

*Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*,
   638 F. App'x 648 (9th Cir. 2016). ...................................................52

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir.2004). ...................................................... 12, 13, 18, 46

*Lange v. Brinegar*,
   625 F.2d 812 (9th Cir. 1980) ................................................................32

*Nat. Res. Def. Council v. Blank*,

    No. C-12-05380 EDL, 2013 WL 2450110 (N.D. Cal. June 5, 2013) ........... 47, 48

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

    No. 3:01-CV-00640-SI, 2015 WL 423090 (D. Or. Feb. 2, 2015).......................47

*Nevada Forest Prot. Campaign v. Weingardt*,

    376 F. Supp. 2d 984 (E.D. Cal. 2005). ......................................................... 14, 45

*ONDA v. Jewell*,

    840 F.3d 562 (9th Cir. 2016) ................................................................ 14, 21, 43

*ONDA v. Rose*,

    921 F.3d 1185 (9th Cir. 2019). ...................................................................... 39, 41

*Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*,

    No. 2:17-CV-00715-JRG, 2019 WL 11585347 (E.D. Tex. Apr. 23, 2019) ........37

*Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989). ..................................14

*S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*,

    588 F.3d 718 (9th Cir. 2009). .............................................................................43

*S. Fork Band v. U.S. Dep't of Interior*,

    No. 3:08-CV-00616-LRH, 2010 WL 3419181 (D. Nev. Aug. 25, 2010)............31

*Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*,

    472 F.3d 1097 (9th Cir. 2006). ...........................................................................60

*Sierra Club v. Penfold*,

    857 F.2d 1307 (9th Cir. 1988)…………………………………..……...19

*Theodore Roosevelt Conservation P'ship v. Salazar*,

    605 F. Supp. 2d 263 (D.D.C. 2009), ..................................................................15

*Thompson v. U.S. Dep't of Lab.*,

    885 F.2d 551 (9th Cir. 1989). .............................................................................50

*Union Oil Co. of Cal. v. Smith*,

    249 U.S. 337, 39 S.Ct. 308, 63 L.Ed. 635 (1919) .............................................55

*United States v. Rice*,

886 F.2d 334 (9th Cir. 1989) ...............................................................56

*W. Watersheds Project v. Schneider*,
   417 F. Supp. 3d 1319 (D. Idaho 2019) ..............................................47

*W. Watersheds Project v. Zinke*,
   441 F. Supp. 3d 1042 (D. Idaho 2020). ..............................................59

*Wilderness Watch, Inc. v. Bureau of Land Mgmt.*,
   No. 209CV00302KJDGWF, 2010 WL 11579044 (D. Nev. May 11, 2010) .......50


**STATUTES**

5 U.S.C. § 706(2)(A) ..........................................................................12

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 1331 ..................................................................................1

42 U.S.C. § 4332(C). ..........................................................................13

42 U.S.C. §§ 4321–4370m-12 ...............................................................1

43 U.S.C. § 1701(a)(8) .......................................................................15

43 U.S.C. § 1712(a). ...........................................................................15

43 U.S.C. § 1712 .................................................................................52

43 U.S.C. § 1732(a). ......................................................................15, 52

43 U.S.C. § 1732(b). ......................................................................52, 58

43 U.S.C. §§ 1701–87 ...........................................................................1

5 U.S.C. § 702. .....................................................................................1


**REGULATIONS**

40 C.F.R. § 1502.23 ................................................................ 14, 30, 35

40 C.F.R. § 1506.5(a) .................................................................. 14, 31

43 C.F.R. § 1610.5-3 ...........................................................................15

43 C.F.R. § 3715 et seq ................................................................. 56, 57

43 C.F.R. § 3715.1 ..............................................................................56

43 C.F.R. § 3809 et seq................................................................. 56, 57

43 C.F.R. § 3809.401 ...................................................................................3

43 C.F.R. § 3809.420(a)(3) .........................................................................56

## OTHER AUTHORITIES

Holly Doremus, *Scientific and Political Integrity in Environmental Policy*, 86 Tex. L. Rev. 1601, 1623-1626 (2008)……………………………………………….35

## STATEMENT OF JURISDICTION

Subject matter jurisdiction exists under 28 U.S.C. § 1331 because this action is brought against the Bureau of Land Management ("BLM") for violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–87. The federal government waived sovereign immunity pursuant to 5 U.S.C. § 702.

Appellants Bartell Ranch, LLC and Edward Bartell are a small family-owned company and an individual who raise cattle, and use and enjoy for recreational and aesthetic satisfaction, private and public lands in the arid high desert of Northern Nevada. These private and public lands are affected by BLM's Record of Decision ("ROD") and Final Environmental Impact Statement ("FEIS") approving the construction, occupation, and operation of a massive open-pit lithium mine at Thacker Pass ("Mine") by Lithium Nevada Corporation ("LNC"). Appellants engaged extensively in the public processes for the ROD and FEIS because the delicate springs, desert streams, wetlands, and meadows located on their private lands, and the public lands they use and enjoy, are threatened with destruction as a result of the Mine intercepting and draining shallow groundwater tables during

1

mining activities, as well as from pumping and consuming water from a deep aquifer during mineral processing.[1]

This appeal seeks review of the district court's February 6, 2023 Order and February 7, 2023 Judgment on the merits, and the court's November 15, 2022 Order denying Appellants' motion to admit extra-record evidence. 1-ER-54—62; 1-ER-52; 1-ER-3. Appellants timely appealed on February 22, 2023. 5-ER-886. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

(1) Whether the BLM violated NEPA by withholding documents and adopting a water resources analysis that relies on a baseline that misrepresents surveys and data in the record, that BLM failed to verify for accuracy, and which was created by LNC contractors who did not follow survey protocols or respect private property boundaries and otherwise lacked scientific integrity.

(2) Whether the district court abused its discretion in denying Appellants' motion to admit as extra-record evidence sworn testimony from LNC's hydrogeologist, and author of BLM's water resources analysis for the FEIS, containing admissions that LNC's water resources contractors

---

[1] Appellants have standing, which the district court recognized below. 1-ER-57—58; 3-ER-410—431.

violated Appellants' private property rights and failed to follow survey protocols during the creation of the water resources baseline.

(3) Whether the BLM violated FLPMA by approving LNC's mining plan of operations under 43 C.F.R. § 3809.401 without first evaluating the validity of LNC's mining claims supporting its approved occupancy, thereby violating the governing resource management plans.

(4) Whether the district court abused its discretion in remanding the ROD without vacatur.

## STATEMENT OF THE CASE

The case arises out of the BLM's approval of a massive open-pit lithium mine and processing plant following a rushed environmental review process. Appellants raise cattle adjacent to the Mine on BLM and private lands and have spent over a decade enjoying and photographing the beauty of the area and working to protect habitats at Thacker Pass essential for sage grouse and threatened Lahontan cutthroat trout ("LCT"). 3-ER-412—417.

Meanwhile, LNC and BLM have displayed a disregard for Appellants' private property rights, data accuracy and scientific integrity, as well as the Thacker Pass ecosystem and wildlife—all in violation of NEPA and FLPMA—and all while hyping a clean energy revolution. 3-ER-416—421. In doing so, BLM blindly adopted an arbitrary and capricious water resources analysis and companion

3

mitigation concepts, all prepared and developed by LNC's contractors, which relied on a materially inaccurate baseline and lacked scientific integrity. In addition to these blatant NEPA violations, BLM further violated FLPMA by approving LNC's mining plan of operations, including the destruction of sage grouse habitat and visual resources, based on unvalidated mineral claims.

Had BLM complied with FLPMA and NEPA, BLM would have faithfully considered and *disclosed to the public* the full environmental impacts of the Mine. Unfortunately, that is not what happened here. Instead, BLM rushed through the environmental review process to give this project the stamp of approval just prior to the change in presidential administrations, while ignoring and sweeping under the rug numerous errors and problems with the data and analysis of LNC's contractors that BLM adopted into the FEIS.

Faced with a grossly inadequate examination of how the Mine will destroy private and public lands vital to Appellants' interests and livelihood, Appellants filed suit in federal district court challenging the ROD and FEIS. The parties briefed cross-motions for summary judgment and, on February 6, 2023, the district court denied in part and granted in part Appellants' motion for summary judgment. 1-ER-52. The district court granted in part Appellants' motion for summary judgment under FLPMA pursuant to this Court's ruling in *Ctr. For Biological Diversity v. United States Fish & Wildlife Serv.*, 33 F.4th 1202 (9th Cir. 2022) ("*Rosemont*"),

4

finding that BLM unlawfully approved LNC's plan of operations, and its associated occupancy of federal lands, by approving the Mine's proposed waste rock piles and clay tailings filter stack ("CTFS") on BLM land without first evaluating the validity of the mining claims underlying those project features. 1-ER-15. However, the district court declined to extend *Rosemont* to other project features challenged by Appellants. 1-ER-17. The district court then denied Appellants' NEPA claims, finding that Appellants' claims were merely "flyspecks." 1-ER-34—40. The district court also found that this was not a case where baseline surveys contradict baseline assumptions in the FEIS and suggested that Appellants were engaging in a "battle of the experts." 1-ER-35—36. Finally, the district court found that LNC's water resources contractors were not required to follow survey protocols in the development of the water resources baseline, that BLM adequately evaluated the baseline information prepared by LNC's contractors, and that the contractors' failure to follow protocols and trespasses onto Appellants' property did not affect the integrity of the NEPA analysis. 1-ER-36—37. Appellants timely appealed.

## STATEMENT OF RELEVANT FACTS

### I. Collection of Water Resources Data for the Mine.

BLM's analysis of the environmental consequences of the Mine, and all of its devastating impacts on the surrounding ecosystem, lasted ten and a half months. 4-ER-578 (Jan. 21, 2020 Notice of Intent to Prepare EIS); 4-ER-585 (Dec. 4, 2020

FEIS). However, the foundation of the NEPA analysis for water resources started much earlier, with the haphazard collection of spring and seep data by an assortment of mining company contractors occurring over the span of a decade.

In 2011 Western Lithium Corporation and its contractor SRK Consulting Inc. ("SRK") began surveying springs around Thacker Pass.[2] 4-ER-509. To complete these surveys SRK would visit spring locations, photograph the spring, and note whether it was flowing. 4-ER-509—511. For some springs SRK would record the quantity of the flow. For most, SRK would not.

After Western Lithium changed its name to LNC, it hired Piteau Associates to continue collecting baseline spring data. 4-ER-551. As part of this continuing data collection effort, an agreement was reached between Piteau and BLM outlining the data collection and surveying standards Piteau would follow. 4-ER-546 ("BLM and other agencies concurred with Piteau's approach regarding the Thacker Pass Project surface and groundwater baseline data program"); 4-ER-544—545 (describing the stipulated protocols); 4-ER-552 (Piteau representing that surveys would be conducted "in accordance with the *Inventory and Monitoring Protocols for Springs Ecosystems* guidance (Stevens et al., 2016"); 4-ER-520. Piteau then continued conducting spring monitoring in the same manner as SRK.

---

[2] SRK's surveys were preceded by surveys from Lumos Associates, another contractor for Western Lithium. *See* 4-ER-508.

