**No. 23-15259**

**Consolidated with Nos. 23-15261, 23-15262**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

WESTERN WATERSHEDS PROJECT, GREAT BASIN RESOURCE WATCH,
BASIN AND RANGE WATCH, and WILDLANDS DEFENSE,
*Plaintiffs-Appellants*,

v.

ESTER MCCULLOUGH; UNITED STATES DEPARTMENT OF THE INTERIOR;
and BUREAU OF LAND MANAGEMENT;
*Defendants-Appellees*,

and

LITHIUM NEVADA CORPORATION,
*Intervenor-Defendant-Appellee.*
_____

On Appeal From the United States District Court
for the District of Nevada
(District Judge Miranda M. Du)
_____

**WESTERN WATERSHEDS PROJECT'S OPENING BRIEF**

i

Roger Flynn, (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

*Attorneys for Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense*

Talasi B. Brooks (ISB # 9712)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise, Idaho 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Attorney for Western Watersheds Project*

Christopher Mixson (NV Bar # 10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

*Attorney for All Plaintiffs-Appellants*

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES ......................................................v

CORPORATE DISCLOSURE STATEMENT ......................................x

STATEMENT OF JURISDICTION ...............................................1

STATEMENT OF ISSUES .........................................................2

STATEMENT OF THE CASE and PROCEDURAL HISTORY ...........................3

STATEMENT OF FACTS .........................................................6

SUMMARY OF ARGUMENT ....................................................12

STANDARD OF REVIEW.........................................................15

ARGUMENT .....................................................................17

I.      **BLM Failed to Comply with the Controlling RMP
        Under FLPMA.** ........................................................17

A.      **BLM Wrongly Assumed LNC Held Valid Existing Rights and
        Thus the Project Was Exempt from Complying with the RMP.** ............18

B.      **BLM Did Not Apply the RMP Standards, in Violation of FLPMA.** ....22

        1.      The RMP Established Binding Standards to Protect Sage-grouse. ....22

        2.      BLM Violated the RMP Based on an Unsupported Belief that
                LNC Has "Valid Rights" to Use and Occupy Its Mining Claims. .....25

        a.      *BLM Exempted the Project from the ARMPA/RMP Standards* ..........25

        b.      *BLM Did Not Mitigate Impacts to Sage-grouse to the
                "Net Conservation Gain" Standard* ....................................29

**II.**     **BLM Violated the RMP's Visual Resource Protection Requirements** ..33

**III.**    **BLM Authorized "Unneccessary or Undue Degradation" in Violation of FLPMA** ...................................................36

**A.**      **Actions That Violate the RMP Constitute UUD.** .....................................37

**B.**      **The Predicted Violation of Groundwater Standards Constitutes UUD.** ...................................................39

**IV.**     **BLM Violated NEPA** ...................................................40

**A.**      **BLM Failed to Adequately Analyze Cumulative Impacts.** ...................42

**B.**      **BLM Failed to Adequately Analyze Mitigation Measures and Their Effectiveness** ...................................................45

      1.     Failure to Analyze Mitigation of Groundwater Pollution .................46

      2.     Failure to Analyze Mitigation of Wildlife Impacts .............................49

      3.     BLM Based Its Plan to Mitigate Air Pollution on an "Undetermined" and "Black Box" Technology That BLM and the Public Never Saw ...................................................50

**C.**      **BLM Failed to Adequately Analyze Baseline Wildlife Conditions.** .......53

      1.     Pronghorn ...................................................54

      2.     Sage-grouse ...................................................55

**D.**      **BLM Failed to Adequately Analyze Impacts to Wildlife** ...................56

**IV.**     **This Court Should Vacate the ROD and FEIS** ...................................................60

CONCLUSION ...................................................63

CERTIFICATES OF COMPLIANCE AND SERVICE ...................................................64

STATEMENT OF RELATED CASES ...................................................64

INDEX OF STATUTORY AND REGULATORY
AUTHORITIES (WITH ADDENDUM) ...................................................................65

## **TABLE OF AUTHORITIES**

## **CASES**

Alliance for the Wild Rockies v. U.S. Forest Serv.,
    907 F.3d 1105 (9th Cir. 2018) ....................................................................61

Bark v. U.S. Forest Serv.,
    958 F.3d 865 (9th Cir. 2020) ......................................................................56

Bartell Ranch v. McCullough, (*District Court Decision*)
    2023 WL 1782343 (D. Nev. 2023)...........................................................*passim*

Blue Mountains Biodiversity Project v. Blackwood,
    161 F.3d 1208 (9th Cir. 1998) .................................................15, 16, 42, 59

Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm.,
    449 F.2d 1109 (D.C. Circ. 1971) ................................................................48

Camp v. Pitts,
    411 U.S. 138 (1973) ....................................................................................61

Center for Bio. Diversity v. Dept. of Interior,
    623 F.3d 633 (9th Cir. 2010) ..........................................................37, 41, 52

Center for Biological Diversity v. U.S. Fish and Wildlife Service
("Rosemont" Mine Decision),
    33 F.4th 1202 (9th Cir. 2022) ..............................................................*passim*

Center for Biological Diversity v. FWS,
    409 F. Supp. 3d 738 (D. Ariz. 2019) ...............................................16, 20, 21

Center for Biological Diversity v. U.S. BLM,
    2023 WL387609 (D. Idaho, 2023) .............................................................44

Chrisman v. Miller,
    197 U.S. 313 (1905)..................................................................... 62

F.C.C. v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009) ...................................................................36

Great Basin Resource Watch v. BLM,
    844 F.3d 1095 (9th Cir. 2016) ....................................... 42, 43, 47, 49, 52, 53

Great Basin Mine Watch v. Hankins,
    456 F.3d 955 (9th Cir. 2006) ...................................................42, 44

Humane Soc'y of the U.S. v. Locke,
    626 F.3d 1040 (9th Cir. 2010) ...................................................61

Karuk Tribe of California v. U.S. Forest Service,
    681 F.3d 1006 (9th Cir. 2012) ...................................................15

Kern v. BLM,
    284 F.3d 1062 (9th Cir. 2002) ...................................................41

Lands Council v. Powell,
    395 F.3d 1019 (9th Cir. 2005) ...................................................15, 16

Marsh v. Oregon Natural Resources Council,
    490 U.S. 360 (1989) ...................................................40

Mineral Policy Center v. Norton,
    292 F. Supp. 2d 30 (D.D.C. 2003) ................................................... 17, 18, 37

Motor Vehicles Manufacturers' Ass'n of U.S. v. State Farm Mutual Auto
Insurance Co.,
    463 U.S. 29 (1983) ...................................................16

N. Plains v. Surface Transportation Board,
    668 F.3d 1067 (9th Cir. 2011) ...................................................41

Native Village of Point Hope v. Jewell,
    740 F.3d 489 (9th Cir. 2014) .............................................................. 51, 52

Neighbors of Cuddy Mountain v. U.S. Forest Service,
   137 F.3d 1372 (9th Cir. 1998) ................................................................. 58, 59

Oregon Nat. Desert Ass'n v. U.S. BLM,
   625 F.3d 1092 (9th Cir. 2010) .................................................................... 17

Oregon Nat. Desert Ass'n v. Rose,
   921 F.3d 1185 (9th Cir. 2019) ..................................................................... 49

Oregon Nat. Resources Council Fund v. Brong,
   492 F.3d 1120 (9th Cir. 2007) .............................................................. 15, 17

Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation
v. California,
   813 F.3d 1155 (9th Cir. 2015) .................................................................... 61

Pollinator Stewardship Council v. E.P.A,
   806 F.3d 520 (9th Cir. 2015) ...................................................................... 61

Robertson v. Methow Valley Citizens Council,
   490 U.S. 332 (1989) ...................................................................... 41, 45, 46

Save the Yaak Committee v. Block,
   840 F.2d 714 (9th Cir.1988) ...................................................................... 16

South Fork Band Council v. Dept. of Interior,
   588 F.3d 718 (9th Cir. 2009) ..................................................................... 46

Te–Moak Tribe of W. Shoshone v. Dept. of Interior,
   608 F.3d 592 (9th Cir. 2010) ..................................................................... 42

The Steamboaters v. FERC,
   759 F.2d 1382 (9th Cir. 1985) ................................................................... 48

U.S. v. Coleman,
   390 U.S. 599 (1968)................................................................................... 19

W. Watersheds Project v. Bernhardt,
   543 F.Supp.3d 958 (D. Idaho 2021) .......................................................... 55

W. Watersheds Project v. Kraayenbrink,
    632 F.3d 472 (9th Cir. 2011) ........................................................ 50

W. Watersheds Project v. Schneider,
    417 F. Supp. 3d 1319 (D. Idaho 2019) ........................................22

Western Exploration v. U.S. Dept. of the Interior,
    250 F. Supp. 3d 718 (D. Nev. 2017) ................................... 23, 29

## **STATUTES**

Administrative Procedure Act (APA),
    5 U.S.C. §706(2) ............................................... 1, 15, 60

28 U.S.C. §1291 ...................................................................3

28 U.S.C. §1292(a)(1) .........................................................3

1872 Mining Law,
    30 U.S.C. §§21 *et seq.* ...................................................1

1872 Mining Law,
    30 U.S.C. §22 .................................................................19

1872 Mining Law,
    30 U.S.C. §23 .................................................................19

1872 Mining Law,
    30 U.S.C. §26 .................................................................19

Federal Land Policy and Management Act of 1976,
    43 U.S.C. §§1701 *et seq.* (FLPMA) ...........................1

FLPMA,
    43 U.S.C. §1701(a)(8) ........................................... 17, 33

FLPMA,
    43 U.S.C. §1702 ...........................................................33

FLPMA,

 43 U.S.C. §1732 ........................................................ 17, 18, 28, 36

National Environmental Policy Act,

 42 U.S.C. §§4321 *et seq.* (NEPA) ............................................1

## **REGULATIONS**

40 C.F.R. §1502.2 ................................................................50

40 C.F.R. §1502.14 ..............................................................46

40 C.F.R. §1502.16 .......................................................... 42, 45

40 C.F.R. §1502.22 ..............................................................51

40 C.F.R. §1508.7 ........................................................... 41, 42

40 C.F.R. §1508.8 ........................................................... 41, 42

40 C.F.R. §1508.9 ...............................................................41

40 C.F.R. §1508.20 ..............................................................46

40 C.F.R. §1508.22 ........................................................... 51

40 C.F.R. §1508.25(c). .................................................... 41, 42

43 C.F.R. §1601.0-5 ............................................................17

43 C.F.R. §1610.5-3(a) .........................................................17

43 C.F.R. §3809.5 ............................................................ 37

43 C.F.R. §3809.401 .......................................................... 12

43 C.F.R. §3809.411 .......................................................... 36

43 C.F.R. §3809.420 ...................................................... 37, 38, 50

## **OTHER AUTHORITIES**

65 Fed. Reg. 70053 (Nov. 21, 2000) ........................................................37

80 Fed.Reg. 59857 (Oct. 2, 2015) ..........................................................23

85 Fed.Reg. 3413 (Jan. 21, 2020) ..........................................................34

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to FRAP 26.1, Appellants, Western Watersheds Project, Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense, have no parent companies, no subsidiaries or subordinate companies, and no affiliate companies that have issued shares to the public.

## STATEMENT OF JURISDICTION

**Jurisdiction of the District Court**

Plaintiffs-Appellants Western Watersheds Project, Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense (collectively WWP) challenged the Bureau of Land Management's (BLM) review and approval of the Thacker Pass Mine Project (Project/project or Mine/mine), proposed by Lithium Nevada Corporation (LNC). The Mine would be the nation's first open-pit lithium mine, and one of the largest mines in Nevada. WWP challenged BLM's January 15, 2021 Record of Decision, (ROD), 3-WWPER-332-355, approving LNC's Plans of Operations for the open-pit mine and related operations, and the extensive exploration drilling adjacent to the mine site, as well as the Final Environmental Impact Statement covering all operations (FEIS), 3-WWPER-403-492 (Excerpts).

The district court had subject matter jurisdiction under 28 U.S.C. §1331 because the action arose under federal laws including: the Administrative Procedure Act (APA), 5 U.S.C. §§702-706; the 1872 Mining Law, 30 U.S.C. §§21 *et seq.*; the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 *et seq.*; and the Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §1701 *et seq.*

**Jurisdiction of the Court of Appeals**

WWP appeals from the district court's Order and Judgment denying in part WWP's motion for summary judgment, 1-WWPER-14-64, as well as from the

court's denial of WWP's motion for injunction pending appeal. 1-WWPER-3-13. This Court has jurisdiction to review the district court's decisions under 28 U.S.C. §§1291 and 1292(a)(1).

**Finality of Judgment and Timeliness of Appeal**

The district court issued its Order on cross-motions for summary judgment on February 6, 2023. 1-WWPER-16.  A Final Judgment issued on February 7, 2023, 1-WWPER-14.  WWP filed its Notice of Appeal on February 20, 2023 (2-WWPER-93) as amended on February 27, 2023 (2-WWPER-67).  Pursuant to Fed.R.App.P. 4(a)(1)(B), this appeal is thus timely.

## STATEMENT OF ISSUES

1.    Did BLM violate FLPMA by authorizing the Project without requiring compliance with the binding provisions of its Resource Management Plan (RMP), adopted to protect the imperiled greater sage-grouse, when BLM assumed that LNC holds "valid rights" under the 1872 Mining Law to use and occupy the entire Project area, even though BLM never determined whether LNC had discovered "valuable minerals" on each of its mining claims – the same error that was held to violate federal public land and mining laws in Center for Biological Diversity v. U.S. FWS, 33 F.4th 1202 (9th Cir. 2022)("Rosemont" mine decision)?

2.    Did BLM violate FLPMA when it approved the Project, even though the Project would violate the RMP's Visual Resource Management (VRM) standards?

3.     Did BLM violate its mandate under FLPMA to "prevent unnecessary or undue degradation" to public lands by authorizing actions that violate the RMP and water quality standards, and by approving the Project without necessary mitigation for its significant environmental effects?

4.     Did BLM violate its duties under NEPA to allow for informed public participation and to fully disclose and analyze environmental impacts when its analysis of cumulative effects did little more than list acreages of disturbance and ignored nearby mining activity, it approved the Project with inadequate mitigation plans that were never subject to public review, its discussions of wildlife baselines omitted information vital to understanding the Project's effects, and its effects analysis relied on vague and generalized statements without support in the record?

5.     Did the district court err when it denied WWP's request to vacate BLM's Project-approving ROD, despite finding that BLM violated FLPMA and the controlling <u>Rosemont</u> decision?

The relied-upon statutes and regulations are attached as an addendum to this brief.

## <u>STATEMENT OF THE CASE AND PROCEDURAL HISTORY</u>

This appeal seeks to reverse the portions of the district court's decision denying WWP's summary judgment motion and requests this Court to vacate BLM's decision approving the Project.

The Federal Defendants-Appellees put the Project on an "expedited" track to

"streamline environmental review" and provide for quick approval in the final days of the previous Administration. 2-WWPER-217, 2-WWPER-220. On January 15, 2021, BLM issued its ROD which approved the Project. 3-WWPER-332-355. The ROD was based on the FEIS, which was issued in December of 2020 by BLM's Winnemucca District. 3-WWPER-409-498(Excerpts). The ROD approved LNC's two Plans of Operations: for the open-pit mine and its processing plant and waste facilities; and for the adjacent North/South Exploration Project.

A local ranching family, Bartell Ranch, filed the first lawsuit challenging the ROD and FEIS on February 11, 2021. WWP sued on February 26, 2023. 2-WWPER-261. LNC intervened as a defendant in both lawsuits. The Reno-Sparks Indian Colony and Burns Paiute Tribe (Tribes) intervened as plaintiffs in WWP's case. The district court consolidated the cases.

Because the ROD authorized full operations, WWP filed a motion for preliminary injunction in May, 2021 to stop Project construction. The Tribes filed separate motions for preliminary injunction. After BLM and LNC disclosed that they planned to limit the initial disturbance to less than one acre for cultural resource evaluations, the district court denied the motions in 2021. LNC then agreed to provide Bartell Ranch with at least 60-days' notice before starting any additional disturbance so that plaintiffs could file renewed injunction motions if needed. 2-WWPER-215. LNC never sent that notice.

4

In 2022, the parties filed cross-motions for summary judgment. On February 6, 2023, the district court granted WWP's motion for summary judgment in part, applying this Circuit's Rosemont decision to hold that BLM violated FLPMA when it assumed, without inquiring and verifying, that LNC held valid existing rights under the Mining Law to permanently occupy lands it plans to bury under tailings and waste rock facilities. 1-WWPER-26. The district court, however, did not specifically decide whether BLM violated FLPMA by exempting the Project from the RMP requirements. 1-WWPER-30.

The district court otherwise ruled against all plaintiffs. 1-WWPER-17. The district court also refused to vacate the unlawful ROD because it said that BLM could easily "fix" its errors by examining mining claim validity sometime in the future, long after the Project starts. 1-WWPER-18.

Even though LNC never informed the plaintiffs that it intended to begin Project construction within 60 days, after the district court ruled, LNC notified plaintiffs that it planned to begin Project construction under the unlawful ROD within three weeks, before the end of February 2023. WWP, Bartell Ranch, and the Burns Paiute Tribe filed notices of appeal and emergency motions for injunction pending appeal. *See* 2-WWPER-67, 2-WWPER-79, 2-WWPER-93. The district court denied the motions on February 24, 2023. 1-WWPER-3.

WWP and Bartell Ranch filed emergency motions for injunction pending

appeal with this Court on February 27, 2023.  On March 1, 2023, the motions panel denied the motions, consolidated the appeals, set an expedited merits briefing schedule, and ordered argument set for the June calendar (Dkt. 32).  LNC immediately began Project construction.

## **STATEMENT OF FACTS**

The Thacker Pass Mine would be the nation's first open-pit lithium mine, and one of the largest open-pit mines in the West.  It is located in the last intact, south-facing sagebrush habitat in the Montana Mountains of northern Nevada, which provides crucial winter range, and migration corridors, for a wide array of wildlife.  Most of the Project site lies within the vital "Priority Habitat Management Areas" (PHMA) BLM designated to protect the imperiled sage-grouse. FEIS Figure 4.5-11, 3-WWPER-446.  The area also contains invaluable and nationally-recognized cultural resources, which along with the wildlife habitat and local springs and streams, will be eliminated by the Project.

The ROD allows LNC to blast and excavate an open mine pit, as well as construct two large waste rock storage facilities, an even larger processed tailings waste dump facility, a sulfuric acid processing plant, numerous roads, transmission lines, and additional facilities to support mining and lithium processing operations. ROD, 3-WWPER-332-3455.  LNC will also pump groundwater out of the pit area for decades, which will dewater regional streams and springs. FEIS at 4-6-10, 3-

6

WWPER-416-420.  The Mine will last 41 years, although many environmental impacts will be permanent. FEIS at 2-4, 3-WWPER-411.

The Project area covers 17,933 acres of public land administered by the BLM's Winnemucca District: 10,468 acres associated with the mine itself and 7,465 acres with the exploration drilling. ROD at 3, 3-WWPER-335.  Although the Project is spread across these acres, and would have significant effects across the region, the direct disturbance "footprint" occupied by the open pit and Mine facilities would be 5,695 acres. Id.

The mine pit would be 400 feet deep and cover 1,099 acres. FEIS Fig. 2-3, 3-WWPER-443; FEIS Table 2.1, 3-WWPER-410.  At least 230 Million Cubic Yards (MCY) of ore would be mined. FEIS at 2-4, 3-WWPER-411.  LNC would "Construct[] two Waste Rock Storage Facilities (WRSFs) to accommodate permanent storage of approximately 45.9 MCY of excavated mine waste rock material." Plan of Operations (PoO) at ii, 3-WWPER-447.  The west waste rock dump would be 482 feet high. FEIS at 2-5, 3-WWPER-412.  The east dump would be 208 feet high. Id.  Together, they would cover 190 acres. FEIS Table 2.1, 3-WWPER-410.

The ore with mineral value would be sent to an on-site processing plant, utilizing molten sulfuric acid to chemically extract the lithium.  To dispose of the processed waste from that plant, LNC would "Construct[] and operate[] a Clay

Tailings Filter Stack (CTFS) to permanently store [waste materials] generated during lithium processing. LNC will place approximately 353.6 MCY of material on the CTFS." PoO at ii, 3-WWPER-447. The CTFS would be 350 feet high, FEIS at 2-9 to 2-10, 3-WWPER-413-414, and cover 1,166 acres. FEIS Table 2.1, 3-WWPER-410.

The Mine will have permanent and serious impacts to wildlife and the environment. As the Nevada Department of Wildlife (NDOW) stated after reviewing the FEIS, the Project "will likely result in adverse impacts to wildlife, ground and surface waters, and riparian vegetation within and outside the project area. These impacts include effects to an array of species and will likely have permanent ramifications on the area's wildlife and habitat resources." NDOW FEIS comments, 3-WWPER-356.

The Project will permanently destroy BLM-designated PHMA for the greater sage-grouse, a ground-nesting bird famous for its mating dance performed on breeding grounds called leks. The sage-grouse depends upon sagebrush for all of its lifecycle and birds return to the same leks to breed year after year. Braun Decl. ¶¶ 16-17, 2-WWPER-244. It is imperiled by destruction and degradation of its sagebrush habitat by industrial development, including mining, and other activities. BLM's Approved Resource Management Plan Amendment (ARMPA) at 1-8, 1-9, 4-WWPER-735-736. In 2015, to stave off the need to list this bird under the federal

Endangered Species Act, BLM amended land use plans across 67 million acres of sage-grouse habitat to adopt conservation measures for the species and its habitat, including BLM's Winnemucca RMP that governs the lands here. ARMPA at 1-6, 1-8, 4-WWPER-733, 4-WWPER-735.

Sage-grouse use the Project area, which is adjacent to at least four leks and which BLM designated mostly as priority, "best of the best," sage-grouse habitat. Habitat Quantification Report, 4-WWPER-714. The Project will destroy this habitat. Impacts from Project-related noise alone may cause population-level impacts to sage-grouse by causing them to abandon the critical Montana-10 lek, which is located less than a mile from the Project area. FEIS at R-184 (comment #P830), 3-WWPER-493. The Project could also cause "permanent negative impacts to sage-grouse late brood rearing habitat." NDOW Preliminary Draft EIS (PDEIS) comments, 4-WWPER-684.

Nevertheless, BLM refused to require LNC to adhere to the vital sage-grouse protections in the RMP, based upon an assumption that LNC had valid rights under the Mining Law that eliminated the agency's discretion over the Project – the same assumption this Court held in Rosemont violated over a hundred years of precedent.

BLM also approved the Project with no plan in place to mitigate for these impacts, let alone to meet the "net conservation gain" standard for compensatory mitigation required by the RMP. The FEIS briefly discusses two potential

mitigation options, but neither contains anything to offset impacts to sage-grouse from permanent Mine-caused dewatering that will degrade or eliminate vital sage-grouse brood-rearing riparian habitats north of the Project area or lek abandonment from noise. NDOW PDEIS comments, 4-WWPER-684; NDOW FEIS comments, 3-WWPER-358.

The Project will destroy habitats for other wildlife, as well. While BLM acknowledges impacts will occur, the FEIS does not provide adequate information to evaluate their extent and magnitude. For instance, it fails to consider the effects of severing two pronghorn movement corridors and destroying 4,960 acres of pronghorn winter range in the Project area.

The Project will also cause serious groundwater pollution. The FEIS predicts that the mine pit backfill (waste dumped into the mine pit below the water table) will cause the groundwater to exceed the applicable Nevada water quality standard for antimony, a harmful pollutant. "Geochemical modeling results indicate" that the water released into the groundwater "will exceed MCLs [Maximum Contaminant Levels]." FEIS at R-121, 3-WWPWE-478.

According to the U.S. Environmental Protection Agency (EPA), "[a] plume of groundwater exceeding the Nevada Division of Environmental Protection Profile I Reference Values for antimony is expected to flow uncontrolled from the backfilled pit." EPA FEIS comments, 3-WWPER-484. As the Nevada Division of

10

Environmental Protection (NDEP) determined: "Based on the most recent predictive groundwater modeling results, elevated antimony concentrations will occur outside the proposed final pit shell." NDEP letter ¶50, 3-WWPER-505.  Yet, BLM never required LNC to prevent the migration of pollution from the pit backfill into the groundwater.

To address air pollution from the Project, especially from the harmful sulfur dioxide ($SO_2$) that will be produced by the sulfuric-acid processing plant, BLM presumed LNC would apply a tail-gas "scrubbing" process to plant emissions. FEIS Appx. K, 3-WWPER-459.  BLM admitted, however, that the "scrubbing system has not yet been determined," and was a "black box" which neither BLM nor the public has seen, and which BLM admitted it did not have the technical knowledge to evaluate. FEIS Appx. K, 3-WWPER-459-460; Ken Loda (BLM) email, 4-WWPER-703.

Due to the Project's massive scale, BLM acknowledged that the Project will violate the RMP's Visual Resource Management (VRM) protection standards: "Overall, the construction and operation of [the approved Alternative] would not meet the current VRM Class II objectives, and would not conform with the existing ROD/RMP (see Section 1.5.3)." FEIS at 4-101, 3-WWPER-439.  Yet BLM still approved the Project.

11

## SUMMARY OF ARGUMENT

BLM assumed when it approved the Project that LNC had "valid" statutory rights to use and occupy all the public lands at the site under the 1872 Mining Law, and therefore BLM had no discretion over the Project. As a result, BLM refused to apply the environmental protections adopted to protect the sage-grouse and its priority habitat in the governing Winnemucca RMP.

But BLM never determined whether LNC held valid mining claims conferring rights under the Mining Law – assuming that they existed without any inquiry into the facts. To hold valid rights under the Mining Law to use and occupy public lands (especially for the massive waste and tailings dumps), a claimant must make a "discovery of a valuable mineral deposit" on each claim.

As this Circuit held in its Rosemont decision, an agency cannot simply assume a mining claimant holds valid rights, since without valid rights to use and occupy public lands, the Project could not legally be approved as proposed. Center for Biological Diversity, 33 F.4th at 1202. "[D]iscovery of valuable minerals is essential to the right to any occupancy—temporary or permanent—beyond the occupancy necessary for exploration. As soon as exploration on a claim is finished, the right to continue to occupy that claim is contingent on the discovery of valuable minerals, whether or not the occupation will be permanent." Id. at 1220.

The district court properly applied Rosemont, holding that BLM violated

12

FLPMA by approving the Project's use and permanent occupation of 1,300 acres for waste dumps when it illegally assumed that LNC had statutory rights under the Mining Law to use and occupy these lands. 1-WWPER-17. Yet, the district court did not specifically decide whether BLM violated FLPMA by failing to apply the sage-grouse RMP provisions based on LNC's purported "valid rights." 1-WWPER-62.

This was a critical error. BLM could not lawfully suspend the requirement to comply with its RMP, particularly where BLM failed to determine that LNC held "valid rights" on its claims under the Mining Law. Relying on the unsupported assumption that LNC held valid rights, BLM waived sage-grouse protections, fundamentally altering the legal framework for the decision.

The district court declined to vacate the ROD because it believed BLM could later "fix the error—it could find on remand that Lithium Nevada possesses valid rights to the waste dump and mine tailings land it intends to use for the Project." 1-WWPER-61. This misunderstands claim validity review under the Mining Law as interpreted by controlling precedent, which is an exacting and fact-intensive inquiry. It also fails to recognize the far-reaching nature of the error, which allows BLM to ignore the environmental protections from its RMP – protections that will mean little if BLM finds the claims invalid but only after the lands are bulldozed, stripped of vegetation, and buried by mine waste.

BLM also approved the Project even though it would violate the RMP's VRM standards. Although WWP argued this violated FLPMA, the district court rejected that claim without analysis. 1-WWPER-63.

By failing to require compliance with the binding standards of its RMP, BLM also violated its duty under FLPMA to "prevent unnecessary or undue degradation" to public lands. It further violated that duty by approving the Project without mitigation plans to prevent the predicted violation of water quality standards and significant impacts to sage-grouse.

For instance, BLM approved the excavation of the mine pit, and waste dumping into the pit, below the groundwater table, even though the record showed that would cause harmful antimony to leach into the groundwater, in violation of state water quality standards. FEIS at 4-14, 3-WWPER-421; *see also* EPA FEIS comments, 3-WWPER-372. Instead of preventing this contamination, BLM's ROD contains a general condition requiring LNC to eventually meet water standards and monitor the pollution plume, ROD at 11, 3-WWPER-341, but no actual plan to prevent the pollution.

In its admittedly "fast-tracked" review of the Project, BLM failed to take the required "hard look" under NEPA at the Project's extensive impacts to wildlife and water and air quality. Its analysis of the Project's cumulative impacts was little more than a list of disturbance acreages of other projects in the area, and completely

overlooked nearby lithium mineral operations.

BLM assumed any adverse impacts would be mitigated, even though the FEIS omitted essential details to determine whether proposed mitigation would be effective, and BLM approved the Project with no actual mitigation plans in place for water and wildlife. It relied on a vague, general, and misleading analysis of effects to wildlife based on an incomplete discussion of baseline conditions. Throughout the process, BLM gave short shrift to comments from NDOW and EPA, who criticized the FEIS's rushed review and failure to accurately analyze the Project's unmitigated environmental impacts.

## **STANDARD OF REVIEW**

The Circuit court "review[s] *de novo* a district court's denial of summary judgment." Karuk Tribe of California v. U.S. Forest Service, 681 F.3d 1006, 1017 (9th Cir. 2012); Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).

Pursuant to the APA, a federal court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] … (D) without observance of procedures required by law." 5 U.S.C. §706(2). *See* Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998).

On *de novo* review, this Court will "engage in a substantial inquiry," and conduct a "thorough, probing, in-depth review." Oregon Natural Resources Council

15

Fund v. Brong, 492 F.3d 1120, 1125 (9th Cir. 2007). The agency's decisions must be "fully informed and well-considered." Save the Yaak Committee v. Block, 840 F.2d 714, 717 (9th Cir.1988). The court "need not forgive a 'clear error of judgment.'" Blue Mountains, 161 F.3d at 1208. "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of the problem, if the agency offers an explanation that is contrary to the evidence, … or if the agency's decision is contrary to the governing law." Lands Council, 395 F.3d at 1026.