6

The springs SRK and Piteau surveyed to collect baseline data were located on both BLM and private lands. 4-ER-543 ("Spring sites SP-023 and SP-035 are… located on private land."); 4-ER-553 (Tyler Cluff providing survey report on SP-035). SRK and Piteau both surveyed springs on Appellants' private lands—SP-023, SP-035, and SP-042—without first informing Appellants, much less seeking permission. 5-ER-851 (explaining contractors surveyed Appellants' springs without permission); 4-ER-530 (SRK surveying SP-035); 3-ER-363—364 (admitting Piteau never contacted Bartell Ranch). This was inconsistent with the data collection and surveying standards Piteau agreed to follow. 3-ER-363—364; 5-ER-775 (prior "to conducting field work, the survey team should contact private landowners").

After Piteau completed its spring surveys, the data recorded by both SRK and Piteau was compiled and averaged. 4-ER-563—570.[3] These averages formed the "baseline" for the springs. 4-ER-563—570; 4-ER-639; 4-ER-643—645. However, in many instances these "baselines" were not accurate representations of the spring flow conditions actually observed. Rather, SRK and Piteau's surveys demonstrate that in numerous instances surveyors would observe spring flow in multiple channels, or under grasses, or even overflowing the spring channel. Rather than

---

[3] Piteau prepared a spreadsheet to calculate baselines. In the spreadsheet, Piteau averaged spring flow by quarter. Once the quarterly averages were calculated, the quarterly averages were themselves averaged to calculate the baseline. *See* 4-ER-563—570.

record this flow, SRK and Piteau's surveyors frequently assigned "zero" flow merely because it would have been inconvenient to measure spring flow. 4-ER-521—532; 4-ER-556—557. After the spring survey data was compiled into a baseline, the "zero-flow" non-measurement of springs SRK and Piteau observed to be flowing shifted baseline estimates downward, often all the way to zero gpm, resulting in baselines which are inaccurate representations of the springs. 4-ER-563—570.

## II.     BLM's Review and Approval of the Thacker Pass Plan of Operations.

BLM formally initiated the NEPA process for the Mine on January 21, 2020, 4-ER-578, and had one year to complete it. Secretarial Order 3355; Executive Order 13807.  Under this time-crunch, BLM hired contractor ICF to prepare the NEPA documents and analysis. 3-ER-484. ICF then hired Plumley Associates to prepare the water resources portion of the NEPA analysis. 3-ER-484. Thus, the NEPA process proceeded as follows: Piteau Associates—LNC's contractor—took and compiled spring and stream data to calculate "baselines," used that data, as well as other groundwater flow data, to create a "groundwater flow model," and used that model to estimate the impacts[4] the Mine would have on the springs, seeps, streams, and groundwater levels. *See* 4-ER-642. This analysis was then provided to BLM and Plumley Associates, who reviewed the results of Piteau's calculations. 3-ER-484.

---

[4] Impacts were estimated by comparing the results of the model to the baselines.

Following this review, BLM and Plumley Associates sent Piteau's water resources analysis to ICF, for its inclusion in the NEPA documents. 3-ER-373—380.

Appellants repeatedly informed BLM and LNC of errors in the water resources analysis, particularly the spring monitoring that had occurred. 5-ER-836—845; 5-ER-852—859; 4-ER-721—728; 4-ER-756; 5-ER-880—883. Appellants explained that measurements were taken at incorrect locations, that LNC's contractors trespassed on Appellants' property, and that significant spring flow had been ignored. 5-ER-852—860; 4-ER-756 (noting that many spring flow baselines were unjustifiably set at zero). During BLM's review of the water resources analysis prepared by Piteau, BLM staff admitted that it appeared spring measurements were taken in the wrong locations. 5-ER-824. However, because BLM was under significant time pressure, BLM never visited Piteau's spring monitoring locations to evaluate whether Piteau's survey data was accurate or whether Piteau's surveys complied with the survey standards agreement Piteau and BLM had mutually reached. 5-ER-824; 2-ER-200. The record shows that Plumley and ICF also never visited Piteau's spring monitoring locations or evaluated Piteau's compliance with the workplan.[5]

---

[5] There is no evidence in the record showing that ICF or Plumley visited spring survey locations.

9

BLM was also presented with LNC's mining plan of operations ("PoO") for the Mine. The PoO described the various features which would be part of the Mine. *See, e.g.*, 4-ER-614. In addition to the mine pit itself, LNC's PoO requested approval of a seven-mile power transmission line and water pipeline across Thacker Pass, power substations, two water wells and pumping facilities, a lithium processing plant, sulfuric acid plant, guard facilities, fencing, waste rock piles, and a CTFS, among other things. 4-ER-613—620.

Much of this would be placed on priority sage grouse habitat, and the water and power lines would pass through a lek of unknown occupancy. 4-ER-605—609; 4-ER-591 ("the Proposed Action would remove approximately 5,011 acres of PHMA and 545 acres of GHMA"). Although BLM's RMP covering Thacker Pass set restrictions on projects which would impair visual resources and destroy sage grouse habitat, BLM's analysis ignored the RMP under the belief that the RMP could not restrict a mining proponents' ability to utilize their mining claims, notwithstanding whether the claims were valid. 2-ER-203. Likewise, BLM did not require that LNC prove the validity of its mining claims. 1-ER-14—15.

Despite having never visited the locations of Piteau's spring monitoring, nor verified Piteau's compliance with the survey standards stipulated in the workplan, nor evaluated whether LNC's mining claims were valid, BLM approved the ROD on January 15, 2021. 4-ER-679.

10

### III.   Testimony of NEPA Contractor Tyler Cluff.

A critical element of the Mine is the sulfuric acid plant, which will utilize hundreds of thousands of tons of molten sulfur shipped from oil refineries, and water pumped from the groundwater aquifer below Thacker Pass, to create sulfuric acid, which will then be used to extract lithium from clay, before being dumped on the landscape in the CTFS. 4-ER-588; 4-ER-604; 4-ER-654—655. This process is impossible without large quantities of water.[6] Thus, LNC applied to the Nevada Division of Water Resources to transfer water rights to Thacker Pass. 3-ER-382. LNC plans to pump this water from two wells. 4-ER-611.

Appellants have water rights on Thacker Pass and therefore filed protests on LNC's transfer applications with the State Engineer. 3-ER-417; 5-ER-849—879. During a December, 2021 hearing before the State Engineer, Tyler Cluff of Piteau testified for LNC about the results of Piteau's spring surveying efforts, and the groundwater flow model Piteau produced—each of which were a critical part of the NEPA analysis. 3-ER-386—386.

Appellants questioned Mr. Cluff about Piteau's spring surveys, and adherence to the survey protocols BLM required Piteau to follow, as well as Piteau's process for providing environmental information to BLM. 3-ER-373—380; 3-ER-352—

---

[6] Unless, of course, BLM approved a more ecologically-friendly means of extracting lithium. *See* 5-ER-849.

11

371. During cross examination Mr. Cluff admitted that Piteau did not follow the survey protocols, did not contact Appellants before he personally surveyed the springs on Appellants' private land, and did not measure springs at their point of maximum discharge (a critical part of the stipulated survey protocols). 3-ER-352—371. Mr. Cluff also admitted Piteau was not in contact with BLM. 3-ER-379—380. Because of the exceptionally probative nature of these admissions, which directly concerned Piteau's adherence to stipulated survey protocols during spring monitoring for collecting baseline data, Appellants moved to supplement the record with a transcript of Mr. Cluff's testimony. 3-ER-392. The district court denied Appellants' motion on the sole basis that Mr. Cluff's testimony occurred after BLM adopted the ROD. 1-ER-59.

## LEGAL BACKGROUND

### I.    APA

The APA provides that agency action shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court's review of agency actions is limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005). A district court may admit extra-record evidence under four circumstances:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or

12

complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council*, 395 F.3d at 1029 (quotations omitted). These exceptions only apply to information which pre-dates an agency's decision. *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018).

## II. NEPA

"NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018). NEPA's procedural requirements serve two "twin aims": (1) "it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and (2) "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id*. (citation omitted).

NEPA requires that agencies prepare a detailed EIS in connection with proposals for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This requires recording the environmental baseline. "The establishment of a baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action." *Oregon Nat.*

*Desert Ass'n ("ONDA") v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (quotation omitted).

Agencies must "[e]nsure the professional integrity, including scientific integrity, of the discussions and analyses in an EIS." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1213 (9th Cir. 2004) (citing 40 C.F.R. § 1502.23) (simplified). To do so requires an EIS to contain "high quality" information and "accurate scientific analysis." *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1249 (W.D. Wash. 2009) (citing *Ctr. for Biological Diversity v. U.S. Forest Svc.*, 349 F.3d 1157, 1167 (9th Cir.2003). While agencies may use environmental information prepared by a project proponent, they must independently evaluate the information that is provided. *See Friends of Earth v. Hintz*, 800 F.2d 822, 834–35 (9th Cir.1986); 40 C.F.R. § 1506.5(a).

NEPA requires that the agency make available to the public relevant information that may play a role in the decision-making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846, 104 L. Ed. 2d 351 (1989). This information must be made available to the extent practicable. *See Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 990 (E.D. Cal. 2005).

## III.   FLPMA

When FLPMA was enacted "Congress declared that it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1075 (9th Cir. 2009) (quoting 43 U.S.C. § 1701(a)(8)). The purposes of FLPMA are achieved through the creation of RMPs that govern the management of those lands. *See* 43 U.S.C. § 1712(a).

FLPMA provides that "[t]he Secretary shall manage the public lands . . . in accordance with the land use plans developed by him under section 1712 of this title." 43 U.S.C. § 1732(a). "All future resource management authorizations and actions . . . shall conform to the approved plan," and "[i]f a proposed action is not in conformance, and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment[.]" 43 C.F.R. § 1610.5-3. Mining actions are subject to the applicable RMPs and must comply with the RMP or amend the plan where compliance would otherwise not be possible. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 281 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010). BLM cannot avoid compliance with governing RMP's by allowing mine proponents to occupy BLM land pursuant to unvalidated mining claims. *See, e.g., Rosemont*, 33 F.4th at 1219.

15

## SUMMARY OF THE ARGUMENT

It is beyond reasonable dispute that the water resources baseline adopted in the FEIS contains errors. Quite simply, the FEIS's representations of spring flows, and groundwater levels, are inconsistent with the data and surveys in the administrative record. The district court wrongly concluded that such errors were mere "fly specks" or a product of a "battle of experts" between Appellants' public comments and LNC's consultants. The district court inexplicably excused Piteau from not following survey protocols that BLM *required* Piteau to follow and the FEIS *represented* to the public *were* followed. Worse yet, in doing so, the district court effectively held that a NEPA process can be stamped with the seal of scientific integrity, despite data being collected secretively and through trespass on Appellants' private land. The reality is that the errors at issue here, and lack of scientific integrity, were material and substantial, resulting in BLM not considering the impacts of the Mine and failing to disclose such impacts to the public. Contrary to the district court's conclusion, this case is not materially distinguishable from this Court's decision in *ONDA v. Jewell* and other decisions of this Court.