Moreover, as the district court held in Rosemont, under the APA, BLM must, based on the record, support its assumption that LNC has "existing valid rights" on its mining claims, since "[a]ny decision made without first establishing a factual basis upon which the [agency] could form an opinion on surface rights would entirely ignore an important aspect of this problem." Center for Biological Diversity v. FWS, 409 F.Supp.3d 738, 758 (D. Ariz. 2019), citing Motor Vehicles Manufacturers' Ass'n of U.S. v. State Farm Mutual Auto Insurance Co., 463 U.S. 29, 43 (1983)(agency cannot "fail[] to consider an important aspect of the problem, [or] offer[] an explanation for its decision that runs counter to the evidence before the agency.").

## ARGUMENT

## I.  BLM Failed to Comply with the Controlling RMP Under FLPMA.

Under FLPMA, BLM cannot authorize an action that violates its RMP.

FLPMA mandates that BLM "protect the quality of scientific, scenic, historical,

ecological, environmental, air and atmospheric, water resource, and archeological

values" of the public's land. 43 U.S.C. §1701(a)(8).  FLPMA requires that BLM

"shall manage the public lands under principles of multiple use and sustained yield,

in accordance with the land use plans." Id. §1732(a); *see also* 43 C.F.R. §1610.5-

3(a)(actions "shall conform" with the plan); §1601.0-5(b)("actions…shall be clearly

consistent with the terms, conditions, and decisions of the approved plan or plan

amendment."); §1601.0-5(c)(BLM decisions "will adhere to the terms, conditions,

and decisions of officially approved and adopted resource related plans."); Brong,

492 F.3d at 1128 (BLM-approved project components "are inconsistent with the

Plan and, consequently, violate FLPMA.").

Mining operations are not exempt from FLPMA's requirement to comply

with the RMP simply because they are mining operations.  "[W]hen BLM receives a

proposed plan of operations under the 2001 [and still current] rules, pursuant to

Section 3809.420(a)(3), it assures that the proposed mining use conforms to the

terms, conditions, and decisions of the applicable land use plan, in full compliance

with FLPMA's land use planning and multiple use policies." Mineral Policy Center

v. Norton, 292 F.Supp.2d 30, 49 (D.D.C. 2003).

Under FLPMA, BLM has full discretion over the Project unless its discretion, and duty to comply with the RMP, would "impair rights of any locators or claims under that Act [the Mining Law]." 43 U.S.C. §1732(b). Thus, as a fundamental prerequisite for the assertion of such rights (and any limits on BLM's discretion), the claimant must show, based on the record, that the claims are valid under the Mining Law. As this Circuit held in Rosemont, BLM cannot simply assume that LNC has "rights" – and thus that BLM has no discretion over the Project or duty to comply with the RMP – when the agency refused to inquire into whether the claims were valid, let alone verify claim validity.

But that is exactly what BLM did here. In approving the Project, BLM determined that the RMP's standards to protect sage-grouse did not apply because it assumed LNC held valid rights under the Mining Law to occupy the entire Project area, even lands it intended to permanently bury under waste rock and tailings. That assumption was unsupported and BLM's decision to approve a Project that violated its RMP was arbitrary and capricious and violated FLPMA.

## A. BLM Wrongly Assumed LNC Held Valid Existing Rights and Thus the Project Was Exempt from Complying with the RMP.

When it refused to apply the sage-grouse standards, BLM wrongly assumed—without verifying—that LNC held valid rights to occupy the entire Project area. As this Circuit held in Rosemont, a mining company has no "rights" to use and occupy

18

public lands (except for the initial exploration) without the discovery of a "valuable mineral deposit" on each claim. 33 F.4th at 1220. By failing to inquire into whether LNC had made such a discovery on each of its mining claims, BLM simply assumed "valid rights" into existence, with no support in the record.

Section 22 of the Mining Law grants two separate rights: the right to explore public lands to find valuable minerals and the right to occupy lands on which valuable minerals are found. "All **valuable mineral deposits** in lands belonging to the United States … shall be free and open to exploration and purchase, **and the lands in which they are found to occupation** and purchase." 30 U.S.C. §22 (emphasis added). To qualify as a valuable mineral deposit, "it must be shown that the mineral can be extracted, removed and marketed at a profit." U.S. v. Coleman, 390 U.S. 599, 602 (1968).

As this Circuit held in Rosemont, "[i]n the absence of a discovery of a valuable mineral deposit, Section 22 [of the Mining Law] gives a miner no right to occupy the claim beyond the temporary occupancy necessary for exploration." Center for Biological Diversity, 33 F.4th at 1209. That case dealt with the Forest Service's approval of the "Rosemont" mine, a large open pit copper mine. Ruling on the extent of "rights" under the Mining Law, the Circuit held:

> [T]he right of "occupation" depends on valuable minerals having been "found" on the land in question. *See* 30 U.S.C. §§ 23, 26. If no valuable minerals have been found on the land, Section 22 gives no right of occupation beyond the temporary occupation inherent in exploration.

19

Id. at 1219.

The Court also held that the agency's failure to inquire into whether the mining claims were valid under the Mining Law – what BLM did here – was essentially the same as erroneously assuming the claimant had a right to use and occupy its claims, and that such an assumption illegally created statutory rights where none exist:

> In the FEIS, the Service either assumed that Rosemont's mining claims on that land were valid or (**what amounted to the same thing**) did not inquire into the validity of the claims. Based on its assumption that the mining claims were valid, the Service concluded that Rosemont's permanent occupation of the claims with its waste rock was permitted under the Mining Law.

Id. at 1212 (emphasis added). This Circuit rejected the argument that the agency could simply assume the claims were valid and authorize occupation without verifying that they contained the requisite discovery of a valuable mineral deposit. "The Government's argument is not only foreclosed by the text of Section 22. It is also foreclosed by a century of precedent." Id. at 1219.

As the district court held in Rosemont, under the APA, BLM must support its assumption that LNC has "existing valid rights" on its mining claims based on the record: "Any decision made without first establishing a factual basis upon which the [agency] could form an opinion on surface rights would entirely ignore an important aspect of this problem." Center for Biological Diversity, 409 F.Supp.3d at 758.

Yet, at Thacker Pass, just as the Forest Service did in the Rosemont case,

BLM "accepted, without question, that those unpatented mining claims were valid," a "crucial error" that "tainted the [agency's] evaluation of the [Project] from the start." Id. at 747. BLM's decision to exempt the Project from the sage-grouse RMP standards and requirements, as well as its overall review of the Project, was based on its illegal and unsupported assumption that BLM's discretion over the Project was severely limited, indeed non-existent, because LNC held statutory rights to use and occupy all of public lands at the site.

The district court here agreed with WWP that BLM's position was contrary to the Mining Law and the Rosemont decision. BLM and LNC had argued that that the Rosemont decision does not apply to BLM's review and approval of a mining project because that mine was on U.S. Forest Service land and was approved under that agency's governing laws and regulations, not under BLM's.

After reviewing the applicable BLM and Forest Service laws and regulations, including FLPMA and the Mining Law, the court correctly held that Rosemont directly applies to this case: "[T]he Court finds that under *Rosemont*, BLM was required to make a validity determination as to the waste dump and mine tailings land before issuing the ROD, regardless of BLM's regulations and handbook." 1-WWPER-26.

The court thus concluded "that BLM's approval of the Project violated FLPMA as it relates to the approximately 1300 acres of land Lithium Nevada

21

intends to bury under waste rock because BLM did not first make a mining rights validity determination as to those land[s]." 1-WWPER-17.  Until BLM determines that LNC holds valid rights under the strict test for the "discovery of a valuable mineral deposit" on the mining claims, the company has no rights to occupy these lands under the Mining Law. 1-WWPER-24.

Despite determining that BLM unlawfully approved the Project due to its illegal assumption that LNC held "rights" under the Mining Law, however, the district court did not rule on WWP's claim that BLM's refusal to apply the binding requirements of its RMP based on the non-existent rights, also violated FLPMA. 1-WWPER-30, 1-WWPER-62.  Under <u>Rosemont</u>, though, based on BLM's unsupported assumption of LNC's purported "rights" to those lands, BLM's determination that requirements of the RMP do not apply cannot withstand judicial review.

## B.    BLM Did Not Apply the RMP Standards, in Violation of FLPMA.

1.    <u>The RMP Established Binding Standards to Protect Sage-grouse.</u>

In 2015, after the U.S. Fish and Wildlife Service (FWS) found that the greater sage-grouse warranted listing under the ESA due to inadequate regulatory mechanisms in federal land use plans, BLM and the Forest Service amended their land-use plans in sage-grouse range to adopt sage-grouse protection measures. *See* <u>W. Watersheds Project v. Schneider</u>, 417 F.Supp.3d 1319, 1325-28 (D. Idaho

2019)(summarizing RMPs); <u>Western Exploration v. U.S. Dept. of the Interior</u>, 250 F.Supp.3d 718, 737 (D. Nev. 2017)(upholding RMPs). Relying on the strict protections in the Approved Resource Management Plan Amendments (ARMPAs), the FWS determined that the sage-grouse was not warranted for listing under the ESA. 80 Fed.Reg. 59857 (Oct. 2, 2015).

Because sage-grouse are a landscape species that need intact expanses of sagebrush habitat to thrive, the RMP/ARMPA amendments focused on identifying and protecting key sage-grouse habitats. To this end, the FWS identified and mapped sage-grouse "Priority Areas for Conservation" (PACs), maintaining the integrity of which is "the essential foundation for sage-grouse conservation." COT Report at 36, 4-WWPER-834.

The Winnemucca RMP was amended by the 2015 Nevada and Northeastern California Greater Sage-Grouse ARMPA. 4-WWPER-733. In the ARMPA, BLM identified "Priority Habitat Management Areas" (PHMAs), and "General Habitat Management Areas" (GHMAs). Table 1-4, 4-WWPER-734-735. PHMAs are BLM-administered lands "identified as having the highest habitat value for maintaining sustainable GRSG populations" which largely coincide with the FWS PACs. ARMPA at 1-4, 4-WWPER-731. The ARMPA established specific management direction and sage-grouse protections for sage-grouse habitats, including PHMAs and GHMAs.

23

The Project area lies within the Lone Willow Population Management Unit (PMU) designated by the Nevada Department of Wildlife (NDOW). FEIS at 4-43, 3-WWPER-427.  Virtually the entire Lone Willow PMU, including all or nearly all of the Project area, is within the Western Great Basin PAC.  The 2015 ARMPA designated most of the Project area as PHMA and the rest as GHMA.[1] FEIS Figure 4.5-11, 3-WWPER-446.

Recognizing the importance of preserving expanses of interconnected sagebrush habitats to sage-grouse conservation, the ARMPA requires that: "In PHMAs and GHMAs, apply the concept of 'avoid, minimize, and compensatory mitigation' for all human disturbance in areas not already excluded or closed, so as to avoid adverse effects on GRSG and its habitat." Objective SSS-4, 4-WWPER-749.

To give effect to these mandates, the ARMPA caps disturbance in PHMA at 3% at both the PMU and project scale:

> If the 3 percent human disturbance cap is exceeded on all lands (regardless of ownership) within a proposed project analysis area in a PHMA, then no further anthropogenic disturbance will be permitted by BLM until disturbance in the proposed project analysis area has been reduced to maintain the area under the cap (subject to applicable laws and regulations, such as the 1872 Mining Law, as amended, valid existing rights….).

MD-SSS-2A(2), 4-WWPER-750.  BLM must also impose "Required Design

---

[1] Although the Trump Administration in 2019 revised the 2015 ARMPA, those changes were enjoined by <u>Schneider</u>.  Thus, the 2015 ARMPA governs this case.

Features" (RDFs) and other conservation measures on each approved project as a further means to protect sage-grouse. ARMPA Appx. C, 4-WWPER-822-829.

The ARMPA also restricts disturbance within buffers around sage-grouse mating ground leks. MD-SSS-2D, 4-WWPER-751. Like the other standards, the lek buffers apply "consistent with valid and existing rights and applicable law in authorizing third-party actions." Id. BLM also must restrict discretionary surface-disturbing activities that disturb sage-grouse during the March 1 through June 30 breeding season, including by applying strict noise limits. MD-SSS-2E, 4-WWPER-751-752; MD-SSS-2F, 4-WWPER-752.

Overall, BLM must "ensure that a net conservation gain of GRSG habitat is achieved in mitigating human disturbances in PHMAs and GHMAs (see Appendix F) on all agency-authorized activities." MD-SSS-9a, 4-WWPER-754. BLM must "ensure mitigation that provides a net conservation gain to the species," such as by using the Nevada Conservation Credit System (CCS). MD-SSS-2B, 4-WWPER-751.

2. <u>BLM Violated the RMP Based on an Unsupported Belief that LNC Has "Valid Rights" to Use and Occupy Its Mining Claims.</u>

*a. BLM Exempted the Project from the ARMPA/RMP Standards.*

Nothing in the ARMPA standards says that they categorically do not apply to mining projects. The only arguable restrictions in the ARMPA standards' plain language are that they apply "consistent with" and "subject to" "valid existing rights"

and "applicable laws and regulations, such as the 1872 Mining Law," or else apply only to "discretionary" actions. Thus, in this case, a central question is whether LNC has "valid existing rights" under the Mining Law that might place limits on BLM's discretion. In declining to apply the ARMPA standards, BLM just assumed those rights existed and that therefore, key provisions did not apply.

First, BLM jettisoned the 3% disturbance cap requirement, even though disturbance in the Project area already surpasses the 3% threshold beyond which no further disturbance may be authorized. The Project will increase disturbance from 4.4 percent to 12 percent in the Project area. FEIS at N-17, 3-WWPER-476. In fact, the Project would completely span the southeastern portion of the sage-grouse PMU, severing the southernmost portion of the PMU from the rest of the PMU. FEIS Figure 4.5-1, 3-WWPER-444.

BLM acknowledged that it never met the criteria for invoking an exception to the 3% disturbance cap: "BLM did not convene the 'technical team,' described in the 2015 NV/CA ARMPA, Appendix E, to conduct the biological analysis regarding a net conservation gain to the greater sage-grouse prior to the issuance of the ROD for this Project." BLM Answer ¶79, 2-WWPER-260. Instead, BLM determined that "any exceedances of the cap (at both the BSU and project levels scales) do not preclude a locatable mineral resources project with existing valid rights from BLM

26

approval." FEIS at 4-45, 3-WWPER-429.[2] *See also* FEIS at N-5, 3-WWPER-465 (waiving 3% cap due to "applicable laws and regulations such as the 1872 Mining Law, as amended, and valid existing rights").

Second, BLM did not apply the ARMPA's Required Design Features (RDFs), or other requirements to minimize disturbance to sage grouse, such as the "lek buffer" distances, and seasonal restrictions on surface-disturbing activities and uses to prevent disturbances to sage-grouse during seasonal life-cycle periods. 4-WWPER-822-829(RDFs, Appx. C); MD-SSS- 2D, 4-WWPER-751 (lek buffers); MD-SSS-2E, 4-WWPER-751-752 (seasonal restrictions).

For instance, it did not apply the ARMPA's strict noise limits which require BLM to limit noise from activities to a maximum of 10 decibels above ambient sound levels at least 0.25 miles from active and pending leks. MD-SSS-2F, 4-WWPER-752. BLM believed these requirements were "voluntary" for locatable minerals projects, even though Project noise was predicted to surpass allowable thresholds where NDOW projected potential population-level effects from changes in lek attendance. FEIS at R-184-185 (Response to NDOW comments), 3-WWPER-493-494.

BLM also did not apply the RDFs specifically designed for locatable mineral

---

[2] A "locatable mineral project," is a project proposing to extract minerals, such as lithium, where one can stake, or "locate," a mining claim under the 1872 Mining Law.

projects. *See* Table N.4, 3-WWPER-475.  BLM could have, but did not, require LNC to: (1) "Install noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season.  Apply GRSG seasonal timing restrictions when noise restrictions cannot be met. (LOC 1);" and (2) "Address post reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs. (LOC 5)." Id.

BLM bypassed these requirements because it believed that "[p]roposed locatable minerals resource projects are not subject to lek buffer distances identified in Appendix B of the GRSG Amendment," FEIS at N-6, 3-WWPER-466, and that "[p]roposed locatable minerals resource projects are not subject to the application of seasonal restrictions identified in the 2015 GRSG Amendment." FEIS at N-8, N-9, 3-WWPER-468-469.  For whether the locatable minerals RDFs applied, BLM simply checked "no," without explanation. FEIS at N-15, 3-WWPER-475.

BLM violated FLPMA by authorizing the Project without requiring compliance with the ARMPA standards, which apply "consistent with applicable law," MD-SSS-2C, 4-WWPER-751, or else to all "discretionary surface-disturbing activities." MD-SSS-2E, 4-WWPER-751-752.  Applying these standards is not only fully consistent with applicable law, it is required.

BLM's discretion post-exploration is only arguably limited if it would

28

"impair the rights of the locator" of valid claims under the Mining Law. 43 U.S.C. §1732(b). Under Rosemont, BLM could not lawfully avoid applying the standards without verifying whether LNC's claims are valid—an inquiry it never undertook.

b.      *BLM Did Not Mitigate Impacts to Sage-grouse to the "Net Conservation Gain" Standard.*

The ARMPA also requires that impacts to sage-grouse from "all agency activities" be mitigated to achieve a "net conservation gain" for the sage-grouse. MD-SSS-9a, 4-WWPER-754; MD-SSS-2B, 4-WWPER-751. "[I]f actions by third parties result in habitat loss and degradation, even after applying avoidance and minimization measures, then compensatory mitigation projects will be used to provide a net conservation gain to the sage-grouse." Western Exploration, 250 F.Supp.3d at 747. The RMP's "goals to enhance, conserve, and restore sage-grouse habitat and to increase the abundance and distribution of the species, … is best met by the net conservation gain strategy because it permits disturbances so long as habitat loss is both mitigated and counteracted through restorative projects." Id.

BLM approved the Project with no mitigation plan in place to meet the ARMPA standard. Instead, the FEIS generally outlines two potential mitigation options in Appendix N, and the ROD commits LNC to only consider mitigation measures sometime in the future, long after the public NEPA review process ended in 2020: "LNC will continue to consult with the BLM and the Nevada Department

of Conservation and Natural Resources (DCNR) Sagebrush Ecosystem Technical Team (SETT) on a mitigation plan based on the Habitat Quantification Tool [HQT] analysis.  The mitigation plan will be developed by the SETT consistent with the Nevada Conservation Credit System [CCS] or other applicable state requirements." ROD at 11, 3-WWPER-341.  The ROD thus does not approve an actual mitigation plan that will result in the required "net conservation gain." MD-SSS-9a, 4-WWPER-754; MD-SSS-2B, 4-WWPER-751.

In addition, the two mitigation options mentioned in the FEIS will not achieve a "net conservation gain" because neither addresses the long-term impacts to water-based riparian habitat (resulting from the groundwater dewatering) or loss of leks from noise.  The first option involves the purchase of only temporary conservation credits, which are "not intended to offset effects to other resources, such as impacts to riparian and water resources…." FEIS at N-25, 3-WWPER-483.  BLM admits that LNC's mitigation is only for the "anticipated temporary effects during the life of the Project." FEIS at 4-45, 3-WWPER-429.

Yet as the NDOW wildlife experts determined, the *long-term* "predicted impacts to ground and surface water resources may have the most significant implications for wildlife." NDOW PDEIS comments, 4-WWPER-654.

> [T]here could be major impacts to GRSG from the hydrologic impacts presented in the hydrologic model. Loss or degradation of wet meadows, springs, seeps, and associated habitat could result in significant and long-term impacts to GRSG within and well outside the Project Area.  This is based on

the potential for mining and dewatering to impact ground and surface waters a signficant [sic] distance north of the Project Area.

Id., 4-WWPER-701.  Those impacts could include "permanent negative impacts to

sage-grouse late brood rearing habitat." Id., 4-WWPER-684.

NDOW thus informed BLM that reliance on the purchase of conservation

credits fails to comply with the applicable sage-grouse standards and mitigation

requirements:

> The CCS does not account for effects to GRSG from loss of surface water.
>
> The CCS only mitigates indirect impacts (excluding ground/surface water impacts) within 6km of the project boundary, so any effects outside that 6km boundary would not be captured in the credit calculations.
>
> Finally, the credit calculations are generally based on the length of time the mine is operating. Under the current structure, the credit calculation would not include impacts that extend beyond the 41-year mine life. Given that hydrologic impacts are still present at 300 years, **there are significant and permanent impacts that would not be mitigated under the CCS.**

Id., 4-WWPER-695.

The Program Manager for the Nevada Sagebrush Ecosystem Program (in

charge of the SETT mitigation program that provides conservation credits) reiterated

this point:

> It should be made clear that potentially permanent impacts to riparian resources that are not directly within the project footprint are not accounted for in the CCS analysis, whether they occur within or outside the 6 km project area analyzed by the CCS, and **an assumption that these impacts will be mitigated for using the CCS is incorrect.**  Additional mitigation measures should be taken to account for the potential temporary or permanent loss of riparian resources not only for sage-grouse but for other wildlife as well.

March 20, 2020 Kelly McGowan email, 6-WWPER-656. The Program Manager also reiterated that there was only, at best, short-term potential mitigation of impacts, and none for the essentially permanent impacts from the dewatering, as "the HQT [Habitat Quantification Tool] is only intended to mitigate for term impacts to sage-grouse and sagebrush habitat." 4-WWP-655. Despite these concerns from the wildlife experts, the ROD does not impose compensatory mitigation to address the permanent loss of vital riparian habitats.

Further, the "Greater Sage-grouse Habitat Quantification Report," prepared by LNC and relied upon by BLM, erroneously determined that the "best of the best" Priority/PHMA sage-grouse habitat in the Project area is only "low quality" habitat. 4-WWPER-714-717. The assignment of future conservation credits to LNC is thus premised on that inaccurate determination. 3-WWPER-429.

In addition to the impacts from the Project's dewatering of the aquifers, the Project involves significant noise impacts likely to have population-level effects to sage-grouse, including by reducing lek attendance or causing abandonment of leks altogether near the Project area. As NDOW pointed out, the conservation credit system "does not account for the loss of sage grouse leks." NDOW FEIS comments, 3-WWPER-358.

The second mitigation option, described in three sentences in the FEIS, relies on yet-to-be-determined "habitat enhancement" projects, including, potentially,

"noxious weed treatments, pinon-juniper removal, water developments, sagebrush and forb seeding, and wildfire prevention fuel breaks." FEIS at N-25, 3-WWPER-483. This brief summary, though, does not describe how (or whether) a "net conservation gain" would be achieved.

## II.  BLM Violated the RMP's Visual Resource Protection Requirements

BLM also exempted the Project from the RMP's Visual Resource Management (VRM) protection standards. Unlike the violation of the various RMP/ARMPA standards for sage-grouse, the FEIS does not assert that the VRM standards do not apply to mining operations. Instead, BLM reversed, without explanation, its previous and stated position that the RMP had to be amended in order to approve the Project.

FLPMA mandates the protection of scenic values, requiring that "the public lands be managed in a manner that will protect the quality of the ... scenic ... values...." 43 U.S.C. §1701(a)(8). "[N]atural scenic … values" are one of the resources for which public land should be managed. 43 U.S.C. §1702(c). The RMP implements these mandates by requiring BLM to "[m]anage public land actions and activities to provide protection of the visual values and scenic quality of existing landscapes consistent with the Visual Resource Management (VRM) class objectives." RMP, 4-WWPER-832.

"The objective of Visual Resource Management (VRM) is to manage public lands in a manner which would protect the quality of the scenic (visual) values of these lands." FEIS at 4-98, 3-WWPER-436. Most of the Project site is protected under VRM Class II. "The objective of VRM Class II is to retain the existing character of the landscape, while keeping the level of change to the characteristic landscape low." FEIS at 4-99, 3-WWPER-437.

BLM admits that the Project will violate the RMP's VRM standards. "[T]he construction and operation of the Proposed Alternative would not meet the current VRM Class II objectives, and would not conform with the existing ROD/RMP (see Section 1.5.3)." FEIS at 4-101, 3-WWPER-439. *See also* FEIS at 1-5, 3-WWPER-409.

BLM had informed the public that, because the Project would violate the RMP's VRM standards, BLM would have to remove these standards by amending the RMP. *See* Notice of Intent to prepare EIS, 85 Fed. Reg. 3413, 3414 (Jan. 21, 2020). Key BLM officials recognized that an RMP Amendment would be needed for the Project to comply with FLPMA and the VRM standards: "an RMP Amendment will be necessary to enable Plan conformance for this project, as required under BLM regulations." Nov. 29, 2019 Deputy State Director Raul Morales email, 4-WWPER-705. "VRM is a planning decision subject to the BLM

34

regulations that require approved projects to be in conformance with the applicable RMP." Id.

The Draft EIS that BLM submitted to the other reviewing agencies included a full chapter on the need to amend the RMP to change the VRM standards so that the Project could be approved. Agency Review Draft EIS, 4-WWPER-649-655. Unless the RMP was amended to remove the Class II VRM standards, BLM "would not allow for significant development unless highly restrictive mitigation measures are applied." Table 5.2, 4-WWPER-652.

Yet BLM never amended the RMP, despite admitting that the Project would violate the VRM standards, and never explained its changed approach. In response to the "fast-track" push to get the Project approved, BLM officials stated that: "This is where the project triangle fall [sic] down. The focus is on fast, so quality and cost go out the window." May 18, 2019 Robin Michel (BLM) email, 4-WWPER-646. This was in response to an email from BLM Project Lead Ken Loda the previous day, who stated that amending the RMP "would definitely delay the DEIS further … because it seriously impacts our ability to meet the 3355 deadline without killing ICF's staff (and many of ours) with overtime work." 4-WWPER-646.[3]

Then, without public explanation, BLM abruptly switched positions. "Late

---

[3] The "3355 deadline" refers to the Trump Admin. Interior Secretary's Order of 8-31-17 to "streamline" NEPA reviews. Secretarial Order 3355 (doi.gov)(last viewed March 16, 2023). "ICF" is the contractor, paid by LNC, that prepared the FEIS.

Wednesday there was an unexpected development in the NEPA document and process – we have concluded that an amendment to the RMP is unnecessary." June 12, 2020 Ken Loda email to LNC, 4-WWPER-642. The day before, BLM's Public Affairs Specialist told agency staff to "scrub" references to the Plan Amendment from all documents. 4-WWPER-645.

In response to WWP's extensive comments highlighting how the Project would violate the VRM standards, BLM simply stated: "Thank you for your comment," with no analysis or response. FEIS at R-143-146, 3-WWPER-486-489. An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books" in this way and still meet its obligation to provide a reasoned explanation for its action. F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

## III.   BLM Authorized "Unneccessary or Undue Degradation" in Violation of FLPMA.

Separate from, and in addition to, BLM's discretionary authority over the Project and its duty comply with the RMP standards, as an overarching mandate for BLM's management of public lands, FLPMA requires that BLM "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. §1732(b)(the "UUD" standard). "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law."

36

Center for Biological Diversity v. Dept. of Interior, 623 F.3d 633, 644 (9th Cir. 2010). This duty is "the heart of FLPMA [that] amends and supersedes the Mining Law." Mineral Policy Center, 292 F. Supp. 2d at 42. Even where valid rights exist, BLM cannot approve a mining project that would cause UUD. 43 C.F.R. §3809.411(d)(3)(iii)(BLM mining regulations).

To prevent UUD, BLM must ensure that all operations comply with the Performance Standards found at §3809.420. *See* 43 C.F.R. §3809.5 (definition of UUD, specifying that failing to comply with the Performance Standards constitutes UUD). These Standards require BLM to ensure that all operations comply with its land use plan, as well as all environmental protection standards, including standards for water and air quality. *See* 43 C.F.R. §3809.5 (definition of UUD includes "fail[ure] to comply with one or more of the following: … Federal and state laws related to environmental protection.").

"Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary." 65 Fed.Reg. at 70053 (Preamble to BLM's 43 C.F.R. Part 3809 mining regulations).

## A. Actions That Violate the RMP Constitute UUD.

Although the district court held that BLM violated FLPMA when it erroneously assumed LNC held valid mining claims, it ruled against WWP on its

37

UUD claim. 1-WWPER-31-34. Yet BLM authorized development without mandatory RMP protections on the basis of that unlawful assumption.

BLM's Performance Standards to prevent UUD require that "operations and post-mining land use must comply with the applicable BLM land-use plans." 43 C.F.R. §3809.420(a)(3). The only limitation on this is that compliance with the RMP be "consistent with the mining laws." Id. But as discussed above, under Rosemont, operations on LNC's mining claims are not "consistent with the mining laws" if BLM has not verified that LNC has made the requisite "discovery of a valuable mineral deposit" on each mining claim – the case here.

Moreover, even if LNC *did* hold "valid rights," BLM's duty to prevent UUD would still require the agency to impose mitigation measures to protect the sage-grouse. BLM did not do this, as it assumed that its regulatory authority over the Project was essentially eliminated by LNC's purported rights and any mitigation was strictly voluntary.

To the extent the FEIS' brief discussion of potential mitigation options could be called a plan, NDOW, EPA, and the Nevada Sagebrush Ecosystem Technical Team (the state program that oversees the conservation credit system) all determined that the Project impacts would not be adequately mitigated in light of permanent impacts to sage-grouse populations from noise and changes to water resources, as explained above.

**B.      The Predicted Violation of Groundwater Standards Constitutes UUD.**

To comply with FLPMA's mandate to prevent UUD, BLM must also ensure that activities comply with all environmental protection requirements—including all water quality standards. 43 C.F.R. §3809.420(b)(4)("All operators shall comply with applicable Federal and state water quality standards."). *See also* Winnemucca RMP (same), 4-WWPER-831.

BLM failed to meet these requirements because antimony, a harmful pollutant, will be released into the groundwater in violation of water quality standards, yet BLM approved the Project without a specific mitigation plan to prevent this pollution.  "Geochemical modeling results indicate" that the water released into the groundwater "will exceed MCLs [Maximum Contaminant Levels]." FEIS at R-121, 3-WWPER-484.

NDEP expressed grave concerns about the predicted violation of groundwater standards after the mine pit reaches the water table: "Based on the most recent predictive groundwater modeling results, elevated antimony concentrations will occur outside the proposed final pit shell …. NDEP letter ¶50, 3-WWPER-505. EPA stated, "[w]ithout mitigation, a plume of groundwater exceeding the Nevada Division of Environmental Protection Profile I Reference Values for antimony is expected to flow uncontrolled from the backfilled pit." EPA FEIS comments, 3-WWPER-372.

Just as in the case of sage-grouse, BLM approved the Project without an adequately developed plan to mitigate for these impacts. As EPA found: "While the Final EIS includes three **conceptual** options that have the potential to mitigate antimony groundwater contamination … **the plans are not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated.**" Id. (emphasis added). Indeed, BLM admitted that "options for blending/discharge and active treatment 'have not been evaluated, and therefore may not be feasible for consideration as mitigation for the Final EIS' (Appendix R p. R-180)." Id.