The district court further erred by refusing to admit damning testimony from the person who *actually prepared* the water resources baseline for the FEIS, Mr. Cluff, who *confirmed* that Piteau accessed Appellants' land without permission and did not follow required survey protocols. Contrary to the district court's reasoning,

there is no categorical prohibition on supplementing the record with *evidence* post-dating the ROD, so long as the *information* reflected by the evidence does not post-date the ROD.

Next, the district court also erred by refusing to extend *Rosemont* beyond waste piles and tailings stacks when, in fact, BLM's approval of LNC's PoO will result in other forms of occupancy which will harm the Thacker Pass ecosystem, concepts of multiple use, and visual resources in violation of the governing RMP despite being premised on unvalidated mining claims. This Court should confirm that *Rosemont* bars occupation, other than for exploration, of unvalidated mining claims.

Finally, the district court erred in remanding the ROD without vacatur. The district's court's rationale for finding that this case presented the "rare circumstances" where remand without vacatur was appropriate is contrary to this Court's precedents.

Each of the errors outlined above warrants reversal of the district court's judgments and this Court ordering vacatur of the ROD.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 554 (9th Cir. 2006). "A

district court's decision whether to admit extra-record evidence is reviewed for abuse of discretion." *Lands Council*, 395 F.3d at 1030.

## ARGUMENT

### I.    The FEIS's Water Resources Baseline is Arbitrary and Capricious.

#### A.    The Baseline is Inconsistent with Data and Surveys in the Record.

The Thacker Pass NEPA analysis for water resources is intended to predict the impact the Mine will have on resources, like springs, streams, and groundwater levels.[7] 4-ER-586. The entire water resources analysis in the FEIS, including the baseline, totaled 1,464 pages. It was one of the biggest, if not *the* biggest, focus of the FEIS because open pit mining can have such devastating effects on water resources by penetrating and draining groundwater through mining, and pumping and consuming water through mineral processing. These concerns are particularly acute here, as the lithium deposit of interest is in the middle of the high desert, where water is extremely scarce. Consequently, mining companies have a vested interest in minimizing the potential impacts of mining on water resources. *See Sierra Club*

---

[7] This analysis is of great importance because of the scarcity of water around Thacker Pass, and its importance to the ecosystem. Threatened Lahontan Cutthroat Trout ("LCT") live in small spring-fed streams around Thacker Pass, where a small change in spring flow can mean the difference between life and death for these ESA-listed fish. 4-ER-624 ("[LCT] … occur in the upper reaches of Pole Creek, Riser Creek, Washburn Creek, and the upper reaches of Crowley Creek"); 4-ER-584 (Pole Creek's connectivity to Crowley Creek is vital for LCT). Likewise, rare springsnails exist in some springs, while larger species like deer, antelope, and bighorn sheep rely on springs for water in this desert ecosystem. 4-ER-623—624; 3-ER-413.

*v. Penfold*, 857 F.2d 1307, 1321 (9th Cir. 1988); *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 441 F. Supp. 3d 843, 863 (D. Ariz. 2020). As explained below, LNC contractors made egregious errors in determining the baseline of spring and groundwater resources and BLM arbitrarily rubber-stamped that baseline in the FEIS, all in violation of NEPA.

### 1. The FEIS Misrepresents the Springs Baseline.

Here, for springs, the baselines developed by LNC's contractors are purported in the FEIS to be an average of conditions observed and measured during field surveys. 4-ER-563—570 (Piteau's spreadsheet used to calculate baselines. Note the function in the spreadsheet's formula bar); 4-ER-639; 4-ER-643—645. However, in many instances the flow recorded by the surveyor and the flow observed by the surveyor conflict. Specifically, when it was purportedly difficult for LNC's contractors to measure the spring flow they were observing, rather than estimating flow, the contractors instead just recorded "zero"[8] flow. *See, e.g.*, 5-ER-799—802 (explaining how to properly measure flow for various types of springs). The Thacker Pass administrative record reveals that this occurred when springs contained large

---

[8] When LNC's contractors would choose not to measure the flow in a spring, they did not always write "zero flow" on their survey form. Instead, they would often record "N/A gpm." *See* 4-ER-557. However, when the baselines were compiled into spreadsheets, "N/A" became equal to "zero flow." *See* 4-ER-563—575. Thus, for purposes of this brief, Appellants refer to springs that LNC's contractors chose not to measure, recording "N/A gpm," as springs assigned a value of "zero flow."

areas of upwelling, flowed through multiple channels, flowed under heavy vegetation, or simply overflowed the spring channel. 4-ER-521—532; 4-ER-556—557. In each of these instances, rather than go through the effort of taking a survey measurement or estimating spring flow, Piteau recorded "zero" flow to calculate averages. 4-ER-521—532; 4-ER-556—557; 4-ER-563—575.

When the baselines were created by averaging the records of the surveyors, the results were automatically skewed by the presence of a significant number of "zero" flow records. For many springs, their baseline was calculated to be "zero gpm," despite survey records depicting significant amounts of <u>observed</u> (but not <u>recorded</u>) flow. *Compare* 4-ER-512 *with* 4-ER-563; *compare* 4-ER-523 *with* 4-ER-643; *compare* 4-ER-525 *with* 4-ER-564; *compare* 4-ER-557 *with* 4-ER-564.



**Figure 1**: The SRK survey of BLM-02 at 4-ER-512 depicts flowing water in the spring on Dec. 7, 2011, which SRK declined to measure because it "was not concentrated in one area." In Piteau's spreadsheet at 4-ER-563, Piteau assigned BLM-02 a value of "0" for SRK's December, 2011 survey, despite SRK's observations. Ultimately, this led to a baseline of "0" for BLM-02. 4-ER-639. Appellants' "compare" citation here is intended to compare the results of SRK's surveys, which often observed, but did not record, significant amounts of flow, with Piteau's treatment of those surveys, and their ultimate effect on the baseline. *I.e.*, Piteau treated SRK's *non*-measurements as a "zero flow" *measurement*, which has caused multiple springs with significant observed flow to have a baseline of zero.

20

In turn, the spring baselines reported in the FEIS do not match the observations of the surveyors who collected the baseline data. This is a substantial and material NEPA violation.

Contrary to the district court's reasoning, the Ninth Circuit's decision in *ONDA v. Jewell*, 840 F.3d 562 is on-point. The district court acknowledged that *ONDA v. Jewell* is a case "where the pertinent FEIS relied on an assumption that was contradicted by a baseline survey." 1-ER-35. More specifically, in *ONDA v. Jewell* the district court there affirmed the BLM's approval of a transmission line that would serve a wind energy farm on private land, finding that the BLM's NEPA analysis was sufficient. 840 F.3d at 567. However, when the case came before this Court, evidence was brought to light showing that the BLM's baseline for sage grouse was incorrect because the FEIS represented that no sage grouse wintered in an area relevant to the project, despite a survey in the record demonstrating the opposite. *Id*. at 569. Thus, this Court found that the BLM's NEPA analysis was arbitrary and capricious based on a single survey contradicting the FEIS's representation that no sage grouse were present. *Id*. at 570. Put simply, the FEIS did not provide an "accurate scientific analysis [which] is essential to implementing NEPA." *Id*. at 568 (simplified).

Here, contradictions are rampant between the FEIS's representations of the water resource baseline and the survey observations of springs. SP-035 is one

example where LNC's contractors' survey observations do not match the reported baseline. SP-035 is a large spring located on Appellants' private lands where water seeps to the surface, feeding Appellants' water right.[9] 4-ER-543 (SP-035 is located on private land); 5-ER-872—873 (Appellants have water rights on SP-035); 4-ER-556. SP-035 has a significant amount of flowing water. 4-ER-547—550 (a 2018 springsnail survey showed SP-035 had "moderate flow" with riffles). In May of 2018, Piteau's surveyors reported that the spring had a riparian area of 3 acres, and contained a "large reed pond." 4-ER-556. However, rather than estimate the quantity of flow within SP-035, Piteau's surveyors recorded that the spring had a total flow of "0.0 gpm." 4-ER-556. During each survey taken by Piteau or SRK, surveyors observed a large spring area, and water in the spring, but nonetheless declined to ever take a survey measurement, always recording 0.0 gpm of flow. 4-ER-556; 4-ER-518 ("No flow measurement was taken <u>as there were multiple channels</u>" (emphasis added)); 4-ER-530 (same); 4-ER-540 ("Flow rates [of SP-035] were not measured due to the multiple channels which comprise the spring, but are estimated not to exceed 5 gpm"); 4-ER-572 (summarizing the flows <u>recorded</u> at SP-035). Therefore, the baseline for SP-035 in the FEIS is reported as zero gpm. 4-ER-644. Because LNC's contractors observed that SP-035 is a large spring containing

---

[9] SP-035 provides a large oasis in the high desert, where the otherwise-dry landscape is teeming with lush green grasses and a wetland ecosystem. *See* 4-ER-530 (contrasting SP-035 against the Thacker Pass sage steppe ecosystem behind it).

"riffles," has flow across "multiple channels," and even a "large reed pond," the FEIS baseline of "zero" is patently arbitrary and capricious for precisely the same reasons as in *ONDA v. Jewell. See also Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("we hold that the BLM's analysis of air impacts in the FEIS was inadequate because the agency did not provide any support for its use of baseline values of zero").

SP-036 is another example. This spring is a vital tributary to Pole Creek, which provides habitat critical to threatened LCT. 4-ER-557 (SP-036 is tributary to Pole Creek); 4-ER-584 (Pole Creek is vital for LCT). In May of 2018, Piteau's surveyor visited SP-036 to take baseline measurements. 4-ER-557. The surveyor observed that SP-036 exhibited substantial flow, so much that the surveyor was "unable to acquire an accurate measurement." 4-ER-557. The amount of flow recorded by the surveyor was "n/a gpm." 4-ER-557. Then, when the baseline for SP-036 was averaged, n/a gpm became *zero* gpm. 4-ER-568; 4-ER-573. As a result, the average was shifted downwards sharply, with the FEIS still representing that SP-036 has zero flow during spring months. *Compare* 4-ER-568 *with* 4-ER-644. Yet, this too resulted in a baseline which purposely excluded the highest amount of flow LNC's surveyors observed in SP-036. Once again, the baseline in the FEIS contradicts the observations of LNC's surveyors because it fails to account for SP-036's May, 2018 observed flow, which was purportedly *too much to measure*.

23

Appellants raised the issue with the baselines for both SP-035 and SP-036 in their summary judgment motion. 3-ER-471—472. In response, LNC and BLM asserted that these instances of baseline errors were mere "fly specks" of an otherwise accurate NEPA analysis. 2-ER-282; 2-ER-314. However, Appellants explained in reply that these are not isolated errors but, rather, are examples indicative of a pattern, where springs which were difficult to measure were assigned a value of "zero gpm"—a value which ultimately made its way into the final baselines. 2-ER-227—230. As a result, many other springs have baselines of "zero" (or incorporated incorrect zero-flow values into the spring flow averages) despite surveyors having observed flowing water at the spring, often at great quantities.