Without this analysis, as EPA pointed out, "conclusions in the Final EIS that groundwater quality management plans would 'effectively mitigate impacts to groundwater quality downgradient from the pit' (p. 4-25) are not adequately supported." Id. "Without detailed information about mitigation and its efficacy, it is unclear how a Record of Decision could state that all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." Id.

## III. **BLM Violated NEPA.**

In the fast-tracked FEIS, BLM failed to take the "hard look" at the Project's environmental impacts that NEPA requires. NEPA "prevent[s] or eliminate[s] damage to the environment and biosphere by focusing government and public attention on the environmental effects of proposed agency action." Marsh v. Oregon

40

Natural Resources Council, 490 U.S. 360, 371 (1989).  NEPA "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).

"NEPA establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." Center for Biological Diversity, 623 F.3d at 642.  The statute has "twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002).

A NEPA review must be supported by detailed data and analysis, N. Plains v. Surface Transportation Board, 668 F.3d 1067, 1075 (9th Cir. 2011), and include a full analysis of a project's direct, indirect, and cumulative impacts and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. 40 C.F.R. §§1508.7, 1508.8, 1508.9, 1508.25(c).[4]  "[G]eneral statements about "possible" effects and "some risk" do not constitute a "hard look" absent a

---

[4] The Council on Environmental Quality revised its national NEPA regulations in 2020 and 2022.  Because BLM began conducting its NEPA review before the new regulations became effective, the CEQ regulations existing prior to September 14, 2020 (issued in 1978), at 40 C.F.R. Part 1500, apply to the project and this Court's review.

41

justification regarding why more definitive information could not be provided."

Blue Mountains, 161 F.3d at 1213.

## A.    BLM Failed to Adequately Analyze Cumulative Impacts.

NEPA requires that BLM fully analyze all direct, indirect, and cumulative environmental impacts of the proposed action. 40 C.F.R. §§1502.16; 1508.8; 1508.25(c).  Cumulative impacts are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions…Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. §1508.7.  "In a cumulative impact analysis, an agency must take a 'hard look' at *all* actions' that may combine with the action under consideration to affect the environment." Great Basin Resource Watch v. BLM, 844 F.3d 1095, 1104 (9th Cir. 2016), citing Te–Moak Tribe of W. Shoshone v. Dept. of Interior, 608 F.3d 592, 603 (9th Cir. 2010)(emphasis original).

The cumulative effects analysis must include "mine-specific or cumulative data." Great Basin Resource Watch, 844 F.3d at 1105, quoting Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973 (9th Cir. 2006).  It must provide a detailed "quantified" analysis of other projects' combined environmental impacts, and "identify and discuss the impacts that will be caused by each successive project,

including how the combination of those various impacts is expected to affect the environment" within the area. <u>Great Basin Resource Watch</u>, 844 F.3d at 1105.

BLM's FEIS does not adequately analyze the cumulative impacts from the other proposed activities within the cumulative effects study areas on wildlife and other potentially affected resources. BLM identifies "Cumulative Effects Study Areas" (CESA) for critical resources that will be affected by the Project, FEIS at 5-1, 3-WWPER-440, and lists some of the other mining, oil/gas, and activities within the CESAs. FEIS at 5-2, 5-3, 3-WWPER-441-442. Yet the FEIS contains little, if any, detailed analysis of these and other past, present, and "Reasonably Foreseeable Future Activities" (RFFAs) within the CESAs that may cumulatively affect these resources. The FEIS largely just lists the acreages of these activities, with a brief narrative of the projects, but contains no detailed impacts analysis.

The Ninth Circuit has repeatedly rejected similarly cursory analyses contained in BLM EISs for mines in Nevada, holding that listing other projects does not satisfy NEPA: "simply listing all relevant actions is not sufficient." <u>Great Basin Resource Watch</u>, 844 F.3d at 1104. Rather, "some quantified or detailed information is required. Without such information, neither the courts nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." <u>Id</u>.

43

The Ninth Circuit specifically rejected BLM's argument that a brief mention of other projects and their acreages satisfied NEPA's cumulative impacts analysis requirements: "A calculation of the total number of acres to be impacted by other projects in the watershed is a necessary component of a cumulative effects analysis, but is not a sufficient description of the actual environmental effects that can be expected." Hankins, 456 F.3d at 973. *See also* Center for Biological Diversity v. U.S. BLM, No. 4:21-cv-182-BLW, 2023 WL387609, **11-12 (D. Idaho Jan. 24, 2023)(rejecting analysis of cumulative effects on sage-grouse on this basis).

The inadequate list of projects/acreages is especially insufficient here because the FEIS does not even mention the ongoing McDermitt lithium drilling project on BLM lands just to the north across the Oregon border. 2-WWER-223-226.

While this "acreage-list-analysis" shortcoming is fatal to BLM's cumulative impacts discussion, the FEIS also improperly truncates its analysis for affected wildlife. For the sage grouse, BLM arbitrarily cuts off its review of cumulative impacts at the nearby Nevada/Oregon border, considering only the "Lone Willow PMU" which ends at the border. FEIS at 5-1, 3-WWPER-440. Yet the Lone Willow PMU is part of the larger sage grouse PAC (Priority Area of Conservation) that extends into Oregon. *See* COT Report at 14 (Figure 2), 4-WWPER-833. BLM's cumulative impacts analysis does not consider other projects in the Western Great

44

Basin PAC (including the McDermitt lithium project) that, along with the Thacker Pass Project, contribute to impacts to the sage-grouse population there.

The same is true for other wildlife where BLM arbitrarily curtails its review of cumulative impacts at the state border, even though wildlife movement and impacts do not recognize such an arbitrary line. For example, the FEIS limits its consideration of cumulative wildlife impacts to "General Wildlife" to just the "NDOW Hunt Unit 031" covering the "Recreation CESA." FEIS at 5-1, Table 5.1, 3-WWPER-440. NDOW wildlife experts criticized this early in the NEPA process: "It is unclear why Hunt Unit 031 is used as the area to reference proportion of habitat loss. Hunt Units are specific to a few game species for the primary purpose of managing hunting and are not related to all species/populations." 4-WWPER-682. There is no analysis to support these arbitrary limits to cumulative impacts, especially for wide-ranging species such as pronghorn.

## B. BLM Failed to Adequately Analyze Mitigation Measures and Their Effectiveness.

NEPA requires that mitigation measures be fully reviewed in the FEIS, not in the future. "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." Robertson, 490 U.S. at 353. An EIS must: (1) "include appropriate mitigation measures not already included in the

proposed action or alternatives," 40 C.F.R. §1502.14(f); and (2) "include discussions

of: . . . Means to mitigate adverse environmental impacts (if not already covered under

1502.14(f))," 40 C.F.R. §1502.16(h). "Mitigation" is a way to avoid, minimize,

rectify, or compensate for the impact of a potentially harmful action. 40 C.F.R.

§§1508.20(a)-(e).

Mitigation measures must be discussed with "sufficient detail to ensure that

environmental consequences have been fairly evaluated." Robertson, 490 U.S. at

352. "An essential component of a reasonably complete mitigation discussion is an

assessment of whether the proposed mitigation measures can be effective." South

Fork Band Council v. Dept. of Interior, 588 F.3d 718, 726 (9th Cir. 2009).

1.    Failure to Analyze Mitigation of Groundwater Pollution

EPA determined that the FEIS contained neither the required analysis of

mitigation measures for water quality impacts nor a credible analysis of the

effectiveness of these measures. For the predicted groundwater pollution, EPA

stated that the FEIS lacked the required analysis because BLM's mitigation plan had

not been developed in adequate detail. EPA FEIS comments, 3-WWPER-372. This

was even though EPA had "recommended that the Final EIS include additional

analysis and information on the full extent of project-related impacts to groundwater

quality, the potential efficacy of proposed mitigation options, and specific details

needed for the mitigation, monitoring, and adaptive management plans." 3-

46

WWPER-370.

EPA also highlighted how BLM failed to respond to serious concerns about the inadequate groundwater analysis and consequently failed to support the FEIS' conclusion that impacts to groundwater quality downgradient from the pit would be mitigated. Id. BLM's hydrogeologist recognized the need for treatment of the predicted pollution coming from the mine pit saying that "proposed mitigation includes active groundwater extraction and treatment." Dan Erbes email, 3-WWPER-508.

Yet the ROD did **not** require such treatment. Instead, BLM just required LNC to "update the groundwater model" every five years and, only if adverse changes had occurred, "adopt mitigation strategies." ROD at 11, 3-WWPER-341. *See also* FEIS at 4-24, 3-WWPER-422 (LNC has the "option" of proposing groundwater extraction and treatment).

This "pollute first, review later" approach violates NEPA: "Putting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." Great Basin Resource Watch, 844 F.3d at 1107.

BLM, and the district court, relied heavily on BLM's assumption that LNC will obtain state permits to ensure they comply with groundwater standards in the

47

future. That is not a substitute for conducting the analysis. "One agency cannot rely on another's examination of environmental effects under NEPA. The agency must independently assess the consequences of a project." The Steamboaters v. FERC, 759 F.2d 1382, 1393-94 (9th Cir. 1985)(internal quotations and citations omitted). See also Calvert Cliffs Coordinating Comm. v. U.S. Atomic Energy Comm., 449 F.2d 1109, 1123-24 (D.C. Cir. 1971)(commitment to meeting environmental standards does not satisfy NEPA duties to independently analyze project impacts).

Moreover, LNC's monitoring plan to detect the pollution was submitted only after the FEIS was done. "This revised monitoring plan includes a new potential future mitigation option for groundwater quality impacts that was not discussed in the Draft or Final EIS." EPA FEIS comments, 3-WWPER-372. Plaintiffs had specifically requested that BLM provide these plans during the NEPA process for public review. See FEIS at R-122, 3-WWPER-485 (BLM needed to "Present a model for an alternative closure option for the backfilled pits that prevents the release of pollutants in a groundwater plume, such as a period of active pumping and treating of pore water until the discharge from the waste-rock backfill is below the groundwater MCLs.").

BLM never presented a plan for public review and the public never had an opportunity to review and comment upon the new monitoring plan, let alone the future groundwater treatment and mitigation plan. "Such late analysis, 'conducted

without any input from the public,' impedes NEPA's goal of giving the public a role

to play in the decisionmaking process and so 'cannot cure deficiencies' in a [NEPA

document]." <u>Oregon Natural Desert Ass'n v. Rose</u>, 921 F.3d 1185, 1192 (9th Cir.

2019) *quoting* <u>Great Basin Resource Watch</u>, 844 F.3d at 1104.

2. <u>Failure to Analyze Mitigation of Wildlife Impacts.</u>

Likewise, for wildlife, both EPA and NDOW raised serious concerns about

the lack of actual plans for mitigation and monitoring.  EPA found that "[t]he Final

EIS did not include a mitigation, monitoring, and adaptive management plan for

wildlife mitigation measures SSS-1 to SSS-9 (p. 4-62 to 4-65).  Although the

updated Plan of Operations included a monitoring plan in Appendix H, this did not

include information on these measures." EPA FEIS comments, 3-WWPER-373.

NDOW did not mince words in decrying BLM's failure to disclose plans for

monitoring and mitigating impacts to sage-grouse:

> The lack of disclosure on how BLM and LNC will be implementing
> monitoring, mitigation, and adaptive management leaves out the tremendous
> importance and efforts toward collectively conserving greater sage-grouse and
> is contrary to the on-going efforts of the BLM to manage for this species.  The
> Department cannot stress enough how important it is to provide this
> information to the public and implement appropriate measures to protect sage-
> grouse.

NDOW FEIS comments, 3-WWPER-358.  NDOW had also raised this issue in

comments on the Draft EIS. FEIS R-182-187, 3-WWPER-491-496.

Even though the expert state and federal agencies determined that the FEIS

did not contain enough information for the public to evaluate the effectiveness of mitigation measures, BLM still did not address these issues. Where an agency gives "short shrift" to serious considered comments by expert agencies in this way, it "renders the procedural requirement meaningless and the EIS an exercise in "form over substance." W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 493 (9th Cir. 2011).

3.    BLM Based Its Plan to Mitigate Air Pollution on an "Undetermined" and "Black Box" Technology That BLM and the Public Never Saw.

Regarding the extensive mitigation needed to drastically reduce the air pollution emissions from the sulfuric acid processing plant, BLM asserts that the Project will comply with all applicable air quality standards, but the FEIS lacks critical information to support its claim. NEPA requires that an EIS show how alternatives and decisions "will or will not achieve the requirements of . . . other environmental laws and policies." 40 C.F.R. §1502.2(d). BLM mining regulations require that "[a]ll operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act." 43 C.F.R. §3809.420(b)(4).

In their comments to BLM, Plaintiffs highlighted serious air quality concerns, describing how the sulfur dioxide ($SO_2$) emissions and mitigation analysis is inadequate. 4-WWPER-604-605, 3-WWPER-380-382. BLM claims that the sulfuric acid processing plant would meet all air quality standards and only emit roughly 76 tons per year of $SO_2$ out of the 337,895 tons of sulfur to be produced.

Table 4.10, 3-WWPER-435, FEIS Air Emissions Inventory, 3-WWPER-461.

The FEIS assumes these massive emissions reductions will be achieved based upon "state-of-the-art scrubbing control" technology. FEIS Appx. K, 3-WWPER-459. Yet, BLM admits that "**the exact scrubbing system has not yet been determined.**" 3-WWPER-459-460 (emphasis added). There is no evidence to support these bold predictions, based on an "undetermined," and yet-to-be-seen, system.

BLM knew that it did not have enough information on the processing plant. "[T]he process plant is pretty much a black box." Dec. 6, 2019 Ken Loda email, 4-WWPER-703. BLM further admitted that it did not have the technical expertise to adequately analyze LNC's predicted emissions reductions using the "tail-gas scrubber." "[T]o my knowledge the BLM does not employ anyone with that kind of background, which would likely be a chemical or metallurgical engineer." Id.

BLM cannot rely on such incomplete information and NEPA requires BLM to obtain information about how and whether the scrubbing technology will work. "If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 CFR §1502.22(a). "If there is 'essential' information at the plan- or site-specific development and production stage, [the

agency] will be required to perform the analysis under §1502.22(b)." <u>Native Village of Point Hope v. Jewell</u>, 740 F.3d 489, 496 (9th Cir. 2014).

As this Circuit has held, in reviewing mine plans, if BLM does not have critical information for its analysis, it must require LNC to provide it: "The BLM may require information beyond that submitted with an initial MPO [Mining Plan of Operations.]. … BLM not only has the authority to require the filing of supplemental information, it has the obligation to do so." <u>Center for Biological Diversity</u>, 623 F.3d at 644.

Without understanding how the scrubber will work, BLM's determination that it *will* work cannot pass muster under NEPA and the APA because it is unsupported. "At a minimum, an agency must support its conclusions with studies the agency deems reliable." <u>Great Basin Resource Watch</u>, 844 F.3d at 1103 (citations omitted). Here, BLM simply accepted LNC's consultant's air emissions report as fact, without the required independent analysis, as BLM admitted it did not have the technical staff to analyze the critical and needed air pollution "scrubbing" process.

There is no analysis of how, and whether, the "undetermined" scrubber system will work. In another BLM mine EIS, where BLM failed to supply the needed support for its air quality assumptions, this Circuit recently stated: "This important information, which effects the air impacts analysis, was essentially

52

immune from meaningful scrutiny by the public because BLM never provided any data or reasoning in support of it." Great Basin Resource Watch, 844 F.3d at 1103. Neither the public nor BLM can assess the effectiveness of this "undetermined" process as mitigation for sulfur dioxide emissions when they never saw it, in violation of NEPA.

**C.      BLM Failed to Adequately Analyze Baseline Wildlife Conditions.**

BLM does not have adequate baseline information on wildlife species' presence in, and use of, the Project area. NEPA requires the analysis of the baseline conditions of the affected environment, as an inadequate environmental baseline precludes an accurate assessment of Project impacts. "[W]ithout establishing the baseline conditions which exist before a project begins, there is simply no way to determine what effect the project will have on the environment, and consequently, no way to comply with NEPA." Id. at 1101.

BLM states that "[i]nformation regarding the existing conditions of resources potentially affected by the Proposed Action are summarized in Appendix G." FEIS at 3-3, 3-WWPER-415. Yet there are no details regarding the existing conditions, especially for the critical sage-grouse, pronghorn, or other important wildlife species that will be affected by the Project (including by the dewatering of the regional streams and springs). Indeed, the entire wildlife "baseline" section of Appendix G is only 7 pages and it includes only one sentence mentioning

53

pronghorn. Appx. G.2, 3-WWPER-452-458.  While some information relevant to the baseline exists in other parts of the FEIS (as discussed below), taken together it is not adequate to assess the effects of the Project.

1.      Pronghorn

Nearly the entire Project area is within pronghorn winter range. Figure 4.5-7, 3-WWPER-445.  "Two pronghorn movement corridors lie within the Project area. These corridors facilitate access between limited use and winter range habitat to the south of the Project area and winter range, summer range, and year-round habitat to the north of the Project area." FEIS at 4-38, 3-WWPER-424.  As NDOW said, "we consider the loss of 4,960 acres of pronghorn habitat to be a significant loss." 4-WWPER-697.

Yet the baseline for pronghorn is limited to vague and general statements, mentioning that "limited use, winter, and summer pronghorn antelope distributions, and a pronghorn movement corridor, occur through portions of the study area and buffer," FEIS Appx. G.2, 3-WWPER-453, and "[t]he pronghorn antelope population in Hunt Unit 31 has remained stable, though the rest of the hunt units within GMU 3 have experienced a slight decline in populations compared to previous years." FEIS, G-14, 3-WWPER-450.

No data or analysis—needed to fully understand pronghorn use and occupancy of the Project area, how the area may contribute to the unique "stability"

of the population in Hunt Unit 31, or the importance of the movement corridors and winter habitat that will be destroyed by the Project—is provided. *See* W. Watersheds Project v. Bernhardt, 543 F.Supp.3d 958, 985 (D. Idaho 2021)(baseline inadequate where it did not provide critical species and habitat information).

2.    Sage-grouse

Despite BLM designating much of the Project area as PHMA, the entire "wildlife baseline" discussion for sage-grouse is a paragraph disclosing the designation and that sage-grouse use the Project area, breed in the vicinity of the Project area, and may use the area for nesting. FEIS Appx G.2, 3-WWPER-458. The FEIS discloses that sage-grouse use the area extensively, with presence documented by field survey observations and radio-collar data. FEIS at G-18, 3-WWPER-451.

Presence of the bird and its habitat, however, does not provide information on local population trends, habitat function and conditions, or the area's role in achieving population connectivity. *See* W. Watersheds Project, 543 F.Supp.3d at 985 (baseline was inadequate where it omitted this discussion).  BLM's cursory review certainly does not permit "a clear understanding of project-related noise increases and changes in lek attendance at [the Montana-10 and Pole Creek] leks sites," as recommended by NDOW, even though NDOW judged those effects as potentially "of high consequence." NDOW FEIS comments, 3-WWPER-358.

Without that information, BLM also cannot adequately assess impacts to the species from likely destruction of the population at Thacker Pass to the encompassing Lone Willow PMU and the Western Priority Area for Conservation (PAC).

**D.** **BLM Failed to Adequately Analyze Impacts to Wildlife.**

Having failed to define an adequate baseline for wildlife, the FEIS also fails to adequately analyze the Project's potential impacts to wildlife. "NEPA requires agencies to consider all important aspects of a problem" but BLM paid lip service to issues raised repeatedly by expert agencies without truly addressing them. Bark v. U.S. Forest Serv., 958 F.3d 865, 871 (9th Cir. 2020).

The district court dismissed the concerns for the wildlife impacts raised by NDOW and EPA because it determined that BLM is not required to "agree" with other expert agencies and believed the issues were raised only post-FEIS. 1-WWPER-42.   In truth, NDOW and EPA raised these issues in comments throughout the EIS process but BLM continued to brush them off. *See, e.g.,* EPA FEIS comments, 3-WWPER-370 ("we note that no additional analysis or information was added addressing our Draft EIS comments"); NDOW FEIS comments, 3-WWPER-356-369 (noting numerous unaddressed issues).

Thus, BLM did not "consider and respond" to concerns raised by EPA and NDOW, and its failure to analyze and disclose environmental impacts they raised concerns about was arbitrary and capricious.  In any event, NDOW's and EPA's

56

comments on the FEIS highlight BLM's fundamental NEPA failures, which cannot be ignored, regardless of when they were raised.

For example, NDOW extensively raised concerns regarding the potential for the Montana-10 lek and others to be abandoned based on projected noise levels, yet BLM stated "[i]t would be speculative to conclude the Montana 10 lek would be abandoned." 3-WWPER-497. BLM never disclosed or analyzed the effects to sage-grouse from lek abandonment or reductions in lek attendance, or the resulting potential for population-level impacts to sage-grouse from impacts to the Montana-10 and Pole Creek 01 leks, which NDOW considered foreseeable. FEIS at 4-42-45, 52-53; 3-WWPER-426-429, 3-WWPER-431-432. Instead, BLM referred vaguely to LNC's future plan to offset impacts through the CCS credit system and also refused to require mitigation for noise impacts because "[t]he proposed project is a non-discretionary 43 CFR 3809 action…." FEIS at R-184, 3-WWPER-493. That is why, in its comments on the FEIS, NDOW reiterated that "the anticipated project related noise increases at Montana-10 and Pole Creek 01 could have significant negative effects on these leks and the Lone Willow PMU" and those impacts would not be mitigated because "the CCS does not account for the loss of sage grouse leks." 3-WWPER-358.

Impacts to wildlife from changes in water availability provide another example. As NDOW found upon review of the PDEIS, "the impacts [of loss of

wetland habitats to wildlife] are likely to be high because water and riparian habitats are very limited in Nevada and provide crucial sources of water and riparian vegetation to much broader areas of habitat." 4-WWPER-682.  NDOW concluded: "[t]he Hydrologic Report indicates a high probability of significant impacts to water resources (groundwater and related surface water expression) of springs and seeps not only within and immediately adjacent to the project area, but well outside the project boundary (north onto the top Montana Mountains and northeast along the western face of the Montana Mountains)." 4-WWPER-685-686.

Rather than analyzing impacts to wildlife from changes to water availability at any scale flagged by NDOW, the FEIS merely states in broad terms:

> Potential risks to wildlife from dewatering associated with mining operations include changes in surface water and ground water flow to seeps, springs, creeks, and surrounding wildlife habitat in the Project area.  This could create a localized loss of wildlife drinking water sources and reductions in aquatic food sources, and an increase inter-and intra-species competition for local water resources.

FEIS at 4-54, 3-WWPER-433.  Further, "[l]oss or degradation of wet meadows, springs, seeps, and associated habitat could result in longterm impacts to GRSG within and outside the Project Area." Id.

These are the type of generalized statements that this Circuit has repeatedly held do not satisfy NEPA.  "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." Neighbors of Cuddy Mountain v.

58

U.S. Forest Service, 137 F.3d 1372, 1379-80 (9th Cir. 1998). *See also* Blue

Mountains, 161 F.3d at 1213 (same).

After reviewing the FEIS, NDOW informed BLM that its concerns had not

been adequately addressed. NDOW continued to find that plans for monitoring and

mitigation of water impacts were insufficient and not adequately defined, and that

ultimately "[g]iven the arid nature of this region, water sources, riparian vegetation,

and wet-meadow habitats are essential to wildlife and the loss or degradation of

these areas will have significant negative impacts on wildlife populations." NDOW

FEIS comments, 3-WWPER-356; *see also* 3-WWPER-357-358.

For pronghorn and other wildlife, the FEIS similarly relies on vague

statements, such as the Project "would directly affect wildlife through the loss of

potentially suitable habitat by vegetation removal, and removal of seeps and springs

and seasonal water sources for wildlife." FEIS at 4-34, 3-WWPER-423. BLM notes

that "[s]urface disturbance would also result in habitat fragmentation." Id.

These generalizations do not analyze or disclose the actual impacts to wildlife

populations resulting from these impacts to water resources or habitat

fragmentation. For example, the FEIS does not consider or disclose how severing

pronghorn movement corridors, or destroying nearly 5,000 acres of pronghorn

winter range, will actually impact pronghorn populations. This is a serious

oversight since, as NDOW determined "[d]irect and indirect impacts associated with

energy development and mineral development have potential to affect ungulate population dynamics, especially when concentrated on winter ranges." NDOW PDEIS comments, 4-WWPER-669.

Instead, BLM relies on misleading statements that "[h]abitat loss could cause displacement of more mobile species (e.g., bats, birds), or generalist species into adjacent habitats", and "[i]t is possible that big game species may acclimate to human activity…." FEIS at 4-34, 3-WWPER-423; FEIS at 4-39, 3-WWPER-425. NDOW repeatedly informed BLM that these statements were incorrect: "As with other portions of this EIS, we continue to disagree that mobile wildlife species will simply re-locate and use adjacent habitat, thus resulting in minor impacts…. For habitat alteration and loss, it is more reasonable to assume that a portion of the displaced population will be lost." NDOW PDEIS comments, 4-WWPER-700; *see also* 4-WWPER-699 (raising these issues in other comments). Despite this, the FEIS did not disclose which portion of any wildlife population would be displaced or analyze effects from population losses to sage-grouse, pronghorn, or other wildlife.

## IV.    This Court Should Vacate the ROD and FEIS.

Due to the numerous violations of federal law, this Court should vacate the ROD and FEIS. The APA mandates that, when agency action violates the law, "[t]he reviewing court shall … hold unlawful and set aside [the] agency action." 5

U.S.C. §706(2). Because BLM's decisions are "not sustainable on the administrative record made, then the [agency's] decision[s] must be vacated and the matter remanded to [the agency] for further consideration." Camp v. Pitts, 411 U.S. 138, 143 (1973). Although the district court's decision not to vacate the illegal ROD is generally reviewed for abuse of discretion, "[a] misapplication of the correct legal rule constitutes an abuse of discretion." Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California, 813 F.3d 1155, 1163 (9th Cir. 2015).

Vacatur is the default and presumptive remedy under the APA for an invalid agency action. Alliance for the Wild Rockies v. U.S. Forest Service, 907 F.3d 1105, 1121-22 (9th Cir. 2018). Defendants have the heavy burden to show why anything less than vacating the unlawful agency action is the proper remedy. Id. Remand without vacatur only occurs in "rare" or "limited" circumstances. Pollinator Stewardship Council v. Vilsack, 806 F.3d 520, 532 (9th Cir. 2015)("limited circumstances"); Humane Soc'y of the U.S. v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010)("rare circumstances").

Despite finding that BLM violated FLPMA, and erroneously interpreted the Mining Law contrary to controlling Ninth Circuit precedent, the district court did not vacate or enjoin the illegal agency approval. The court reasoned that BLM could "fix the error" of assuming, without support, that mining "rights" existed because "it could find on remand that Lithium Nevada possesses valid rights to the

waste dump and mine tailings land it intends to use for the Project." 1-WWPER-61.

This seriously underestimates the legal requirements for the showing that there has been the "discovery of a valuable mineral deposit" on the claims. Determining claim validity is more than just a minor procedural fix, it is a demanding and fact-intensive inquiry that BLM must undertake *before* authorizing LNC to occupy federal public lands for mining purposes under Rosemont. "The question is whether valuable minerals have been 'found' on the claims, not whether valuable minerals might be found." Center for Biological Diversity, 33 F.4th at 1222.

BLM could not determine claim validity, and verify LNC's "right" to use and occupy its mining claims, on the very limited record in this case. LNC's own Technical Report shows that the "known zone of Li [lithium] mineralization" is in the pit and does not extend to the waste dump, tailings, and other Project lands. 4-WWPER-718. At most, the record contains "some evidence" of general "mineralization" of the region, 1-WWPER-61-62. But "[t]he mere indication or presence of gold or silver is not sufficient to establish the existence of a lode. The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and extraction of the mineral." Chrisman v. Miller, 197 U.S. 313, 322 (1905).

The district court abused its discretion by failing to vacate the ROD in the

62

face of BLM's pervasive and serious errors, which cannot be easily "fixed." This Court should vacate the ROD to prevent the illegally-approved Project from permanently damaging, and essentially obliterating, critically-valuable public lands.

## CONCLUSION

Accordingly, this Court should declare illegal, and set aside and vacate, BLM's ROD, FEIS, and actions reviewing and authorizing the Project.

Respectfully submitted this 24th day of March, 2023.

*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar #21078)
Jeffrey C. Parsons, (Colo. Bar #30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs GBRW, BRW, and WD

*/s/ Talasi Brooks*
Talasi B. Brooks (ISB #9712)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

Attorney for Plaintiff WWP

*/s/ Christopher Mixson*
Christopher Mixson (NV Bar#10685)

KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

Attorney for All Plaintiffs

## CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32 (a)(7)(C) AND CIRCUIT RULE 32-1

I certify that: Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is:

Proportionately spaced, has a typeface of 14 points or more and contains 13,979 words (opening brief must not exceed 14,000 words).

*/s/ Talasi Brooks*                3-24-23

## CERTIFICATE OF SERVICE OF ELECTRONIC FILING OF BRIEF

I also certify that on March 24, 2023, I electronically filed the foregoing brief, along with the Excerpts of Record (ER) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all of participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Talasi Brooks*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6(b), Appellants state that the following cases before this Court are related:

Burns Paiute Tribe v. McCullough, No. 23-15261.

Bartell Ranch v. McCullough, No. 23-15262.

# INDEX OF STATUTORY AND REGULATORY ADDENDUM

1. Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

2. 28 U.S.C. §1291, §1292 (a)(1).

3. Mining Law of 1872, 30 U.S.C. §§ 21-42.

4. National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4335.

5. Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 (excerpts).

6. Council on Environmental Quality NEPA Regulations, 40 C.F.R. §§ 1500-1508.

7. BLM Surface Management Regulations for Hardrock Mining, 43 C.F.R. Part 3809, §§ 3809.1 *et seq.* (excerpts).

resentatives'' for ''the committees on the Judiciary of the Senate and the House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'', was executed by making the substitution for ''the Committees on the Judiciary of the Senate and House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'' to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104–121, §243(b)(2), substituted ''his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the'' for ''his views with respect to the''.

CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701.    Application; definitions.
702.    Right of review.
703.    Form and venue of proceeding.
704.    Actions reviewable.
705.    Relief pending review.
706.    Scope of review.

SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the ''Administrative Procedure Act''. That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

## § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—

(1) ''agency'' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

(A) the Congress;

(B) the courts of the United States;

(C) the governments of the territories or possessions of the United States;

(D) the government of the District of Columbia;

(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F) courts martial and military commissions;

(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

(2) ''person'', ''rule'', ''order'', ''license'', ''sanction'', ''relief'', and ''agency action'' have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) ............ | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause). 60 Stat. 243. |

In subsection (a), the words ''This chapter applies, according to the provisions thereof,'' are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words ''or naval'' are omitted as included in ''military''.

In subsection (b)(1)(H), the words ''functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947'' are omitted as executed. Reference to the ''Selective Training and Service Act of 1940'' is omitted as that Act expired on Mar. 31, 1947. Reference to the ''Sugar Control Extension Act of 1947'' is omitted as that Act expired on Mar. 31, 1948. References to the ''Housing and Rent Act of 1947, as amended'' and the ''Veterans' Emergency Housing Act of 1946'' have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

REFERENCES IN TEXT

Sections 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were omitted from the Code as executed.

AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out ''chapter 2 of title 41;'' after ''title 12;''.

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted ''subchapter II of chapter 471 of title 49; or sections'' for ''or sections 1622,''.

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .............. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

(2) Cases certified to the Court of Appeals for the Armed Forces by the Judge Advocate General under section 867(a)(2) of title 10.

(3) Cases in which the Court of Appeals for the Armed Forces granted a petition for review under section 867(a)(3) of title 10.

(4) Cases, other than those described in paragraphs (1), (2), and (3) of this subsection, in which the Court of Appeals for the Armed Forces granted relief.

(Added Pub. L. 98–209, §10(a)(1), Dec. 6, 1983, 97 Stat. 1405; amended Pub. L. 101–189, div. A, title XIII, §1304(b)(3), Nov. 29, 1989, 103 Stat. 1577; Pub. L. 103–337, div. A, title IX, §924(d)(1)(C), (2)(A), Oct. 5, 1994, 108 Stat. 2832.)

### Editorial Notes

#### AMENDMENTS

1994—Pub. L. 103–337 substituted ''Court of Appeals for the Armed Forces'' for ''Court of Military Appeals'' in section catchline and wherever appearing in text.

1989—Pub. L. 101–189 substituted ''section 867(a)(1)'' for ''section 867(b)(1)'' in par. (1), ''section 867(a)(2)'' for ''section 867(b)(2)'' in par. (2), and ''section 867(a)(3)'' for ''section 867(b)(3)'' in par. (3).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective on the first day of the eighth calendar month beginning after Dec. 6, 1983, see section 12(a)(1) of Pub. L. 98–209, set out as an Effective Date of 1983 Amendment note under section 801 of Title 10, Armed Forces.

### § 1260. Supreme Court of the Virgin Islands; certiorari

Final judgments or decrees rendered by the Supreme Court of the Virgin Islands may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Virgin Islands is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

(Added Pub. L. 112–226, §2(a), Dec. 28, 2012, 126 Stat. 1606.)

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Pub. L. 112–226, §3, Dec. 28, 2012, 126 Stat. 1607, provided that: ''The amendments made by this Act [enacting this section and amending section 1613 of Title 48, Territories and Insular Possessions] apply to cases commenced on or after the date of the enactment of this Act [Dec. 28, 2012].''

## CHAPTER 83—COURTS OF APPEALS

Sec.
1291.    Final decisions of district courts.
1292.    Interlocutory decisions.
[1293.    Repealed.]
1294.    Circuits in which decisions reviewable.
1295.    Jurisdiction of the United States Court of Appeals for the Federal Circuit.
1296.    Review of certain agency actions.

### Editorial Notes

#### AMENDMENTS

1996—Pub. L. 104–331, §3(a)(2), Oct. 26, 1996, 110 Stat. 4069, added item 1296.

1984—Pub. L. 98–620, title IV, §402(29)(C), Nov. 8, 1984, 98 Stat. 3359, struck out item 1296 ''Precedence of cases in the United States Court of Appeals for the Federal Circuit''.

1982—Pub. L. 97–164, title I, §127(b), Apr. 2, 1982, 96 Stat. 39, added items 1295 and 1296.

1978—Pub. L. 95–598, title II, §236(b), Nov. 6, 1978, 92 Stat. 2667, directed the addition of item 1293, ''Bankruptcy appeals'', which amendment did not become effective pursuant to section 402(b) of Pub. L. 95–598, as amended, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

1961—Pub. L. 87–189, §4, Aug. 30, 1961, 75 Stat. 417, struck out item 1293 ''Final decisions of Puerto Rico and Hawaii Supreme Courts''.

### § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

(June 25, 1948, ch. 646, 62 Stat. 929; Oct. 31, 1951, ch. 655, §48, 65 Stat. 726; Pub. L. 85–508, §12(e), July 7, 1958, 72 Stat. 348; Pub. L. 97–164, title I, §124, Apr. 2, 1982, 96 Stat. 36.)

#### HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., §§225(a), 933(a)(1), and section 1356 of title 48, U.S.C., 1940 ed., Territories and Insular Possessions, and sections 61 and 62 of title 7 of the Canal Zone Code (Mar. 3, 1911, ch. 231, §128, 36 Stat. 1133; Aug. 24, 1912, ch. 390, §9, 37 Stat. 566; Jan. 28, 1915, ch. 22, §2, 38 Stat. 804; Feb. 7, 1925, ch. 150, 43 Stat. 813; Sept. 21, 1922, ch. 370, §3, 42 Stat. 1006; Feb. 13, 1925, ch. 229, §1, 43 Stat. 936; Jan. 31, 1928, ch. 14, §1, 45 Stat. 54; May 17, 1932, ch. 190, 47 Stat. 158; Feb. 16, 1933, ch. 91, §3, 47 Stat. 817; May 31, 1935, ch. 160, 49 Stat. 313; June 20, 1938, ch. 526, 52 Stat. 779; Aug. 2, 1946, ch. 753, §412(a)(1), 60 Stat. 844).

This section rephrases and simplifies paragraphs ''First'', ''Second'', and ''Third'' of section 225(a) of title 28, U.S.C., 1940 ed., which referred to each Territory and Possession separately, and to sections 61 and 62 of the Canal Zone Code, section 933(a)(1) of said title relating to jurisdiction of appeals in tort claims cases, and the provisions of section 1356 of title 48, U.S.C., 1940 ed., relating to jurisdiction of appeals from final judgments of the district court for the Canal Zone.

The district courts for the districts of Hawaii and Puerto Rico are embraced in the term ''district courts of the United States.'' (See definitive section 451 of this title.)

Paragraph ''Fourth'' of section 225(a) of title 28, U.S.C., 1940 ed., is incorporated in section 1293 of this title.

Words ''Fifth. In the United States Court for China, in all cases'' in said section 225(a) were omitted. (See reviser's note under section 411 of this title.)

Venue provisions of section 1356 of title 48, U.S.C., 1940 ed., are incorporated in section 1295 of this title.

Section 61 of title 7 of the Canal Zone Code is also incorporated in sections 1291 and 1295 of this title.

In addition to the jurisdiction conferred by this chapter, the courts of appeals also have appellate jurisdiction in proceedings under Title 11, Bankruptcy, and jurisdiction to review:

(1) Orders of the Secretary of the Treasury denying an application for, suspending, revoking, or annulling a basic permit under chapter 8 of title 27;

(2) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(3) Orders of the Secretary of the Army under sections 504, 505 and 516 of title 33, U.S.C., 1940 ed., Navigation and Navigable Waters;

(4) Orders of the Civil Aeronautics Board under chapter 9 of title 49, except orders as to foreign air carriers which are subject to the President's approval;

(5) Orders under chapter 1 of title 7, refusing to designate boards of trade as contract markets or suspending or revoking such designations, or excluding persons from trading in contract markets;

(6) Orders of the Federal Power Commission under chapter 12 of title 16;

(7) Orders of the Federal Security Administrator under section 371(e) of title 21, in a case of actual controversy as to the validity of any such order, by any person adversely affected thereby;

(8) Orders of the Federal Power Commission under chapter 15B of title 15;

(9) Final orders of the National Labor Relations Board;

(10) Cease and desist orders under section 193 of title 7;

(11) Orders of the Securities and Exchange Commission;

(12) Orders to cease and desist from violating section 1599 of title 7;

(13) Wage orders of the Administrator of the Wage and Hour Division of the Department of Labor under section 208 of title 29;

(14) Orders under sections 81r and 1641 of title 19, U.S.C., 1940 ed., Customs Duties.

The courts of appeals also have jurisdiction to enforce:

(1) Orders of the Interstate Commerce Commission, the Federal Communications Commission, the Civil Aeronautics Board, the Board of Governors of the Federal Reserve System, and the Federal Trade Commission, based on violations of the antitrust laws or unfair or deceptive acts, methods, or practices in commerce;

(2) Final orders of the National Labor Relations Board;

(3) Orders to cease and desist from violating section 1599 of title 7.

The Court of Appeals for the District of Columbia also has jurisdiction to review orders of the Post Office Department under section 576 of title 39 relating to discriminations in sending second-class publications by freight; Maritime Commission orders denying transfer to foreign registry of vessels under subsidy contract; sugar allotment orders; decisions of the Federal Communications Commission granting or refusing applications for construction permits for radio stations, or for radio station licenses, or for renewal or modification of radio station licenses, or suspending any radio operator's license.

Changes were made in phraseology.

### Editorial Notes

#### AMENDMENTS

1982—Pub. L. 97–164, § 124, inserted "(other than the United States Court of Appeals for the Federal Circuit)" after "The court of appeals" and inserted provision that the jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

1958—Pub. L. 85–508 struck out provisions which gave courts of appeals jurisdiction of appeals from District Court for Territory of Alaska. See section 81A of this title which establishes a United States District Court for the State of Alaska.

1951—Act Oct. 31, 1951, inserted reference to District Court of Guam.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–164 effective Oct. 1, 1982, see section 402 of Pub. L. 97–164, set out as a note under section 171 of this title.

#### EFFECTIVE DATE OF 1958 AMENDMENT

Amendment by Pub. L. 85–508 effective Jan. 3, 1959, on admission of Alaska into the Union pursuant to Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c.16 as required by sections 1 and 8(c) of Pub. L. 85–508, see notes set out under section 81A of this title and preceding section 21 of Title 48, Territories and Insular Possessions.

#### TERMINATION OF UNITED STATES DISTRICT COURT FOR THE DISTRICT OF THE CANAL ZONE

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 2101 and 2201 to 2203 of Pub. L. 96–70, title II, Sept. 27, 1979, 93 Stat. 493, formerly classified to sections 3831 and 3841 to 3843, respectively, of Title 22, Foreign Relations and Intercourse.

### § 1292. Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion,

ness or other organizations, corporations, associations, universities, scientific societies, and individuals, upon such terms and conditions as he may prescribe.

(Dec. 18, 1942, ch. 764, § 2, 56 Stat. 1057.)

#### Statutory Notes and Related Subsidiaries

##### Transfer of Functions

For provisions relating to closure and transfer of functions of the United States Bureau of Mines, see note set out under section 1 of this title.

### § 15. Repealed. Pub. L. 86–533, § 1(17), June 29, 1960, 74 Stat. 248

Section, act Dec. 18, 1942, ch. 764, § 3, 56 Stat. 1057, related to reports to Congress of expenditures and donations to laboratory established under sections 13 to 16 of this title.

### § 16. Research laboratory for utilization of anthracite coal; establishment of advisory committee; composition; functions; appointment

The Secretary of the Interior, acting through the United States Bureau of Mines, may, in his discretion, create and establish an advisory committee composed of not more than six members to exercise consultative functions, when required by the Secretary, in connection with the administration of sections 13 to 16 of this title. The said committee shall be composed of representatives of anthracite coal mine owners, of representatives of anthracite coal mine workers and the public in equal number. The members of said committee shall be appointed by the Secretary of the Interior without regard to the civil-service laws.

(Dec. 18, 1942, ch. 764, § 4, 56 Stat. 1057.)

#### Statutory Notes and Related Subsidiaries

##### Transfer of Functions

For provisions relating to closure and transfer of functions of the United States Bureau of Mines, see note set out under section 1 of this title.

##### Termination of Advisory Committees

Advisory committees in existence on Jan. 5, 1973, to terminate not later than the expiration of the 2-year period following Jan. 5, 1973, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### CHAPTER 2—MINERAL LANDS AND REGULATIONS IN GENERAL

Sec.
21.     Mineral lands reserved.
21a.    National mining and minerals policy; ''minerals'' defined; execution of policy under other authorized programs.
22.     Lands open to purchase by citizens.
23.     Length of claims on veins or lodes.
24.     Proof of citizenship.
25.     Affidavit of citizenship.
26.     Locators' rights of possession and enjoyment.
27.     Mining tunnels; right to possession of veins on line with; abandonment of right.
28.     Mining district regulations by miners: location, recordation, and amount of work; marking of location on ground; records; annual labor or improvements on claims pending issue of patent; co-owner's succession in interest upon delinquency in contributing proportion of expenditures; tunnel as lode expenditure.
28–1.   Inclusion of certain surveys in labor requirements of mining claims; conditions and restrictions.
28–2.   Definitions.
28a.    Omitted.
28b.    Annual assessment work on mining claims; temporary deferment; conditions.
28c.    Length and termination of deferment.
28d.    Performance of deferred work.
28e.    Recordation of deferment.
28f.    Fee.
28g.    Location fee.
28h.    Co-ownership.
28i.    Failure to pay.
28j.    Other requirements.
28k.    Regulations.
28ℓ.    Collection of mining law administration fees.
29.     Patents; procurement procedure; filing: application under oath, plat and field notes, notices, and affidavits; posting plat and notice on claim; publication and posting notice in office; certificate; adverse claims; payment per acre; objections; nonresident claimant's agent for execution of application and affidavits.
30.     Adverse claims; oath of claimants; requisites; waiver; stay of land office proceedings; judicial determination of right of possession; successful claimants' filing of judgment roll, certificate of labor, and description of claim in land office, and acreage and fee payments; issuance of patents for entire or partial claims upon certification of land office proceedings and judgment roll; alienation of patent title.
31.     Oath: agent or attorney in fact, beyond district of claim.
32.     Findings by jury; costs.
33.     Existing rights.
34.     Description of vein claims on surveyed and unsurveyed lands; monuments on ground to govern conflicting calls.
35.     Placer claims; entry and proceedings for patent under provisions applicable to vein or lode claims; conforming entry to legal subdivisions and surveys; limitation of claims; homestead entry of segregated agricultural land.
36.     Subdivisions of 10-acre tracts; maximum of placer locations; homestead claims of agricultural lands; sale of improvements.
37.     Proceedings for patent where boundaries contain vein or lode; application; statement including vein or lode; issuance of patent: acreage payments for vein or lode and placer claim; costs of proceedings; knowledge affecting construction of application and scope of patent.
38.     Evidence of possession and work to establish right to patent.
39.     Surveyors of mining claims.

Sec.
40.      Verification of affidavits.
41.      Intersecting or crossing veins.
42.      Patents for nonmineral lands: application, survey, notice, acreage limitation, payment.
43.      Conditions of sale by local legislature.
44, 45.  Omitted.
46.      Additional land districts and officers.
47.      Impairment of rights or interests in certain mining property.
48.      Lands in Michigan, Wisconsin, and Minnesota; sale and disposal as public lands.
49.      Lands in Missouri and Kansas; disposal as agricultural lands.
49a.     Mining laws of United States extended to Alaska; exploration and mining for precious metals; regulations; conflict of laws; permits; dumping tailings; pumping from sea; reservation of roadway; title to land below line of high tide or high-water mark; transfer of title to future State.
49b.     Mining laws relating to placer claims extended to Alaska.
49c.     Recording notices of location of Alaskan mining claims.
49d.     Miners' regulations for recording notices in Alaska; certain records legalized.
49e.     Annual labor or improvements on Alaskan mining claims; affidavits; burden of proof; forfeitures; location anew of claims; perjury.
49f.     Fees of recorders in Alaska for filing proofs of work and improvements.
50.      Grants to States or corporations not to include mineral lands.
51.      Water users' vested and accrued rights; enumeration of uses; protection of interest; rights-of-way for canals and ditches; liability for injury or damage to settlers' possession.
52.      Patents or homesteads subject to vested and accrued water rights.
53.      Possessory actions for recovery of mining titles or for damages to such title.
54.      Liability for damages to stock raising and homestead entries by mining activities.

## § 21. Mineral lands reserved

In all cases lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law.

(R.S. § 2318.)

### Editorial Notes

#### Codification

R.S. § 2318 derived from act July 4, 1866, ch. 166, § 5, 14 Stat. 86.

## § 21a. National mining and minerals policy; "minerals" defined; execution of policy under other authorized programs

The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.

For the purpose of this section "minerals" shall include all minerals and mineral fuels including oil, gas, coal, oil shale and uranium.

It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section.

(Pub. L. 91–631, title I, § 101, formerly § 2, Dec. 31, 1970, 84 Stat. 1876; Pub. L. 104–66, title I, § 1081(b), Dec. 21, 1995, 109 Stat. 721; renumbered title I, § 101, Pub. L. 104–325, § 2(1), (2), Oct. 19, 1996, 110 Stat. 3994.)

### Editorial Notes

#### Amendments

1995—Pub. L. 104–66 in last par. struck out at end "For this purpose the Secretary of the Interior shall include in his annual report to the Congress a report on the state of the domestic mining, minerals, and mineral reclamation industries, including a statement of the trend in utilization and depletion of these resources, together with such recommendations for legislative programs as may be necessary to implement the policy of this section."

### Statutory Notes and Related Subsidiaries

#### Short Title

Pub. L. 91–631, § 1, Dec. 31, 1970, 84 Stat. 1876, provided: "That this Act [enacting this section] may be cited as the 'Mining and Minerals Policy Act of 1970'."

## § 22. Lands open to purchase by citizens

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

(R.S. § 2319.)

### Editorial Notes

#### Codification

R.S. § 2319 derived from act May 10, 1872, ch. 152, § 1, 17 Stat. 91.

Words "Except as otherwise provided," were editorially supplied on authority of act Feb. 25, 1920, ch. 85, 41 Stat. 437, popularly known as the Mineral Lands Leasing Act, which is classified to chapter 3A (§ 181 et seq.) of this title.

### Statutory Notes and Related Subsidiaries

#### Short Title

Sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 43, and 47 of this title are based on sections of the Revised

Statutes which are derived from act May 10, 1872, ch. 152, 17 Stat. 91, popularly known as the ''General Mining Act of 1872'' and as the ''Mining Law of 1872''.

### § 23. Length of claims on veins or lodes

Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, located prior to May 10, 1872, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their location. A mining claim located after the 10th day of May 1872, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the 10th day of May 1872 render such limitation necessary. The end lines of each claim shall be parallel to each other.

(R.S. § 2320.)

#### Editorial Notes

##### Codification

R.S. § 2320 derived from act May 10, 1872, ch. 152, § 2, 17 Stat. 91.

### § 24. Proof of citizenship

Proof of citizenship, under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, may consist, in the case of an individual, of his own affidavit thereof; in the case of an association of persons unincorporated, of the affidavit of their authorized agent, made on his own knowledge, or upon information and belief; and in the case of a corporation organized under the laws of the United States, or of any State or Territory thereof, by the filing of a certified copy of their charter or certificate of incorporation.

(R.S. § 2321.)

#### Editorial Notes

##### References in Text

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original ''this chapter'', meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

##### Codification

R.S. § 2321 derived from act May 10, 1872, ch. 152, § 7, 17 Stat. 94.

### § 25. Affidavit of citizenship

Applicants for mineral patents, if residing beyond the limits of the district wherein the claim is situated, may make any oath or affidavit required for proof of citizenship before the clerk of any court of record or before any notary public of any State or Territory.

(Apr. 26, 1882, ch. 106, § 2, 22 Stat. 49.)

### § 26. Locators' rights of possession and enjoyment

The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. Nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another.

(R.S. § 2322.)

#### Editorial Notes

##### Codification

R.S. § 2322 derived from act May 10, 1872, ch. 152, § 3, 17 Stat. 91.

### § 27. Mining tunnels; right to possession of veins on line with; abandonment of right

Where a tunnel is run for the development of a vein or lode, or for the discovery of mines, the owners of such tunnel shall have the right of possession of all veins or lodes within three thousand feet from the face of such tunnel on the line thereof, not previously known to exist, discovered in such tunnel, to the same extent as if discovered from the surface; and locations on the line of such tunnel of veins or lodes not appearing on the surface, made by other parties after the commencement of the tunnel, and while the same is being prosecuted with reasonable diligence, shall be invalid; but failure to prosecute the work on the tunnel for six months shall be considered as an abandonment of the right to all undiscovered veins on the line of such tunnel.

(R.S. § 2323.)

#### Editorial Notes

##### Codification

R.S. § 2323 derived from act May 10, 1872, ch. 152, § 4, 17 Stat. 92.

##### Short Title

This section is popularly known as the Tunnel Site Act.

**§ 28. Mining district regulations by miners: location, recordation, and amount of work; marking of location on ground; records; annual labor or improvements on claims pending issue of patent; co-owner's succession in interest upon delinquency in contributing proportion of expenditures; tunnel as lode expenditure**

The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: The location must be distinctly marked on the ground so that its boundaries can be readily traced. All records of mining claims made after May 10, 1872, shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the 10th day of May 1872, that is granted a waiver under section 28f of this title, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. On all claims located prior to the 10th day of May 1872, $10 worth of labor shall be performed or improvements made each year, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. Upon the failure of any one of several cowners to contribute his proportion of the expenditures required hereby, the coowners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion of the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures. The period within which the work required to be done annually on all unpatented mining claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12:01 ante meridian on the first day of September succeeding the date of location of such claim.

Where a person or company has or may run a tunnel for the purposes of developing a lode or lodes, owned by said person or company, the money so expended in said tunnel shall be taken and considered as expended on said lode or lodes, whether located prior to or since May 10, 1872; and such person or company shall not be required to perform work on the surface of said lode or lodes in order to hold the same as required by this section. On all such valid claims the annual period ending December 31, 1921, shall continue to 12 o'clock meridian July 1, 1922.

(R.S. §2324; Feb. 11, 1875, ch. 41, 18 Stat. 315; Jan. 22, 1880, ch. 9, §2, 21 Stat. 61; Aug. 24, 1921, ch. 84, 42 Stat. 186; Pub. L. 85–736, §1, Aug. 23, 1958, 72 Stat. 829; Pub. L. 103–66, title X, §10105(b), Aug. 10, 1993, 107 Stat. 406; Pub. L. 110–161, div. F, title I, (1), Dec. 26, 2007, 121 Stat. 2101.)

### Editorial Notes

#### CODIFICATION

R.S. §2324 derived from act May 10, 1872, ch. 152, §5, 17 Stat. 92.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, "in section 28", was executed by making the amendment to R.S. §2324, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

#### AMENDMENTS

2007—Pub. L. 110–161 substituted "shall commence at 12:01 ante meridian on the first day of September" for "shall commence at 12 o'clock meridian on the 1st day of September". See Codification note above.

1993—Pub. L. 103–66 inserted "that is granted a waiver under section 28f of this title," after "On each claim located after the 10th day of May 1872,".

1958—Pub. L. 85–736 changed period for doing annual assessment work on unpatented mineral claims, substituting "1st day of September" for "1st day of July".

### Statutory Notes and Related Subsidiaries

#### ASSESSMENT WORK YEARS, 1957–58 AND 1958–59

Pub. L. 85–736, §2, Aug. 23, 1958, 72 Stat. 829, provided that the period commencing in 1957 for the performance of annual assessment work under this section shall end at 12 o'clock meridian on the 1st day of July 1958, and the period commencing in 1958 for the performance of such annual assessment work shall commence at 12 o'clock meridian on the 1st day of July 1958, and shall continue to 12 o'clock meridian on Sept. 1, 1959.

### Executive Documents

#### ADMISSION OF ALASKA AS STATE

Admission of Alaska into the Union was accomplished Jan. 3, 1959, on issuance of Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as notes preceding section 21 of Title 48, Territories and Insular Possessions.

**§ 28–1. Inclusion of certain surveys in labor requirements of mining claims; conditions and restrictions**

The term "labor", as used in the third sentence of section 28 of this title, shall include, without being limited to, geological, geochemical and geophysical surveys conducted by qualified experts and verified by a detailed report filed in the county office in which the claim is located which sets forth fully (a) the location of the work performed in relation to the point of discovery and boundaries of the claim, (b) the nature, extent, and cost thereof, (c) the basic findings therefrom, and (d) the name, address,

and professional background of the person or persons conducting the work. Such surveys, however, may not be applied as labor for more than two consecutive years or for more than a total of five years on any one mining claim, and each such survey shall be nonrepetitive of any previous survey on the same claim.

(Pub. L. 85–876, §1, Sept. 2, 1958, 72 Stat. 1701.)

### § 28–2. Definitions

As used in section 28–1 of this title,

(a) The term ''geological surveys'' means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of geology as they relate to the search for and discovery of mineral deposits;

(b) The term ''geochemical surveys'' means surveys on the ground for mineral deposits by the proper application of the principles and techniques of the science of chemistry as they relate to the search for and discovery of mineral deposits;

(c) The term ''geophysical surveys'' means surveys on the ground for mineral deposits through the employment of generally recognized equipment and methods for measuring physical differences between rock types or discontinuities in geological formations;

(d) The term ''qualified expert'' means an individual qualified by education or experience to conduct geological, geochemical or geophysical surveys, as the case may be.

(Pub. L. 85–876, §2, Sept. 2, 1958, 72 Stat. 1701.)

### § 28a. Omitted

#### Editorial Notes

##### Codification

Section, act June 29, 1950, ch. 404, 64 Stat. 275, provided for extension of time of annual assessment work, on mining claims in the United States, including Alaska, for period commencing July 1, 1949, until 12 o'clock noon Oct. 1, 1950, and also provided for commencement of assessment work or improvements required for year ending 12 o'clock noon July 1, 1951, immediately following 12 o'clock noon July 1, 1950. See sections 28b to 28e of this title.

### § 28b. Annual assessment work on mining claims; temporary deferment; conditions

The performance of not less than $100 worth of labor or the making of improvements aggregating such amount, which labor or improvements are required under the provisions of section 28 of this title to be made during each year, may be deferred by the Secretary of the Interior as to any mining claim or group of claims in the United States upon the submission by the claimant of evidence satisfactory to the Secretary that such mining claim or group of claims is surrounded by lands over which a right-of-way for the performance of such assessment work has been denied or is in litigation or is in the process of acquisition under State law or that other legal impediments exist which affect the right of the claimant to enter upon the surface of such claim or group of claims or to gain access to the boundaries thereof.

(June 21, 1949, ch. 232, §1, 63 Stat. 214.)

### § 28c. Length and termination of deferment

The period for which said deferment may be granted shall end when the conditions justifying deferment have been removed: *Provided*, That the initial period shall not exceed one year but may be renewed for a further period of one year if justifiable conditions exist: *Provided further*, That the relief available under sections 28b to 28e of this title is in addition to any relief available under any other Act of Congress with respect to mining claims.

(June 21, 1949, ch. 232, §2, 63 Stat. 215.)

### § 28d. Performance of deferred work

All deferred assessment work shall be performed not later than the end of the assessment year next subsequent to the removal or cessation of the causes for deferment or the expiration of any deferments granted under sections 28b to 28e of this title and shall be in addition to the annual assessment work required by law in such year.

(June 21, 1949, ch. 232, §3, 63 Stat. 215.)

### § 28e. Recordation of deferment

Claimant shall file or record or cause to be filed or recorded in the office where the notice or certificate of location of such claim or group of claims is filed or recorded, a notice to the public of claimant's petition to the Secretary of the Interior for deferment under sections 28b to 28e of this title, and of the order or decision disposing of such petition.

(June 21, 1949, ch. 232, §4, 63 Stat. 215.)

### § 28f. Fee

#### (a) Claim maintenance fee

##### (1) Lode mining claims, mill sites, and tunnel sites

The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in appropriations Acts, a claim maintenance fee of $100 per claim or site, respectively. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28–28e)[1] and the related filing requirements contained in section 1744(a) and (c) of title 43.

##### (2) Placer mining claims

The holder of each unpatented placer mining claim located pursuant to the mining laws of the United States before, on, or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, the claim maintenance fee described in subsection (a)(1), for each 20 acres of the placer claim or portion thereof. Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28 to 28e)[1] and the re-

---

[1] See References in Text note below.

lated filing requirements contained in section 1744(a) and (c) of title 43.

**(b) Time of payment**

The claim main tenance[2] fee under subsection (a) shall be paid for the year in which the location is made, at the time the location notice is recorded with the Bureau of Land Management. The location fee imposed under section 28g of this title shall be payable not later than 90 days after the date of location.

**(c) Oil shale claims subject to claim maintenance fees under Energy Policy Act of 1992**

This section shall not apply to any oil shale claims for which a fee is required to be paid under section 2511(e)(2) of the Energy Policy Act of 1992 (Public Law 102–486; 106 Stat. 3111; 30 U.S.C. 242).

**(d) Waiver**

(1) The claim maintenance fee required under this section may be waived for a claimant who certifies in writing to the Secretary that on the date the payment was due, the claimant and all related parties—

(A) held not more than 10 mining claims, mill sites, or tunnel sites, or any combination thereof, on public lands; and

(B) have performed assessment work required under the Mining Law of 1872 (30 U.S.C. 28–28e)[1] to maintain the mining claims held by the claimant and such related parties for the assessment year ending on noon of September 1 of the calendar year in which payment of the claim maintenance fee was due.

(2) For purposes of paragraph (1), with respect to any claimant, the term "related party" means—

(A) the spouse and dependent children (as defined in section 152 of title 26), of the claimant; and

(B) a person who controls, is controlled by, or is under common control with the claimant.

For purposes of this section, the term control includes actual control, legal control, and the power to exercise control, through or by common directors, officers, stockholders, a voting trust, or a holding company or investment company, or any other means.

(3) If a small miner waiver application is determined to be defective for any reason, the claimant shall have a period of 60 days after receipt of written notification of the defect or defects by the Bureau of Land Management to: (A) cure such defect or defects, or (B) pay the $100 claim maintenance fee due for such period.

(Pub. L. 103–66, title X, § 10101, Aug. 10, 1993, 107 Stat. 405; Pub. L. 105–240, § 116, Sept. 25, 1998, 112 Stat. 1570; Pub. L. 105–277, div. A, § 101(e) [title I], Oct. 21, 1998, 112 Stat. 2681–231, 2681–235; Pub. L. 107–63, title I, (1), Nov. 5, 2001, 115 Stat. 418; Pub. L. 108–108, title I, (1), Nov. 10, 2003, 117 Stat. 1245; Pub. L. 110–161, div. F, title I, (2), Dec. 26, 2007, 121 Stat. 2101; Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907; Pub. L. 112–74, div. E, title IV, § 430, Dec. 23, 2011, 125 Stat. 1047; Pub.