In SP-010, LNC's contractor SRK observed that "water flowed freely through many channels." 4-ER-523. A picture of SP-010 included in SRK's spring survey depicts substantial amounts of flow. 4-ER-523 (*see infra*, photo of SP-010). Yet, because the spring flowed through many channels, SRK's surveyor recorded that the spring flow was "N/A." 4-ER-523. Over each quarter that SRK surveyed SP-010, the surveyor always noted that the spring flowed freely across many channels. 4-ER-523; 4-ER-516; 4-ER-537; 4-ER-511; 4-ER-513. Yet, not once did SRK or Piteau take a flow measurement from the spring. As a result, the baseline for SP-010 reflected in the FEIS is "zero gpm"—a clear instance where the observations of the

surveyor, memorialized in photographs, expressly contradict the baseline value assigned to the resource. 4-ER-643; *see also* 4-ER-571.



**Figure 2:** Photograph of SP-010 taken by LNC's contractors on June 5, 2012, depicting significant visible and channelized flow. The surveyor did not measure SP-010 because the spring "flowed freely through many channels." 4-ER-523. The FEIS represented SP-010 as having a baseline of zero flow. 4-ER-643.

The same is true for BLM-02. SRK observed that the water in the spring "was not concentrated in one area." 4-ER-521. Instead, the spring had multiple flowing channels. 4-ER-521. Simply because it would have been difficult to measure each channel the surveyor recorded that the spring flow was "N/A." 4-ER-521. This

occurred for each quarter that SRK surveyed BLM-02. 4-ER-521; 4-ER-510; 4-ER-512; 4-ER-515. Therefore, the baseline for BLM-02 in the FEIS says that the spring has a baseline of zero—an assertion contradicted by SRK's observations and photographs. 4-ER-639; *see also* 4-ER-563.

In yet another example, SRK observed that SP-029 "flowed through many channels under the common reed grass." 4-ER-525. Sign of deer, antelope, and cattle was observed at SP-029, indicating that wildlife extensively used the spring. 4-ER-525. Yet, because of the heavy grasses present at the spring, SRK's surveyors opted not to measure the "many channels" of water flowing from the spring. 4-ER-525. Over the course of multiple measurements SRK's surveyors continued to find that SP-029 had extensive flow covering multiple channels, but not once did the surveyor take a flow recording. 4-ER-525; 4-ER-517; 4-ER-534; 4-ER-536; 4-ER-538. The FEIS represented SP-029 as having zero flow, while SRK's actual survey observations establish that the spring has significant flow. 4-ER-644; *see also* 4-ER-564.

This scenario is precisely like that in *ONDA v. Jewell*, "where the pertinent FEIS relied on an assumption that was contradicted by a baseline survey." 1-ER-35. Here, the FEIS is relying on the assumption—or worse, a misrepresentation—that SP-035, SP-036, SP-010, BLM-02, SP-029, and a multitude of other springs have

zero flow throughout the year, or in the case of SP-036, during springtime.[10] But the observations of LNC's surveyors, memorialized in the surveyors' photographs and descriptions of the springs, contradict the FEIS's representations. The errors in this case demonstrate that the BLM was unaware of the impacts the Mine will have on delicate water resources and the vital wildlife habitat they support, and likewise conceals these impacts from public disclosure, both of which violate NEPA's central tenets.[11] *See also Great Basin Res. Watch*, 844 F.3d at 1104.

Not only did the district court not appreciate the significance of these errors, the district court did not understand the source of the baseline surveys themselves, erroneously finding that it reflected an impermissible battle of the experts between the observations of Appellants' and their expert, Dr. Powell, and BLM/LNC's

---

[10] The June 2012 survey shows 12 springs had documented *but unmeasured* flow, which was incorporated into the baseline calculations as zero flow. 4-ER-519—532 (Springs BLM-02, BLM-03, SP-010, SP-023, SP-029, SP-030, SP-032, SP-033, SP-034, SP-035, SP-037, and SP-040 had unrecorded flow); 4-ER-565 (view row 51 of datasheet). Moreover, there are inconsistencies between surveys and baseline data inputs which are not explained in the record. *Compare* 4-ER-639 *with* 4-ER-643—645 and 4-ER-567—568; *compare* 4-ER-561 (recording 38.6 gpm in SP-048) *with* 4-ER-568 (including unknown value of 66.6 into datasheet); *see also* 4-ER-669.

[11] With the baselines provided in the FEIS, BLM will not know when critical wildlife habitat is destroyed because, when future effects of the Mine are compared to the baseline, the baseline will show that many springs have zero flow (a conspicuously convenient outcome for LNC, who would otherwise be responsible for mitigation).

experts.[12] 1-ER-37. This was nothing more than a strawman argument presented by LNC but, unfortunately, one the district court nevertheless found convincing. The reality is that the baseline represented in the FEIS is materially and substantially inconsistent with the documented observations (i.e., surveys) of LNC's own contractors SRK and Piteau, more so than even was the case in *ONDA v. Jewell*, which was based on a single survey. Thus, this Court should reverse the judgment of the district court and hold that the water resources baseline is arbitrary and capricious, in violation of NEPA.

## 2. The FEIS Misrepresents the Groundwater Baseline.

The FEIS relied upon a report, prepared by a consultant hired by LNC (Dr. Stringham), to conclude that water levels within a certain wetland area essential to Appellants' ranching operation, and use and enjoyment of public lands, ranged from 14-30 feet below ground surface ("bgs"). 4-ER-592. Meanwhile, fourteen years of groundwater monitoring by NDWR within the same Section 33 wetland area showed

---

[12] Appellants submitted substantial comments containing personal observations and expert measurements of spring flows around Thacker Pass, which contradict the FEIS. *See* 4-ER-716—759. However, in their summary judgment briefing Appellants heavily relied on LNC contractor surveys for demonstrating the inaccuracy of the baseline.

groundwater levels had never dropped lower than 6.92 feet bgs.[13] 5-ER-884—885.[14]

The sole source of ground water elevation data relied upon by Dr. Stringham was, as the Court might predict, Piteau. 4-ER-582—583; 4-ER-638. Yet, Piteau's documents show their *only* source of data for Township N 44 E 36, Sections 33 is the same NDWR monitoring well data (33BCDA1) showing groundwater never exceeded 6.92' bgs, which directly contradict Dr. Stringham's groundwater elevations. 4-ER-641; 4-ER-646; 5-ER-844—845. Hence, the FEIS groundwater baselines were ostensibly created out of thin air.

These grossly inaccurate groundwater baselines threaten to allow unmitigated depletion of groundwater underneath Appellants' private ranchlands and BLM wetlands, transforming the productive grassland into barren desert.

---

[13] Piteau also manually measured water levels in section 33 on 9/2/2020, noting water levels were merely 6.7 (bgs), again directly contradicting Stringham and the FEIS. 4-ER-677.

[14] Dr. Stringham's assertions, relied upon in the FEIS, that Section 33 wetlands were caused by irrigation, negating the possibility of impacts from the Mine, are likewise false and directly contradicted by well-developed facts. 4-ER-674—677; 4-ER-592.



**Figure 2:** The above photos taken out of Appellants' comments to BLM show Appellants' private ranch lands (left), BLM wetlands (middle), and nearby uplands (right). 4-ER-731—732. The uplands are outside of the high-water table, revealing what will happen to the landscape as the water table declines. All photos taken on 8/9/2020. 4-ER-731—732.

Once again, as in *ONDA v. Jewell*, BLM relied on an apparent assumption or guess as to groundwater levels, an important aspect of potential impacts of the Mine that BLM required LNC's consultants to evaluate. And that assumption is directly contrary to the very NDWR groundwater surveys LNC's consultants relied upon to establish groundwater elevations. Accordingly, the water resource groundwater baseline is arbitrary and capricious.

## B. BLM Failed to Ensure the Accuracy and Scientific Integrity of the Baseline.

NEPA requires that agencies "[e]nsure the professional integrity, including scientific integrity, of the discussions and analyses in an EIS." *Sausalito*, 386 F.3d at 1213 (citing 40 C.F.R. § 1502.23) (simplified). NEPA also requires the

environmental information provided by project proponents be independently evaluated. *See Friends of Earth*, 800 F.2d at 834–35; 40 C.F.R. § 1506.5(a): *see also S. Fork Band v. U.S. Dep't of Interior*, No. 3:08-CV-00616-LRH, 2010 WL 3419181, at *4 (D. Nev. Aug. 25, 2010) (citing 40 C.F.R. § 1506.5(a)). Here, BLM failed miserably to satisfy both duties. As explained above, the FEIS misrepresents the water resources baseline because it is inconsistent with the underlying data and surveys. That problem, standing alone, is an egregious NEPA violation. However, as explained below, the record also reveals that one of the likely reasons this happened is because BLM failed to ensure the accuracy and scientific integrity of the contractor's work on the baseline, which are equally egregious.

The record shows that BLM did not independently evaluate the baseline information provided by Piteau for inclusion in the FEIS, that Piteau and BLM grossly disregarded Appellants' private property rights, and that BLM failed to ensure that Piteau followed required protocols described in its workplan. Each of these errors is indicative of arbitrary and capricious decisionmaking and warrants remand and vacatur of BLM's ROD.

### 1. BLM Failed to Ensure Accuracy of Contractor Work Product.

Here, Piteau's surveys and water resources analysis were sent to BLM and NEPA contractor Plumley Associates for review. And, to be clear, email records

show that BLM and Plumley did review Piteau's *analysis*. 5-ER-814—823.[15] Yet, missing from the record is any indication that BLM ever evaluated SRK and Piteau's *surveys*—i.e., reviewed the observations described in the surveys and compared them to the baseline data and descriptions Piteau provided for inclusion in the FEIS.[16] Moreover, we know that BLM failed to visit spring survey locations to verify any of the data or surveys. *See* 5-ER-824; 2-ER-200. Indeed, BLM acknowledged that Piteau's surveys were likely taken in the wrong locations but that the agency lacked the time and ability to evaluate the survey locations. 5-ER-824. Thus, it is clear that BLM failed to verify whether the FEIS accurately reflected the observations recorded in surveys and, further, failed to do anything to rectify apparent errors in how the surveys were conducted. *Lange v. Brinegar*, 625 F.2d 812, 819 (9th Cir. 1980) (agency satisfied its duty to independently evaluate NEPA document prepared by state officials where agency participated in preparation of drafts, and made numerous trips to visit the affected area).

In point of fact, BLM has demonstrated a complete unawareness for how baselines were derived for springs and seeps. During the NEPA comment period

---

[15] An evaluation of Piteau's analysis, as is evidenced by these citations, is not the same as an evaluation of Piteau's surveys themselves, which never occurred, leaving baseline errors and survey protocol violations unconsidered by BLM.

[16] Similarly, BLM failed to verify the sourcing of Stringham's claim of groundwater levels with the actual data in the record, resulting in a significant error that will directly prejudice and injure Appellants.

Appellants explained that many springs with baselines of zero actually did have flow. 4-ER-648. In response to comments in the FEIS, BLM stated that springs with baselines of zero "never produced measured discharge during several visits[.]" 4-ER-648.[17] Similarly, during oral argument before the district court, counsel for BLM again asserted that springs with baselines of zero are the result of surveys showing, on average, "spring flow was zero." 2-ER-75. However, as explained above, these assertions have no basis in fact. *See supra*, n. 17. They may well be honest reflections of what BLM *believes* but that only serves to confirm that BLM *still misunderstands* that many springs have baselines of zero only because the surveyors failed to measure or estimate flow, despite observing significant flow at the site. Had BLM independently, and responsibly, evaluated the surveys, or the spring survey locations, BLM would have understood that a zero-flow baseline does not mean springs have not been observed flowing and it would have been required by NEPA to redo and fix the inaccurate baseline. BLM's failures to do so are quintessentially arbitrary and capricious and violate NEPA.