---

[2] So in original. Probably should be "maintenance".

L. 113–6, div. F, title IV, § 1403, Mar. 26, 2013, 127 Stat. 419.)

### Editorial Notes

#### References in Text

The Mining Law of 1872 (30 U.S.C. 28–28e), referred to in subsecs. (a) and (d)(1)(B), probably means act May 10, 1872, ch. 152, 17 Stat. 91. That act was incorporated into the Revised Statutes as R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of this title. For complete classification of R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

#### Codification

Pub. L. 111–88, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, "in section 28f(a)," was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

Pub. L. 108–108, which directed the amendment of section 28 of title 30, United States Code, "in section 28f(a)," was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2003 Amendment note below.

Pub. L. 107–63, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2001 Amendment note below.

Pub. L. 105–277, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment notes below.

Pub. L. 105–240, which directed the amendment of section 28f of title 30, United States Code, was executed by making the amendment to section 10101 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment note below.

#### Amendments

2013—Subsec. (a)(1). Pub. L. 113–6, § 1403(1), substituted "before, on, or after August 10, 1993" for "on or after August 10, 1993".

Subsec. (a)(2). Pub. L. 113–6, § 1403(2), struck out "located" after "United States", substituted "subsection (a)(1)" for "subsection (a)", and inserted at end "Such claim maintenance fee shall be in lieu of the assessment work requirement contained in the Mining Law of 1872 (30 U.S.C. 28 to 28e) and the related filing requirements contained in section 1744(a) and (c) of title 43."

2011—Subsec. (a)(1). Pub. L. 112–74, § 430(1)(A), designated existing provisions as par. (1) and substituted "The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in appropriations Acts, a claim maintenance fee of $100 per claim or site, respectively." for "The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before, on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year, to the extent provided in advance in Appropriations Acts, a claim maintenance fee of $100 per claim or site".

Subsec. (a)(2). Pub. L. 112–74, §430(1)(B), added par. (2).

Subsec. (b). Pub. L. 112–74, §430(2), substituted ''The claim main tenance fee under subsection (a) shall be paid for the year in which the location is made, at the time the location notice is recorded with the Bureau of Land Management.'' for ''The claim maintenance fee payable pursuant to subsection (a) of this section for any assessment year shall be paid before the commencement of the assessment year, except that for the initial assessment year in which the location is made, the locator shall pay the claim maintenance fee at the time the location notice is recorded with the Bureau of Land Management.''

2009—Subsec. (a). Pub. L. 111–88 substituted '', to the extent provided in advance in Appropriations Acts,'' for ''for years 2004 through 2008,''. See Codification note above.

Pub. L. 111–8, which directed the removal of the modifications made by Pub. L. 110–161, was executed by inserting ''for years 2004 through 2008'' after ''before September 1 of each year''. See 2007 Amendment note below.

2007—Subsec. (a). Pub. L. 110–161 struck out ''for years 2004 through 2008'' after ''before September 1 of each year''. See Codification note above.

2003—Subsec. (a). Pub. L. 108–108 substituted ''for years 2004 through 2008'' for ''for years 2002 through 2003''. See Codification note above.

2001—Subsec. (a). Pub. L. 107–63 substituted ''The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before, on or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year for years 2002 through 2003, a claim maintenance fee of $100 per claim or site'' for ''The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before or after August 10, 1993, shall pay to the Secretary of the Interior, on or before September 1 of each year for years 1999 through 2001, a claim maintenance fee of $100 per claim or site.'' See Codification note above.

1998—Subsec. (a). Pub. L. 105–277 added first sentence and struck out former first sentence which read as follows: ''The holder of each unpatented mining claim, mill, or tunnel site located pursuant to the mining laws of the United States before October 1, 1998 shall pay the Secretary of the Interior, on or before September 1, 1999 a claim maintenance fee of $100 per claim site.'' See Codification note above.

Pub. L. 105–240 substituted ''The holder of each unpatented mining claim, mill, or tunnel site located pursuant to the mining laws of the United States before October 1, 1998 shall pay the Secretary of the Interior, on or before September 1, 1999 a claim maintenance fee of $100 per claim site.'' for ''The holder of each unpatented mining claim, mill or tunnel site located pursuant to the Mining Laws of the United States, whether located before or after August 10, 1993, shall pay to the Secretary of the Interior, on or before August 31 of each year, for years 1994 through 1998, a claim maintenance fee of $100 per claim.'' See Codification note above.

Subsec. (d)(3). Pub. L. 105–277 added par. (3). See Codification note above.

### Statutory Notes and Related Subsidiaries

#### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28g. Location fee

Notwithstanding any other provision of law, for every unpatented mining claim, mill or tunnel site located after August 10, 1993, to the extent provided in advance in Appropriations Acts, pursuant to the Mining Laws of the United States, the locator shall, at the time the location notice is recorded with the Bureau of Land Management, pay to the Secretary of the Interior a location fee, in addition to the claim maintenance fee required by section 28f of this title, of $25.00 per claim.

(Pub. L. 103–66, title X, §10102, Aug. 10, 1993, 107 Stat. 406; Pub. L. 105–277, div. A, §101(e) [title I], Oct. 21, 1998, 112 Stat. 2681–231, 2681–235; Pub. L. 107–63, title I, (2), Nov. 5, 2001, 115 Stat. 419; Pub. L. 108–108, title I, (2), Nov. 10, 2003, 117 Stat. 1245; Pub. L. 110–161, div. F, title I, (3), Dec. 26, 2007, 121 Stat. 2101; Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907.)

### Editorial Notes

#### Codification

Pub. L. 111–88, which directed the amendment of section 28g of title 30, United States Code, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

Pub. L. 110–161, which directed the amendment of section 28 of title 30, United States Code, ''in section 28g'', was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2007 Amendment note below.

Pub. L. 108–108, which directed the amendment of section 28 of title 30, United States Code, ''in section 28g'', was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2003 Amendment note below.

Pub. L. 107–63, which directed the amendment of section 28f(a) of title 30, United States Code, in section 28g, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2001 Amendment note below.

Pub. L. 105–277, which directed the amendment of section 28g of title 30, United States Code, was executed by making the amendment to section 10102 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 1998 Amendment note below.

#### Amendments

2009—Pub. L. 111–88 substituted '', to the extent provided in advance in Appropriations Acts,'' for ''and before September 30, 2008,''. See Codification note above.

Pub. L. 111–8, which directed the removal of the modifications made by Pub. L. 110–161, was executed by inserting ''and before September 30, 2008,'' before ''pursuant to''. See 2007 Amendment note below.

2007—Pub. L. 110–161 struck out ''and before September 30, 2008,'' before ''pursuant to''. See Codification note above.

2003—Pub. L. 108–108 substituted ''2008'' for ''2003''. See Codification note above.

2001—Pub. L. 107–63 substituted ''2003'' for ''2001''. See Codification note above.

1998—Pub. L. 105–277 substituted ''2001'' for ''1998''. See Codification note above.

### Statutory Notes and Related Subsidiaries

#### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28h. Co-ownership

The co-ownership provisions of the Mining Law of 1872 (30 U.S.C. 28)[1] shall remain in effect, except that in applying such provisions, the annual claim maintenance fee required under this Act shall, where applicable, replace applicable assessment requirements and expenditures.

(Pub. L. 103–66, title X, § 10103, Aug. 10, 1993, 107 Stat. 406.)

### Editorial Notes

#### References in Text

The Mining Law of 1872 (30 U.S.C. 28), referred to in text, probably means act May 10, 1872, ch. 152, 17 Stat. 91, as amended. That act was incorporated into the Revised Statutes as R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of this title. For complete classification of R.S. §§ 2319 to 2328, 2331, 2333 to 2337, and 2344 to the Code, see Tables.

This Act, referred to in text, is Pub. L. 103–66, Aug. 10, 1993, 107 Stat. 312, known as the Omnibus Budget Reconciliation Act of 1993. The annual claim maintenance fee required under this Act probably refers to the fee required under section 28f of this title. For complete classification of this Act to the Code, see Tables.

#### Statutory Notes and Related Subsidiaries

##### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28i. Failure to pay

Failure to pay the claim maintenance fee or the location fee as required by sections 28f to 28*l* of this title shall conclusively constitute a forfeiture of the unpatented mining claim, mill or tunnel site by the claimant and the claim shall be deemed null and void by operation of law.

(Pub. L. 103–66, title X, § 10104, Aug. 10, 1993, 107 Stat. 406; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2908.)

### Editorial Notes

#### Codification

Pub. L. 111–88, which directed the amendment of section 28i of title 30, United States Code, was executed by making the amendment to section 10104 of Pub. L. 103–66, which is classified to this section, to reflect the probable intent of Congress. See 2009 Amendment note below.

#### Amendments

2009—Pub. L. 111–88 substituted "28*l*" for "28k". See Codification note above.

#### Statutory Notes and Related Subsidiaries

##### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28j. Other requirements

### (a) Federal Land Policy and Management Act requirements

Nothing in sections 28f to 28k of this title shall change or modify the requirements of section 314(b) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(b)), or the requirements of section 314(c) of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1744(c)) related to filings required by section 314(b), and such requirements shall remain in effect with respect to claims, and mill or tunnel sites for which fees are required to be paid under this section.

### (b) Omitted

### (c) Fee adjustments

(1) The Secretary of the Interior shall adjust the fees required by sections 28f to 28k of this title to reflect changes in the Consumer Price Index published by the Bureau of Labor Statistics of the Department of Labor every 5 years after August 10, 1993, or more frequently if the Secretary determines an adjustment to be reasonable.

(2) The Secretary shall provide claimants notice of any adjustment made under this subsection not later than July 1 of any year in which the adjustment is made.

(3) A fee adjustment under this subsection shall begin to apply the first assessment year which begins after adjustment is made.

(Pub. L. 103–66, title X, § 10105, Aug. 10, 1993, 107 Stat. 406.)

### Editorial Notes

#### Codification

Section is comprised of section 10105 of Pub. L. 103–66. Subsec. (b) of section 10105 of Pub. L. 103–66 amended section 28 of this title.

#### Statutory Notes and Related Subsidiaries

##### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28k. Regulations

The Secretary of the Interior shall promulgate rules and regulations to carry out the terms and conditions of sections 28f to 28k of this title as soon as practicable after August 10, 1993.

(Pub. L. 103–66, title X, § 10106, Aug. 10, 1993, 107 Stat. 407.)

#### Statutory Notes and Related Subsidiaries

##### Similar Provisions

Similar provisions were contained in Pub. L. 102–381, title I, Oct. 5, 1992, 106 Stat. 1378, 1379.

## § 28*l*. Collection of mining law administration fees

In fiscal year 2009 and each fiscal year thereafter, the Bureau of Land Management shall collect from mining claim holders the mining claim maintenance fees and location fees; such fees shall be collected in the same manner as authorized by sections 28f and 28g of this title only to the extent provided in advance in appropriations Acts.

(Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 704; Pub. L. 111–88, div. A, title I, Oct. 30, 2009, 123 Stat. 2907.)

---

[1] See References in Text note below.

## Editorial Notes

### AMENDMENTS

2009—Pub. L. 111–88 substituted "from mining claim holders the mining claim maintenance fees and location" for "mining law administration" and struck out "those" before "authorized".

## § 29. Patents; procurement procedure; filing: application under oath, plat and field notes, notices, and affidavits; posting plat and notice on claim; publication and posting notice in office; certificate; adverse claims; payment per acre; objections; nonresident claimant's agent for execution of application and affidavits

A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person, association, or corporation authorized to locate a claim under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, having claimed and located a piece of land for such purposes, who has, or have, complied with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43, may file in the proper land office an application for a patent, under oath, showing such compliance, together with a plat and field notes of the claim or claims in common, made by or under the direction of the Director of the Bureau of Land Management, showing accurately the boundaries of the claim or claims, which shall be distinctly marked by monuments on the ground, and shall post a copy of such plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat previous to the filing of the application for a patent, and shall file an affidavit of at least two persons that such notice has been duly posted, and a copy of the notice in such land office, and shall thereupon be entitled to a patent for the land, in the manner following: The register of the land office, upon the filing of such application, plat, field notes, notices, and affidavits, shall publish a notice that such application has been made, for the period of sixty days, in a newspaper to be by him designated as published nearest to such claim; and he shall also post such notice in his office for the same period. The claimant at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the Director of the Bureau of Land Management that $500 worth of labor has been expended or improvements made upon the claim by himself or grantors; that the plat is correct, with such further description by such reference to natural objects or permanent monuments as shall identify the claim, and furnish an accurate description, to be incorporated in the patent. At the expiration of the sixty days of publication the claimant shall file his affidavit, showing that the plat and notice have been posted in a conspicuous place on the claim during such period of publication. If no adverse claim shall have been filed with the register of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the

proper officer of $5 per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43. Where the claimant for a patent is not a resident of or within the land district wherein the vein, lode, ledge, or deposit sought to be patented is located, the application for patent and the affidavits required to be made in this section by the claimant for such patent may be made by his, her, or its authorized agent, where said agent is conversant with the facts sought to be established by said affidavits.

(R.S. § 2325; Jan. 22, 1880, ch. 9, § 1, 21 Stat. 61; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

## Editorial Notes

### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

### CODIFICATION

R.S. § 2325 derived from act May 10, 1872, ch. 152, § 6, 17 Stat. 92.

### AMENDMENTS

1925—Act Mar. 3, 1925, affected words, in first sentence of text, now reading "United States supervisor of surveys," and words, in next to last sentence of text, now reading "register of the proper land office." Those words formerly read "United States surveyor general" and "register and receiver of the proper land office," respectively. This act abolished the office of surveyor general, and transferred to and consolidated with the Field Surveying Service, under the jurisdiction of the U.S. Supervisor of Surveys, the administration, equipment, etc., of such office, and consolidated the offices and functions of the register and receiver.

## Executive Documents

### TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys wherever appearing. In the establishment of The Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg.

Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

See also Transfer of Functions note set out under section 1 of this title.

### § 30. Adverse claims; oath of claimants; requisites; waiver; stay of land office proceedings; judicial determination of right of possession; successful claimants' filing of judgment roll, certificate of labor, and description of claim in land office, and acreage and fee payments; issuance of patents for entire or partial claims upon certification of land office proceedings and judgment roll; alienation of patent title

Where an adverse claim is filed during the period of publication, it shall be upon oath of the person or persons making the same, and shall show the nature, boundaries, and extent of such adverse claim, and all proceedings, except the publication of notice and making and filing of the affidavit thereof, shall be stayed until the controversy shall have been settled or decided by a court of competent jurisdiction, or the adverse claim waived. It shall be the duty of the adverse claimant, within thirty days after filing his claim, to commence proceedings in a court of competent jurisdiction, to determine the question of the right of possession, and prosecute the same with reasonable diligence to final judgment; and a failure so to do shall be a waiver of his adverse claim. After such judgment shall have been rendered, the party entitled to the possession of the claim, or any portion thereof, may, without giving further notice, file a certified copy of the judgment roll with the register of the land office, together with the certificate of the Director of the Bureau of Land Management that the requisite amount of labor has been expended or improvements made thereon, and the description required in other cases, and shall pay to the register $5 per acre for his claim, together with the proper fees, whereupon the whole proceedings and the judgment roll shall be certified by the register to the Director of the Bureau of Land Management, and a patent shall issue thereon for the claim, or such portion thereof as the applicant shall appear, from the decision of the court, to rightly possess. If it appears from the decision of the court that several parties are entitled to separate and different portions of the claim, each party may pay for his portion of the claim, with the proper fees, and file the certificate and description by the Director of the Bureau of Land Management whereupon the register shall certify the proceedings and judgment roll to the Director of the Bureau of Land Management, as in the preceding case, and patents shall issue to the several parties according to their respective rights. Nothing herein contained shall be construed to prevent the alienation of the title conveyed by a patent for a mining claim to any person whatever.

(R.S. § 2326; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

**Editorial Notes**

CODIFICATION

R.S. § 2326 derived from act May 10, 1872, ch. 152, § 7, 17 Stat. 93.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words, in third and fourth sentences of text, now reading ''United States supervisor of surveys'', and words, in third sentence of text, now reading ''pay to the register $5 per acre.'' Such words formerly read ''surveyor-general'', and ''pay to the receiver five dollars per acre'', respectively. Such act is treated more fully in notes under section 29 of this title.

**Executive Documents**

TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys following the words ''certificate of the'' in sentence beginning ''After such judgment'' and following the words ''description by the'' in sentence beginning ''If it appears''. In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

''Director of the Bureau of Land Management'' was substituted for ''Commissioner of the General Land Office'' following the words ''register to the'' in sentence beginning ''After such judgment'' and in sentence beginning ''If it appears'' following the words ''judgment roll to the'' on authority of Reorg. Plan No. 3 of 1946, set § 403, set out in the Appendix to Title 5. Section 403 of Reorg. Plan No. 3 of 1946, abolished the office of the Commissioner of the General Land Office and consolidated the functions of the General Land Office with the Grazing Service to form the Bureau of Land Management.

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

### § 31. Oath: agent or attorney in fact, beyond district of claim

The adverse claim required by section 30 of this title may be verified by the oath of any duly authorized agent or attorney in fact of the adverse claimant cognizant of the facts stated; and the adverse claimant, if residing or at the time being beyond the limits of the district wherein the claim is situated, may make oath to the adverse claim before the clerk of any court of record of the United States or of the State or Territory where the adverse claimant may then be, or before any notary public of such State or Territory.

(Apr. 26, 1882, ch. 106, § 1, 22 Stat. 49.)

## § 32. Findings by jury; costs

If, in any action brought pursuant to section 30 of this title, title to the ground in controversy shall not be established by either party, the jury shall so find, and judgment shall be entered according to the verdict. In such case costs shall not be allowed to either party, and the claimant shall not proceed in the land office or be entitled to a patent for the ground in controversy until he shall have perfected his title.

(Mar. 3, 1881, ch. 140, 21 Stat. 505.)

## § 33. Existing rights

All patents for mining claims upon veins or lodes issued prior to May 10, 1872, shall convey all the rights and privileges conferred by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 where no adverse rights existed on the 10th day of May, 1872.

(R.S. § 2328.)

#### Editorial Notes

##### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

##### CODIFICATION

R.S. § 2328 derived from act May 10, 1872, ch. 152, § 9, 17 Stat. 94.

Provision of this section respecting prosecution of applications for patents for mining claims in General Land Office, pending May 10, 1872, was omitted from the Code.

## § 34. Description of vein claims on surveyed and unsurveyed lands; monuments on ground to govern conflicting calls

The description of vein or lode claims upon surveyed lands shall designate the location of the claims with reference to the lines of the public survey, but need not conform therewith; but where patents have been or shall be issued for claims upon unsurveyed lands, the Director of the Bureau of Land Management in extending the public survey, shall adjust the same to the boundaries of said patented claims so as in no case to interfere with or change the true location of such claims as they are officially established upon the ground. Where patents have issued for mineral lands, those lands only shall be segregated and shall be deemed to be patented which are bounded by the lines actually marked, defined, and established upon the ground by the monuments of the official survey upon which the patent grant is based, and the Director of the Bureau of Land Management in executing subsequent patent surveys, whether upon surveyed or unsurveyed lands, shall be governed accordingly. The said monuments shall at all times constitute the highest authority as to what land is patented, and in case of any conflict between the said monuments of such patented claims and the descriptions of said claims in the patents issued therefor the monuments on the ground shall govern, and erroneous or inconsistent descriptions or calls in the patent descriptions shall give way thereto.

(R.S. § 2327; Apr. 28, 1904, ch. 1796, 33 Stat. 545; Mar. 3, 1925, ch. 462, 43 Stat. 1144; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

#### Editorial Notes

##### CODIFICATION

R.S. § 2327 derived from act May 10, 1872, ch. 152, § 8, 17 Stat. 94.

##### AMENDMENTS

1925—Act Mar. 3, 1925, affected words now reading "United States supervisor of surveys" in first and second sentences of text. These words formerly read "the surveyor-general." This act abolished the office of surveyor general, and transferred to and consolidated with the Field Surveying Service, under the jurisdiction of the U.S. Supervisor of Surveys, the administration, equipment, etc., of such office.

#### Executive Documents

##### TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management, substituted for United States Supervisor of Surveys wherever appearing. In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

See also note set out under section 1 of this title.

## § 35. Placer claims; entry and proceedings for patent under provisions applicable to vein or lode claims; conforming entry to legal subdivisions and surveys; limitation of claims; homestead entry of segregated agricultural land

Claims usually called "placers," including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; but where the lands have been previously surveyed by the United States, the entry in its exterior limits shall conform to the legal subdivisions of the public lands. And where placer claims are upon surveyed lands, and conform to legal subdivisions, no further survey or plat shall be required, and all placer-mining claims located after the 10th day of May 1872, shall conform as near as practicable with the United States system of public-land surveys, and the rectangular subdivisions of such surveys, and no such location shall include more than twenty acres for each individual claimant; but where placer claims cannot be conformed to legal subdivi-

sions, survey and plat shall be made as on unsurveyed lands; and where by the segregation of mineral land in any legal subdivision a quantity of agricultural land less than forty acres remains, such fractional portion of agricultural land may be entered by any party qualified by law, for homestead purposes.

(R.S. §§ 2329, 2331; Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097.)

### Editorial Notes

#### CODIFICATION

R.S. § 2329 derived from act July 9, 1870, ch. 235, § 12, 16 Stat. 217.

R.S. § 2331 derived from act May 10, 1872, ch. 152, § 10, 17 Stat. 94.

### Statutory Notes and Related Subsidiaries

#### SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

## § 36. Subdivisions of 10-acre tracts; maximum of placer locations; homestead claims of agricultural lands; sale of improvements

Legal subdivisions of forty acres may be subdivided into ten-acre tracts; and two or more persons, or associations of persons, having contiguous claims of any size, although such claims may be less than ten acres each, may make joint entry thereof; but no location of a placer claim, made after the 9th day of July 1870, shall exceed one hundred and sixty acres for any one person or association of persons, which location shall conform to the United States surveys; and nothing in this section contained shall defeat or impair any bona fide homestead claim upon agricultural lands, or authorize the sale of the improvements of any bona fide settler to any purchaser.

(R.S. § 2330; Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097.)

### Editorial Notes

#### CODIFICATION

R.S. § 2330 derived from act July 9, 1870, ch. 235, § 12, 16 Stat. 217.

### Statutory Notes and Related Subsidiaries

#### SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

## § 37. Proceedings for patent where boundaries contain vein or lode; application; statement including vein or lode; issuance of patent: acreage payments for vein or lode and placer claim; costs of proceedings; knowledge affecting construction of application and scope of patent

Where the same person, association, or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, including such vein or lode, upon the payment of $5 per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim, shall be paid for at the rate of $2.50 per acre, together with all costs of proceedings; and where a vein or lode, such as is described in section 23 of this title, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof.

(R.S. § 2333.)

### Editorial Notes

#### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

#### CODIFICATION

R.S. § 2333 derived from act May 10, 1872, ch. 152, § 11, 17 Stat. 94.

## § 38. Evidence of possession and work to establish right to patent

Where such person or association, they and their grantors, have held and worked their claims for a period equal to the time prescribed by the statute of limitations for mining claims of the State or Territory where the same may be situated, evidence of such possession and working of the claims for such period shall be sufficient to establish a right to a patent thereto under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, in the absence of any adverse claim; but nothing in such sections shall be deemed to impair any lien which may have attached in any way whatever to any mining claim or property thereto attached prior to the issuance of a patent.

(R.S. § 2332.)

### Editorial Notes

#### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

#### CODIFICATION

R.S. § 2332 derived from act July 9, 1870, ch. 235, § 13, 16 Stat. 217.

**Statutory Notes and Related Subsidiaries**

SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

## § 39. Surveyors of mining claims

The Director of the Bureau of Land Management may appoint in each land district containing mineral lands as many competent surveyors as shall apply for appointment to survey mining claims. The expenses of the survey of vein or lode claims, and the survey and subdivision of placer claims into smaller quantities than one hundred and sixty acres, together with the cost of publication of notices, shall be paid by the applicants, and they shall be at liberty to obtain the same at the most reasonable rates, and they shall also be at liberty to employ any United States deputy surveyor to make the survey. The Director of the Bureau of Land Management shall also have power to establish the maximum charges for surveys and publication of notices under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43; and, in case of excessive charges for publication, he may designate any newspaper published in a land district where mines are situated for the publication of mining notices in such district, and fix the rates to be charged by such paper; and, to the end that the Director may be fully informed on the subject, each applicant shall file with the register a sworn statement of all charges and fees paid by such applicant for publication and surveys, together with all fees and money paid the register of the land office, which statement shall be transmitted, with the other papers in the case, to the Director of the Bureau of Land Management.

(R.S. § 2334; Mar. 3, 1925, ch. 462, 43 Stat. 1144, 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

**Editorial Notes**

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original ''this chapter'', meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2334 derived from act May 10, 1872, ch. 152, § 12, 17 Stat. 95.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words in first sentence of text, now reading ''The United States supervisor of surveys,'' and words in third sentence of text, now reading ''money paid the register of the Land Office.'' Such words formerly read ''the surveyor-general of the United States,'' and ''and money paid the register and the receiver of the land-office.'' Such act is treated more fully in note under section 29 of this title.

**Executive Documents**

TRANSFER OF FUNCTIONS

Director of the Bureau of Land Management substituted for United States Supervisor of Surveys in sentence beginning ''The Director of the Bureau of Land Management may appoint''. In the establishment of the Bureau of Land Management by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees, the office of Supervisor of Surveys was abolished and the functions and powers were transferred to the Secretary of the Interior, to be performed by such officers or agencies of the Department as might be designated by the Secretary. Under that authority, the functions and powers formerly exercised by the Supervisor of Surveys were delegated to the Chief Cadastral Engineer, subject to the supervision of the Director of the Bureau of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

In sentence beginning ''The Director of the Bureau of Land Management shall also have power'', ''Director of the Bureau of Land Management'' substituted for ''Commissioner of the General Land Office'' in two instances and ''Director'' for ''Commissioner'' on authority of Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5. Section 403 of Reorg. Plan No. 3 of 1946, abolished the office of the Commissioner of the General Land Office and consolidated the functions of the General Land Office with the Grazing Service to form the Bureau of Land Management.

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

See also note set out under section 1 of this title.

## § 40. Verification of affidavits

All affidavits required to be made under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43 may be verified before any officer authorized to administer oaths within the land district where the claims may be situated, and all testimony and proofs may be taken before any such officer, and, when duly certified by the officer taking the same, shall have the same force and effect as if taken before the register of the land office. In cases of contest as to the mineral or agricultural character of land, the testimony and proofs may be taken as herein provided on personal notice of at least ten days to the opposing party; or if such party cannot be found, then by publication of at least once a week for thirty days in a newspaper, to be designated by the register of the land office as published nearest to the location of such land; and the register shall require proof that such notice has been given.

(R.S. § 2335; Mar. 3, 1925, ch. 462, 43 Stat. 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

**Editorial Notes**

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original ''this chapter'', meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2335 derived from act May 10, 1872, ch. 152, § 13, 17 Stat. 95.

AMENDMENTS

1925—Act Mar. 3, 1925, affected words in first sentence of text, now reading "before the register of the land office." Such words formerly read "before the register and receiver of the land-office." Such act is treated more fully in note under section 29 of this title.

**Executive Documents**

TRANSFER OF FUNCTIONS

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees.

See also note set out under section 1 of this title.

## § 41. Intersecting or crossing veins

Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right-of-way through the space of intersection for the purposes of the convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection.

(R.S. § 2336.)

**Editorial Notes**

CODIFICATION

R.S. § 2336 derived from act May 10, 1872, ch. 152, § 14, 17 Stat. 96.

## § 42. Patents for nonmineral lands: application, survey, notice, acreage limitation, payment

### (a) Vein or lode and mill site owners eligible

Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith, subject to the same preliminary requirements as to survey and notice as are applicable to veins or lodes; but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres, and payment for the same must be made at the same rate as fixed by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 for the superficies of the lode. The owner of a quartz mill or reduction works, not owning a mine in connection therewith, may also receive a patent for his mill site, as provided in this section.

### (b) Placer claim owners eligible

Where nonmineral land is needed by the proprietor of a placer claim for mining, milling, processing, beneficiation, or other operations in connection with such claim, and is used or occupied by the proprietor for such purposes, such land may be included in an application for a patent for such claim, and may be patented therewith subject to the same requirements as to survey and notice as are applicable to placers. No location made of such nonmineral land shall exceed five acres and payment for the same shall be made at the rate applicable to placer claims which do not include a vein or lode.

(R.S. § 2337; Pub. L. 86–390, Mar. 18, 1960, 74 Stat. 7.)

**Editorial Notes**

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in subsec. (a), were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2337 derived from act May 10, 1872, ch. 152, § 15, 17 Stat. 96.

AMENDMENTS

1960—Pub. L. 86–390 designated existing provisions as subsec. (a) and added subsec. (b).

## § 43. Conditions of sale by local legislature

As a condition of sale, in the absence of necessary legislation by Congress, the local legislature of any State or Territory may provide rules for working mines, involving easements, drainage, and other necessary means to their complete development; and those conditions shall be fully expressed in the patent.

(R.S. § 2338.)

**Editorial Notes**

CODIFICATION

R.S. § 2338 derived from act July 26, 1866, ch. 262, § 5, 14 Stat. 252.

**Statutory Notes and Related Subsidiaries**

SUBMERGED LANDS ACT

Provisions of this section as not amended, modified or repealed by the Submerged Lands Act, see section 1303 of Title 43, Public Lands.

## §§ 44, 45. Omitted

**Editorial Notes**

CODIFICATION

Section 44, R.S. § 2341; act Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097, provided for extension of provisions of Homestead laws to citizens of United States who had prior to 1874 located on lands designated prior to 1866 as mineral lands, and improved them for agricultural purposes, provided no valuable mineral deposits had been discovered thereon.

Section 45, R.S. § 2342; act Mar. 3, 1891, ch. 561, § 4, 26 Stat. 1097, provided for setting apart the lands as agricultural.

## § 46. Additional land districts and officers

The President is authorized to establish additional land districts, and to appoint the necessary officers under existing laws, wherever he may deem the same necessary for the public convenience in executing the provisions of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43.



Sec.

### SUBCHAPTER I—POLICIES AND GOALS

4331.   Congressional declaration of national environmental policy.
4332.   Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.
4333.   Conformity of administrative procedures to national environmental policy.
4334.   Other statutory obligations of agencies.
4335.   Efforts supplemental to existing authorizations.

### SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

4341.   Omitted.
4342.   Establishment; membership; Chairman; appointments.
4343.   Employment of personnel, experts and consultants.
4344.   Duties and functions.
4345.   Consultation with Citizens' Advisory Committee on Environmental Quality and other representatives.
4346.   Tenure and compensation of members.
4346a.   Travel reimbursement by private organizations and Federal, State, and local governments.
4346b.   Expenditures in support of international activities.
4347.   Authorization of appropriations.

### SUBCHAPTER III—MISCELLANEOUS PROVISIONS

4361, 4361a. Repealed.
4361b.   Implementation by Administrator of Environmental Protection Agency of recommendations of "CHESS" Investigative Report; waiver; inclusion of status of implementation requirements in annual revisions of plan for research, development, and demonstration.
4361c.   Staff management.
4362.   Interagency cooperation on prevention of environmental cancer and heart and lung disease.
4362a.   Membership of Task Force on Environmental Cancer and Heart and Lung Disease.
4363.   Continuing and long-term environmental research and development.
4363a.   Pollution control technologies demonstrations.
4364.   Expenditure of funds for research and development related to regulatory program activities.
4365.   Science Advisory Board.
4366.   Identification and coordination of research, development, and demonstration activities.
4366a.   Omitted.
4367.   Reporting requirements of financial interests of officers and employees of Environmental Protection Agency.
4368.   Grants to qualified citizens groups.
4368a.   Utilization of talents of older Americans in projects of pollution prevention, abatement, and control.
4368b.   General assistance program.
4369.   Miscellaneous reports.
4369a.   Reports on environmental research and development activities of Agency.
4370.   Reimbursement for use of facilities.
4370a.   Assistant Administrators of Environmental Protection Agency; appointment; duties.
4370b.   Availability of fees and charges to carry out Agency programs.
4370c.   Environmental Protection Agency fees.
4370d.   Percentage of Federal funding for organizations owned by socially and economically disadvantaged individuals.

Sec.
4370e.   Working capital fund in Treasury.
4370f.   Availability of funds after expiration of period for liquidating obligations.
4370g.   Availability of funds for uniforms and certain services.
4370h.   Availability of funds for facilities.

## § 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

(Pub. L. 91–190, § 2, Jan. 1, 1970, 83 Stat. 852.)

### SHORT TITLE

Section 1 Pub. L. 91–190 provided: "That this Act [enacting this chapter] may be cited as the 'National Environmental Policy Act of 1969'."

### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with system activities requiring coordination and approval under this chapter, and enforcement functions of Secretary or other official in Department of Agriculture, insofar as they involve lands and programs under jurisdiction of that Department, related to compliance with this chapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(e), (f), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees, Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

### EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to Administrator of Environmental Protection Agency, see Parts 1, 2, and 16 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

### MODIFICATION OR REPLACEMENT OF EXECUTIVE ORDER NO. 13423

Pub. L. 111–117, div. C, title VII, § 742(b), Dec. 16, 2009, 123 Stat. 3216, provided that: "Hereafter, the President may modify or replace Executive Order No. 13423 [set out as a note under this section] if the President determines that a revised or new executive order will achieve equal or better environmental or energy efficiency results."

Pub. L. 111–8, div. D, title VII, § 748, Mar. 11, 2009, 123 Stat. 693, which provided that Ex. Ord. No. 13423 (set out as a note under this section) would remain in effect on and after Mar. 11, 2009, except as otherwise provided by law after Mar. 11, 2009, was repealed by Pub. L.

subsection. To the maximum extent practicable, and without compromising national security, each agency shall strive to comply with the purposes, goals, and implementation steps in this order.

(e) The head of an agency may submit to the President, through the CEQ Chair, a request for an exemption of an agency activity, and related personnel, resources, and facilities, from this order.

SEC. 19. *Definitions.* As used in this order:

(a) "absolute greenhouse gas emissions" means total greenhouse gas emissions without normalization for activity levels and includes any allowable consideration of sequestration;

(b) "agency" means an executive agency as defined in section 105 of title 5, United States Code, excluding the Government Accountability Office;

(c) "alternative fuel vehicle" means vehicles defined by section 301 of the Energy Policy Act of 1992, as amended (42 U.S.C. 13211), and otherwise includes electric fueled vehicles, hybrid electric vehicles, plug-in hybrid electric vehicles, dedicated alternative fuel vehicles, dual fueled alternative fuel vehicles, qualified fuel cell motor vehicles, advanced lean burn technology motor vehicles, self-propelled vehicles such as bicycles and any other alternative fuel vehicles that are defined by statute;

(d) "construction and demolition materials and debris" means materials and debris generated during construction, renovation, demolition, or dismantling of all structures and buildings and associated infrastructure;

(e) "divert" and "diverting" means redirecting materials that might otherwise be placed in the waste stream to recycling or recovery, excluding diversion to waste-to-energy facilities;

(f) "energy intensity" means energy consumption per square foot of building space, including industrial or laboratory facilities;

(g) "environmental" means environmental aspects of internal agency operations and activities, including those aspects related to energy and transportation functions;

(h) "excluded vehicles and equipment" means any vehicle, vessel, aircraft, or non-road equipment owned or operated by an agency of the Federal Government that is used in:

(i) combat support, combat service support, tactical or relief operations, or training for such operations;

(ii) Federal law enforcement (including protective service and investigation);

(iii) emergency response (including fire and rescue); or

(iv) spaceflight vehicles (including associated ground-support equipment);

(i) "greenhouse gases" means carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride;

(j) "renewable energy" means energy produced by solar, wind, biomass, landfill gas, ocean (including tidal, wave, current, and thermal), geothermal, municipal solid waste, or new hydroelectric generation capacity achieved from increased efficiency or additions of new capacity at an existing hydroelectric project;

(k) "scope 1, 2, and 3" mean;

(i) scope 1: direct greenhouse gas emissions from sources that are owned or controlled by the Federal agency;

(ii) scope 2: direct greenhouse gas emissions resulting from the generation of electricity, heat, or steam purchased by a Federal agency; and

(iii) scope 3: greenhouse gas emissions from sources not owned or directly controlled by a Federal agency but related to agency activities such as vendor supply chains, delivery services, and employee travel and commuting;

(l) "sustainability" and "sustainable" mean to create and maintain conditions, under which humans and nature can exist in productive harmony, that permit fulfilling the social, economic, and other requirements of present and future generations;

(m) "United States" means the fifty States, the District of Columbia, the Commonwealth of Puerto Rico,

Guam, American Samoa, the United States Virgin Islands, and the Northern Mariana Islands, and associated territorial waters and airspace;

(n) "water consumption intensity" means water consumption per square foot of building space; and

(o) "zero-net-energy building" means a building that is designed, constructed, and operated to require a greatly reduced quantity of energy to operate, meet the balance of energy needs from sources of energy that do not produce greenhouse gases, and therefore result in no net emissions of greenhouse gases and be economically viable.

SEC. 20. *General Provisions.*

(a) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(b) Nothing in this order shall be construed to impair or otherwise affect the functions of the OMB Director relating to budgetary, administrative, or legislative proposals.

(c) This order is intended only to improve the internal management of the Federal Government and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and

maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, §101, Jan. 1, 1970, 83 Stat. 852.)

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at Federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

**§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

#### AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

#### CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: "The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

"(1) the Department of the Army has issued a permit for the activity; and

"(2) the Army Corps of Engineers has found that the activity has no significant impact."

---

[1] So in original. The period probably should be a semicolon.

#### EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term "cooperative conservation" means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

### § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, admin-

istrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

### § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

### § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

### § 4341. Omitted

#### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

### § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

(Pub. L. 91–190, title II, § 202, Jan. 1, 1970, 83 Stat. 854.)

#### COUNCIL ON ENVIRONMENTAL QUALITY; REDUCTION OF MEMBERS

Provisions stating that notwithstanding this section, the Council was to consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as chairman and exercising all powers, functions, and duties of the Council, were contained in the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. 109–54, title III, Aug. 2, 2005, 119 Stat. 543, and were repeated in provisions of subsequent appropriations acts which are not set out in the Code. Similar provisions were also contained in the following prior appropriations acts:

Pub. L. 108–447, title I, title III, Dec. 8, 2004, 118 Stat. 3332.

Pub. L. 108–199, div. G, title III, Jan. 23, 2004, 118 Stat. 408.

Pub. L. 108–7, div. K, title III, Feb. 20, 2003, 117 Stat. 514.

Pub. L. 107–73, title III, Nov. 26, 2001, 115 Stat. 686.

Pub. L. 106–377, § 1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–45.

Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1084.

Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2500.

Pub. L. 105–65, title III, Oct. 27, 1997, 111 Stat. 1375.

### § 4343. Employment of personnel, experts and consultants

(a) The Council may employ such officers and employees as may be necessary to carry out its functions under this chapter. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this chapter, in accordance with section 3109 of title 5 (but without regard to the last sentence thereof).

(b) Notwithstanding section 1342 of title 31, the Council may accept and employ voluntary and uncompensated services in furtherance of the purposes of the Council.

(Pub. L. 91–190, title II, § 203, Jan. 1, 1970, 83 Stat. 855; Pub. L. 94–52, § 2, July 3, 1975, 89 Stat. 258.)

#### REFERENCES IN TEXT

The last sentence of section 3109 of title 5, referred to in subsec. (a), probably means the last sentence of section 3109(b) of title 5, which was the last sentence of that section when the reference was enacted. Since then, section 3109 of title 5 has been amended to add subsecs. (c) to (e) at the end.

#### CODIFICATION

In subsec. (b), "section 1342 of title 31" substituted for "section 3679(b) of the Revised Statutes (31 U.S.C. 665(b))" on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

#### AMENDMENTS

1975—Pub. L. 94–52 designated existing provisions as subsec. (a) and added subsec. (b).

### § 4344. Duties and functions

It shall be the duty and function of the Council—

(1) to assist and advise the President in the preparation of the Environmental Quality Report required by section 4341[1] of this title;

---

[1] See References in Text note below.

# Federal Land Policy and Management Act
## 43 U.S.C. §§1701-1785
### Subchapter I—General Provisions

## §1701.   [FLPMA §102]
**Congressional declaration of policy**

(a) The Congress declares that it is the policy of the United States that—

(1) the public lands be retained in Federal ownership, unless as a result of the land use planning procedure provided for in this Act, it is determined that disposal of a particular parcel will serve the national interest;

(2) the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried and their present and future use is projected through a land use planning process coordinated with other Federal and State planning efforts;

(3) public lands not previously designated for any specific use and all existing classifications of public lands that were effected by executive action or statute before October 21, 1976, be reviewed in accordance with the provisions of this Act;

(4) the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action;

(5) in administering public land statutes and exercising discretionary authority granted by them, the Secretary be required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking;

(6) judicial review of public land adjudication decisions be provided by law;

(7) goals and objectives be established by law as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law;

(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use;

(9) the United States receive fair market value of the use of the public lands and their resources unless otherwise provided for by statute;

(10) uniform procedures for any disposal of public land, acquisition of non-Federal land for public purposes, and the exchange of such lands be established by statute, requiring each disposal, acquisition, and exchange to be consistent with the prescribed mission of the department or agency involved, and reserving to the Congress review of disposals in excess of a specified acreage;

(11) regulations and plans for the protection of public land areas of critical environmental concern be promptly developed;

(12) the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands including implementation of the Mining and Minerals Policy Act of 1970 (84 Stat. 1876, 30 U.S.C. 21a) as it pertains to the public lands; and

(13) the Federal Government should, on a basis equitable to both the Federal and local taxpayer, provide for payments to compensate States and local governments for burdens created as a result of the immunity of Federal lands from State and local taxation.

(b) The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.
(Pub. L. 94-579, title I, §102, Oct. 21, 1976, 90 Stat. 2744.)

**References In Text**

This Act, referred to in subsecs. (a)(1), (3) and (b), is Pub. L. 94-579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining and Minerals Policy Act of 1970, referred to in subsec. (a)(12), is Pub. L. 91-631, Dec. 31, 1970, 84 Stat. 1876, which is classified to section 21a of Title 30, Mineral Lands and Mining.

**Short Title Of 1988 Amendment**

Pub. L. 100-409, Sec. 1, Aug. 20, 1988, 102 Stat. 1086, provided that: "This Act [enacting section 1723 of this title, amending section 1716 of this title and sections 505a, 505b, and 521b of Title 16, Conservation, and enacting provisions set out as notes under sections 751 and 1716 of this title] may be cited as the 'Federal Land Exchange Facilitation Act of 1988'."

**Short Title**

Section 101 of Pub. L. 94-579 provided that: "This Act [enacting this chapter and amending and repealing numerous other laws, which for complete classification, see Tables] may be cited as the 'Federal Land Policy and Management Act of 1976'."

**Savings Provision**

Section 701 of Pub. L. 94-579 provided that:

"(a) Nothing in this Act, or in any amendment made by this Act [see Short Title note set out above], shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act [Oct. 21, 1976].

"(b) Notwithstanding any provision of this Act, in the event of conflict with or inconsistency between this Act and the Acts of August 28, 1937 (50 Stat. 874; 43 U.S.C. 1181a-1181j) and May 24, 1939 (53 Stat. 753), insofar as they relate to management of timber resources, and disposition of revenues from lands and resources, the latter Acts shall prevail.

"(c) All withdrawals, reservations, classifications, and designations in effect as of the date of approval of this Act shall remain in full force and effect until modified under the provisions of this Act or other applicable law.

"(d) Nothing in this Act, or in any amendments made by this Act, shall be construed as permitting any person to place, or allow to be placed, spent oil shale, overburden, or byproducts from the recovery of other minerals found with oil shale, on any Federal land other than Federal land which has been leased for the recovery of shale oil under the Act of February 25, 1920 (41 Stat. 437, as amended; 30 U.S.C. 181 et seq.).

"(e) Nothing in this Act shall be construed as modifying, revoking, or changing any provision of the Alaska Native Claims Settlement Act (85 Stat. 688, as amended; 43 U.S.C. 1601 et seq.).

"(f) Nothing in this Act shall be deemed to repeal any existing law by implication.

"(g) Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or—

"(1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands;

"(2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control;

"(3) as displacing, superseding, limiting, or modifying any interstate compact or the jurisdiction or responsibility of any legally established joint or common agency of two or more States or of two or more States and the Federal Government;

"(4) as superseding, modifying, or repealing, except as specifically set forth in this Act, existing laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto;

"(5) as modifying the terms of any interstate compact;

"(6) as a limitation upon any State criminal statute or upon the police power of the respective States, or as derogating the authority of a local police officer in the performance of his duties, or as depriving any State or political subdivision thereof of any right it may have to exercise civil and criminal jurisdiction on the national resource lands; or as amending, limiting, or infringing the existing laws providing grants of lands to the States.

"(h) All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

"(i) The adequacy of reports required by this Act to be submitted to the Congress or its committees shall not be subject to judicial review.

"(j) Nothing in this Act shall be construed as affecting the distribution of livestock grazing revenues to local governments under the Granger-Thye Act (64 Stat. 85, 16 U.S.C. 580h), under the Act of May 23, 1908 (35 Stat. 260, as amended; 16 U.S.C.

500), under the Act of March 4, 1913 (37 Stat. 843, as amended; 16 U.S.C. 501), and under the Act of June 20, 1910 (36 Stat. 557)."

**Severability**

Section 707 of Pub. L. 94-579 provided that: "If any provision of this Act [see Short Title note set out above] or the application thereof is held invalid, the remainder of the Act and the application thereof shall not be affected thereby."

**Agency-Wide Joint Permitting And Leasing Programs**

Pub. L. 106-291, title III, Sec. 330, Oct. 11, 2000, 114 Stat. 996, as amended Pub. L. 109-54, title IV, Sec. 428, Aug. 2, 2005, 119 Stat. 555, provided that: "In fiscal years 2001 through 2008, the Secretaries of the Interior and Agriculture, subject to annual review of Congress, may establish pilot programs involving the land management agencies referred to in this section to conduct projects, planning, permitting, leasing, contracting and other activities, either jointly or on behalf of one another; may co-locate in Federal offices and facilities leased by an agency of either Department; and promulgate special rules as needed to test the feasibility of issuing unified permits, applications, and leases. The Secretaries of the Interior and Agriculture may make reciprocal delegations of their respective authorities, duties and responsibilities in support of the 'Service First' initiative agency-wide to promote customer service and efficiency. Nothing herein shall alter, expand or limit the applicability of any public law or regulation to lands administered by the Bureau of Land Management, National Park Service, Fish and Wildlife Service, or the Forest Service. To facilitate the sharing of resources under the Service First initiative, the Secretaries of the Interior and Agriculture may make transfers of funds and reimbursement of funds on an annual basis, including transfers and reimbursements for multi-year projects, except that this authority may not be used to circumvent requirements and limitations imposed on the use of funds."

**Existing Rights-of-Way**

Section 706(b) of Pub. L. 94-579 provided that: "Nothing in section 706(a) [see Tables for classification], except as it pertains to rights-of-way, may be construed as affecting the authority of the Secretary of Agriculture under the Act of June 4, 1897 (30 Stat. 35, as amended, 16 U.S.C. 551); the Act of July 22, 1937 (50 Stat. 525, as amended, 7 U.S.C. 1010-1212); or the Act of September 3, 1954 (68 Stat. 1146, 43 U.S.C. 931c)."

# §1702. [FLPMA §103]

**Definitions**

Without altering in any way the meaning of the following terms as used in any other statute, whether or not such statute is referred to in, or amended by, this Act, as used in this Act—

(a) The term "areas of critical environmental concern" means areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards.

(b) The term "holder" means any State or local governmental entity, individual, partnership, corporation, association, or other business entity receiving or using a right-of-way under subchapter V of this chapter.

(c) The term "multiple use" means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of those resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

(d) The term "public involvement" means the opportunity for participation by affected citizens in rulemaking, decisionmaking, and planning with respect to the public lands, including public meetings or hearings held at locations near the affected lands, or advisory mecha-

nisms, or such other procedures as may be necessary to provide public comment in a particular instance.

(e) The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except—

(1) lands located on the Outer Continental Shelf; and

(2) lands held for the benefit of Indians, Aleuts, and Eskimos.

(f) The term "right-of-way" includes an easement, lease, permit, or license to occupy, use, or traverse public lands granted for the purpose listed in subchapter V of this chapter.

(g) The term "Secretary," unless specifically designated otherwise, means the Secretary of the Interior.

(h) The term "sustained yield" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use.

(i) The term "wilderness" as used in section 1782 of this title shall have the same meaning as it does in section 1131(c) of title 16.

(j) The term "withdrawal" means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land, other than "property" governed by the Federal Property and Administrative Services Act, as amended (40 U.S.C. 472)[1] from one department, bureau or agency to another department, bureau or agency.

(k) An "allotment management plan" means a document prepared in consultation with the lessees or permittees involved, which applies to livestock operations on the public lands or on lands within National Forests in the eleven contiguous Western States and which:

(1) prescribes the manner in, and extent to, which livestock operations will be conducted in order to meet the multiple-use, sustained-yield, economic and other needs and objectives as determined for the lands by the Secretary concerned; and

(2) describes the type, location, ownership, and general specifications for the range improvements to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and

(3) contains such other provisions relating to livestock grazing and other objectives found by the Secretary concerned to be consistent with the provisions of this Act and other applicable law.

(*l*) The term "principal or major uses" includes, and is limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production.

(m) The term "department" means a unit of the executive branch of the Federal Government which is headed by a member of the President's Cabinet and the term "agency" means a unit of the executive branch of the Federal Government which is not under the jurisdiction of a head of a department.

(n) The term "Bureau"[2] means the Bureau of Land Management.

(o) The term "eleven contiguous Western States" means the States of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming.

(p) The term "grazing permit and lease" means any document authorizing use of public lands or lands in National Forests in the eleven contiguous western States for the purpose of grazing domestic livestock.

(Pub. L. 94-579, title I, §103, Oct. 21, 1976, 90 Stat. 2745.)

**References In Text**

This Act, referred to in the opening par. and in subsec. (k), is Pub. L. 94-579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The general land laws, referred to in subsec. (j), are classified generally to this title.

The Federal Property and Administrative Services Act, referred to in subsec. (j), is act June 30, 1949, ch. 288, 63 Stat. 377, as amended, known as the Federal Prop-

---

1. See References in Text note below.
2. So in original. Probably should have a close quote.

erty and Administrative Services Act of 1949, as amended. Except for title III of the Act, which is classified generally to subchapter IV (Sec. 251 et seq.) of chapter 4 of Title 41, Public Contracts, the Act was repealed and reenacted by Pub. L. 107-217, Secs. 1, 6(b), Aug. 21, 2002, 116 Stat. 1062, 1304, as chapters 1 to 11 of Title 40, Public Buildings, Property, and Works. Section 3(d) of the Act (former 40 U.S.C. 472(d)), which provided the definition of "property", was repealed and reenacted as section 102(9) of Title 40.

# Subchapter II—Land Use Planning And Land Acquisition And Disposition

## §1711. [FLPMA §201]

### Continuing inventory and identification of public lands; preparation and maintenance

(a) The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values. The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands.

(b) As funds and manpower are made available, the Secretary shall ascertain the boundaries of the public lands; provide means of public identification thereof including, where appropriate, signs and maps; and provide State and local governments with data from the inventory for the purpose of planning and regulating the uses of non-Federal lands in proximity of such public lands.

(Pub. L. 94-579, title II, §201, Oct. 21, 1976, 90 Stat. 2747.)

## §1712. [FLPMA §202]

### Land use plans

**(a) Development, maintenance, and revision by Secretary**

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands. Land use plans shall be developed for the public lands regardless of whether such lands previously have been classified, withdrawn, set aside, or otherwise designated for one or more uses.

**(b) Coordination of plans for National Forest System lands with Indian land use planning and management programs for purposes of development and revision**

In the development and revision of land use plans, the Secretary of Agriculture shall coordinate land use plans for lands in the National Forest System with the land use planning and management programs of and for Indian tribes by, among other things, considering the policies of approved tribal land resource management programs.

**(c) Criteria for development and revision**

In the development and revision of land use plans, the Secretary shall—

(1) use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

(2) use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

(3) give priority to the designation and protection of areas of critical environmental concern;

(4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other values;

(5) consider present and potential uses of the public lands;

(6) consider the relative scarcity of the values involved and the availability of alternative means (including recycling) and sites for realization of those values;

(7) weigh long-term benefits to the public against short-term benefits;

(8) provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans; and

(9) to the extent consistent with the laws governing the administration of the public lands, coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of other Federal departments and agencies and of the States and local governments within which the lands are located, including, but not limited to, the statewide outdoor recreation plans developed under the Act of September 3, 1964 (78 Stat. 897), as amended [16 U.S.C. 460l-4 et seq.], and of or for Indian tribes by, among other things, considering the

policies of approved State and tribal land resource management programs. In implementing this directive, the Secretary shall, to the extent he finds practical, keep apprised of State, local, and tribal land use plans; assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans, and shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary with respect to the development and revision of land use plans, land use guidelines, land use rules, and land use regulations for the public lands within such State and with respect to such other land use matters as may be referred to them by him. Land use plans of the Secretary under this section shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

**(d) Review and inclusion of classified public lands; review of existing land use plans; modification and termination of classifications**

Any classification of public lands or any land use plan in effect on October 21, 1976, is subject to review in the land use planning process conducted under this section, and all public lands, regardless of classification, are subject to inclusion in any land use plan developed pursuant to this section. The Secretary may modify or terminate any such classification consistent with such land use plans.

**(e) Management decisions for implementation of developed or revised plans**

The Secretary may issue management decisions to implement land use plans developed or revised under this section in accordance with the following:

(1) Such decisions, including but not limited to exclusions (that is, total elimination) of one or more of the principal or major uses made by a management decision shall remain subject to reconsideration, modification, and termination through revision by the Secretary or his delegate, under the provisions of this section, of the land use plan involved.

(2) Any management decision or action pursuant to a management decision that excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more shall be reported by the Secretary to the House of Representatives and the Senate. If within ninety days from the giving of such notice (exclusive of days on which either House has adjourned for more than three consecutive days), the Congress adopts a concurrent resolution of nonapproval of the management decision or action, then the management decision or action shall be promptly terminated by the Secretary. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the management decision or action. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same management decision or action. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been dis-

agreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

(3) Withdrawals made pursuant to section 1714 of this title may be used in carrying out management decisions, but public lands shall be removed from or restored to the operation of the Mining Law of 1872, as amended (R.S. 2318–2352; 30 U.S.C. 21 et seq.) or transferred to another department, bureau, or agency only by withdrawal action pursuant to section 1714 of this title or other action pursuant to applicable law: *Provided,* That nothing in this section shall prevent a wholly owned Government corporation from acquiring and holding rights as a citizen under the Mining Law of 1872.

**(f) Procedures applicable to formulation of plans and programs for public land management**

The Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands.

(Pub. L. 94–579, title II, §202, Oct. 21, 1976, 90 Stat. 2747.)

**References In Text**

This Act, referred to in subsecs. (a) and (c)(9), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

Act of September 3, 1964, as amended, referred to in subsec. (c)(9), is Pub. L. 88–578, Sept. 3, 1964, 78 Stat. 897, as amended, known as the Land and Water Conservation Fund Act of 1965, which is classified generally to part B (Sec. 4601–4 et seq.) of subchapter LXIX of chapter 1 of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 4601–4 of Title 16 and Tables.

The Mining Law of 1872, as amended, referred to in subsec. (e)(3), is act May 10, 1872, ch. 152, 17 Stat. 91, as amended, which was incorporated into the Revised Statutes of 1878 as R.S. Secs. 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of R.S. Secs. 2318–2352, see Tables.

# §1713.   [FLPMA §203]

## Sales of public land tracts

**(a) Criteria for disposal; excepted lands**

A tract of the public lands (except land in units of the National Wilderness Preservation System, National Wild and Scenic Rivers Systems, and National System of Trails) may be sold under this Act where, as a result of land use planning required under section 1712 of this title, the Secretary determines that the sale of such tract meets the following disposal criteria:

(1) such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or

(2) such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or

(3) disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

**(b) Conveyance of land of agricultural value and desert in character**

Where the Secretary determines that land to be conveyed under clause (3) of subsection (a) of this section is of agricultural value and is desert in character, such land shall be conveyed either under the sale authority of this section or in accordance with other existing law.

**(c) Congressional approval procedures applicable to tracts in excess of two thousand five hundred acres**

Where a tract of the public lands in excess of two thousand five hun-

dred acres has been designated for sale, such sale may be made only after the end of the ninety days (not counting days on which the House of Representatives or the Senate has adjourned for more than three consecutive days) beginning on the day the Secretary has submitted notice of such designation to the Senate and the House of Representatives, and then only if the Congress has not adopted a concurrent resolution stating that such House does not approve of such designation. If the committee to which a resolution has been referred during the said ninety day period, has not reported it at the end of thirty calendar days after its referral, it shall be in order to either discharge the committee from further consideration of such resolution or to discharge the committee from consideration of any other resolution with respect to the designation. A motion to discharge may be made only by an individual favoring the resolution, shall be highly privileged (except that it may not be made after the committee has reported such a resolution), and debate thereon shall be limited to not more than one hour, to be divided equally between those favoring and those opposing the resolution. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to. If the motion to discharge is agreed to or disagreed to, the motion may not be made with respect to any other resolution with respect to the same designation. When the committee has reprinted, or has been discharged from further consideration of a resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. The motion shall be highly privileged and shall not be debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion was agreed to or disagreed to.

**(d) Sale price**

Sales of public lands shall be made at a price not less than their fair market value as determined by the Secretary.

**(e) Maximum size of tracts**

The Secretary shall determine and establish the size of tracts of public lands to be sold on the basis of the land use capabilities and development requirements of the lands; and, where any such tract which is judged by the Secretary to be chiefly valuable for agriculture is sold, its size shall be no larger than necessary to support a family-sized farm.

**(f) Competitive bidding requirements**

Sales of public lands under this section shall be conducted under competitive bidding procedures to be established by the Secretary. However, where the Secretary determines it necessary and proper in order (1) to assure equitable distribution among purchasers of lands, or (2) to recognize equitable considerations or public policies, including but not limited to, a preference to users, he may sell those lands with modified competitive bidding or without competitive bidding. In recognizing public policies, the Secretary shall give consideration to the following potential purchasers:

(1) the State in which the land is located;

(2) the local government entities in such State which are in the vicinity of the land;

(3) adjoining landowners;

(4) individuals; and

(5) any other person.

**(g) Acceptance or rejection of offers to purchase**

The Secretary shall accept or reject, in writing, any offer to purchase made through competitive bidding at his invitation no later than thirty days after the receipt of such offer or, in the case of a tract in excess of two thousand five hundred acres, at the end of thirty days after the end of the ninety-day period provided in subsection (c) of this section, whichever is later, unless the offeror waives his right to a decision within such thirty-day period. Prior to the expiration of such periods the Secretary may refuse to accept any offer or may withdraw any land or interest in land from sale under this section when he determines that consummation of the sale would not be consistent with this Act and other applicable law.

(Pub. L. 94–579, title II, §203, Oct. 21, 1976, 90 Stat. 2750.)

**References In Text**

This Act, referred to in subsecs. (a) and (g), is Pub. L. 94–579, Oct. 21, 1976, 90

# Subchapter III—Administration

## §1731. [FLPMA §301]
### Bureau of Land Management

**(a) Director; appointment, qualifications, functions, and duties**

The Bureau of Land Management established by Reorganization Plan Numbered 3, of 1946 shall have as its head a Director. Appointments to the position of Director shall hereafter be made by the President, by and with the advice and consent of the Senate. The Director of the Bureau shall have a broad background and substantial experience in public land and natural resource management. He shall carry out such functions and shall perform such duties as the Secretary may prescribe with respect to the management of lands and resources under his jurisdiction according to the applicable provisions of this Act and any other applicable law.

**(b) Statutory transfer of functions, powers and duties relating to administration of laws**

Subject to the discretion granted to him by Reorganization Plan Numbered 3 of 1950, the Secretary shall carry out through the Bureau all functions, powers, and duties vested in him and relating to the administration of laws which, on October 21, 1976, were carried out by him through the Bureau of Land Management established by section 403 of Reorganization Plan Numbered 3 of 1946. The Bureau shall administer such laws according to the provisions thereof existing as of October 21, 1976, as modified by the provisions of this Act or by subsequent law.

**(c) Associate Director, Assistant Directors, and other employees; appointment and compensation**

In addition to the Director, there shall be an Associate Director of the Bureau and so many Assistant Directors, and other employees, as may be necessary, who shall be appointed by the Secretary subject to the provisions of title 5 governing appointments in the competitive service, and shall be paid in accordance with the provisions of chapter 51 and subchapter 3[3] of chapter 53 of such title relating to classification and General Schedule pay rates.