---

[17] These comment responses were prepared by Piteau and adopted by BLM. 4-ER-652. Thus, while this statement was a blatant misrepresentation by Piteau, for BLM's part it demonstrates the agency's willful ignorance of how the baselines were actually determined and, thus, failure to ensure accuracy of the information supplied by LNC's contractor.

33

## 2. BLM Ignored Clear Evidence of Trespass in the Collection of Data.

Unfortunately, BLM's failure to ensure accuracy of the baseline was part of a pattern of BLM blindly trusting Piteau's work while abdicating the agency's duties under NEPA to independently evaluate the work and ensure scientific integrity. Nowhere was this exhibited more clearly than in BLM's "hands off" approach to Appellants' repeated complaints that Piteau had trespassed to collect data on Appellants' private property. Rather than requiring Piteau to redo the surveys in coordination with Appellants, and investigate Appellants' submission of substantial evidence that Piteau had misrepresented the water resources on Appellants' property—e.g., recording SP-35 as having zero flow—BLM did nothing. 4-ER-719. BLM ignored these issues and forged on with incorporating Piteau's inaccurate baseline, based on illegally-obtained data. In doing so, BLM failed to ensure scientific integrity, in violation of NEPA.

Put simply, Piteau displayed a gross disregard for private property rights during its surveys. Piteau surveyed two springs located on Appellants' private lands—SP-035 and SP-042—without Appellants' knowledge or consent. 4-ER-543 ("Spring sites SP-023 and SP-035 are … located on private land."); 4-ER-640 (depicting SP-042 in relation to SP-023); 4-ER-553—554 (Tyler Cluff's surveys of SP-035 and SP-042); 5-ER-851 (LNC never requested access to Appellants' land); 3-ER-364 (Piteau never contacted Bartell Ranch). The record shows that Piteau

34

knew these springs were on Appellants' land when it was conducting the surveys, but surveyed the springs anyway. 4-ER-543; 4-ER-572 (containing the results of Piteau's surveys of SP-035); 4-ER-574.

Contrary to the district court's finding, there can be no genuine dispute that Piteau knowingly accessed Appellants' private lands without Appellants' permission or knowledge. Piteau's workplan admits that SP-035 and SP-023 (which are both near SP-042) are located on private land. 4-ER-543. Piteau's spring surveys show that they surveyed SP-035 and SP-042 four times in 2018. 4-ER-572; 4-ER-574. Appellants' NEPA comments informed BLM that this occurred without Appellants' knowledge or permission. 5-ER-851 (FEIS comments); 4-ER-718 (DEIS comments). Thus, prior to BLM's adoption of the ROD, the agency was on notice of the trespasses and did nothing about it—effectively sanctioning the federal government's reliance on illegally-obtained data for an agency's environmental analysis. This bears no resemblance to scientific integrity.

Also contrary to the district court's reasoning, these transgressions are relevant to BLM's decision. NEPA requires both scientific and professional integrity. 40 C.F.R. § 1502.23. This is intended to promote trust in the NEPA process. *AWARE v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998); Holly Doremus, *Scientific and Political Integrity in Environmental Policy*, 86 Tex. L. Rev. 1601, 1623-1626 (2008). While there can be no question that Appellants'

35

trust in the NEPA process has been entirely eroded at the hands of Piteau's surveyors, the agency and the district court condoning such subversive data collection practices threatens to encourage agencies, and project proponents, to try to get away with it again in the future.

Appellants respectfully ask that the Court consider Appellants' perspective. SP-035 is not only critical to wildlife, it is critical to Appellants' ranching operation. Appellants water and graze livestock at this spring, and have a water right here. 5-ER-872—873. Yet, Piteau repeatedly trespassed to survey this spring, and each time reported that SP-035 had a total flow of zero gpm. 4-ER-572. Appellants had no knowledge of how Piteau reached such an erroneous value because Appellants were never able to be present for Piteau's secretive surveys. So, from Appellants' perspective, Piteau secretly monitored SP-035, a vitally important spring, and then used those "surveys" to justify establishing a baseline flow of zero in the FEIS. With a baseline of zero, *on paper* it will be impossible for the Mine to impact SP-035, a conspicuously convenient outcome for LNC but an alarming disaster for Appellants. Even if the mine completely dries this spring, rendering Appellants' water right useless, and destroys Appellants' enjoyment of wildlife on their property, LNC will presumably avoid blame or responsibility because Piteau's secretive surveys set the baseline flow for SP-035 at zero. As explained below, whatever mitigation BLM may claim is required for this project, mitigation for zero will presumably be zero.

36

This scenario is why professional and scientific integrity in the NEPA process is vital. If Piteau had informed Appellants of the need to survey SP-035, Appellants could have had their own expert present for the survey and a significant portion of the dispute over the Mine might have been avoided.[18] The lack of scientific and professional integrity caused by Piteau's actions, and BLM's failure to address it, is staggering.

Even so, Appellants recognize that there may not be another case directly on point for these circumstances. However, that is likely more a function of the recklessness of the conduct at issue here, rather than a function of it being common and excusable. This Court should hold that NEPA integrity requires that agencies, project proponents, and contractors show respect for private property rights and laws when collecting scientific information.[19] Here, the NEPA process lacked integrity because Piteau chose to trespass instead of seeking Appellants' permission and coordinating the surveys with them. This resulted in a "zero flow" baseline for a

---

[18]    While "[i]t's easier to ask forgiveness than it is to get permission," this adage should not apply under NEPA, where the simple task of asking permission may have eliminated a significant amount of litigation costs, attorney time, and judicial resources in this matter. *See Polaris PowerLED Techs., LLC v. Samsung Elecs. Am., Inc.*, No. 2:17-CV-00715-JRG, 2019 WL 11585347, at *2 (E.D. Tex. Apr. 23, 2019) (crediting Rear Admiral Grace Hopper of the U.S. Navy of the quoted adage).

[19] Indeed, as explained below, this is precisely what the Stevens Protocols recognize. "Prior to conducting field work, the survey team should contact private landowners…. Because information collected on the sites is the intellectual property of the springs owner, the team needs to ensure the security and ownership of the inventory data with the steward." 5-ER-775.

critical spring on Appellants' private property and created a serious lack of trust in the NEPA process. BLM's decision to approve the Thacker Pass ROD in light of Piteau's undisputable trespasses, and its effect on both the accuracy and scientific integrity of the water resources baseline, renders the FEIS arbitrary and capricious under NEPA.

### 3. BLM Failed to Ensure Piteau Followed Required Protocols.[20]

BLM required that Piteau's spring surveys were to follow the Stevens Protocols, which describe the manner in which spring surveys should be taken to maintain consistency and scientific integrity. 4-ER-544—545 (listing the stipulated protocols); 4-ER-546 (explaining that the workplan memorializes an agreement between BLM and Piteau). The FEIS represented that Piteau followed the Stevens Protocols during its spring surveys. *See* 4-ER-643. The AR, and Tyler Cluff's testimony (discussed *infra*), reveal that this FEIS representation was false. Piteau's failure to follow protocols, and BLM's failure to require compliance with protocols, is a clear NEPA violation.

The district court rejected this argument for two reasons. First, the district court found that Piteau only agreed to follow "level 1" of the Stevens Protocols. 1-

---

[20] This argument relies, in part, on the Cluff testimony that the district court refused to admit as extra-evidence, which is addressed *infra*. Appellants' other arguments, while occasionally citing Mr. Cluff's testimony for additional context or factual support, are supported by the administrative record.

ER-36. Second, the district court found that NEPA does not require adherence to protocols at all. 1-ER-37. This reasoning should be rejected by this Court.

It is true that NEPA does not require adherence to particular analytical protocols. *ONDA v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019). It is also true that the FEIS states that Piteau's spring surveys followed "level 1" Stevens Protocols. 4-ER-643. But neither argument excuses Piteau's failure to follow the protocols that BLM *required* Piteau to follow.

Piteau's "Baseline and Model Workplan" was a stipulated agreement between BLM and Piteau that set various spring survey protocols "designed to meet the Data Adequacy Standards for the BLM and the guidelines for implementation of the Nevada BLM's 'Rock Characterization and Water Resources Analysis Guidance for Mining Activities.'" 4-ER-542—546. It logically follows that if Piteau deviated from the workplan, then Piteau's surveys would fail to meet BLM's data adequacy standards designed to ensure scientific accuracy and integrity.[21] That is exactly what happened here.

---

[21] During prior surveys LNC recognized the importance of following protocols, noting that prior surveyors Lumos and Associates conducted a survey "that did not follow the entire protocol as outlined in the BLM's new survey protocol and [therefore] is asking the BLM for additional guidance and input." 4-ER-508.

The workplan requires spring surveys to follow the elements of the Stevens Protocols for measuring or estimating flow. 4-ER-544.[22]  In plain terms the Stevens Protocols state that spring flow measurements should be taken "at the point of maximum surface discharge, which is not likely to be the source but rather some distance downstream." 5-ER-799.  However, Piteau did not follow this survey protocol. In multiple instances Piteau's surveyors measured springs away from the point of maximum discharge.

In Mr. Cluff's testimony before the Nevada State Engineer, he admitted that Piteau did not survey SP-047 or SP-035 at the point of maximum discharge, and in fact Piteau *always* attempted to measure flow from the *source* of the spring. 3-ER-353; 3-ER-368. In the case of SP-035, a spring Appellants own and have water rights in, this resulted in a false baseline of "zero" in the FEIS. 4-ER-644; 4-ER-572. The record further reveals that Piteau did not measure SP-048 at the point of maximum discharge. Piteau's own spring surveys for SP-048 admit that, although Piteau measured the spring's discharge downstream of the orifice (measuring 23.9 gpm of flow), further downstream the spring had significantly more flow (measuring 38.6 gpm). 4-ER-555. Yet, for purposes of the baseline Piteau used the lesser

---

[22] In hopes of avoiding the confusion about "level 1" vs. "level 2" protocols, Appellants wish to clarify that the Stevens Protocols has a single section dedicated to "flow measurement" protocols that apply to both level 1 and level 2 spring inventories. 5-ER-798. Therefore, it is irrelevant whether Piteau's spring inventory was required by the workplan to be a "level 1" or "level 2" inventory.

measurement, rather than the measurement with greater discharge. 4-ER-568; 4-ER-575.

Because there was not an independent evaluation of Piteau's measurements, it is impossible to know from the AR the extent of Piteau's errors. Given that protocols were not followed none of the data should be presumed accurate. Regardless, Piteau's measurements of SP-047, SP-035, and SP-048—and Mr. Cluff's admission that Piteau's surveyors sought to measure springs at their source instead of the point of maximum discharge—are sufficient to demonstrate that Piteau did not follow the stipulated protocol requiring flow to be measured at the point of maximum discharge. This resulted in very real, and very prejudicial, errors in the NEPA baseline, as springs were assigned lesser flow baselines than would have occurred if Piteau correctly surveyed springs at their point of maximum discharge as required in the workplan.