**(d) Existing regulations relating to administration of laws**

Nothing in this section shall affect any regulation of the Secretary with respect to the administration of laws administered by him through the Bureau on October 21, 1976.

(Pub. L. 94-579, title III, §301, Oct. 21, 1976, 90 Stat. 2762.)

#### References in Text

The provision of Reorg. Plan No. 3 of 1946 establishing the Bureau of Land Management, referred to in subsec. (a), is section 403 of such Reorg. Plan. Section 403 of Reorg. Plan No. 3 of 1946, also referred to in subsec. (b), is set out as a note under section 1 of this title.

This Act, referred to in subsecs. (a) and (b), is Pub. L. 94-579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

Reorganization Plan Numbered 3 of 1950, referred to in subsec. (b), is set out under section 1451 of this title.

The provisions of title 5, governing appointments in the competitive service, referred to in subsec. (c), are classified to section 3301 et seq. of Title 5, Government Organization and Employees.

The General Schedule, referred to in subsec. (c), is set out under section 5332 of Title 5.

#### Use Of Appropriated Funds For Protection Of Lands And Surveys Of Federal Lands In Alaska

Pub. L. 102-381, title I, Oct. 5, 1992, 106 Stat. 1378, provided in part: "That appropriations herein [Department of the Interior and Related Agencies Appropriations Act, 1993] made, in fiscal year 1993 and thereafter, may be expanded for surveys of Federal lands and on a reimbursable basis for surveys of Federal lands and for protection of lands for the State of Alaska".

## §1732. [FLPMA §302]
### Management of use, occupancy, and development of public lands

**(a) Multiple use and sustained yield requirements applicable; exception**

The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when they are available, except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law.

**(b) Easements, permits, etc., for utilization through habitation, cultivation, and development of small trade or manufacturing concerns; applicable statutory requirements**

In managing the public lands, the Secretary shall, subject to this Act and other applicable law and under such terms and conditions as are consistent with such law, regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands, including, but not limited to, long-term leases to permit individuals to utilize public lands for habitation, cultivation, and the development of small trade or manufacturing concerns: *Provided,* That unless otherwise provided for by law, the Secretary may permit Federal departments and agencies to use, occupy, and develop public lands only through rights-of-way under section 1767 of this title, withdrawals under section 1714 of this title, and, where the proposed use and development are similar or closely related to the programs of the Secretary for the public lands involved, cooperative agreements under section 1737(b) of this title: *Provided further,* That nothing in this Act shall be construed as authorizing the Secretary concerned to require Federal permits to hunt and fish on public lands or on lands in the National Forest System and adjacent waters or as enlarging or diminishing the responsibility and authority of the States for management of fish and resident wildlife. However, the Secretary concerned may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law. Except in emergencies, any regulations of the Secretary concerned relating to hunting and fishing pursuant to this section shall be put into effect only after consultation with the appropriate State fish and game department. Nothing in this Act shall modify or change any provision of Federal law relating to migratory birds or to endangered or threatened species. Except as provided in section 1744, section 1782, and subsection (f) of section 1781 of this title and in the last sentence of this paragraph, no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress. In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands.

**(c) Revocation or suspension provision in instrument authorizing use, occupancy or development; violation of provision; procedure applicable**

The Secretary shall insert in any instrument providing for the use, occupancy, or development of the public lands a provision authorizing revocation or suspension, after notice and hearing, of such instrument upon a final administrative finding of a violation of any term or condition of the instrument, including, but not limited to, terms and conditions requiring compliance with regulations under Acts applicable to the public lands and compliance with applicable State or Federal air or water quality standard or implementation plan: *Provided,* That such violation occurred on public lands covered by such instrument and occurred in connection with the exercise of rights and privileges granted by it: *Provided further,* That the Secretary shall terminate any such suspension no later than the date upon which he determines the cause of said violation has been rectified: *Provided further,* That the Secretary may order an immediate temporary suspension prior to a hearing or final administrative finding if he determines that such a suspension is necessary to protect health or safety or the environment: *Provided further,* That, where other applicable law contains specific provisions for suspension, revocation, or cancellation of a permit, license, or other authorization to use, occupy, or develop the public lands, the specific provisions of such law shall prevail.

---

3. So in original. Probably should be subchapter "III".

**(d) Authorization to utilize certain public lands in Alaska for military purposes**

(1) The Secretary of the Interior, after consultation with the Governor of Alaska, may issue to the Secretary of Defense or to the Secretary of a military department within the Department of Defense or to the Commandant of the Coast Guard a nonrenewable general authorization to utilize public lands in Alaska (other than within a conservation system unit or the Steese National Conservation Area or the White Mountains National Recreation Area) for purposes of military maneuvering, military training, or equipment testing not involving artillery firing, aerial or other gunnery, or other use of live ammunition or ordnance.

(2) Use of public lands pursuant to a general authorization under this subsection shall be limited to areas where such use would not be inconsistent with the plans prepared pursuant to section 1712 of this title. Each such use shall be subject to a requirement that the using department shall be responsible for any necessary cleanup and decontamination of the lands used, and to such other terms and conditions (including but not limited to restrictions on use of off-road or all-terrain vehicles) as the Secretary of the Interior may require to—

(A) minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved; and

(B) minimize the period and method of such use and the interference with or restrictions on other uses of the public lands involved.

(3)(A) A general authorization issued pursuant to this subsection shall not be for a term of more than three years and shall be revoked in whole or in part, as the Secretary of the Interior finds necessary, prior to the end of such term upon a determination by the Secretary of the Interior that there has been a failure to comply with its terms and conditions or that activities pursuant to such an authorization have had or might have a significant adverse impact on the resources or values of the affected lands.

(B) Each specific use of a particular area of public lands pursuant to a general authorization under this subsection shall be subject to specific authorization by the Secretary and to appropriate terms and conditions, including such as are described in paragraph (2) of this subsection.

(4) Issuance of a general authorization pursuant to this subsection shall be subject to the provisions of section 1712(f) of this title, section 3120 of title 16, and all other applicable provisions of law. The Secretary of a military department (or the Commandant of the Coast Guard) requesting such authorization shall reimburse the Secretary of the Interior for the costs of implementing this paragraph. An authorization pursuant to this subsection shall not authorize the construction of permanent structures or facilities on the public lands.

(5) To the extent that public safety may require closure to public use of any portion of the public lands covered by an authorization issued pursuant to this subsection, the Secretary of the military Department concerned or the Commandant of the Coast Guard shall take appropriate steps to notify the public concerning such closure and to provide appropriate warnings of risks to public safety.

(6) For purposes of this subsection, the term "conservation system unit" has the same meaning as specified in section 3102 of title 16.

(Pub. L. 94–579, title III, §302, Oct. 21, 1976, 90 Stat. 2762; Pub. L. 100–586, Nov. 3, 1988, 102 Stat. 2980.)

**References In Text**

This Act, referred to in subsec. (b), is Pub. L. 94–579, Oct. 21, 1976, 90 Stat. 2743, as amended, known as the Federal Land Policy and Management Act of 1976. For complete classification of this Act to the Code, see Tables.

The Mining Law of 1872, referred to in subsec. (b), is act May 10, 1872, ch. 152, 17 Stat. 91, which was incorporated into the Revised Statutes of 1878 as R.S. Sec. 2319 to 2328, 2331, 2333 to 2337, and 2344, which are classified to sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 42, and 47 of Title 30, Mineral Lands and Mining. For complete classification of such Revised Statutes sections to the Code, see Tables.

**Transfer Of Functions**

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see section 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with land use permits for temporary use of public lands and other associated land uses, issued under sections 1732, 1761, and 1763 to 1771 of this title, with respect pre-construction, construction, and initial operation of transportation systems for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, Secs. 102(e), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, effective July 1, 1979, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade.

**Management Guidelines To Prevent Wasting Of Pacific Yew**

For Congressional findings relating to management guidelines to prevent wasting of Pacific yew in current and future timber sales on Federal lands, see section 4801(a)(8) of Title 16, Conservation.

## §1733. [FLPMA §303]

**Enforcement authority**

**(a) Regulations for implementation of management, use, and protection requirements; violations; criminal penalties**

The Secretary shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property located thereon. Any person who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined no more than $1,000 or imprisoned no more than twelve months, or both. Any person charged with a violation of such regulation may be tried and sentenced by any United States magistrate judge designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions and limitations as provided for in section 3401 of title 18.

**(b) Civil actions by Attorney General for violations of regulations; nature of relief; jurisdiction**

At the request of the Secretary, the Attorney General may institute a civil action in any United States district court for an injunction or other appropriate order to prevent any person from utilizing public lands in violation of regulations issued by the Secretary under this Act.

**(c) Contracts for enforcement of Federal laws and regulations by local law enforcement officials; procedure applicable; contract requirements and implementation**

(1) When the Secretary determines that assistance is necessary in enforcing Federal laws and regulations relating to the public lands or their resources he shall offer a contract to appropriate local officials having law enforcement authority within their respective jurisdictions with the view of achieving maximum feasible reliance upon local law enforcement officials in enforcing such laws and regulations. The Secretary shall negotiate on reasonable terms with such officials who have authority to enter into such contracts to enforce such Federal laws and regulations. In the performance of their duties under such contracts such officials and their agents are authorized to carry firearms; execute and serve any warrant or other process issued by a court or officer of competent jurisdiction; make arrests without warrant or process for a misdemeanor he has reasonable grounds to believe is being committed in his presence or view, or for a felony if he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony; search without warrant or process any person, place, or conveyance according to any Federal law or rule of law; and seize without warrant or process any evidentiary item as provided by Federal law. The Secretary shall provide such law enforcement training as he deems necessary in order to carry out the contracted for responsibilities. While exercising the powers and authorities provided by such contract pursuant to this section, such law enforcement officials and their agents shall have all the immunities of Federal law enforcement officials.

(2) The Secretary may authorize Federal personnel or appropriate local officials to carry out his law enforcement responsibilities with respect to the public lands and their resources. Such designated

# CHAPTER V—COUNCIL ON ENVIRONMENTAL QUALITY

| Part | | Page |
|------|---|------|
| 1500 | Purpose, policy, and mandate | 835 |
| 1501 | NEPA and agency planning | 837 |
| 1502 | Environmental impact statement | 841 |
| 1503 | Commenting | 848 |
| 1504 | Predecision referrals to the Council of proposed Federal actions determined to be environmentally unsatisfactory | 849 |
| 1505 | NEPA and agency decisionmaking | 851 |
| 1506 | Other requirements of NEPA | 852 |
| 1507 | Agency compliance | 857 |
| 1508 | Terminology and index | 859 |
| | Index to Parts 1500 Through 1508 | 864 |
| 1515 | Freedom of Information Act procedures | 865 |
| 1516 | Privacy Act implementation | 872 |
| 1517 | Public meeting procedures of the Council on Environmental Quality | 874 |
| 1518 | Office of Environmental Quality Management Fund | 878 |

# PART 1500—PURPOSE, POLICY, AND MANDATE

Sec.
1500.1 Purpose.
1500.2 Policy.
1500.3 Mandate.
1500.4 Reducing paperwork.
1500.5 Reducing delay.
1500.6 Agency authority.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## § 1500.1 Purpose.

(a) The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2 Policy.

Federal agencies shall to the fullest extent possible:

(a) Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b) Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## § 1500.3 Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act)

§ 1500.4

except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514. Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

§ 1500.4  Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

(n) Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o) Combining environmental documents with other documents (§ 1506.4).

(p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

[43 FR 55990, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

§ 1500.5  Reducing delay.

Agencies shall reduce delay by:

**Council on Environmental Quality** §1501.1

(a) Integrating the NEPA process into early planning (§1501.2).

(b) Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§1501.6).

(c) Insuring the swift and fair resolution of lead agency disputes (§1501.5).

(d) Using the scoping process for an early identification of what are and what are not the real issues (§1501.7).

(e) Establishing appropriate time limits for the environmental impact statement process (§§1501.7(b)(2) and 1501.8).

(f) Preparing environmental impact statements early in the process (§1502.5).

(g) Integrating NEPA requirements with other environmental review and consultation requirements (§1502.25).

(h) Eliminating duplication with State and local procedures by providing for joint preparation (§1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (§1506.3).

(i) Combining environmental documents with other documents (§1506.4).

(j) Using accelerated procedures for proposals for legislation (§1506.8).

(k) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

§1500.6  **Agency authority.**

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1  Purpose.
1501.2  Apply NEPA early in the process.
1501.3  When to prepare an environmental assessment.
1501.4  Whether to prepare an environmental impact statement.
1501.5  Lead agencies.
1501.6  Cooperating agencies.
1501.7  Scoping.
1501.8  Time limits.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

§1501.1  **Purpose.**

The purposes of this part include:

(a) Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b) Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c) Providing for the swift and fair resolution of lead agency disputes.

(d) Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e) Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

## § 1501.2 Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a) Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b) Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

(1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(3) The Federal agency commences its NEPA process at the earliest possible time.

## § 1501.3 When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

## § 1501.4 Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

**Council on Environmental Quality** §1501.6

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

§ 1501.5  Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

§ 1501.6  Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

## § 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed

**Council on Environmental Quality** §1502.1

action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

### §1501.8 Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by §1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided,* That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1 Purpose.
1502.2 Implementation.
1502.3 Statutory requirements for statements.
1502.4 Major Federal actions requiring the preparation of environmental impact statements.
1502.5 Timing.
1502.6 Interdisciplinary preparation.
1502.7 Page limits.
1502.8 Writing.
1502.9 Draft, final, and supplemental statements.
1502.10 Recommended format.
1502.11 Cover sheet.
1502.12 Summary.
1502.13 Purpose and need.
1502.14 Alternatives including the proposed action.
1502.15 Affected environment.
1502.16 Environmental consequences.
1502.17 List of preparers.
1502.18 Appendix.
1502.19 Circulation of the environmental impact statement.
1502.20 Tiering.
1502.21 Incorporation by reference.
1502.22 Incomplete or unavailable information.
1502.23 Cost-benefit analysis.
1502.24 Methodology and scientific accuracy.
1502.25 Environmental review and consultation requirements.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

### §1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

§ 1502.2 Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

§ 1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

§ 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such

as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

### § 1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

### § 1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

### § 1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

## § 1502.10  Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11 through 1502.18, in any appropriate format.

## § 1502.11  Cover sheet.

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

## § 1502.12  Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice

**Council on Environmental Quality** §1502.16

among alternatives). The summary will normally not exceed 15 pages.

## §1502.13 Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

## §1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16). it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## §1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data

and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

## §1502.16 Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

845

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

**Council on Environmental Quality** § 1502.24

may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

### § 1502.22  Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

### § 1502.23  Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24  Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

**§ 1502.25 Environmental review and consultation requirements.**

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

## PART 1503—COMMENTING

Sec.
1503.1   Inviting comments.
1503.2   Duty to comment.
1503.3   Specificity of comments.
1503.4   Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24. 1977).

SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

**§ 1503.1   Inviting comments.**

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards.

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

**§ 1503.2   Duty to comment.**

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

**§ 1503.3   Specificity of comments.**

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

**Council on Environmental Quality** § 1504.1

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

§ 1503.4  **Response to comments.**

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs

(a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

§ 1504.1  **Purpose.**

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews

must be made available to the President, the Council and the public.

[43 FR 55998, Nov. 29, 1978]

### § 1504.2 Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.

(b) Severity.

(c) Geographical scope.

(d) Duration.

(e) Importance as precedents.

(f) Availability of environmentally preferable alternatives.

[43 FR 55998, Nov. 29, 1978]

### § 1504.3 Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

(2) Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.

(3) Identify any essential information that is lacking and request that it be made available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c)(2) of this section.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

(ii) Identify any existing environmental requirements or policies which would be violated by the matter,

(iii) Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered

**Council on Environmental Quality**

§ 1505.1

not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Hold public meetings or hearings to obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedure Act).

[43 FR 55998, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

## PART 1505—NEPA AND AGENCY DECISIONMAKING

Sec.
1505.1 Agency decisionmaking procedures.
1505.2 Record of decision in cases requiring environmental impact statements.
1505.3 Implementing the decision.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55999, Nov. 29, 1978, unless otherwise noted.

### § 1505.1  Agency decisionmaking procedures.

Agencies shall adopt procedures (§ 1507.3) to ensure that decisions are made in accordance with the policies and purposes of the Act. Such procedures shall include but not be limited to:

(a) Implementing procedures under section 102(2) to achieve the requirements of sections 101 and 102(1).

(b) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them.

(c) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(d) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that agency officials use the statement in making decisions.

(e) Requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

851

## § 1505.2 Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision. The record, which may be integrated into any other record prepared by the agency, including that required by OMB Circular A–95 (Revised), part I, sections 6(c) and (d), and part II, section 5(b)(4), shall:

(a) State what the decision was.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

## § 1505.3 Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1  Limitations on actions during NEPA process.
1506.2  Elimination of duplication with State and local procedures.
1506.3  Adoption.
1506.4  Combining documents.
1506.5  Agency responsibility.
1506.6  Public involvement.
1506.7  Further guidance.
1506.8  Proposals for legislation.
1506.9  Filing requirements.
1506.10  Timing of agency action.
1506.11  Emergencies.
1506.12  Effective date.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

## § 1506.1  Limitations on actions during NEPA process.

(a) Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c) While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement,

**Council on Environmental Quality** §1506.3

agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

**§1506.2 Elimination of duplication with State and local procedures.**

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for

cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

**§1506.3 Adoption.**

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of

853

a judicial action which is not final, the agency shall so specify.

§ 1506.4  Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

§ 1506.5  Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in

the outcome of the project. If the document is prepared by contract. the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

§ 1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A–95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

**Council on Environmental Quality** §1506.8

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:

(1) Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2) A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

### §1506.7 Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a) A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b) Publication of the Council's Memoranda to Heads of Agencies.

(c) In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1) Research activities;

(2) Meetings and conferences related to NEPA; and

(3) Successful and innovative procedures used by agencies to implement NEPA.

### §1506.8 Proposals for legislation.

(a) The NEPA process for proposals for legislation (§1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b) Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1) There need not be a scoping process.

(2) The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; *Provided,* That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§1503.1 and 1506.10.

(i) A Congressional Committee with jurisdiction over the proposal has a

855

rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*) and the Wilderness Act (16 U.S.C. 1131 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(c) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

§ 1506.9   Filing requirements.

(a) Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Mail Code 2252–A, Room 7220, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This address is for deliveries by US Postal Service (including USPS Express Mail).

(b) For deliveries in-person or by commercial express mail services, including Federal Express or UPS, the correct address is: US Environmental Protection Agency, Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Room 7220, 1200 Pennsylvania Avenue, NW., Washington, DC 20004.

(c) Statements shall be filed with the EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its re-

sponsibilities under this section and § 1506.10.

[70 FR 41148, July 18, 2005]

§ 1506.10   Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the FEDERAL REGISTER each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

(1) Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

**Council on Environmental Quality** § 1507.2

(c) If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see § 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

[43 FR 56000, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1506.11 Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.12 Effective date.

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under section 102(2)(D) of the Act or section 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1 Compliance.
1507.2 Agency capability to comply.
1507.3 Agency procedures.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56002, Nov. 29, 1978, unless otherwise noted.

### § 1507.1 Compliance.

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by § 1507.3 to the requirements of other applicable laws.

### § 1507.2 Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by section 102(2)(B) to insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of section 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

## § 1507.3 Agency procedures.

(a) Not later than eight months after publication of these regulations as finally adopted in the FEDERAL REGISTER, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements

**Council on Environmental Quality** §1508.5

which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in §1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by §1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

## PART 1508—TERMINOLOGY AND INDEX

Sec.
1508.1 Terminology.
1508.2 Act.
1508.3 Affecting.
1508.4 Categorical exclusion.
1508.5 Cooperating agency.
1508.6 Council.
1508.7 Cumulative impact.
1508.8 Effects.
1508.9 Environmental assessment.
1508.10 Environmental document.
1508.11 Environmental impact statement.
1508.12 Federal agency.
1508.13 Finding of no significant impact.
1508.14 Human environment.
1508.15 Jurisdiction by law.
1508.16 Lead agency.
1508.17 Legislation.
1508.18 Major Federal action.
1508.19 Matter.
1508.20 Mitigation.
1508.21 NEPA process.
1508.22 Notice of intent.
1508.23 Proposal.
1508.24 Referring agency.
1508.25 Scope.
1508.26 Special expertise.
1508.27 Significantly.
1508.28 Tiering.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

### §1508.1 Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

### §1508.2 Act.

*Act* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

### §1508.3 Affecting.

*Affecting* means will or may have an effect on.

### §1508.4 Categorical exclusion.

*Categorical exclusion* means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in §1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### §1508.5 Cooperating agency.

*Cooperating agency* means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in §1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

### § 1508.6 Council.

*Council* means the Council on Environmental Quality established by title II of the Act.

### § 1508.7 Cumulative impact.

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

### § 1508.8 Effects.

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

### § 1508.9 Environmental assessment.

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

### § 1508.10 Environmental document.

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

### § 1508.11 Environmental impact statement.

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

### § 1508.12 Federal agency.

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

### § 1508.13 Finding of no significant impact.

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

repeat any of the discussion in the assessment but may incorporate it by reference.

### § 1508.14  Human environment.

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

### § 1508.15  Jurisdiction by law.

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

### § 1508.16  Lead agency.

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

### § 1508.17  Legislation.

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

### § 1508.18  Major Federal action.

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

### § 1508.19  Matter.

*Matter* includes for purposes of part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation. project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### § 1508.20  Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### § 1508.21  NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### § 1508.22  Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### § 1508.23  Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### § 1508.24  Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### § 1508.25  Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

**Council on Environmental Quality** §1508.28

consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26 Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27 Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28 Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

**Index**            **40 CFR Ch. V (7–1–11 Edition)**

subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

## Index to Parts 1500 Through 1508

EDITORIAL NOTE: This listing is provided for information purposes only. It is compiled and kept up-to-date by the Council on Environmental Quality, and is revised through July 1, 2011.

INDEX

| | |
|---|---|
| Act | 1508.2 |
| Action | 1508.18, 1508.25. |
| Action-forcing | 1500.1, 1502.1. |
| Adoption | 1500.4(n), 1500.5(h), 1506.3. |
| Affected Environment | 1502.10(f), 1502.15. |
| Affecting | 1502.3, 1508.3. |
| Agency Authority | 1500.6. |
| Agency Capability | 1501.2(a), 1507.2. |
| Agency Compliance | 1507.1. |
| Agency Procedures | 1505.1, 1507.3. |
| Agency Responsibility | 1506.5. |
| Alternatives | 1501.2(c), 1502.2, 1502.10(e), 1502.14, 1505.1(e), 1505.2, 1507.2(d), 1508.25(b). |
| Appendices | 1502.10(k), 1502.18, 1502.24. |
| Applicant | 1501.2(d)(1), 1501.4(b), 1501.8(a), 1502.19(b), 1503.1(a)(3), 1504.3(e), 1506.1(d), 1506.5(a), 1506.5(b). |
| Apply NEPA Early in the Process. | 1501.2. |
| Categorical Exclusion | 1500.4(p), 1500.5(k), 1501.4(a), 1507.3(b), 1508.4. |
| Circulation of Environmental Impact Statement. | 1502.19, 1506.3. |
| Classified Information | 1507.3(c). |
| Clean Air Act | 1504.1(b), 1508.19(a). |
| Combining Documents | 1500.4(o), 1500.5(i), 1506.4. |
| Commenting | 1502.19, 1503.1, 1503.2, 1503.3, 1503.4, 1506.6(f). |
| Consultation Requirement | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25. |
| Context | 1508.27(a). |

INDEX—Continued

| | |
|---|---|
| Cooperating Agency | 1500.5(b), 1501.1(b), 1501.5(c), 1501.5(f), 1501.6, 1503.1(a)(1), 1503.2, 1503.3, 1506.3(c), 1506.5(c), 1508.5. |
| Cost-Benefit | 1502.23. |
| Council on Environmental Quality. | 1500.3, 1501.5(e), 1501.5(f), 1501.6(c), 1502.9(c)(4), 1504.1, 1504.2, 1504.3, 1506.6(f), 1506.9, 1506.10(d), 1506.11, 1507.3, 1508.6, 1508.24. |
| Cover Sheet | 1502.10(a), 1502.11. |
| Cumulative Impact | 1508.7, 1508.25(a), 1508.25(c). |
| Decisionmaking | 1505.1, 1506.1. |
| Decision points | 1505.1(b). |
| Dependent | 1508.25(a). |
| Draft Environmental Impact Statement. | 1502.9(a). |
| Early Application of NEPA | 1501.2. |
| Economic Effects | 1508.8. |
| Effective Date | 1506.12. |
| Effects | 1502.16, 1508.8. |
| Emergencies | 1506.11. |
| Endangered Species Act | 1502.25, 1508.27(b)(9). |
| Energy | 1502.16(e). |
| Environmental Assessment | 1501.3, 1501.4(b), 1501.4(c), 1501.7(b)(3), 1506.2(b)(4), 1506.5(b), 1508.4, 1508.9, 1508.10, 1508.13. |
| Environmental Consequences | 1502.10(g), 1502.16. |
| Environmental Consultation Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Environmental Documents | 1508.10. |
| Environmental Impact Statement. | 1500.4, 1501.4, 1501.7, 1502.1, 1502.2, 1502.3, 1502.4, 1502.5, 1502.6, 1502.7, 1502.8, 1502.9, 1502.10, 1502.11, 1502.12, 1502.13, 1502.14, 1502.15, 1502.16, 1502.17, 1502.18, 1502.19, 1502.20, 1502.21, 1502.22, 1502.23, 1502.24, 1502.25, 1506.2(c), 1506.3, 1506.8, 1508.11. |
| Environmental Protection Agency. | 1502.11(f), 1504.1, 1504.3, 1506.7(c), 1506.9, 1506.10, 1508.19(a). |
| Environmental Review Requirements. | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Expedite | 1501.8(b)(3). |
| Federal Agency | 1508.12. |
| Filing | 1506.9. |
| Final Environmental Impact Statement. | 1502.9(b), 1503.1, 1503.4(b). |
| Finding of No Significant Impact. | 1500.3, 1500.4(q), 1500.5(l), 1501.4(e), 1508.13. |
| Fish and Wildlife Coordination Act. | 1502.25. |
| Format for Environmental Impact Statement. | 1502.10. |
| Freedom of Information Act | 1506.6(f). |
| Further Guidance | 1506.7. |
| Generic | 1502.4(c)(2). |
| General Services Administration. | 1506.8(b)(2)(iii). |
| Geographic | 1502.4(c)(1). |
| Graphics | 1502.8. |
| Handbook | 1506.7(a). |
| Housing and Community Development Act. | 1506.12, 1508.12. |

864

This content is from the eCFR and is authoritative but unofficial.

# Title 43 - Public Lands: Interior
## Subtitle B - Regulations Relating to Public Lands
## Chapter II - Bureau of Land Management, Department of the Interior
## Subchapter C - Minerals Management (3000)
## Part 3800 - Mining Claims Under the General Mining Laws

**Authority:** 16 U.S.C. 3101 *et seq.;* 30 U.S.C. 22-42, 181 *et seq.;* 301-306, 351-359, and 601 *et seq.;* 31 U.S.C. 9701; 40 U.S.C. 471 *et seq.;* 42 U.S.C. 6508; 43 U.S.C. 1701 *et seq.;* and Pub. L. No. 97-35, 95 Stat. 357.

**Source:** 45 FR 13974, Mar. 3, 1980, unless otherwise noted.

## Subpart 3809  Surface Management

### General Information

§ 3809.1    What are the purposes of this subpart?
§ 3809.2    What is the scope of this subpart?
§ 3809.3    What rules must I follow if State law conflicts with this subpart?
§ 3809.5    How does BLM define certain terms used in this subpart?
§ 3809.10   How does BLM classify operations?
§ 3809.11   When do I have to submit a plan of operations?
§ 3809.21   When do I have to submit a notice?
§ 3809.31   Are there any special situations that affect what submittals I must make before I conduct operations?
§ 3809.100  What special provisions apply to operations on segregated or withdrawn lands?
§ 3809.101  What special provisions apply to minerals that may be common variety minerals, such as sand, gravel, and building stone?
§ 3809.111  Will BLM disclose to the public the information I submit under this subpart?
§ 3809.115  Can BLM collect information under this subpart?
§ 3809.116  As a mining claimant or operator, what are my responsibilities under this subpart for my project area?

### Federal/State Agreements

§ 3809.200  What kinds of agreements may BLM and a State make under this subpart?
§ 3809.201  What should these agreements address?
§ 3809.202  Under what conditions will BLM defer to State regulation of operations?
§ 3809.203  What are the limitations on BLM deferral to State regulation of operations?
§ 3809.204  Does this subpart cancel an existing agreement between BLM and a State?

### Operations Conducted Under Notices

§ 3809.300  Does this subpart apply to my existing notice-level operations?
§ 3809.301  Where do I file my notice and what information must I include in it?
§ 3809.311  What action does BLM take when it receives my notice?
§ 3809.312  When may I begin operations after filing a complete notice?

§ 3809.313   Under what circumstances may I not begin operations 15 calendar days after filing my notice?
§ 3809.320   Which performance standards apply to my notice-level operations?
§ 3809.330   May I modify my notice?
§ 3809.331   Under what conditions must I modify my notice?
§ 3809.332   How long does my notice remain in effect?
§ 3809.333   May I extend my notice, and, if so, how?
§ 3809.334   What if I temporarily stop conducting operations under a notice?
§ 3809.335   What happens when my notice expires?
§ 3809.336   What if I abandon my notice-level operations?

Operations Conducted Under Plans of Operations

§ 3809.400   Does this subpart apply to my existing or pending plan of operations?
§ 3809.401   Where do I file my plan of operations and what information must I include with it?
§ 3809.411   What action will BLM take when it receives my plan of operations?
§ 3809.412   When may I operate under a plan of operations?
§ 3809.415   How do I prevent unnecessary or undue degradation while conducting operations on public lands?
§ 3809.420   What performance standards apply to my notice or plan of operations?
§ 3809.421   Enforcement of performance standards.
§ 3809.423   How long does my plan of operations remain in effect?
§ 3809.424   What are my obligations if I stop conducting operations?

Modifications of Plans of Operations

§ 3809.430   May I modify my plan of operations?
§ 3809.431   When must I modify my plan of operations?
§ 3809.432   What process will BLM follow in reviewing a modification of my plan of operations?
§ 3809.433   Does this subpart apply to a new modification of my plan of operations?
§ 3809.434   How does this subpart apply to pending modifications for new or existing facilities?