Piteau's failure to measure springs according to the protocols stipulated in the workplan means BLM's data adequacy standards were violated, and inaccurate baselines were developed. *See ONDA v. Rose*, 921 F.3d at 1191-92 (NEPA integrity is lacking where an agency (or its contractors) said they were going to do something

as part of the NEPA process, but did not)[23]; *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1302 (9th Cir. 2003) ("In *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 972 (9th Cir.2002), by contrast, we invalidated the Forest Service's use of habitat as a proxy for population trends in part because its methodology produced obviously inaccurate habitat numbers"). This, in turn, leads to a lack of professional and scientific integrity in the NEPA process. BLM's approval of the Mine ROD is arbitrary and capricious because Piteau failed to follow required survey protocols during development of baseline surveys.

### C. Reliance on Unspecified and Undisclosed Mitigation Without an Accurate Baseline Violates NEPA.

The FEIS tells the public that the impacts of the Mine on springs and seeps will be mitigated. 4-ER-589—590. However, BLM's proposed mitigation cannot possibly be effective because many springs have baselines of zero. Moreover, the FEIS contains no discussion of how mitigation will be applied or evaluated for effectiveness. BLM's reliance on mitigation without evaluating its effectiveness is arbitrary and capricious.

---

[23] This is the district court's interpretation of *ONDA v. Rose*, which Appellants share. 1-ER-37. In *ONDA v. Rose*, the BLM had "Route Analysis Forms" to guide its NEPA analysis. 921 F.3d at 1192. Part of the form required the BLM to state the baseline conditions of the roads at issue. *Id*. But, when BLM conducted its analysis, the BLM did not follow the prompts in the form. *Id.* This Court therefore found that without following the prompts in the BLM's form to describe the baseline, BLM "could not have analyzed the environmental impacts of the Recreation Plan properly." *Id*.

"An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). Mitigation effectiveness is directly intertwined with the accuracy of baseline conditions. *ONDA v. Jewell*, 840 F.3d at 571. Without an accurate baseline, BLM cannot "know what impacts to mitigate, or whether the mitigation proposed would be adequate to offset damage[s]…." *Id.*

As discussed previously, the baselines for many springs have been set at zero. *See, e.g.*, 4-ER-639; 4-ER-643—645. Yet, the FEIS contains no discussion of how LNC can effectively mitigate springs with a baseline of zero, nor how BLM can ensure that effective mitigation will be required. The answer is that neither LNC nor BLM can do this because the FEIS fails to explain how a spring with an inaccurate baseline of zero could possibly be mitigated, much less accurately and effectively. The district court entirely ignored this issue, despite it being clearly raised.[24] The absence of any discussion of mitigation effectiveness in the FEIS renders the Thacker Pass ROD arbitrary and capricious. The lack of a cognizable mitigation plan in the record, much less the FEIS, renders the Thacker Pass ROD arbitrary and capricious.

---

[24] *See* 3-ER-478 ("the erroneous baseline will prohibit effective mitigation").

43

### D. BLM's Failure to Produce Environmental Records Violated NEPA.

BLM repeatedly failed to provide pre-decisional environmental information to the public for meaningful review and comment during the NEPA process. For instance, when Appellants realized it was Piteau, not BLM, that was reviewing the Mine's impacts on water resources, Appellants requested Piteau's responses to Appellants' comments that were utilized in the FEIS. 5-ER-831—832. BLM never provided the requested documents,[25] instead inaccurately claiming that "[t]he source of the comment responses is BLM staff, assisted by NEPA contractor specialists." 5-ER-831—832. Likewise, Appellants requested documentation supporting the statement in the FEIS that LNC's well pump test "data was confirmed to be valid," despite Appellants' raising errors in the data. 5-ER-827—830. Again, BLM did not produce the requested documents, instead seeking to "respond[], but not respond[]" to Appellants' inquiry.[26] 5-ER-827. BLM's FEIS also relies on a Biological Assessment for LCT which was not made public until after the ROD was signed. 4-ER-685; 5-ER-809—810. BLM's "complete failure to involve or even inform the public about" the preparation of relevant environmental documents violates NEPA. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir.

---

[25] Many other documents were not provided to the public at all, or in a timely manner. 4-ER-662—663; 5-ER-825—826; 5-ER-809—810; 4-ER-682.

[26] Ultimately BLM did not evaluate the pump test data, and accepted Piteau's assurances that the data was accurate. *Compare* 4-ER-651 *with* 4-ER-647.

2003). Thus, BLM's failure to make relevant information publicly available renders the Thacker Pass ROD arbitrary and capricious. *See Weingardt*, 376 F. Supp. 2d at 993.

## II. The District Court Abused Its Discretion by Not Admitting Non-Record Evidence that Further Confirms that the Water Resources Baseline is Arbitrary and Capricious.

The district court denied Appellants' motion to admit as extra-record evidence the transcript of Mr. Cluff's testimony that Piteau did not follow the Stevens Protocols during spring surveys and that he trespassed on Appellants' private lands when conducting surveys. 3-ER-352—392; 1-ER-59. The district court abused its discretion in denying the motion because it relied on the erroneous premise that Mr. Cluff's testimony was barred merely because the testimony took place after BLM's issuance of the ROD. Therefore, Appellants respectfully request that this Court reverse and consider Mr. Cluff's testimony in this Court's *de novo* review of Appellants' NEPA claims.

### A. Post-ROD Documents are not Categorically Barred in APA Cases.

Motions to supplement the record may be granted if any one of the four factors described in *Lands Council* is satisfied. Those factors are: (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when extra-record evidence is necessary to explain technical terms or complex subject

matter, or (4) when plaintiffs make a showing of agency bad faith. *Lands Council*, 395 F.3d at 1030. These exceptions only apply to <u>information</u> available at the time of the agency's decision. *Cachil*, 889 F.3d at 600.

The district court denied Appellants' motion to supplement the record on the grounds that Mr. Cluff's testimony constituted a document not available to BLM at the time of its decision. 1-ER-59. Relying on *Cachil*, the district court held that "no *Lands Council* exceptions apply when the *<u>documents</u>* at issue postdate the ROD." 1-ER-59 (emphasis added) The district court went so far as to state that Appellants' distinction between post-decisional *documents* and post-decisional *information* "begins to verge on the semantic." 1-ER-59.  Far from semantics, the district court failed to recognize that all of Mr. Cluff's testimony consisted of information that was available to BLM prior to issuance of the ROD and, therefore, should have been admitted under *Lands Council* factor one or four.

The district court's holding was directly contrary to that of the District of Montana in *All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1261 (D. Mont. 2021). There, citing *Cachil*, the court held that "Plaintiffs' distinction between 'documents' and 'information' has merit[,]" finding that pre-decisional information contained within a post-decisional document may be supplemented into the record. *Id*. ("*Cachil* itself recognized the difference between post-decisional *documents* and post-decisional *information*." (emphasis in original)). Given this split of authority in

46

this circuit, Appellants request that this Court confirm that it is only post-decisional *information* which is barred under *Cachil*.

Ninth Circuit case law establishes that post-decisional declarations or affidavits may be admitted if one of the *Lands Council* factors is satisfied, despite such declarations or affidavits themselves often, if not always, post-dating the agency's decision.[27] The relevant question is not whether the form of the evidence post-dates the ROD, but rather whether the information reflected by the evidence post-dates the ROD. Only if the information being provided by the post-decisional declarations and affidavits was unavailable to the agency before its decision is that

---

[27] *See All. for the Wild Rockies*, 585 F. Supp. 3d at 1262; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-00640-SI, 2015 WL 423090, at *4 (D. Or. Feb. 2, 2015) (District of Oregon admitting post-decisional documents consisting of 226 pages worth of expert declarations and exhibits); *Ctr. for Food Safety v. Perdue*, No. 20-CV-00256-JSW, 2022 WL 4793438, at *8 (N.D. Cal. Sept. 30, 2022) (Northern District of California admitting post-decisional declaration presenting new analysis of data in the record); *Bundorf v. Jewell*, 142 F. Supp. 3d 1138, 1145–46 (D. Nev.), clarified on denial of reconsideration, 142 F. Supp. 3d 1133 (D. Nev. 2015) (District of Nevada admitting in part a post-decisional declaration identifying unexplained inconsistencies in survey data in the record); *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1330 (D. Idaho 2019) (District of Idaho admitting multiple expert declarations showing BLM did not consider serious environmental consequences); *Conservation Nw.*, 674 F. Supp. 2d at 1242–43 (Western District of Washington admitting post-decisional declarations identifying serious controversies with methodologies used for land management decisions); *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1167 (D. Mont. 2020); *Blank*, 2013 WL 2450110, at *3-5.

information inadmissible.[28] *See, e.g. Nat. Res. Def. Council v. Blank*, No. C-12-05380 EDL, 2013 WL 2450110, at *3-5 (N.D. Cal. June 5, 2013). The testimony of Mr. Cluff is much the same as any declaration or affidavit containing information which pre-dates the agency's decision. Thus, although the transcript of Mr. Cluff's testimony post-dates the BLM's decision, the substance of the testimony (i.e., the information contained therein) was about how Piteau generated its water resources analysis *before* BLM approved the Thacker Pass ROD. 3-ER-351—390. As long as one of the *Lands Council* factors is satisfied, this type of sworn statement about a pre-decisional process is admissible under Ninth Circuit law.

Hypothetically, consider if Mr. Cluff's testimony came in the form of a whistleblower declaration, coming forth to testify about errors or misrepresentations in the scientific process utilized to comply with NEPA. Appellants submit that it is highly unlikely this Court would categorically bar such whistleblower testimony merely because the declaration post-dates the agency's decision. As long as the testimony pertains to pre-decisional information it can be supplemented under *Lands Council*.

---

[28] For example, if a declaration cites and relies on a study, but the study is post-decisional, then the study and declaration are barred. Alternatively, if a declaration cites and relies on a study which the agency never saw or considered, but the study pre-dates the agency's decision, then the declaration may be admissible so long as a *Lands Council* factor is satisfied.

Here, the information revealed in Mr. Cluff's testimony was compelled under cross-examination, rather than offered voluntarily as a whistleblower, but the substance of the testimony is no less relevant and admissible, nor damning. Further, the facts that Mr. Cluff testified to were available to the BLM before issuance of the ROD. If, before BLM signed the ROD, BLM had pressed Mr. Cluff about whether Piteau followed the survey protocols described in the workplan, he could have (and should have) provided BLM the same answers he later testified to. *See, e.g.*, 3-ER-352—371. This makes the content of Mr. Cluff's testimony pre-decisional information that is admissible.

The district court's application of the wrong legal standard, declaring all post-decisional evidence as categorically barred in APA cases, is an abuse of discretion. Accordingly, this Court should reverse.