Financial Guarantee Requirements - General

§ 3809.500   In general, what are BLM's financial guarantee requirements?
§ 3809.503   When must I provide a financial guarantee for my notice-level operations?
§ 3809.505   How do the financial guarantee requirements of this subpart apply to my existing plan of operations?
§ 3809.551   What are my choices for providing BLM with a financial guarantee?

Individual Financial Guarantee

§ 3809.552   What must my individual financial guarantee cover?
§ 3809.553   May I post a financial guarantee for a part of my operations?
§ 3809.554   How do I estimate the cost to reclaim my operations?

§ 3809.555 What forms of individual financial guarantee are acceptable to BLM?

§ 3809.556 What special requirements apply to financial guarantees described in § 3809.555(e)?

Blanket Financial Guarantee

§ 3809.560 Under what circumstances may I provide a blanket financial guarantee?

State-Approved Financial Guarantee

§ 3809.570 Under what circumstances may I provide a State-approved financial guarantee?

§ 3809.571 What forms of State-approved financial guarantee are acceptable to BLM?

§ 3809.572 What happens if BLM rejects a financial instrument in my State-approved financial guarantee?

§ 3809.573 What happens if the State makes a demand against my financial guarantee?

§ 3809.574 What happens if I have an existing corporate guarantee?

Modification or Replacement of a Financial Guarantee

§ 3809.580 What happens if I modify my notice or approved plan of operations?

§ 3809.581 Will BLM accept a replacement financial instrument?

§ 3809.582 How long must I maintain my financial guarantee?

Release of Financial Guarantee

§ 3809.590 When will BLM release or reduce the financial guarantee for my notice or plan of operations?

§ 3809.591 What are the limitations on the amount by which BLM may reduce my financial guarantee?

§ 3809.592 Does release of my financial guarantee relieve me of all responsibility for my project area?

§ 3809.593 What happens to my financial guarantee if I transfer my operations?

§ 3809.594 What happens to my financial guarantee when my mining claim or millsite is patented?

Forfeiture of Financial Guarantee

§ 3809.595 When may BLM initiate forfeiture of my financial guarantee?

§ 3809.596 How does BLM initiate forfeiture of my financial guarantee?

§ 3809.597 What if I do not comply with BLM's forfeiture decision?

§ 3809.598 What if the amount forfeited will not cover the cost of reclamation?

§ 3809.599 What if the amount forfeited exceeds the cost of reclamation?

Inspection and Enforcement

§ 3809.600 With what frequency will BLM inspect my operations?

§ 3809.601 What types of enforcement action may BLM take if I do not meet the requirements of this subpart?

§ 3809.602 Can BLM revoke my plan of operations or nullify my notice?

§ 3809.603 How does BLM serve me with an enforcement action?

§ 3809.604 What happens if I do not comply with a BLM order?

§ 3809.605   What are prohibited acts under this subpart?

Penalties

§ 3809.700   What criminal penalties apply to violations of this subpart?

§ 3809.701   What happens if I make false statements to BLM?

Appeals

§ 3809.800   Who may appeal BLM decisions under this subpart?

§ 3809.801   When may I file an appeal of the BLM decision with OHA?

§ 3809.802   What must I include in my appeal to OHA?

§ 3809.803   Will the BLM decision go into effect during an appeal to OHA?

§ 3809.804   When may I ask the BLM State Director to review a BLM decision?

§ 3809.805   What must I send BLM to request State Director review?

§ 3809.806   Will the State Director review the original BLM decision if I request State Director review?

§ 3809.807   What happens once the State Director agrees to my request for a review of a decision?

§ 3809.808   How will decisions go into effect when I request State Director review?

§ 3809.809   May I appeal a decision made by the State Director?

Public Visits to Mines

§ 3809.900   Will BLM allow the public to visit mines on public lands?

## Subpart 3809 - Surface Management

**Authority:** 16 U.S.C. 1280; 30 U.S.C. 22; 30 U.S.C. 612; 43 U.S.C. 1201; and 43 U.S.C. 1732, 1733, 1740, 1781, and 1782.

**Source:** 65 FR 70112, Nov. 21, 2000, unless otherwise noted.

GENERAL INFORMATION

## § 3809.1 What are the purposes of this subpart?

The purposes of this subpart are to:

(a)  Prevent unnecessary or undue degradation of public lands by operations authorized by the mining laws. Anyone intending to develop mineral resources on the public lands must prevent unnecessary or undue degradation of the land and reclaim disturbed areas. This subpart establishes procedures and standards to ensure that operators and mining claimants meet this responsibility; and

(b)  Provide for maximum possible coordination with appropriate State agencies to avoid duplication and to ensure that operators prevent unnecessary or undue degradation of public lands.

## § 3809.2 What is the scope of this subpart?

(a) This subpart applies to all operations authorized by the mining laws on public lands where the mineral interest is reserved to the United States, including Stock Raising Homestead lands as provided in § 3809.31(d) and (e). When public lands are sold or exchanged under 43 U.S.C. 682(b) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1713 (sales) or 43 U.S.C. 1716 (exchanges), minerals reserved to the United States continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly restores the land to mineral entry, and BLM publishes a notice to inform the public.

(b) This subpart does not apply to lands in the National Park System, National Forest System, and the National Wildlife Refuge System; acquired lands; or lands administered by BLM that are under wilderness review, which are subject to subpart 3802 of this part.

(c) This subpart applies to all patents issued after October 21, 1976 for mining claims in the California Desert Conservation Area, except for any patent for which a right to the patent vested before that date.

(d) This subpart does not apply to private land except as provided in paragraphs (a) and (c) of this section. For purposes of analysis under the National Environmental Policy Act of 1969, BLM may collect information about private land that is near to, or may be affected by, operations authorized under this subpart.

(e) This subpart applies to operations that involve locatable minerals, including metallic minerals; some industrial minerals, such as gypsum; and a number of other non-metallic minerals that have a unique property which gives the deposit a distinct and special value. This subpart does not apply to leasable and salable minerals. Leasable minerals, such as coal, phosphate, sodium, and potassium; and salable minerals, such as common varieties of sand, gravel, stone, and pumice, are not subject to location under the mining laws. Parts 3400, 3500 and 3600 of this title govern mining operations for leasable and salable minerals.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.3 What rules must I follow if State law conflicts with this subpart?

If State laws or regulations conflict with this subpart regarding operations on public lands, you must follow the requirements of this subpart. However, there is no conflict if the State law or regulation requires a higher standard of protection for public lands than this subpart.

## § 3809.5 How does BLM define certain terms used in this subpart?

As used in this subpart, the term:

*Casual use* means activities ordinarily resulting in no or negligible disturbance of the public lands or resources. For example -

(1) Casual use generally includes the collection of geochemical, rock, soil, or mineral specimens using hand tools; hand panning; or non-motorized sluicing. It may include use of small portable suction dredges. It also generally includes use of metal detectors, gold spears and other battery-operated devices for sensing the presence of minerals, and hand and battery-operated drywashers. Operators

may use motorized vehicles for casual use activities provided the use is consistent with the regulations governing such use (part 8340 of this title), off-road vehicle use designations contained in BLM land-use plans, and the terms of temporary closures ordered by BLM.

(2) Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, motorized vehicles in areas when designated as closed to "off-road vehicles" as defined in § 8340.0-5 of this title, chemicals, or explosives. It also does not include "occupancy" as defined in § 3715.0-5 of this title or operations in areas where the cumulative effects of the activities result in more than negligible disturbance.

*Exploration* means creating surface disturbance greater than casual use that includes sampling, drilling, or developing surface or underground workings to evaluate the type, extent, quantity, or quality of mineral values present. Exploration does not include activities where material is extracted for commercial use or sale.

*Minimize* means to reduce the adverse impact of an operation to the lowest practical level. During review of operations, BLM may determine that it is practical to avoid or eliminate particular impacts.

*Mining claim* means any unpatented mining claim, millsite, or tunnel site located under the mining laws. The term also applies to those mining claims and millsites located in the California Desert Conservation Area that were patented after the enactment of the Federal Land Policy and Management Act of October 21, 1976. Mining "claimant" is defined in § 3833.0-5 of this title.

*Mining laws* means the Lode Law of July 26, 1866, as amended (14 Stat. 251); the Placer Law of July 9, 1870, as amended (16 Stat. 217); and the Mining Law of May 10, 1872, as amended (17 Stat. 91); as well as all laws supplementing and amending those laws, including the Building Stone Act of August 4, 1892, as amended (27 Stat. 348); the Saline Placer Act of January 31, 1901 (31 Stat. 745); the Surface Resources Act of 1955 (30 U.S.C. 611-614); and the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 *et seq.*).

*Mitigation,* as defined in 40 CFR 1508.20, may include one or more of the following:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action;

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and

(5) Compensating for the impact by replacing, or providing substitute, resources or environments.

*Operations* means all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a mining claim or not, including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities.

*Operator* means a person conducting or proposing to conduct operations.

*Person* means any individual, firm, corporation, association, partnership, trust, consortium, joint venture, or any other entity conducting operations on public lands.

*Project area* means the area of land upon which the operator conducts operations, including the area required for construction or maintenance of roads, transmission lines, pipelines, or other means of access by the operator.

*Public lands,* as defined in 43 U.S.C. 1702, means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the BLM, without regard to how the United States acquired ownership, except -

(1) Lands located on the Outer Continental Shelf; and

(2) Lands held for the benefit of Indians, Aleuts, and Eskimos.

*Reclamation* means taking measures required by this subpart following disturbance of public lands caused by operations to meet applicable performance standards and achieve conditions required by BLM at the conclusion of operations. For a definition of "reclamation" applicable to operations conducted under the mining laws on Stock Raising Homestead Act lands, see part 3810, subpart 3814 of this title. Components of reclamation include, where applicable:

(1) Isolation, control, or removal of acid-forming, toxic, or deleterious substances;

(2) Regrading and reshaping to conform with adjacent landforms, facilitate revegetation, control drainage, and minimize erosion;

(3) Rehabilitation of fisheries or wildlife habitat;

(4) Placement of growth medium and establishment of self-sustaining revegetation;

(5) Removal or stabilization of buildings, structures, or other support facilities;

(6) Plugging of drill holes and closure of underground workings; and

(7) Providing for post-mining monitoring, maintenance, or treatment.

*Riparian area* is a form of wetland transition between permanently saturated wetlands and upland areas. These areas exhibit vegetation or physical characteristics reflective of permanent surface or subsurface water influence. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are areas such as ephemeral streams or washes that do not exhibit the presence of vegetation dependent upon free water in the soil.

*Tribe* means, and *Tribal* refers to, a Federally recognized Indian tribe.

*Unnecessary or undue degradation* means conditions, activities, or practices that:

(1) Fail to comply with one or more of the following: the performance standards in § 3809.420, the terms and conditions of an approved plan of operations, operations described in a complete notice, and other Federal and state laws related to environmental protection and protection of cultural resources;

(2) Are not "reasonably incident" to prospecting, mining, or processing operations as defined in § 3715.0-5 of this chapter; or

(3) Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]

## § 3809.10 How does BLM classify operations?

BLM classifies operations as -

(a) Casual use, for which an operator need not notify BLM. (You must reclaim any casual-use disturbance that you create. If your operations do not qualify as casual use, you must submit a notice or plan of operations, whichever is applicable. See §§ 3809.11 and 3809.21.);

(b) Notice-level operations, for which an operator must submit a notice (except for certain suction-dredging operations covered by § 3809.31(b)); and

(c) Plan-level operations, for which an operator must submit a plan of operations and obtain BLM's approval.

## § 3809.11 When do I have to submit a plan of operations?

(a) You must submit a plan of operations and obtain BLM's approval before beginning operations greater than casual use, except as described in § 3809.21. Also see §§ 3809.31 and 3809.400 through 3809.434.

(b) You must submit a plan of operations for any bulk sampling in which you will remove 1,000 tons or more of presumed ore for testing.

(c) You must submit a plan of operations for any operations causing surface disturbance greater than casual use in the following special status areas where § 3809.21 does not apply:

(1) Lands in the California Desert Conservation Area (CDCA) designated by the CDCA plan as "controlled" or "limited" use areas;

(2) Areas in the National Wild and Scenic Rivers System, and areas designated for potential addition to the system;

(3) Designated Areas of Critical Environmental Concern;

(4) Areas designated as part of the National Wilderness Preservation System and administered by BLM;

(5) Areas designated as "closed" to off-road vehicle use, as defined in § 8340.0-5 of this title;

(6) Any lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat, unless BLM allows for other action under a formal land-use plan or threatened or endangered species recovery plan; and

(7) National Monuments and National Conservation Areas administered by BLM.

## § 3809.21 When do I have to submit a notice?

(a) You must submit a complete notice of your operations 15 calendar days before you commence exploration causing surface disturbance of 5 acres or less of public lands on which reclamation has not been completed. See § 3809.301 for information on what you must include in your notice.

(b) You must not segment a project area by filing a series of notices for the purpose of avoiding filing a plan of operations. See §§ 3809.300 through 3809.336 for regulations applicable to notice-level operations.

(b) Your reclamation obligations continue beyond the expiration or any termination of your notice until you satisfy them.

## § 3809.336 What if I abandon my notice-level operations?

(a) BLM may consider your operations to be abandoned if, for example, you leave inoperable or non-mining related equipment in the project area, remove equipment and facilities from the project area other than for purposes of completing reclamation according to your reclamation plan, do not maintain the project area, discharge local workers, or there is no sign of activity in the project area over time.

(b) If BLM determines that you abandoned your operations without completing reclamation, BLM may initiate forfeiture under § 3809.595. If the amount of the financial guarantee is inadequate to cover the cost of reclamation, BLM may complete the reclamation, and the operator and all other responsible persons are liable for the cost of reclamation.

OPERATIONS CONDUCTED UNDER PLANS OF OPERATIONS

## § 3809.400 Does this subpart apply to my existing or pending plan of operations?

(a) You may continue to operate under the terms and conditions of a plan of operations that BLM approved before January 20, 2001. All provisions of this subpart except plan content (§ 3809.401) and performance standards (§§ 3809.415 and 3809.420) apply to such plan of operations. See § 3809.505 for the applicability of financial guarantee requirements.

(b) If your unapproved plan of operations is pending on January 20, 2001, then the plan content requirements and performance standards that were in effect immediately before that date apply to your pending plan of operations. (See 43 CFR parts 1000-end, revised as of Oct. 1, 1999.) All other provisions of this subpart apply.

(c) If you want this subpart to apply to any existing or pending plan of operations, where not otherwise required, you may choose to have this subpart apply.

## § 3809.401 Where do I file my plan of operations and what information must I include with it?

(a) If you are required to file a plan of operations under § 3809.11, you must file it with the local BLM field office with jurisdiction over the lands involved. BLM does not require that the plan be on a particular form. Your plan of operations must demonstrate that the proposed operations would not result in unnecessary or undue degradation of public lands.

(b) Your plan of operations must contain the following information and describe the proposed operations at a level of detail sufficient for BLM to determine that the plan of operations prevents unnecessary or undue degradation:

(1) *Operator Information.* The name, mailing address, phone number, taxpayer identification number of the operator(s), and the BLM serial number(s) of any unpatented mining claim(s) where disturbance would occur. If the operator is a corporation, you must identify one individual as the point of contact. You must notify BLM in writing within 30 calendar days of any change of operator or corporate point of contact or in the mailing address of the operator or corporate point of contact;

(2) *Description of Operations.* A description of the equipment, devices, or practices you propose to use during operations including, where applicable -

    (i) Maps of the project area at an appropriate scale showing the location of exploration activities, drill sites, mining activities, processing facilities, waste rock and tailing disposal areas, support facilities, structures, buildings, and access routes;

    (ii) Preliminary or conceptual designs, cross sections, and operating plans for mining areas, processing facilities, and waste rock and tailing disposal facilities;

    (iii) Water management plans;

    (iv) Rock characterization and handling plans;

    (v) Quality assurance plans;

    (vi) Spill contingency plans;

    (vii) A general schedule of operations from start through closure; and

    (viii) Plans for all access roads, water supply pipelines, and power or utility services;

(3) *Reclamation Plan.* A plan for reclamation to meet the standards in § 3809.420, with a description of the equipment, devices, or practices you propose to use including, where applicable, plans for -

    (i) Drill-hole plugging;

    (ii) Regrading and reshaping;

    (iii) Mine reclamation, including information on the feasibility of pit backfilling that details economic, environmental, and safety factors;

    (iv) Riparian mitigation;

    (v) Wildlife habitat rehabilitation;

    (vi) Topsoil handling;

    (vii) Revegetation;

    (viii) Isolation and control of acid-forming, toxic, or deleterious materials;

    (ix) Removal or stabilization of buildings, structures and support facilities; and

    (x) Post-closure management;

(4) *Monitoring Plan.* A proposed plan for monitoring the effect of your operations. You must design monitoring plans to meet the following objectives: To demonstrate compliance with the approved plan of operations and other Federal or State environmental laws and regulations, to provide early detection of potential problems, and to supply information that will assist in directing corrective actions should they become necessary. Where applicable, you must include in monitoring plans details on type and location of monitoring devices, sampling parameters and frequency, analytical methods, reporting procedures, and procedures to respond to adverse monitoring results. Monitoring plans may incorporate existing State or other Federal monitoring requirements to avoid duplication. Examples of monitoring programs which may be necessary include surface- and ground-water quality and quantity, air quality, revegetation, stability, noise levels, and wildlife mortality; and

(5) *Interim management plan.* A plan to manage the project area during periods of temporary closure (including periods of seasonal closure) to prevent unnecessary or undue degradation. The interim management plan must include, where applicable, the following:

(i) Measures to stabilize excavations and workings;

(ii) Measures to isolate or control toxic or deleterious materials (See also the requirements in § 3809.420(c)(12)(vii).);

(iii) Provisions for the storage or removal of equipment, supplies and structures;

(iv) Measures to maintain the project area in a safe and clean condition;

(v) Plans for monitoring site conditions during periods of non-operation; and

(vi) A schedule of anticipated periods of temporary closure during which you would implement the interim management plan, including provisions for notifying BLM of unplanned or extended temporary closures.

(c) In addition to the requirements of paragraph (b) of this section, BLM may require you to supply -

(1) Operational and baseline environmental information for BLM to analyze potential environmental impacts as required by the National Environmental Policy Act and to determine if your plan of operations will prevent unnecessary or undue degradation. This could include information on public and non-public lands needed to characterize the geology, paleontological resources, cave resources, hydrology, soils, vegetation, wildlife, air quality, cultural resources, and socioeconomic conditions in and around the project area, as well as information that may require you to conduct static and kinetic testing to characterize the potential for your operations to produce acid drainage or other leachate. BLM is available to advise you on the exact type of information and level of detail needed to meet these requirements; and

(2) Other information, if necessary to ensure that your operations will comply with this subpart.

(d) *Reclamation cost estimate.* At a time specified by BLM, you must submit an estimate of the cost to fully reclaim your operations as required by § 3809.552. BLM will review your reclamation cost estimate and notify you of any deficiencies or additional information that must be submitted in order to determine a final reclamation cost. BLM will notify you when we have determined the final amount for which you must provide financial assurance.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.411 What action will BLM take when it receives my plan of operations?

(a) BLM will review your plan of operations within 30 calendar days and will notify you that -

(1) Your plan of operations is complete, that is, it meets the content requirements of § 3809.401(b);

(2) Your plan does not contain a complete description of the proposed operations under § 3809.401(b). BLM will identify deficiencies that you must address before BLM can continue processing your plan of operations. If necessary, BLM may repeat this process until your plan of operations is complete; or

(3) The description of the proposed operations is complete, but BLM cannot approve the plan until certain additional steps are completed, including one or more of the following:

(i) You collect adequate baseline data;

(ii) BLM completes the environmental review required under the National Environmental Policy Act;

(iii) BLM completes any consultation required under the National Historic Preservation Act, the Endangered Species Act, or the Magnuson-Stevens Fishery Conservation and Management Act;

(iv) BLM or the Department of the Interior completes other Federal responsibilities, such as Native American consultation;

(v) BLM conducts an on-site visit;

(vi) BLM completes review of public comments on the plan of operations;

(vii) For public lands where BLM does not have responsibility for managing the surface, BLM consults with the surface-managing agency;

(viii) In cases where the surface is owned by a non-Federal entity, BLM consults with the surface owner; and

(ix) BLM completes consultation with the State to ensure your operations will be consistent with State water quality requirements.

(b) Pending final approval of your plan of operations, BLM may approve any operations that may be necessary for timely compliance with requirements of Federal and State laws, subject to any terms and conditions that may be needed to prevent unnecessary or undue degradation.

(c) Following receipt of your complete plan of operations and before BLM acts on it, we will publish a notice of the availability of the plan in either a local newspaper of general circulation or a NEPA document and will accept public comment for at least 30 calendar days on your plan of operations.

(d) Upon completion of the review of your plan of operations, including analysis under NEPA and public comment, BLM will notify you that -

(1) BLM approves your plan of operations as submitted (See part 3810, subpart 3814 of this title for specific plan-related requirements applicable to operations on Stock Raising Homestead Act lands.);

(2) BLM approves your plan of operations subject to changes or conditions that are necessary to meet the performance standards of § 3809.420 and to prevent unnecessary or undue degradation. BLM may require you to incorporate into your plan of operations other agency permits, final approved engineering designs and plans, or other conditions of approval from the review of the plan of operations filed under § 3809.401(b); or

(3) BLM disapproves, or is withholding approval of your plan of operations because the plan:

(i) Does not meet the applicable content requirements of § 3809.401;

(ii) Proposes operations that are in an area segregated or withdrawn from the operation of the mining laws, unless the requirements of § 3809.100 are met; or

(iii) Proposes operations that would result in unnecessary or undue degradation of public lands.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.412 When may I operate under a plan of operations?

You must not begin operations until BLM approves your plan of operations and you provide the financial guarantee required under § 3809.551.

## § 3809.415 How do I prevent unnecessary or undue degradation while conducting operations on public lands?

You prevent unnecessary or undue degradation while conducting operations on public lands by -

(a) Complying with § 3809.420, as applicable; the terms and conditions of your notice or approved plan of operations; and other Federal and State laws related to environmental protection and protection of cultural resources;

(b) Assuring that your operations are "reasonably incident" to prospecting, mining, or processing operations and uses as defined in § 3715.0-5 of this title; and

(c) Attaining the stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54861, Oct. 30, 2001]*

## § 3809.420 What performance standards apply to my notice or plan of operations?

The following performance standards apply to your notice or plan of operations:

(a) *General performance standards* -

(1) *Technology and practices.* You must use equipment, devices, and practices that will meet the performance standards of this subpart.

(2) *Sequence of operations.* You must avoid unnecessary impacts and facilitate reclamation by following a reasonable and customary mineral exploration, development, mining and reclamation sequence.

(3) *Land-use plans.* Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans, and with coastal zone management plans under 16 U.S.C. 1451, as appropriate.

(4) *Mitigation.* You must take mitigation measures specified by BLM to protect public lands.

(5) *Concurrent reclamation.* You must initiate and complete reclamation at the earliest economically and technically feasible time on those portions of the disturbed area that you will not disturb further.

(6) *Compliance with other laws.* You must conduct all operations in a manner that complies with all pertinent Federal and state laws.

(b) *Specific standards* -

(1) *Access routes.* Access routes shall be planned for only the minimum width needed for operations and shall follow natural contours, where practicable to minimize cut and fill. When the construction of access routes involves slopes that require cuts on the inside edge in excess of 3 feet, the operator may be required to consult with the authorized officer concerning the most appropriate location of the access route prior to commencing operations. An operator is entitled to access to his operations consistent with provisions of the mining laws. Where a notice or a plan of operations is required, it shall specify the location of access routes for operations and other conditions necessary to prevent unnecessary or undue degradation. The authorized officer may require the operator to use existing roads to minimize the number of access routes, and, if practicable, to construct access roads within

a designated transportation or utility corridor. When commercial hauling is involved and the use of an existing road is required, the authorized officer may require the operator to make appropriate arrangements for use and maintenance.

(2) *Mining wastes.* All tailings, dumps, deleterious materials or substances, and other waste produced by the operations shall be disposed of so as to prevent unnecessary or undue degradation and in accordance with applicable Federal and state Laws.

(3) *Reclamation.*

   (i) At the earliest feasible time, the operator shall reclaim the area disturbed, except to the extent necessary to preserve evidence of mineralization, by taking reasonable measures to prevent or control on-site and off-site damage of the Federal lands.

   (ii) Reclamation shall include, but shall not be limited to:

      (A) Saving of topsoil for final application after reshaping of disturbed areas have been completed;

      (B) Measures to control erosion, landslides, and water runoff;

      (C) Measures to isolate, remove, or control toxic materials;

      (D) Reshaping the area disturbed, application of the topsoil, and revegetation of disturbed areas, where reasonably practicable; and

      (E) Rehabilitation of fisheries and wildlife habitat.

   (iii) When reclamation of the disturbed area has been completed, except to the extent necessary to preserve evidence of mineralization, the authorized officer shall be notified so that an inspection of the area can be made.

(4) *Air quality.* All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act (42 U.S.C. 1857 *et seq.*).

(5) *Water quality.* All operators shall comply with applicable Federal and state water quality standards, including the Federal Water Pollution Control Act, as amended (30 U.S.C. 1151 *et seq.*).

(6) *Solid wastes.* All operators shall comply with applicable Federal and state standards for the disposal and treatment of solid wastes, including regulations issued pursuant to the Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et seq.*). All garbage, refuse or waste shall either be removed from the affected lands or disposed of or treated to minimize, so far as is practicable, its impact on the lands.

(7) **Fisheries, wildlife and plant habitat.** The operator shall take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations.

(8) **Cultural and paleontological resources.**

   (i) Operators shall not knowingly disturb, alter, injure, or destroy any scientifically important paleontological remains or any historical or archaeological site, structure, building or object on Federal lands.

(ii) Operators shall immediately bring to the attention of the authorized officer any cultural and/or paleontological resources that might be altered or destroyed on Federal lands by his/her operations, and shall leave such discovery intact until told to proceed by the authorized officer. The authorized officer shall evaluate the discoveries brought to his/her attention, take action to protect or remove the resource, and allow operations to proceed within 10 working days after notification to the authorized officer of such discovery.

(iii) The Federal Government shall have the responsibility and bear the cost of investigations and salvage of cultural and paleontology values discovered after a plan of operations has been approved, or where a plan is not involved.

(9) *Protection of survey monuments.* To the extent practicable, all operators shall protect all survey monuments, witness corners, reference monuments, bearing trees and line trees against unnecessary or undue destruction, obliteration or damage. If, in the course of operations, any monuments, corners, or accessories are destroyed, obliterated, or damaged by such operations, the operator shall immediately report the matter to the authorized officer. The authorized officer shall prescribe, in writing, the requirements for the restoration or reestablishment of monuments, corners, bearing and line trees.

(10) *Fire.* The operator shall comply with all applicable Federal and state fire laws and regulations, and shall take all reasonable measures to prevent and suppress fires in the area of operations.

(11) *Acid-forming, toxic, or other deleterious materials.* You must incorporate identification, handling, and placement of potentially acid-forming, toxic or other deleterious materials into your operations, facility design, reclamation, and environmental monitoring programs to minimize the formation and impacts of acidic, alkaline, metal-bearing, or other deleterious leachate, including the following:

(i) You must handle, place, or treat potentially acid-forming, toxic, or other deleterious materials in a manner that minimizes the likelihood of acid formation and toxic and other deleterious leachate generation (source control);

(ii) If you cannot prevent the formation of acid, toxic, or other deleterious drainage, you must minimize uncontrolled migration of leachate; and

(iii) You must capture and treat acid drainage, or other undesirable effluent, to the applicable standard if source controls and migration controls do not prove effective. You are responsible for any costs associated with water treatment or facility maintenance after project closure. Long-term, or post-mining, effluent capture and treatment are not acceptable substitutes for source and migration control, and you may rely on them only after all reasonable source and migration control methods have been employed.

(12) *Leaching operations and impoundments.*

(i) You must design, construct, and operate all leach pads, tailings impoundments, ponds, and solution-holding facilities according to standard engineering practices to achieve and maintain stability and facilitate reclamation.

(ii) You must construct a low-permeability liner or containment system that will minimize the release of leaching solutions to the environment. You must monitor to detect potential releases of contaminants from heaps, process ponds, tailings impoundments, and other structures and remediate environmental impacts if leakage occurs.

(iii) You must design, construct, and operate cyanide or other leaching facilities and impoundments to contain precipitation from the local 100-year, 24-hour storm event in addition to the maximum process solution inventory. Your design must also include allowances for snowmelt events and draindown from heaps during power outages in the design.

(iv) You must construct a secondary containment system around vats, tanks, or recovery circuits adequate to prevent the release of toxic solutions to the environment in the event of primary containment failure.

(v) You must exclude access by the public, wildlife, or livestock to solution containment and transfer structures that contain lethal levels of cyanide or other solutions.

(vi) During closure and at final reclamation, you must detoxify leaching solutions and heaps and manage tailings or other process waste to minimize impacts to the environment from contact with toxic materials or leachate. Acceptable practices to detoxify solutions and materials include natural degradation, rinsing, chemical treatment, or equally successful alternative methods. Upon completion of reclamation, all materials and discharges must meet applicable standards.

(vii) In cases of temporary or seasonal closure, you must provide adequate maintenance, monitoring, security, and financial guarantee, and BLM may require you to detoxify process solutions.

(13) *Maintenance and public safety.* During all operations, the operator shall maintain his or her structures, equipment, and other facilities in a safe and orderly manner. Hazardous sites or conditions resulting from operations shall be marked by signs, fenced, or otherwise identified to alert the public in accordance with applicable Federal and state laws and regulations.

*[66 FR 54861, Oct. 30, 2001]*

## § 3809.421 Enforcement of performance standards.

Failure of the operator to prevent unnecessary or undue degradation or to complete reclamation to the standards described in this subpart may cause the operator to be subject to enforcement as described in §§ 3809.600 through 3809. 605 of this subpart.

*[66 FR 54862, Oct. 30, 2001]*

## § 3809.423 How long does my plan of operations remain in effect?

Your plan of operations remains in effect as long as you are conducting operations, unless BLM suspends or revokes your plan of operations for failure to comply with this subpart.

## § 3809.424 What are my obligations if I stop conducting operations?

(a) To see what you must do if you stop conducting operations, follow this table:

| If - | Then - |
|---|---|
| (1) You stop conducting operations for | (1) You must follow your approved interim management plan submitted under § 3809.401(b)(5); (ii) You must submit a modification to your interim management plan to BLM within 30 calendar days if it does not cover the circumstances of your temporary |