**B.      Admissions of Errors in the NEPA Process Satisfy the *Lands Council* Factors.**

The district court did not evaluate whether the testimony Appellants sought to have supplemented into the record satisfied any *Lands Council* factor because the district court found instead that "no *Lands Council* exceptions apply when the documents at issue postdate the ROD." 1-ER-59. The district court held that the contents of Mr. Cluff's testimony were not available to the agency and thus the testimony was not admissible, largely rendering the *Lands Council* supplementation factors a nullity since pre-decisional information considered by the agency must be

part of the administrative record in the first instance. 1-ER-59; *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989). Contrary to the district court's holding, Mr. Cluff's testimony is clearly admissible under *Lands Council* factors one and four and this Court should so hold and consider the testimony in evaluating Appellants' NEPA claims.[29]

The preceding sections of this brief already explain that an accurate baseline, scientific and professional integrity, and independent evaluation of environmental information are "relevant factors" under NEPA. *See also Wilderness Watch, Inc. v. Bureau of Land Mgmt.*, No. 209CV00302KJDGWF, 2010 WL 11579044, at *3 (D. Nev. May 11, 2010) (considering NEPA's "cumulative impacts" requirement to be a "relevant factor"); *Bundorf*, 142 F.Supp. 3d at 1146 (failure to follow protocols is a relevant factor). Therefore, evidence pertaining to the accuracy of the baseline, the integrity of the NEPA process, and BLM's independent evaluation of environmental information is admissible under *Lands Council* factor one. The Cluff testimony is pertinent to these relevant factors. In his testimony Mr. Cluff admitted that Piteau did not measure springs at their point of maximum discharge, did not follow the Stevens Protocols for recording spring data during surveys, and did not make any effort to reach out to Appellants before surveying springs on Appellants' private

---

[29] Factor four, bad faith, is met because, as noted above, Piteau trespassed and misrepresented data, and BLM deliberately concealed information from Appellants.

lands. 3-ER-352—371. The testimony also admits that Piteau did not even know who with BLM reviewed their work product, evidencing that BLM could not have inquired about Piteau's adherence to survey protocols or Piteau's specific spring and seep measurements. 3-ER-380; *see also* 4-ER-577 ("comments and data requests regarding the Piteau hydrology report need to go through Ken [at BLM], and Ken will provide an official request to LNC."). This testimony demonstrates: (1) Piteau's spring surveys generated inaccurate baselines because flow measurements were taken at the wrong locations; (2) Piteau made little-to-no effort to comply with the protocols required by the workplan, and; (3) BLM made no effort to enforce compliance with those protocols or evaluate the sufficiency of Piteau's surveys.

The Cluff testimony satisfies *Lands Council* factor one because it is probative to BLM's compliance with NEPA's baseline, integrity, and independent evaluation requirements. Therefore, Appellants respectfully request that this Court reverse the district court's decision denying Appellants' motion to supplement the administrative record, and consider Mr. Cluff's testimony on the merits of Appellants' NEPA claims.

## III. Degradation of Sage Grouse Habitat and Visual Resources on Lands Covered Merely by Unverified Mining Claims Violates FLPMA.

The Mine will have a devastating impact on wildlife habitat, concepts of multiple use, and visual resources on and around Thacker Pass. The governing RMPs covering the area surrounding Thacker Pass contain strict limitations on degradation

51

of sage grouse habitat and visual resources. *See* 4-ER-625—637; 4-ER-622; 4-ER-649. However, BLM ignored these requirements, finding instead that mineral resource projects take precedence over environmental regulations, and that the RMPs cannot serve as a barrier to allowing mining and occupancy of mineral claims. 4-ER-627—628; 4-ER-587; 2-ER-203—204. This is legal error because BLM cannot ignore the RMPs when approving mine-related occupancy *when the mineral claims supporting the occupancy have not been deemed valid*.

FLPMA requires that BLM "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed under FLPMA, 43 U.S.C. § 1712. 43 U.S.C. § 1732(a). BLM must "take any action necessary to prevent unnecessary or undue degradation of the lands." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011) (quoting 43 U.S.C. § 1732(b)). "BLM may not… take actions 'inconsistent with the provisions of a land use plan.'" *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, No. 214CV00226APGVCF, 2017 WL 3667700, at *15 (D. Nev. Aug. 23, 2017). "[T]he holders of unpatented mining claims do not have an 'unfettered' right to explore and mine federal lands, unencumbered by federal and state environmental regulation." *Bohmker v. Oregon*, 903 F.3d 1029, 1038 (9th Cir. 2018). If BLM wishes to take an action which violates the governing RMP, BLM must amend the RMP. *Klamath-Siskiyou Wildlands Ctr. v. Gerritsma*, 638 F. App'x 648, 653 (9th Cir. 2016).

Here, with regard to sage grouse the RMPs require that BLM, if possible, locate projects outside designated priority sage grouse habitat ("PHMA") and general sage grouse habitat ("GHMA"). 4-ER-627. Moreover, the RMP requires that projects and features constructed on the public lands comply with certain visual resource mandates. 4-ER-593—595. BLM ignored both these requirements. Regarding sage grouse, BLM simply determined that that lithium ore bodies are not flexible in terms of location, therefore BLM was unable to modify the location of the Mine to avoid PHMAs and GHMAs. 4-ER-627. With regards to the RMP's visual resource regulations, BLM admitted "[t]he Proposed Action and Project alternatives conform with the BLM's WD Record of Decision and Resource Management Plan (RMP) (ROD/RMP) *with the exception of existing Visual Resource Management (VRM) designations* (BLM 2015a)." *See* 4-ER-587 (emphasis added).

During public comment periods Appellants reminded BLM that it could not simply ignore the governing RMPs because LNC holds mining claims. 4-ER-744—748. This is especially true where LNC has not yet proven, and BLM has not yet found, that LNC's mining claims are valid across much of the project area. 1-ER-15. The Ninth Circuit's recent interpretation of the mining laws in *Rosemont*, 33 F.4th at 1220, is controlling here, where the question is whether BLM was permitted to ignore the RMPs' provisions on sage grouse habitat and visual resources simply

because LNC holds unvalidated mining claims. Under *Rosemont*, the Court should answer this question in the negative, and hold that BLM violated FLPMA by ignoring the governing RMPs and approving mine-related occupancy of unverified mineral claims.

### A. *Rosemont* Extends to LNC's Water and Power Lines.

To start with, the district court got the scope and reasoning of *Rosemont* wrong. In *Rosemont*, this Court correctly explained that "discovery of valuable minerals is essential to the right to <u>any occupancy</u>—temporary or permanent— beyond the occupancy necessary for exploration." 33 F.4th at 1220 (emphasis added). Accordingly, *Rosemont* extends to all project components of a mining project, contrary to the district court's holding.

The Mine includes guard shacks, fencing, water wells, waste rock piles, a tailings stack, lithium processing facility, sulfuric acid plant, water pipelines, transmission lines, and more. 4-ER-613—619. All of these project features will occupy BLM land on Thacker Pass. The FEIS explains that LNC's mining claims on Thacker Pass provide the surface estate necessary to justify this occupancy. 4-ER-612. Yet, LNC did not prove, and BLM did not find, that LNC's mining claims are valid. 1-ER-15. Instead, BLM assumed validity based on the fact that much, though not all, of the Mine is located upon the McDermitt Caldera, which BLM assumed contains valuable lithium deposits. 1-ER-15; 4-ER-621. However, parts of

the Mine, in particular the water and transmission lines, are located outside the caldera, which is devoid of known mineralization. *Compare* 4-ER-605 *with* 4-ER-606. Appellants raised this issue with the district court. 3-ER-479—480; 2-ER-254—255.

The district court held that *Rosemont* extended only to the waste rock piles and CTFS associated with the Mine, and not other project features. 1-ER-17. The district court justification was merely that *Rosemont* only addressed legality of the Forest Service's approval of a copper mine's massive waste pile and, thus, the case should be extended no further. 1-ER-17. However, nothing in *Rosemont* supports limiting its holding to only waste rock piles.

This Court explained that "discovery of valuable minerals is essential to the right to any occupancy—temporary or permanent—beyond the occupancy necessary for exploration." 33 F.4th at 1220. The cases relied on by this Court in *Rosemont* stand for the same rule of law. *See Union Oil Co. of Cal. v. Smith*, 249 U.S. 337, 346, 39 S.Ct. 308, 63 L.Ed. 635 (1919) (to "create valid rights ... a discovery of mineral is essential."); *Davis v. Nelson*, 329 F.2d 840, 844–45 (9th Cir. 1964) (the mining law grants two rights: "(1) the right to explore and purchase all valuable mineral deposits in lands belonging to the United States; and (2) the right to occupation and purchase of the lands in which valuable mineral deposits are found."); *see also Barrows v. Hickel*, 447 F.2d 80, 82 (9th Cir. 1971) ("In order for

55

a mineral claim on public lands to be valid it is necessary that the discovered mineral deposits be 'valuable.'"); *United States v. Rice*, 886 F.2d 334 (9th Cir. 1989) (evidence that claim is not located where actual deposit exists demonstrates lack of valid claim).

This Court's broad holding in *Rosemont* means exactly what it says: that *any* mine-related occupancy of mineral claims must be preceded by a discovery of valuable minerals on each claim, which is clearly lacking here. Focusing on the water and power lines, BLM approved these project features, which are outside known zones of mineralization, simply because LNC had asserted mining claims over those lands.[30] 4-ER-612; 4-ER-621; 4-ER-746. Pursuant to *Rosemont*, BLM should have first determined whether LNC's claims were valid, before allowing LNC the right of occupation and effectively waiving RMP requirements.

There is no dispute that BLM's approval of the water and power lines as part of the Mine constitutes "occupancy" of BLM's lands. There is also no dispute that a

---

[30] Whether the water and power lines were approved under BLM's regulations at 43 C.F.R. § 3809 et seq. or 43 C.F.R. § 3715 et seq. is irrelevant. 43 C.F.R. § 3809.420(a)(3) requires that mining plans of operations be operated "[c]onsistent with the mining laws[.]" 43 C.F.R. § 3715.1 explains that any occupancy must be allowable under the mining laws. Therefore, whether approved pursuant to 43 C.F.R. § 3809 et seq. or 43 C.F.R. § 3715 et seq., the water and power lines must be consistent with the mining law. Because this Court determined that discovery of valuable minerals is a necessary prerequisite of occupancy under the mining law, occupancy approved pursuant to 43 C.F.R. § 3809 et seq. or 43 C.F.R. § 3715 et seq. must be preceded by a discovery of valuable minerals.

discovery of valuable minerals has not occurred on the mining claims providing the surface estate for the water and power lines. 1-ER-15. Pursuant to *Rosemont*, then, LNC has no right to occupy BLM's lands with its water and power lines pursuant to 43 C.F.R. § 3809 et seq. or 43 C.F.R. § 3715 et seq. until valuable minerals are discovered on the claims underlying the water and power lines. Here, though, such a discovery of valuable minerals is likely impossible because the water and power lines will be located outside the McDermitt Caldera, admittedly beyond zones of lithium mineralization. 4-ER-621; 4-ER-746; *compare* 4-ER-605 *with* 4-ER-606.

This Court should affirm its holding in *Rosemont* that any mine-related occupancy of mineral claims must be preceded by a discovery of valuable minerals *on that claim*. Therefore, the Court should hold that BLM's approval of occupation for the water and power lines was arbitrary and capricious.

### B. Improper Occupancy of Mining Claims Causes Unlawful Degradation of Sage Grouse Habitat and Visual Resources.

The second part of the question detailed above is whether BLM violated the governing RMPs by approving LNC's mineral claim occupancy without evaluating claim validity. BLM's failure to require proof of mineral claim validity before approving mine-related occupancy at Thacker Pass violates FLPMA and the governing RMPs. Explained above, BLM's reasoning for ignoring the RMPs' sage grouse habitat provisions was that lithium ore bodies are not flexible in terms of location, therefore BLM was unable to modify the location of the Mine to avoid

57

PHMAs and GHMAs. 4-ER-627. BLM took the same tact for visual resources, simply ignoring the provisions of the RMP because LNC has mineral claims on Thacker Pass which BLM concluded gave LNC the right to occupy those claims. 4-ER-587.

Because BLM was wrong to conclude that LNC had a right to occupy unverified claims, BLM was also wrong to conclude that the provisions of the RMPs did not govern. If LNC has <u>no right</u> to occupy the land underlying the water and power lines, because there has not been a discovery of valuable minerals on the claims providing the surface estate for these project features, then the RMP must apply. Therefore, BLM could not ignore the RMP's surface occupancy siting requirements within sage grouse habitat, nor the visual resources requirements, when there is no evidence that there is lithium ore underlying the water and power lines.

BLM's disregard for the provisions of the RMP on account of LNC's rights under the mining law is arbitrary and capricious because LNC has no occupancy rights on invalid mineral claims. This constitutes unnecessary and undue degradation of BLM lands because it allows LNC to permanently degrade the public estate based on unsupported rights of occupancy. 43 U.S.C. § 1732(b). Therefore, Appellants request that this Court hold that BLM's approval of the Thacker Pass ROD is arbitrary and capricious.

## IV.   The Court Should Vacate the ROD.

In light of the serious NEPA and FLPMA errors discussed above, but erroneously rejected by the district court, this Court should vacate the ROD. Correcting the NEPA errors will require a new study of the water resources baseline, a new analysis of the potential impacts, and a new mitigation plan that the public has a chance to review and comment on prior to BLM making a new decision on whether to permit the Mine. Those errors cannot be cured based on the existing record through a remand without vacatur. Further, the FLMPA errors cannot be cured through remand either but, rather, will require extensive new evidence and BLM's analysis of claim validity and the application of RMP standards. However, even if the Court were to affirm the district court's opinion on the merits of Appellants' NEPA and FLMPA claims, this Court should still reverse the district court's decision to remand without vacatur because it reflects an abuse of discretion.

Remand without vacatur is controlled by what are commonly known as the *Allied-Signal factors*. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Pursuant to this test, the court first considers "the seriousness of the agency's errors and, second, the disruptive consequences that would result from vacatur." *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020). As explained in Appellants' briefing on their motion for

emergency injunction pending appeal,[31] the error that the district court sustained was serious and, moreover, there would be no disruptive consequences of vacatur, with the exception of inconvenience and possible financial harm to LNC, which are inadequate reasons for remanding without vacatur. *See, e.g., Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1100 (9th Cir. 2006). Accordingly, this Court should reverse the district court and vacate the ROD.

## CONCLUSION

Appellants respectfully request that this Court reverse the district court's judgment and vacate the ROD.

DATED this 24th day of March 2023.

CAROLLO LAW GROUP

*/s/ Dominic M Carollo*
**Dominic M. Carollo, OSB No. 093057**
Email: dcarollo@carollolegal.com
Carollo Law Group LLC
Mail:   P.O. Box 2456
            Roseburg, OR 97470
Office: 2315 Old Highway 99 South
            Roseburg, OR 97471
Ph: (541) 957-5900
      *Attorneys for Plaintiffs-Appellants*

---

[31] Appellants incorporate by reference that briefing here rather than unnecessarily repeat it. *See* Dkt. 4-1 at 9-16.

## STATEMENT OF RELATED CASES

Except for the appeals filed by Western Watersheds Project, Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense (No. 23-15259) and Burns Paiute Tribe (No. 23-15261), which have been consolidated with this appeal, Appellants are not aware of any related cases pending before this Court.

Date: March 24, 2023          /s/ Dominic M. Carollo

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **13,756** words prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: March 24, 2023          /s/ Dominic M. Carollo

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2023, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

DATED this 24th day of March, 2023.

/s/ Dominic M. Carollo

I

**CAROLLO LAW GROUP LLC**
dcarollo@carollolegal.com
Mail:  P.O. Box 2456
Roseburg, OR 97470
Office: 2315 Old Highway 99 South
Roseburg, OR 97471
Ph: (541) 957-5900
*Attorneys for Plaintiffs-Appellants*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

## REGULATIONS

40 C.F.R. § 1502.23……………………………………………………………2

40 C.F.R. § 1506.5……………………………………………………...…………3

43 C.F.R. § 1610.5-3……………………………………………………………4

43 C.F.R. § 3809.420……………………………………………………...…….5

43 C.F.R. § 3715.1……………………………………………………...……6

1

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Subchapter A. National Environmental Policy Act Implementing Regulations
Part 1502. Environmental Impact Statement

**40 C.F.R. § 1502.23 – Methodology and scientific accuracy.**

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement. Agencies may place discussion of methodology in an appendix. Agencies are not required to undertake new scientific and technical research to inform their analyses. Nothing in this section is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Subchapter A. National Environmental Policy Act Implementing Regulations
Part 1506. Environmental Impact Statement

**40 C.F.R. § 1506.5 – Agency responsibility for environmental documents.**

(a) Responsibility. The agency is responsible for the accuracy, scope (§ 1501.9(e) of this chapter), and content of environmental documents prepared by the agency or by an applicant or contractor under the supervision of the agency.

(b) Information. An agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document. An agency also may direct an applicant or authorize a contractor to prepare an environmental document under the supervision of the agency.

(1) The agency should assist the applicant by outlining the types of information required or, for the preparation of environmental documents, shall provide guidance to the applicant or contractor and participate in their preparation.

(2) The agency shall independently evaluate the information submitted or the environmental document and shall be responsible for its accuracy, scope, and contents.

(3) The agency shall include in the environmental document the names and qualifications of the persons preparing environmental documents, and conducting the independent evaluation of any information submitted or environmental documents prepared by an applicant or contractor, such as in the list of preparers for environmental impact statements (§ 1502.18 of this chapter). It is the intent of this paragraph (b)(3) that acceptable work not be redone, but that it be verified by the agency.

(4) Contractors or applicants preparing environmental assessments or environmental impact statements shall submit a disclosure statement to the lead agency that specifies any financial or other interest in the outcome of the action. Such statement need not include privileged or confidential trade secrets or other confidential business information.

(5) Nothing in this section is intended to prohibit any agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to any agency for use in preparing environmental documents.

3

Code of Federal Regulations
Title 43. Public Lands: Interior
Subtitle B. Regulations Relating to Public Lands
Chapter II. Bureau of Land Management, Department of the Interior
Subchapter A. General Management
Part 1600. Planning, Programming, Budgeting
Subpart 1610. Resource Management Planning
§ 1610.5. Resource Management Plan Approval, Use and Modification.

**43 C.F.R. § 1610.5-3 – Conformity and implementation.**

(a) All future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan.

(b) After a plan is approved or amended, and if otherwise authorized by law, regulation, contract, permit, cooperative agreement or other instrument of occupancy and use, the Field Manager shall take appropriate measures, subject to valid existing rights, to make operations and activities under existing permits, contracts, cooperative agreements or other instruments for occupancy and use, conform to the approved plan or amendment within a reasonable period of time. Any person adversely affected by a specific action being proposed to implement some portion of a resource management plan or amendment may appeal such action pursuant to 43 CFR 4.400 at the time the action is proposed for implementation.

(c) If a proposed action is not in conformance, and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment in accordance with the provisions of § 1610.5–5 of this title.

(d) More detailed and site specific plans for coal, oil shale and tar sand resources shall be prepared in accordance with specific regulations for those resources: Group 3400 of this title for coal; Group 3900 of this title for oil shale; and part 3140 of this title for tar sand. These activity plans shall be in conformance with land use plans prepared and approved under the provisions of this part.

Code of Federal Regulations
Title 43. Public Lands: Interior
Subtitle B. Regulations Relating to Public Lands
Chapter II. Bureau of Land Management, Department of the Interior
Subchapter C. Minerals Management
Group 3800. Mining Claims Under the General Mining Laws
Part 3800. Mining Claims Under the General Mining Laws
Subpart 3809. Surface Management
Operations Conducted Under Plans of Operations

### 43 C.F.R. § 3809.420 – What performance standards apply to my notice or plan of operations?

The following performance standards apply to your notice or plan of operations:
(a) General performance standards—
(1) Technology and practices. You must use equipment, devices, and practices that will meet the performance standards of this subpart.
(2) Sequence of operations. You must avoid unnecessary impacts and facilitate reclamation by following a reasonable and customary mineral exploration, development, mining and reclamation sequence.
(3) Land-use plans. Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans, and with coastal zone management plans under 16 U.S.C. 1451, as appropriate.
(4) Mitigation. You must take mitigation measures specified by BLM to protect public lands.
(5) Concurrent reclamation. You must initiate and complete reclamation at the earliest economically and technically feasible time on those portions of the disturbed area that you will not disturb further.
(6) Compliance with other laws. You must conduct all operations in a manner that complies with all pertinent Federal and state laws.

*     *     *

5

Code of Federal Regulations
Title 43. Public Lands: Interior
Subtitle B. Regulations Relating to Public Lands
Chapter II. Bureau of Land Management, Department of the Interior
Subchapter C. Minerals Management
Group 3700. Multiple Use; Mining
Part 3710. Public Law 167; Act of July 23, 1955
Subpart 3715. Use and Occupancy Under the Mining Laws

## 43 C.F.R. § 3715.1 – Do the regulations in this subpart apply to my use or occupancy?

To determine if the regulations in this subpart apply to your activities, refer to Table 1 in this section.

**Table 1**

| Applicability of this subpart | |
| --- | --- |
| If your proposed use of the public lands— | Then— |
| Includes occupancy and is "reasonably incident" as defined by this subpart | The provisions of this subpart apply to you. You must seek concurrence from BLM before beginning this use and comply with all provisions of this subpart. |
| Involves the placement, construction, or maintenance of enclosures, gates, fences, or signs | The provisions of this subpart apply to you. You must seek concurrence from BLM before beginning this use and comply with all provisions of this subpart. |
| Is reasonably incident, but does not involve occupancy | The provisions of this subpart do not apply to you, except for §§ 3715.4, 3715.5 and 3715.7. You are subject to the applicable regulations in 43 CFR part 3800. |
| Is not reasonably incident (involving rights-of- way, for example), but may be allowed under the public land laws | The occupancy consultation provisions of this subpart do not apply to you. Your use is not allowed under this subpart. You must seek authorization under 43 CFR Group 2900. |

6

| | |
|---|---|
| Is not allowed under the public land laws, the mining laws, the mineral leasing laws, or other applicable laws | Your use is prohibited. You must not begin or continue unauthorized uses. |
| Involves occupancy of a site, or any subsequent site within a 25-mile radius of the initially occupied site, for 14 days or less in any 90-day period | The provisions of this subpart do not apply to you. Refer to the applicable regulations in 43 CFR part 8360 and pertinent State Director supplementary rules. 43 CFR part 8360 will not otherwise apply to a reasonably incident use or occupancy that this subpart allows. |