No. 23-15259
(Consolidated with Nos. 23-15261, 23-15262)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WESTERN WATERSHEDS PROJECT; WILDLANDS DEFENSE; GREAT
BASIN RESOURCE WATCH; BASIN AND RANGE WATCH,
Plaintiffs–Appellants, and

BARTELL RANCH, LLC; EDWARD BARTELL, Plaintiffs–Appellants, and

BURNS PAIUTE TRIBE, Plaintiff–Appellant;

v.

ESTER M. MCCULLOUGH; BUREAU OF LAND MANAGEMENT; U.S.
DEPARTMENT OF THE INTERIOR,
Defendants–Appellees,

and

LITHIUM NEVADA CORPORATION,
Intervenor-Defendant–Appellee.

On Appeal from the United States District Court for the District of Nevada
District Court No. 3:21-cv-00080-MMD-CLB
Miranda M. Du, Chief District Judge

## INTERVENOR-DEFENDANT APPELLEE'S
## COMBINED ANSWERING BRIEF

Dated April 28, 2023

Laura K. Granier
Jessica L. Coberly
HOLLAND & HART LLP
5441 Kietzke Lane,
Suite 200
Reno, NV 89511
Tel: 775-327-3011
lkgranier@hollandhart.com
jlcoberly@hollandhart.com

Mark D. Gibson
Andrew C. Lillie
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Tel: 303-295-8121
mdgibson@hollandhart.com
aclillie@hollandhart.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a), Intervenor-Defendant-Appellee Lithium Nevada Corporation ("Lithium Nevada") states that the following may have a direct pecuniary interest in the outcome of this case:

1. Lithium Americas Corp. is Lithium Nevada's parent organization.

2. General Motors Co. recently acquired a 9.999% interest in Lithium Nevada's parent organization Lithium Americas Corp. General Motors Co. recently committed to additional investment in Lithium Americas Corp., which will increase General Motors Co.'s ownership interest.

These representations are made to enable judges of the court to evaluate possible disqualifications or recusal.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ I

TABLE OF AUTHORITIES ...................................................................... VI

INTRODUCTION ................................................................................ 1

ISSUES PRESENTED FOR REVIEW .......................................................... 2

STATEMENT OF THE CASE .................................................................. 3

I. BACKGROUND ...................................................................... 3

    A. Thacker Pass Lithium Project ...................................... 3

    B. NEPA Compliance .................................................... 4

        1. Water ............................................................ 4

        2. Air Quality .................................................... 5

        3. Wildlife ........................................................ 5

    C. Prior Consultation.................................................. 7

    D. NHPA Opportunities ................................................ 11

II. PROCEDURAL HISTORY .......................................................... 12

STANDARD OF REVIEW ...................................................................... 13

ARGUMENT .................................................................................. 14

I. WWP CLAIMS .................................................................... 14

    A. The Project Complies with FLPMA ................................ 15

        1. Compliance with the 2015 RMPA............................ 17

        2. GSG Habitat Mitigation.................................... 21

        3. BLM Prevented UUD ........................................ 28

        4.     VRM Standards are Guidelines ................................32

  B.    NEPA.......................................................................34

        1.     BLM took a "Hard Look" at Cumulative Impacts...................34

        2.     BLM Evaluated Mitigation and Adaptive Management .........36

        3.     BLM Adequately Analyzed Baseline Wildlife Conditions ......42

        4.     BLM Took a Hard Look at Impacts to Wildlife ......................44

II.    BARTELL CLAIMS ........................................................47

  A.    The Water Resource Baseline is Robust .............................48

        1.     There Was No Protocol Violation or Trespass. .......................49

        2.     BLM Oversaw Piteau's Work......................................53

        3.     The Baseline is Accurate. ..........................................56

        4.     BLM Approved an Effective Mitigation Plan. ........................67

        5.     BLM Made Adequate Information Publicly Available ...........69

  B.    The Court Did Not Abuse Its Discretion In Rejecting Bartell's Extra-Record Testimony .......................................................71

        1.     The court correctly declined to consider post-ROD extra-record testimony.........................................................71

        2.     The Testimony is Inadmissible under *Lands Council* Factors One and Four ................................................73

  C.    BLM Complied with FLPMA ............................................75

        1.     Bartell's GSG RMP Claims are Moot .....................................76

        2.     The Project Complies with RMPA GSG Protections...............77

        3.     *Rosemont* Does Not Apply to the Water and Power Lines.......78

III.   BURNS TRIBE CLAIMS ................................................82

A.  BLM Reasonably Did Not Consult with BPT ....................................83

    1.  BPT Did Not Give BLM Notice of Its Traditional Territory ..................................................................................83

    2.  Burns Tribe Expressed Affirmative Disinterest.......................84

    3.  BLM Reasonably Relied on the Burns Tribe's Disinterest ......88

    4.  BLM Reasonably Identified Consulting Tribes.......................90

B.  BPT's NEPA Arguments Are New on Appeal ...................................94

C.  BLM Fulfilled the "Hard Look" NEPA Standard..............................95

IV.  THE DISTRICT COURT DID NOT ABUSE DISCRETION IN REMANDING WITHOUT VACATUR.......................................................98

A.  There is at least a serious possibility that BLM will reach the same decision on remand. ...................................................................99

    1.  The record shows widespread mineralization throughout the Project area..........................................................................100

    2.  There is a serious possibility BLM will substantiate its decision on remand even if BLM finds inadequate mineralization.........................................................................105

    3.  There is a serious possibility BLM will substantiate its decision on remand because the Project complies with the RMPA ..............................................................................107

B.  The district court did not abuse its discretion in determining that the seriousness of BLM's error did not compel vacatur ...........109

C.  The court did not abuse its discretion in determining that environ-mental impacts did not compel vacatur. .............................111

D.  The court did not abuse its discretion in remanding without vacatur given the severe consequences from vacatur. ......................112

CONCLUSION .................................................................................................115

STATEMENT OF RELATED CASES ............................................................117

iv

CERTIFICATE OF SERVICE ..............................................................................117

CERTIFICATE OF COMPLIANCE ....................................................................117

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

'Ilio'ulaokalani Coal. v. Rumsfeld,
   464 F.3d 1083 (9th Cir. 2006) ......................................................... 111

Akiak Native Cmty. v. U.S. Postal Serv.,
   213 F.3d 1140 (9th Cir. 2000) ........................................................... 55

Alliance for the Wild Rockies v. Marten,
   585 F. Supp. 3d 1252 (D. Mont. 2021) ............................................. 73

Allied-Signal, Inc. v. United States Nuclear Regulatory Commission,
   988 F.2d 146 (D.C. Cir. 1993) ................................................... 99, 109

Audubon Soc'y of Portland v. Haaland,
   40 F.4th 967 (9th Cir. 2022) ............................................................. 31

Barrows v. Hickel,
   447 F.2d 80 (9th Cir. 1971) ............................................................... 79

Battle Mt. Band v. U.S. BLM,
   2016 U.S. Dist. LEXIS 115093 (D. Nev. Aug. 25, 2016) .................. 96

Bear Lake Watch, Inc. v. FERC,
   324 F.3d 1071 (9th Cir. 2003) ........................................................... 40

Bohmker v. Oregon,
   903 F.3d 1036 (9th Cir. 2018) ........................................................... 79

Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v.
   Zinke,
   889 F.3d 584 (9th Cir. 2018) ....................................................... 71, 72

Cal. Cmtys. Against Toxics v. EPA,
   688 F.3d 989 (9th Cir. 2012) ................................................... 111, 113

Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. DOI,
   767 F.3d 781 (9th Cir. 2014) ............................................................. 40

*Cal. Wilderness Coal. v. U.S. DOE*, 631 F.3d 1072, 1090 (9th Cir. 2011)……......80

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971) ............................................................37

*Center for Biological Diversity v. BLM*,
   No. 2:14-cv-00226-APG-VCF, 2017 U.S. Dist. LEXIS 137089 (D. Nev.
   Aug. 23, 2017) ....................................................................................98

*Center for Biological Diversity v. U.S. Army Corps of Engineers ("Army
   Corps")*,
   2015 U.S. Dist. LEXIS 199747 (C.D. Cal. June 30, 2015) .........................90, 92

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
   33 F.4th 1202 (9th Cir. 2022) .......................................................*passim*

*Chrisman v. Miller*,
   197 U.S. 313 (1905).....................................................................102

*City of Carmel-by-the-Sea v. U.S. DOT*,
   123 F.3d 1142 (9th Cir. 1997) ...................................................25, 32

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ............................................................57

*Confederated Tribes & Bands of Yakima Indian Nation v. FERC*,
   746 F.2d 466 (9th Cir. 1984) ............................................................93

*Ctr. for Biological Diversity v. U.S. BLM*,
   No. 4:21-cv-00182-BLW, 2023 U.S. Dist. LEXIS 13961 (D. Idaho Jan.
   24, 2023) ....................................................................................35, 92

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
   450 F.3d 930 (9th Cir. 2006) ..............................................................72

*Ctr. for Cmty. Action v. FAA*,
   18 F.4th 592 (9th Cir. 2021) ..............................................................17

*Davis v. Nelson*,
   329 F.2d 840 (9th Cir. 1964) ..............................................................79

*Doe v. Garland*,
   17 F. 4th 941 (9th Cir. 2021) ............................................................91

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ...........................................................51, 52, 55, 58

*Earthworks v. U.S. DOI*,
   496 F. Supp. 3d 472 (D.D.C. 2020), *appeal docketed*, No. 20-5382 (D.C.
   Cir. Dec. 30, 2020)...........................................................................................105

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)............................................................................................33

*Fields v. Palmdale Sch. Dist.*,
   427 F.3d 1197 (9th Cir. 2005) ...........................................................................13

*Fox v. Vice*,
   563 U.S. 826 (2011)............................................................................................71

*Friends of Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) ........................................................................54, 84

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
   887 F.3d 906 (9th Cir. 2018) ........................................................................61, 63

*Friends of Yosemite Valley v. Norton*,
   348 F.3d 789 (9th Cir. 2003) .............................................................................22

*Grand Canyon Tr. v. Provencio*,
   26 F.4th 815 (9th Cir. 2022) ............................................................................103

*Great Basin Res. Watch v. BLM*, 844 F.3d at 1105 ..............................25, 32, 34, 37

*Gulf Restoration Network v. Haaland*,
   47 F.4th 795 (D.C. Cir. 2022)...................................................................111, 113

*Havasupai Tribe v. Robertson*,
   943 F.2d 32 (9th Cir. 1991) ..................................................................22, 50, 57

*Headwaters, Inc. v. Bureau of Land Management*,
   893 F.2d 1012 (9th Cir. 1989) ...........................................................................76

*Idaho Conservation League v. Thomas*,
   91 F.3d 1345 (9th Cir. 1996) .......................................................................26, 28

*Idaho Sporting Congress v. Rittenhouse*,
  305 F.3d 957 (9th Cir.2002) ................................................52

*Inland Empire v. Schultz*,
  992 F.2d 977 (9th Cir. 1993) ...............................................68

*INS v. Yang*,
  519 U.S. 26 (1996).............................................................33

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
  725 F.3d 940 (9th Cir. 2013) .............................................104

*Japanese Vill., Ltd. Liab. Co. v. Fed. Transit Admin.*,
  843 F.3d 445 (9th Cir. 2016) ...........................29, 31, 40, 42

*Jones v. BLM*,
  121 F.3d 1327 (9th Cir. 1997) .............................................94

*Kalispel Tribe of Indians v. U.S. DOI*,
  999 F.3d 683 (9th Cir. 2021) ...............................................44

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)............................................17, 35, 42

*Krueger v. Morton*,
  539 F.2d 235 (D.C. Cir. 1976)............................................107

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) .........................................59, 73

*Lands Council v. Powell*,
  379 F.3d 738 (9th Cir. 2004), *amended by* 395 F.3d 1019 (9th Cir. 2005)..73, 74

*League of Wilderness Defs. v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) .................................52, 55, 67

*Lower Brule Sioux Tribe v. Deer*,
  911 F. Supp. 395 (D.S.D.1995) ...........................................89

*McCall v. Las Vegas Metro. Police Dep't*,
  2020 U.S. Dist. LEXIS 52264 (D. Nev. Mar. 23, 2020) *aff'd sub nom.*
  *McCall v. Jacobitz*, 2021 U.S. App. LEXIS 24635 (9th Cir. Aug. 18,
  2021) ................................................................................53

*Mineral Policy Center v. Norton*,
    292 F. Supp. 2d 30 (D.D.C. 2003)........................................................17

*Moapa Band of Paiutes*, 2011 U.S. Dist. LEXIS 116046, at *19 ..........................42

*Moran v. Screening Pros, LLC*,
    943 F.3d 1175 (9th Cir. 2019) ........................................................15

*Morongo Band of Mission Indians v. FAA*,
    161 F.3d 569 (9th Cir. 1998) ........................................................89

*Morrison-Knudsen Co. v. CHG Int'l, Inc.*,
    811 F.2d 1209 (9th Cir. 1987) ..................................................94, 97

*Mortg. Store v. Field (In re Mortg. Store)*,
    No. 12-00653 JMS/KSC, 2013 U.S. Dist. LEXIS 54825, at *28 (D. Haw.
    Apr. 16, 2013)........................................................77

*N. Plains Res. Council, Inc. v. Surface Trans. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ............................................38, 41, 58

*Nat'l Parks & Conservation Ass n v. U.S. Dep't of Transp.*, 222 F.3d 677,
    681 n.4 (9th Cir. 2000)........................................................25

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)........................................................104

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ........................................................66

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) ................................................*passim*

*Neighbors of Cuddy Mt. v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ........................................................88

*Northcoast Env't Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ........................................................72

*NRDC v. EPA*,
    38 F.4th 34 (9th Cir. 2022) ........................................................111

*Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.*,
460 F.3d 1125 (9th Cir. 2006) ............................................................72

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998)............................................................................88

*Okanogan Highlands v. Williams*,
236 F.3d 468 (9th Cir. 2000) ...............................................25, 38, 69

*Or. Nat. Desert Assoc. v. Zinke*,
250 F. Supp. 3d 773 (D. Or. 2017) ..................................................110

*Or. Nat'l Desert Ass'n v. Rose ("Rose")*,
921 F.3d 1185 (9th Cir. 2019) .......................................................51, 52

*Oregon Nat. Desert Ass'n v. Jewell*,
840 F.3d 562 (9th Cir. 2016) ..............................................................56

*Pit River Tribe v. U.S. Forest Serv.*,
615 F.3d 1069 (9th Cir. 2010) .............................................................99

*Plan v. McMath*,
206 F.3d 821 (9th Cir. 2000) ..............................................................77

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ..............................................................99

*Protect Our Cmtys. Found. v. Jewell*,
825 F.3d 571 (9th Cir. 2016) .......................................21, 25, 26, 31

*Pueblo of Sandia*, 50 F.3d 856, (10th Cir. 1995)....................................93

*Quarles v. United States*,
139 S. Ct. 1872 (2019).....................................................................107

*Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. DOI*,
2012 U.S. Dist. LEXIS 162860 (S.D. Cal. Nov. 14, 2012)..........85, 86

*Reno-Sparks Indian Colony et al. v. Deb Haaland et al.*,
No. 3:23-cv-00070-LRH-CLB .......................................................117

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).....................................................................34, 38

xi

*Rock Creek All. v. U.S. Forest Serv.*,
703 F. Supp. 2d 1152 (D. Mont. 2010) ................................................ 35

*S. Coast Air Quality Mgmt. Dist. v. FERC*,
621 F.3d 1085 (9th Cir. 2010) ............................................................ 39

*S. Fork Band Council of W. Shoshone of Nev. v. DOI*,
588 F.3d 718 (9th Cir. 2009) (per curiam) ................................... 32, 33

*S.F. Baykeeper v. U.S. Army Corps of Eng'rs*,
219 F. Supp. 2d 1001 (N.D. Cal. 2002) .............................................. 55

*Sacora v. Thomas*,
628 F.3d 1059 (9th Cir. 2010) ............................................................ 13

*Salmon River Concerned Citizens v. Robertson*,
32 F.3d 1346 (9th Cir. 1994) .............................................................. 24

*San Juan Citizens All. v. Norton*,
586 F. Supp. 2d 1270 (D.N.M. 2008) ............................................ 86, 95

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................................................... *passim*

*Selkirk Conservation v. Forsgren*,
336 F.3d, 960 (9th Cir. 2003) ........................................................ 35, 36

*Shinseki v. Sanders*,
556 U.S. 396 (2009) .......................................................................... 106

*Sierra Club v. Penfold*,
857 F.2d 1307 (9th Cir. 1988) ....................................................... 77, 79

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) ............................................... 62, 94, 101

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) *vacated in part* 985 F.3d 1032 (2021) ...... 96

*Steamboaters v. FERC*,
759 F.2d 1382 (9th Cir. 1985) ............................................................ 37

xii

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. DOI*,
608 F.3d 592 (9th Cir. 2010) ...............................................................13

*Terry Hankins*,
162 IBLA 198 (July 22, 2004).............................................................81

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016) ...............................................................13

*Thompson v. Commissioner*,
631 F.2d 642 (9th Cir. 1980) ...............................................................98

*Tri-Valley CAREs v. U.S. DOE*,
671 F.3d 1113 (9th Cir. 2012) ........................................................71, 72

*Union Oil Co. v. Smith*,
249 U.S. 337 (1919)..............................................................................78

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
933 F.3d 728 (D.C. Cir. 2019)..............................................................88

*United States v. Rice*,
1989 U.S. App. LEXIS 23812 (9th Cir. Sep. 1989).........................79

*United States v. Shumway*,
199 F.3d 1093 (9th Cir. 1999) ........................................................80, 82

*United Stockgrowers of Am. v. USDA*,
499 F.3d 1108 (9th Cir. 2007) .............................................................75

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021) ...........................................................112

*W. Expl., LLC v. U.S. DOI*,
250 F. Supp. 3d 718, 749, 735 (D. Nev. 2017)...................................22

*W. Org. of Res. Councils v. U.S. BLM*,
2018 U.S. Dist. LEXIS 49635 (D. Mont. Mar. 26, 2018) .................86

*W. Watersheds Project v. Bernhardt*,
519 F. Supp. 3d 763 (D. Idaho 2021) ..................................................16

*W. Watersheds Project v. BLM*,
  2011 U.S. Dist. LEXIS 50056, at *8–9 (D. Nev. Apr. 28, 2011); *aff'd* 443
  F. App'x 278 (9th Cir. 2011) ............................................................... 31

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ............................................................. 39

*Western Watersheds Project* ................................................................ 44

*Winnebago Tribe v. Babbitt*,
  915 F. Supp. 157 (D.S.D. 1996) ......................................................... 89

### STATUTES

5 U.S.C. § 706(2)(A) ............................................................................ 99

30 U.S.C. § 21(a) ................................................................................ 110

30 U.S.C. § 21a (1970) ....................................................................... 107

30 U.S.C. § 1602 ................................................................................ 115

30 U.S.C. § 1602(7), (8) .................................................................... 110

30 U.S.C. § 1607 ................................................................................ 111

42 U.S.C. § 7410(a)(1), (2) ................................................................. 42

43 U.S.C. § 1712(e)(3) ......................................................................... 16

43 U.S.C. § 1732(b) ............................................................................. 16

Administrative Procedure Act ........................................................ xix, 13

Federal Land Policy and Management Act ..................................... *passim*

General Mining Law of 1872 ......................................................... *passim*

National Environmental Policy Act ............................................... *passim*

National Historic Preservation Act ............................................... *passim*

Native American Graves Protection and Repatriation Act ("NAGPRA"), 25
  U.S.C. § 3003(d) ................................................................... 10, 88, 89

Surface Use Act, 30 U.S.C. §§ 611–15 .................................................................82

**REGULATIONS**

36 C.F.R. §800.2(c)(2)(ii) ...........................................................................85

36 C.F.R. § 800.2(c)(2)(ii)(D) ...................................................................92

36 C.F.R. § 800.2(c)(2)(B) ..........................................................................85

36 C.F.R. § 800.3(d) .....................................................................................85

36 C.F.R. § 800.3(f) .......................................................................................85

36 C.F.R. § 800.3(f)(2) ................................................................................85

36 C.F.R. § 800.4(b)(1) ..........................................................................90, 97

40 C.F.R. § 1501.2(b)(4)(ii) (2020) .........................................................95

40 C.F.R. §1502.14(f) ..................................................................................36

40 C.F.R. § 1502.15 ......................................................................................42

40 C.F.R. § 1502.16(a)(5) .....................................................................28, 33

40 C.F.R. § 1502.24 (2019) ...................................................................52, 57

40 C.F.R. § 1503.1(a)(2)(iii) (2020) ........................................................95

40 C.F.R. §§ 1503.4, 1503.1(a)(2)(v) ................................................69, 70

40 C.F.R. § 1506.5(a)(3) ..............................................................................56

40 C.F.R. § 1506.5(b)(3) .............................................................................53

40 C.F.R. § 1506.5(c) ...................................................................................47

40 C.F.R. § 1508.27 ......................................................................................96

43 C.F.R. 2310.2 ............................................................................................16

43 C.F.R. § 10.5(a) ........................................................................................89

43 C.F.R. § 2310.1-3 ...........................................................................6, 8, 16, 77

43 C.F.R. § 3715 ..............................................................................81, 82

43 C.F.R. § 3715.0-5 ..............................................................................81

43 C.F.R. § 3715.2 ..................................................................................81

43 C.F.R. §3809 ......................................................................................81

43 C.F.R. § 3809.420(a)(3) ...............................................................16, 28

43 C.F.R. § 3830.5 ................................................................................106

43 C.F.R. § 3832.32 ..............................................................................105

43 C.F.R. § 3832.34(a)(2) .......................................................................81

65 Fed. Reg. 77698 (Dec. 12, 2000) .......................................................85

78 Fed. Reg. 59959 (Sept. 30, 2013) .................................10, 11, 88, 89

85 Fed. Reg. 3,413-15 .............................................................................11

85 Fed. Reg. at 45,651 ...........................................................................12

85 Fed. Reg, 43304 (July 16, 2020) .......................................................94

NRS 501.181(3)(a), (c) ...........................................................................36

## OTHER AUTHORITIES

ACHP, *Consultation with Indian Tribes in the Section 106 Review Process:
A Handbook* at 18 (June 2021),
https://www.achp.gov/sites/default/files/2021-
06/ConsultationwithIndianTribesHandbook6-11-21Final.pdf ..............87, 92, 93

*BLM Handbook H-1780-1 Improving and Sustaining BLM-Tribal Relations*
at III-16 (Dec. 15, 2016),
https://www.blm.gov/sites/blm.gov/files/uploads/H-1780-1__0.pdf ................87

Circuit Rule 28-1(b) ................................................................................99

Circuit Rule 32-1................................................................................117

Circuit Rule 32-2................................................................................117

Fed. R. App. P. 26.1(a) ...................................................................... i

Fed. R. App. P. 27(d)(2)(A) ......................................................... 117

Fed. R. App. P. 32(f) ................................................................... 117

Fed. R. Evid. 201(b)(2) ..................................................................... 9

H.R. Rep. No. 84-730, reprinted in 1955 U.S.C.C.A.N. 2474 ............... 82

*ITCN Member Tribes*, ITCN, https://itcn.org/?page_id=2927 (last accessed
    Apr. 28, 2023) ........................................................... 90, 91

*Lithium Americas Commences Construction at Thacker Pass*, LITHIUM
    AMERICAS (Mar. 2, 2023),
    https://www.lithiumamericas.com/news/lithium-americas-commences-
    construction-at-thacker-pass ............................................. 76, 112

*Lithium Nevada Corp Water Pollution Control Permit NEV2020104*, NEV.
    STATE ENV'T COMM. (June 28, 2022),
    https://sec.nv.gov/meetings/lithium-nevada-corp-water-pollution-control-
    permit-nev2020104 ............................................................. 29

*Malheur National Forest (N.F.), Flagtail Fire Recovery Project - EIS*, U.S.
    FOREST SERVICE (Feb. 6, 2004), https://bit.ly/3I42VlP ...................... 86

*Montana Mountains EA - Map 1*, BLM (Feb. 8, 2012);
    https://bit.ly/43UypWl ........................................................ 9

*[NDEP] issues air, water, mining permits for Thacker Pass mine*, NDEP
    (Feb. 25, 2022), https://dcnr.nv.gov/news/division-of-environmental-
    protection-issues-air-water-mining-permits-for-thacker-pass-mine; ............ 29

*Nevada & Northeastern California Greater Sage- Grouse Proposed
    LUPA/FEIS* ("RMPA FEIS") Vol. 2 at 3-14, 3-139, 3-140 (June 2015)
    https://eplanning.blm.gov/public_projects/lup/103343/143716/176930/8_
    Volume_2_Chapter_3_NVCA_GRSG.pdf; 1-SER-0137-38 ................. 16, 22

*Thacker Pass Lithium Mine*, NDEP (accessed April 5, 2023),
    https://ndep.nv.gov/land/thacker-pass-project .............................. 42

## TABLE OF ACRONYMS & ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| BPT | Burns Paiute Tribe |
| EIS | Environmental Impact Statement |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| ER | Excerpts of Record |
| FLPMA | Federal Land Policy and Management Act |
| GHMA | General Habitat Management Area |
| Lithium Nevada | Lithium Nevada Corp. |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| PHMA | Priority Habitat Management Area |
| PDEIS | Preliminary Draft Environmental Impact Statement |
| Project | Thacker Pass Lithium Mine Project |
| RMP | Resource Management Plan |
| RMPA | Resource Management Plan Amendment |
| ROD | Record of Decision |
| RSIC | Reno-Sparks Indian Colony |

UUD                         Unnecessary and Undue Degradation

**INTRODUCTION**

This Court should affirm because the district court reasonably determined that the Project approval did not violate FLPMA, NEPA, or the NHPA and vacatur of the ROD pending remand on a single issue was not appropriate.

## ISSUES PRESENTED FOR REVIEW

1.   Did the court err in rejecting WWP's FLPMA claims because the Project complied with state air and water-quality standards and WWP failed to demonstrate the Project caused UUD?

2.   Did the court err in determining BLM complied with NEPA by developing adequate baseline and mitigation for wildlife and water resources and taking a "hard look" at impacts?

3.   Did the court abuse its discretion in excluding post-ROD extra-record testimony?

4.   Did the court err in determining BLM complied with NHPA when it consulted with tribes but not BPT?

5.   Did the court err in determining BLM took a "hard look" at the Project's impacts to cultural resources?

6.   Did the court err in declining to vacate the ROD while BLM evaluates on remand the single issue of Mining Law rights on lands underlying the waste and tailings storage areas ("Storage Areas")?

## STATEMENT OF THE CASE

The Thacker Pass Lithium Project is the result of over a decade of environmental analysis and years of tribal consultation.  BLM understood Project impacts and required robust adaptive management. The Project provides a "net benefit" to Greater Sage Grouse ("GSG") and mitigates water and wildlife impacts. Since BLM issued the ROD, Lithium Nevada received its state permits and continues to collaborate with the local tribe and community.  BLM followed applicable law and Appellants fail to demonstrate the ROD should be vacated.  This Court should affirm the district court's decision.

## I.    Background

### A.    Thacker Pass Lithium Project

The Project will produce lithium, a critical mineral for national security, mitigate the country's dangerous dependence on unfriendly foreign sources, and expand electric-vehicle ("EV") battery production to reduce GHG emissions.  The Project has been over a decade in the making, involving extensive environmental reviews, tribal consultations, and public scoping.  The Project is in the McDermitt caldera, "among the world's most highly [lithium] mineralized calderas." 5-SER-1319 (2016 report); 5-SER-1237–38 (lithium "throughout the caldera").  Lithium Nevada moved the Project's location to "avoid[] potential direct impacts to sage grouse resources in the Montana Mountains."  3-WWPER-465.

### B.     NEPA Compliance

BLM complied with NEPA in approving the Project.

#### 1.     Water

Water-baseline data-gathering began in 2011. 4-BRLER-510. In 2018, Piteau developed a workplan, collected additional monitoring data from over 180 locations, and produced a validated water model to forecast Project impacts. 4-BRLER-542–44; 3-SER-0729, 3-SER-0724; 3-SER-0693. The model's results would not change even if the handful of measurements Bartell disputes were removed. 4-SER-0825. BLM vetted and oversaw Piteau's data and analysis, 5-SER-1153; 4-SER-0952, requesting additional memos, and providing comments. 4-SER-1028–29;4-SER1013–18, 4-SER-0815. The model predicts that any water level drawdown from the Project will not occur until 2055. 3-WWPER-411. Drawdown will be largely centered around the mine pit, an area of non-habitat for GSG and undisputed lithium mineralization. 3-WWPER-416. There is no forecasted impact to perennial streams or to Lahontan Cutthroat Trout from this drawdown, 3-WWPER-419.

The FEIS establishes a monitoring and mitigation plan for water impacts. 3-WWPER-420. The water model will be augmented by continuous monitoring of springs within the forecasted area of impacts and an additional one-mile buffer. 2-SER-0439, 3-SER-0715–16, 3-SER-0702. A "Technical Advisory Group" ("TAG") of state and federal agencies will conduct the monitoring and can request increased

monitoring. 2-SER-0437; 3-SER-0717; 3-SER-0726. Mitigation for potential spring drawdown, 3-SER-0706, "would likely reduce or minimize potential impacts to water dependent resources" 3-SER-0730, through "contingency mitigation measures (including flow augmentation and guzzlers)," 2-SER-0430, and "[a]dditional water will be delivered to surface water features." *Id.* The mitigation plan also addresses water quality. Geochemical modeling predicts that some pore water in the pit may exceed drinking-water standards for antimony but would be limited to one mile within the Project area over 300-years post-closure, 2-SER-0426, and BLM confirmed the efficacy of its water quality mitigation plan. 4-SER-0816–18. The model will be updated every five years and monitoring and mitigation strategies will be adapted early and must be approved by the State. 3-WWPER-341; *see infra* n.39 (state permits will assure "waters of the State will not be degraded").

### 2. Air Quality

BLM thoroughly reviewed the Project's sulfuric-acid plant and its air-quality impacts, including identifying the "tail gas scrubber" as the control technology and the emissions calculation for Project Phase 1 and 2. 3-SER-0622, 3-SER-0573. The Project will not violate state or federal air-quality standards.

### 3. Wildlife

BLM developed baselines for GSG use of the population-management unit ("PMU") encompassing the Project area and disclosed GSG lek locations near the

Project; acres of PHMA and GHMA and quality of GSG habitat in the area. BLM also analyzed baseline habitat for and impacts to pronghorn, its habitat, and its movement corridors. 2-SER-0501; 2-SER-0447–48.

GSG habitat does not prohibit the Project. WWP recognizes that Lithium Nevada discovered valuable lithium in the mine pit, AOB 62; 1-SER-0159, and concedes that the Project is a "locatable mineral project"—meaning the Mining Law protects Lithium Nevada's rights to develop that valuable lithium. WWP seeks to "carve up" the Project area to eliminate these rights, arguing that the RMPA requirements apply to the entire Project area based solely on their dispute about the Storage Areas. But by its express terms, the RMPA "do[es] not preclude a locatable mineral resources project from BLM approval," 5-BRLER-627, and the Project complies with the RMPA in any event.

The 3% cap on GSG habitat disturbance cannot apply to prohibit the Project which BLM projected disturbs 12%. 5-BRLER-627. Such application would functionally withdraw the land from mineral entry. 43 C.F.R. § 2310.1-3.

The FEIS described RMP compliance mitigation, avoiding GSG habitat, 5-BRLER-627, utilizing seasonal restrictions, 2-SER-0500, and mitigating Project noise. 3-SER-0734; 2-SER-0464. The Project achieves a "net conservation gain," through Lithium Nevada's purchasing credits from the State of Nevada Conservation Credit System ("CCS"). 5-BRLER-628. Expert consultant SWCA analyzed the

6

Project area and quantified GSG habitat, 3-WWPER-429, concluding the Project area is "non-habitat" for breeding and late-brood rearing, and is largely a mixture of low- and non-habitat in winter. 4-WWPER-715–17 (noting small band of high-quality winter habitat near or within mine pit); 2-SER-0488. Hence, Nevada's Sagebrush Ecosystem Technical Team ("SETT") determined there would be 1,375 term debits, 3-WWPER-429, likely because the Project only causes "permanent loss of less than five acres." 2-SER-0458. While the credits do not address water impacts, BLM required additional mitigation to "reduce or minimize potential impacts to water dependent resources." 3-SER-0730. Although "[l]imited vegetation loss" could occur, those "[e]ffects would be concurrently reclaimed." 3-SER-0736.

BLM took a "hard look" at cumulative-impacts, 2-SER-0469–70, explaining cumulative effects for each environmental factor, noting specific disturbances and potential impacts on various resources, and selecting relevant geographic areas. *See, e.g.*, 2-SER-0470–87.

## C. Prior Consultation

Relevant BLM consultation began with the Winnemucca Resource Management Plan ("RMP"), 3-BPTER-430, covering 7,256,174 acres, including the Project area. In 2005 BLM consulted BPT, the Fort McDermitt Tribe ("FMT"), and others on the RMP, and prepared an ethnography for that process. 3-BPTER-431.

7

BLM requested that BPT participate, 4-BPTER-585-587, but BPT "defer[red] consultation to the tribes that had reservations closer to the study area" indicating "it would not be necessary to keep the tribe on the mailing list." 4-BPTER-520.

Several tribes commented on the ethnography identifying cultural and religious sites, 4-BPTER-668–733, and the only massacre site identified near Thacker Pass was Disaster Peak, at least 15 miles from the Project boundary. 4-BPTER-678. No tribe identified any interest in Thacker Pass.

In 2010, BLM requested consultation with 20 tribes for the RMP. 5-SER-1244. BPT did not respond. *Id.*

BPT had five other opportunities to inform BLM of any interest in Thacker Pass, but never did until after the ROD. In December 2009, BLM prepared an Environmental Assessment ("EA") for the Kings Valley Lithium Exploration Project within the Project footprint. 5-SER-1320–22. BLM made project documents publicly available and consulted with the FMT. 5-SER-1323.

These pictures show trench digging completed in 2010:[1]

 

1-SER-0223

BLM consulted with FMT and another tribe in 2013 for the open-pit Kings Valley Clay Mine within the Project footprint. 5-SER-1246–47. BLM made project documents publicly available; BPT did not object. 5-SER-1246.

BLM consulted multiple tribes for the Montana Mountains Cooperative Fuels Treatment Project, which also included the Project area. 5-SER-1308–09.[2] BLM

---

[1] These photos were submitted for preliminary injunction briefing and not included in the record. They can be judicially noticed as no party "disputes" their "accuracy." Fed. R. Evid. 201(b)(2); 1-SER-0207–08 ("the Tribes did not respond to Lithium Nevada's proffered evidence showing the authorized, extensive ground disturbance that has already occurred within the Project area," citing the photos).

[2] *Compare Montana Mountains EA - Map 1*, BLM (Feb. 8, 2012); https://bit.ly/43UypWl (encompassing 44N 35E) *with* 2-SER-0488 (Project within 44N 35E).

made project documents publicly available, 5-SER-1312–13, BPT did not object. 5-SER-1310–11.

BLM consulted with tribes between 2011 and 2017 for the District Wide Vegetation Management EA. 5-SER-1233–34. The EA included Thacker Pass and approved reseeding the entire area, plowing to 12 inches deep. 5-SER-1230–32. BLM made project documents publicly available; BPT did not object. 5-SER-1235–36.

In 2013, under the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3003(d) ("NAGPRA"), BLM notified BPT among others of the discovery of human remains about 50 miles from the Project area. Notice, 78 Fed. Reg. 59958, 59959 (Sept. 30, 2013). NAGPRA's consultation scope is broader than NHPA consultation for the Project. 1-SER-0204. BPT did not respond. 78 Fed. Reg. at 59959.

Additionally, when BPT filed its complaint, hundreds of exploration drill holes had already been completed as shown below. 3-SER-0715. BPT never objected.



1-SER-0191.

## D. NHPA Opportunities

The Project's NHPA process began in October 2018. 4-SER-1009. BLM consulted with the Nevada SHPO and notified SHPO that it identified three tribes, FMT, the Summit Lake Paiute Tribe, and the Winnemucca Indian Colony, for consultation. *Id.*; 5-SER-1154; 5-SER-1158. SHPO did not indicate any other tribe should be consulted. *Id.* BLM initiated formal consultation in December 2019. *See, e.g.*, 5-SER-1155–57.

BPT could have provided NHPA public comments. In January 2020, BLM published the Project Notice of Intent, inviting public participation. 85 Fed. Reg. 3,413–15. BLM made the DEIS publicly available in July 2020, summarized

11

identified cultural resources (95% were prehistoric lithic scatter), and identified a plan to address any adverse impacts. 85 Fed. Reg. at 45,651. BLM held two virtual public meetings in August 2020. 4-SER-0934–44. BPT did not participate. The FEIS Notice of Availability was published in December 2020, 3-SER-0802–05. These public notices demonstrate that BPT knew of the Project in January 2020 but waited until after BLM issued its ROD to object. 1-BLRER-73.

## II.    Procedural History

The court denied all of Appellants' claims except one. 1-BPTER-17–31. The court concluded WWP failed to demonstrate the Project caused UUD under FLPMA and that BLM took a hard look at Project impacts and developed adequate baseline. 1-BPTER-18–30. The court rejected Bartell's NEPA arguments as flyspecking. 1-BPTER-32–36. And the court found BPT failed to demonstrate BLM should have known to consult it under NHPA and that BLM conducted a "hard look" in reviewing cultural resource reports and findings. 1-BPTER-38–47.

The court found for Appellants on a single issue: that BLM should have reviewed Lithium Nevada's mining claim rights for the Storage Areas under the Ninth Circuit's recently decided *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 33 F.4th 1202 (9th Cir. 2022) ("*Rosemont*"). 1-BPTER-16. But unlike the record in *Rosemont* that lacked "evidence that valuable minerals ha[d] been found on Rosemont's mining claims," the district court emphasized the critical

12

difference for this Project of "evidence in the record of lithium mineralization throughout the Project area, including the" Storage Areas--the only areas WWP challenged under its FLPMA claim. *Id.*[3]

After thorough briefing and discussion of remedies at hearing, the court found "[t]his is … the rare case where BLM could fix its *Rosemont* issue on remand," given the record evidence of mineralization. 1-BPTER-48.

## STANDARD OF REVIEW

This Court reviews BLM's compliance with NEPA, NHPA, and the FLPMA "[p]ursuant to the APA," determining "whether the agency's final action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. DOI*, 608 F.3d 592, 598 (9th Cir. 2010). This review is "highly deferential" and presumes BLM's action is valid if "a reasonable basis exists" for its decision. *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010).

Vacatur decisions are reviewed for "abuse of discretion." *Teutscher v. Woodson*, 835 F.3d 936, 942 (9th Cir. 2016).

---

[3] The district court and this Court denied WWP's subsequent motions for injunction pending appeal. ECF 10-1 at 7, 9–10. WWP appealed this order, 1-BPTER-212; 1-SER-0002, but cannot show that the court abused its discretion in reaching the same conclusion as this Court. WWP does not articulate how the court abused its discretion and "[t]hose issues are therefore waived." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1203 n.6 (9th Cir. 2005).

# ARGUMENT

## I. WWP Claims

WWP invokes its sole winning argument below—that the *Rosemont* case imposed new duties on BLM that were not previously required in permitting.[4] But the court's decision on that claim was not appealed and WWP's extensive *Rosemont* arguments should be disregarded.

Lithium Nevada complied with the 2015 RMPA, providing GSG net conservation gain, preventing UUD through adaptive management, and addressing where possible visual resource management ("VRM") guidelines. The court properly rejected WWP's NEPA claims based on the extensive record information demonstrating BLM's carefully collected baseline, "hard look" at impacts and cumulative impacts, and robust adaptive management mitigation plans. The Court's affirmance of the ROD in all respects except for the *Rosemont* review and the record

---

[4] The court observed WWP "only challenge[d] the land approved for waste dumps and tailings piles as part of the Project," 1-WWPER-28, and narrowly determined that although evidence of mineralization existed in the record, BLM did not specifically "analyze whether Lithium Nevada had discovered valuable minerals," 1-WWPER-26; 1-WWPER-30. The court remanded for BLM to fix this error, rejected WWP's argument for a particular test, and only ordered "a determination about claim validity." 1-WWPER-24; 1-WWPER-9 (ruling "it's BLM's responsibility"). Like the majority in *Rosemont*, the district court did not dictate what that process entails, as those "are decisions that must be made in the first instance by the [BLM] rather than by our court." 33 F.4th at 1208. There is nothing in the court's decision or the record that dictates BLM must apply the "strict test" for patenting mining claims, AOB 22.

evidence of widespread mineralization, demonstrates the court did not abuse its discretion by remanding without vacatur.

### A.    The Project Complies with FLPMA

WWP argues that despite Lithium Nevada's discovery of valuable lithium in the pit, which WWP concedes,[5] BLM should not have treated Thacker Pass as a locatable mineral project under the RMPA.  WWP contends that *Rosemont* required BLM first analyze Lithium Nevada's mining claims in the Storage Areas.  But *Rosemont* did not address the pertinent facts present here.  And WWP acknowledges that the Project *is* a locatable mineral project, explaining that to meet the definition the Project must only "propos[e] to extract minerals, such as lithium."  AOB 27 n.2.

WWP conceded that (i) Lithium Nevada has valid claims in the pit area, AOB 27, 62; and, (ii) the Project is a locatable mineral project, but argues that because BLM did not evaluate mineralization in the Storage Areas,[6] the Project must comply with every RMP directive—even the ones that would prohibit it altogether.  This conflicts with the RMPA and the Mining Law.  In adopting the 2015 RMPA, BLM explained: "development of locatable mineral deposits are nondiscretionary actions allowed under the General Mining Law of 1872 on all BLM-administered … lands,

---

[5] AOB 62 (noting "known … [lithium] mineralization" is in the [Project mine] pit."

[6] Below, WWP focused solely on the Storage Areas, 1-WWPER-27, waiving their ability to now extend these arguments to any other part of the Project. *See Moran v. Screening Pros, LLC*, 943 F.3d 1175, 1181 (9th Cir. 2019).

unless they are withdrawn from mineral entry,"[7] and WWP has never disputed Lithium Nevada's "valuable lithium in the mine pit." 1-SER-0159. "To restrict locatable mineral development, the BLM … must petition the Secretary of the Interior for withdrawal actions," but in absence of a withdrawal, the RMPA's "[s]*tipulations do not apply to locatable mineral development*." *Id.* Thus, RMPA directives apply to the Project to the greatest extent possible without prohibiting development of the lithium discovered in the pit.

FLPMA is clear that the RMPA cannot interfere with developing the valuable lithium deposit. 43 U.S.C. § 1701, note (h) ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights); *id.* § 1712(e)(3); §1732(b) ("no provision … of this Act shall … impair the rights of any locators"); 43 C.F.R. § 3809.420(a)(3) ("*Consistent with the mining laws*, your operations … must comply with the applicable BLM land-use plans …."). WWP does not dispute the valid existing rights in the pit area. AOB 62; 1-SER-0159; 1-SER-0105. Were BLM to functionally "withdraw" land from mineral entry by applying an RMPA provision to prohibit development of the lithium in the pit, BLM would violate FLPMA's mineral withdrawal process. 43 C.F.R. §§ 2310.1-3; 2310.2; *W. Watersheds Project*

---

[7] Nevada & Northeastern California Greater Sage- Grouse Proposed LUPA/FEIS ("RMPA FEIS") Vol. 2 at 3-139 to 3-140 (June 2015) https://eplanning.blm.gov/public_projects/lup/103343/ 143716/176930/8_Volume_2_Chapter_3_NVCA_GRSG.pdf; 1-SER-0137–38.

*v. Bernhardt*, 519 F. Supp. 3d 763, 778 (D. Idaho 2021) ("Only a withdrawal from location and entry under the Mining Law can … provide certainty that lands not encumbered by mining claims will not be developed.").[8]

WWP only challenged the mineralization of the "waste dumps and tailings piles," and thus that is the only area they may challenge the application of the RMPA on appeal. 1-WWPER-27. Lithium Nevada complied with the RMPA provisions and went beyond what was required by providing a "net conservation gain" through mitigation the ROD requires.

### 1. Compliance with the 2015 RMPA

The Project complies with the 2015 RMPA directives. BLM did not simply "check[] 'no' without explanation," AOB 28. The ROD includes applicant-committed mitigation to protect GSG habitat. WWP limited its RMPA argument to the Storage Areas, 1-WWPER-27, but never identified RMPA violations specific to the Storage Areas or resulting particular harm to GSG and cannot expand its arguments on appeal. WWP thus failed to carry its burden of showing BLM's decision was arbitrary or capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *Ctr. for Cmty. Action v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021).

---

[8] WWP's citation to *Mineral Policy Center v. Norton* does not contradict this—the cited sentence stands for the position that BLM prevents UUD by ensuring compliance with the applicable land-use plan. 292 F. Supp. 2d 30, 49 (D.D.C. 2003). It does not require BLM apply RMPA provisions to prohibit a locatable mineral project, functionally withdrawing the lands from mineral entry.

Lithium Nevada fulfilled the RMPA's avoidance of habitat Management Directive ("MD")-SSS-1, by moving the Project's footprint out of high quality GSG habitat in the Montana Mountains into lower quality habitat.  3-WWPER-465.  This also demonstrated compliance, to the extent possible, with the RMPA's 3% GSG habitat disturbance cap MD-SSS-2A which cannot apply where it would prohibit development of the valuable lithium.   Despite WWP's concession of valuable lithium in the mine pit creating a valid existing right to develop that lithium WWP argues that BLM should have applied the 3% disturbance cap and asserts that would have meant that the "disturbance may [not] be authorized."[9]  AOB 26.  WWP thus concedes application of this directive would prevent the Project, effectively withdrawing lands from mineral entry without the legally required Secretarial approval.[10]  This would be unlawful, and the RMPA states plainly that "mining activities under the 1872 Mining Law may not be subject to the 3% disturbance cap." 5-SER-1242.  BLM therefore did not apply the cap, observing that the cap "[can]not preclude a locatable mineral resources project from BLM approval."  3-WWPER-

---

[9] The requirement "do[es] not preclude a locatable mineral resources project from BLM approval."  3-WWPER-627.

[10] WWP acknowledges "BLM's discretion post-exploration is limited "if it would 'impair the rights of the locator,'" yet advocates for impairment of Lithium Nevada's rights in applying SSS-2A.   WWP's arguments are internally inconsistent, acknowledging that the RMPA does not apply where it would prevent a project but arguing that BLM should have applied the RMPA here in exactly that manner, to prevent the Project.

465.  WWP perhaps means the cap must apply to the Storage Areas only.  But because use of those areas is necessary to develop the valuable lithium, their proposed RMPA application to those lands would interfere with Lithium Nevada's valid existing rights in the pit which is unworkable, inconsistent with the RMPA's provisions, and unlawful.

The Project also complies with the RMPA's seasonal restrictions.  As Lithium Nevada explained in the Plan of Operations it "will schedule land clearing and surface disturbance to prevent destruction of active bird nests or young of birds during the avian breeding season," utilizing "a qualified environmental specialist" to survey Project areas before commencing disturbance and avoiding any area if "evidence of nesting is observed …until the birds are no longer present."  2- SER-0500.[11]  WWP does not explain how these restrictions fail to meet the RMPA seasonal protections.

---

[11] Lithium Nevada also complied with the RDFs for Locatable Mineral Projects ("LOC").  3-WWPER-475; AOB 27–28: committing to protective measures that fulfilled LOC RDF 1, requiring "noise shields" and "seasonal timing restrictions, requiring "sound control devices," a noise monitoring plan, and seasonal restrictions.  2-SER-0464; 2-SER-0500.  Under LOC RDF 2, directing projects "[c]luster disturbances," Lithium Nevada minimized the Project footprint.  5-SER-1161.  Under LOC RDFs 5 and 6, directing projects "[m]aximize … interim" and "post reclamation," Lithium Nevada will concurrently reclaim land "throughout operations."  2-SER-0466–67.  Under LOC RDFs 3,4, and 7, directing projects "[r]educe … threats from West Nile Virus and "[c]over … pits and tanks," Lithium Nevada will "limit standing water," 2-SER-0451, and use "appropriate exclusionary devices" if pond do form.  3-SER-0733.

The remainder of WWP's contentions deal with impacts to GSG from noise, arguing BLM should have required "lek buffers" that "restrict disturbance" and "noise limits" on activity within a quarter mile from leks. AOB 25, 27. The RMPA allows approval of activities that do not comply with lek buffers where BLM determines "the same or greater level of protection to [GSG] and its habitat" can be obtained. 5-SER-1241. BLM noted here that because the purchase of SETT credits achieves **net conservation gain** for GSG, that mitigation "is consistent with the" RMPA. 3-WWPER-466. Furthermore, lek buffers apply only when "consistent with valid and existing rights" and thus cannot be applied to prevent development of the lithium in the pit. 5-SER-1243.

Lithium Nevada's commitment to purchase conservation credits from SETT also mitigates this risk of "indirect effects, such as noise." *Id.* And Lithium Nevada must develop "a noise monitoring plan in coordination with the BLM and NDOW to … identify appropriate noise emission thresholds." 3-SER-0734. Lithium Nevada will also mitigate noise impacts with sound control devices on equipment and shutting down idle equipment, 2-SER-0464, making noise impacts unlikely. 3-WWPER-468. The Project complies with the 2015 RMPA requirements to the greatest extent possible and provides both compensatory mitigation for noise, 3-WWPER-466; 3-WWPER-468, and an adaptive management mitigation plan to

"complement [the] other mitigation measures. *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016); *infra* Section I.A.2.

The Project is not anticipated to exceed the "10 decibels above ambient sound levels" under MD-SSS-2F, AOB 27, and that's not surprising given the nearest lek is approximately 1 mile away from the Project's northern boundary. 3-WWPER-431. Under 2019 "[n]oise simulations" assuming the "'worst-case' scenario" the predicted "maximum noise level increase" would be below 10 decibels ("dBA"). 3-SER-0734. NDOW then issued "interim guidance" in 2020, which resulted in a "'worst-case' scenario," where "noise levels *could* increase to 11.4 dBA." *Id.* But this may be avoided through mitigation, these requirements cannot be imposed to prevent the Project, and WWP fails to explain any RMPA violation at the Storage Areas specifically. 3-WWPER-466.

WWP does not explain why RMPA provisions apply that would prevent development of the lithium that it concedes is in the pit area and fails to identify how allegedly not applying any of these RPMA provisions to the Storage Areas could harm GSG. Thus, WWP fails to carry its burden to show the Project causes UUD through some alleged failure to apply the RMPA to the Storage Areas.

## 2. GSG Habitat Mitigation

The ROD provides compensatory mitigation for noise and groundwater through CCS, which meets the 2015 RMPA's requirement for "net conservation

gain" to GSG. 3-WWPER-429 (purchasing CCS credits "result[s] in a net benefit for the species").[12] WWP now disputes the site-specific maps used to calculate GSG habitat disturbance and claims most of the Project is PHMA. 3-WWPER-446. WWP relies on 2015 model-forecasted maps[13] to argue that the SETT erred in its "assignment of future conservation credits" where SETT relied on 2018 ground-truthing. 5-SER-1214–16. Despite the DEIS' disclosing the SETT's calculated credits, 4-SER-0954, WWP did not challenge the SETT's calculation in their comments, 3-SER-0731, waiving this argument. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

Although WWP touts the 2015 RMPA maps as identifying the "best of the best" GSG habitat, AOB 9, those maps are merely "programmatic," and the ground-truthing of "site-specific impacts" is required "*when* a 'critical decision' has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003); *W. Expl., LLC v. U.S. DOI*, 250 F. Supp. 3d 718, 749, 735 (D. Nev. 2017) (observing the 2015 RMPA maps "erroneous[ly] and undisputed[ly]

---

[12] The RMPA's "net conservation gain" standard cannot apply to deny the Project, *supra* Section I.A.2, but here it is met by Lithium Nevada's credit purchase and extensive mitigation.

[13] "GRSG telemetry location data was compiled from multiple areas" and input into a model and "estimates" were used to create "the *relative probability of selection* at each sub-region." *RMPA FEIS*, Vol. 2 at 3-14 (June 2015), https://eplanning.blm.gov/public_projects/lup/21152/58709/63772/8_Volume_2_Chapter_3_NVCA_GRSG.pdf (emphasis added).

designat[ed] … the town of Eureka as PHMA," among other errors).  Programmatic modeled maps from 2015 cannot override the Project's site-specific ground-truthing.

SWCA's 2018 analysis included field surveys at the Project in 50-meter transects to measure "[s]hrub cover," the distance from the transect to sagebrush cover, complete cover classifications and species counts, and photos of 113 transects.  5-SER-1215.  SWCA's results—from painstaking in-person analysis rather than model-generated mapping—revealed that "the Project and Operation areas" are "primarily" composed of "[n]on-sagebrush habitats."  5-SER-1218; 4-WWPER-715–17 (SWCA maps explaining the Project area is "non-habitat" for breeding, "non-habitat" for late-brood rearing,[14] and largely a mixture of low- and non-habitat for winter habitat).  The report explained this is likely due to past wildfires, leaving "the Project and Operations area …. generally devoid of … healthy sagebrush."  5-SER-1217.  WWP provided no ground-truthing analysis

---

[14] WWP cites March 2020 NDOW comments disagreeing that "loss of habitat would be temporary," arguing there "could [be] permanent negative impacts to … late brood rearing habitat."  4-WWPER-684.  NDOW's concern is not reflected in SWCA's maps, which designate the entire Project and exploration areas as "non-habitat" for late-brood rearing.  4-WWPER-716.  Despite this inconsistency, BLM revised the DEIS to acknowledge that although reclamation and mitigation would occur, "species may not select reclaimed areas" and "revegetating … may … prove challenging," and NDOW applauded this.  4-SER-0932.  BLM explained these risks would be continuously addressed in adaptive mitigation through its "continue[d] … consult[ation]" with Lithium Nevada, SETT, and the Nevada Department of Conservation and Natural Resources.  3-WWPER-341.

to counter SWCA's detailed report or substantiate its claim that the results are "erroneous[]." AOB 32.

Despite the almost complete lack of actual GSG habitat in the Project area, the SETT reviewed SWCA's report, incorporated the data into its habitat quantification tool ("HQT"), and determined Lithium Nevada must purchase "1,375 term debits and 0 permanent debits, to fully offset the anticipated temporary effects during the life of the Project." 3-WWPER-429. SETT did not assess permanent debits, likely because the Project, after reclamation, only results in "the permanent loss of less than five acres" of habitat. 2-SER-0458.[15] The ROD requires Lithium Nevada purchase these term credits and develop a mitigation plan with the SETT. 3-WWPER-341.[16] WWP concedes these credits constitute "a net conservation gain to the species." AOB 25.

---

[15] WWP contends CCS credits don't mitigate loss of surface water. AOB 31. But the credits *do* address "impacts to … sagebrush habitat," the secondary impact of any decrease in surface water. 3-WWPER-429. And, NDOW's PDEIS comments suggest BLM monitor and mitigate beyond the project boundary, which BLM accepted and directed monitoring/mitigation in a one-mile buffer beyond projected impacts. 4-SER-0930–31. NDOW "appreciate[d]" this change in its DEIS comments, and in its FEIS comments requested further monitoring even beyond the one-mile buffer. 3-WWPER-357 (requesting monitoring of additional springs); 2-SER-0489 (the requested springs are outside the buffer).

[16] WWP contends term credits are insufficient because NDOW predicted "permanent ramifications." AOB 8. But BLM has "discretion to rely on the reasonable opinions of its own experts," *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1359 (9th Cir. 1994), and NDOW "strongly supported LNC's commitment to funding" projects that "address concerns related to hydraulic

WWP contends that although Lithium Nevada committed to purchasing conservation credits and a mitigation plan, because the plan is not "in place" there is "no plan." AOB 9. This ignores BLM's adaptive management approach consistently approved by this Court. BLM's reliance on adaptive management to address future uncertain impacts was reasonable given inherent uncertainties in predicting the timing and extent of impacts. NEPA requires an EIS contain a "reasonably complete discussion of possible mitigation measures" *Okanogan Highlands v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000), discussing mitigation in "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Protect Our Cmtys.*, 825 F.3d 571, 582 (9th Cir. 2016). But a mitigation plan does not need to be in "final form." *Nat'l Parks & Conservation Ass n v. U.S. DOT*, 222 F.3d 677, 681 n.4 (9th Cir. 2000). A "conceptual" framework for monitoring and mitigation is sufficient, particularly where impacts are uncertain and years in the future. *City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142, 1153-54 (9th Cir. 1997); *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1107 (9th Cir. 2016) (when "an adverse impact that is predicted to be insignificant and … will not occur for decades," BLM may "reasonably decide to rely on a monitoring scheme to develop future mitigation measures."). BLM here identified noise and water

---

impacts, uncertainty, and the subsequent effect on riparian resources, springs/seeps, and wildlife" to mitigate these potential ramifications. 3-WWPER-357.

mitigation plans for potential GSG direct effects and Lithium Nevada will purchase conservation credits that would address all indirect effects. 3-SER-0734. BLM has "flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." *Protect Our Cmtys*., 825 F.3d at 582.

WWP challenges adaptive management of water and noise impacts to GSG,[17] contending that BLM cannot demonstrate "net conservation gain," AOB 29, despite acknowledging that purchasing CCS credits *is* "net conservation gain." AOB 25. "Net" conservation gain accounts for the overall impacts of the Project and not necessarily each individual aspect and, BLM is the arbiter of mitigation effectiveness—discussing and disagreeing about impacts with NDOW does not mean that BLM is incorrect. *Idaho Conservation League v. Thomas*, 91 F.3d 1345, 1349 (9th Cir. 1996). BLM's plan,[18] which incorporates both mitigation and adaptive management approaches, is reasonable given that groundwater impacts that

---

[17] BLM mitigated for noise. *Supra* Section I.A.1. NDOW incorrectly stated in its FEIS comments that "the CCS does not account for loss of sage grouse leks" from "noise level increases," 3-WWPER-386, but SETT clarified that it does. 3-SER-0734. NDOW concludes by recommending noise monitoring, 3-WWPER-385, which the ROD provides. *Id.*

[18] WWP ignores the FEIS's comprehensive water resources mitigation plan claiming there are only "three sentences" describing "habitat enhancement efforts." 3-WWPER-483. WWP ignores that there are many pages of mitigation options as discussed *infra*. 3-SER-0698-708.

could affect GSG habitat[19] will not occur for a decade or longer, will be minor, and addressed through robust monitoring and mitigation.[20]  The local water table would not be encountered until 2037, 2-SER-0419–21, and BLM will incorporate collected data into the model in the interim, increasing its accuracy.  The monitoring will create a warning system, 3-SER-0716, triggering mitigation that will "minimize drawdown effects" in the event unanticipated "wetland and riparian habitat and seeps and springs" are impacted by "Project dewatering."  2-SER-0450.

BLM concluded the mitigation plan "reduce[s] or minimize[s] potential impacts to water dependent resources," 3-SER-0730, and that concurrent reclamation mitigates any "[l]imited vegetation loss."  3-SER-0736.  If drawdown occurs,[21] BLM's "contingency mitigation measures includ[e] flow augmentation and

---

[19] WWP contends LNC will "dewater regional streams," AOB at 6–7, but the drawdown areas are centered around the concededly mineralized mine pit, mapped largely as non-habitat. 3-WWPER-416.  Pit dewatering is not anticipated until 2055, 3-WWPER-411, but there is no expected measurable impact to streams "within or near the maximum extent of the projected drawdown."  3-WWPER-419; 3-WWPER-419.  The drawdown within the Project area "is predicted to recover," 3-WWPER-418, but to account for uncertainty "the EIS analysis conservatively assumes that there is a potential risk that drawdown … to perennial springs located within (or within one mile of) the maximum extent of the 10-foot drawdown contour," 3-WWPER-420, which will be mitigated.  3-SER-0706.

[20] WWP argues the Project causes "permanent loss of vital riparian habitats," AOB 31–32, but only temporary impacts were anticipated based on SWCA's comprehensive report.

[21] Monitoring and mitigation continues beyond the Project, because impacts to water are not anticipated until "decades after closure."  3-SER-0703. WWP incorrectly conflates the CCS credits, which "fully offset the anticipated temporary effects

guzzlers," 2-SER-0430, and delivering solar-pumped surface water "to augment flow." *Id.* This ensures no changes to the GSG water supply, specifically focusing on surface water features in GSG habitat. 3-SER-0706 (May 2020 mitigation includes wells and guzzlers); 4-SER-0819 (October 2020 mitigation includes "constructing a water development"). The Project complies with the RMPA's net conservation requirements. 3-WWPER-464.

### 3. BLM Prevented UUD

WWP argues the Project causes UUD by not following every RMPA directive. AOB 37. The court rejected this contention and WWP concedes RMPA directives cannot prevent locatable mineral projects. AOB 27, 1-SER-0137. Where an RMPA directive does not apply because it would prevent the project altogether, the project cannot have failed to "comply with the applicable BLM land-use plans" when such plans are only applied "[c]onsistent with the mining laws." 43 C.F.R. § 3809.420(a)(3); *see also* 40 C.F.R. § 1502.16(a)(5) (projects may conflict with land use plans). And undisputed evidence shows compliance with net conservation gain, which holds projects to a standard higher than UUD, 1-WWPER-32, demonstrating FLPMA compliance.

---

during the life of the Project" to GSG with the water mitigation plan. Because the water impacts are largely concentrated in the Project area, which is largely non-habitat, the water mitigation plan has a different timeline than GSG-only mitigation.

####    a.    GSG

WWP falsely asserts that there are not mitigation measures to protect GSG. AOB 38.  As discussed above, CCS credits provide a "net benefit," BLM expanded the water monitoring, and will mitigate noise, demonstrating the Project does not cause UUD.

####    b.    Groundwater

WWP incorrectly argues that the mine pit backfill will release antimony into the groundwater, ignoring applicable mitigation.  BLM approved the FEIS with "effective control[s] to counter [antimony] contaminant migration," 3-SER-0703, and required Lithium Nevada to "maintain water quality to State of Nevada standards" pursuant to mitigation and monitoring in the ROD-required state water permit. 3-WWPER-341.[22]  Although modeling does predict pore water in the pit may

---

[22] WWP cites to NDEP concerns prior to the FEIS during the separate state water permitting process.  AOB 39.  NDEP requested pore water mitigation and a monitoring well downgradient of the pit.  3-WWPER-505.  The FEIS correspondingly states all groundwater mitigation options would "provide source control during backfilling."  3-SER-0703–04.  BLM monitoring and mitigation options will effectively mitigate any impacts of antimony seepage.  2-SER-0438–39.  NDEP ultimately agreed and issued the water permit, which was upheld on appeal.  *[NDEP] issues air, water, mining permits for Thacker Pass mine*, NDEP (Feb. 25, 2022), https://dcnr.nv.gov/news/division-of-environmental-protection-issues-air-water-mining-permits-for-thacker-pass-mine; *Lithium Nevada Corp Water Pollution Control Permit NEV2020104*, NEV. STATE ENV'T COMM. (June 28, 2022), https://sec.nv.gov/meetings/lithium-nevada-corp-water-pollution-control-permit-nev2020104 (the commission "voted unanimously to affirm the Department's approval of Permit# NEV2020104"); *see Japanese Vill., Ltd. Liab.*

exceed drinking water standards for antimony post-closure, that water will remain within the Project area, migrating no farther than one mile from the pit over the simulated *300-year post-closure period*. 2-SER-0426.[23]   The water quality mitigation plan[24] addresses these minor direct effects, evolving over time responsive to data collection and coordination with BLM's Water Resources TAG. 2-SER-0437; 3-SER-0698; 3-WWPER-342.  BLM determined that monitoring and multiple mitigation options will effectively mitigate any antimony seepage. 2-SER-0438–39; 3-SER-0718.[25]   This plan provides "flexibility in responding to environmental

_____

*Co. v. Fed. Transit Admin.*, 843 F.3d 445, 454 (9th Cir. 2016) (government websites can be judicially noticed).

[23] WWP cites BLM's response to comments that antimony in the "backfill will exceed MCLs for longer than 20 pore volumes," but misses the citation to the water quality report. 3-WWPER-484.  The report "conservatively assesses groundwater chemistry down-gradient of backfilled sub-pits," 3-SER-0696, but additional analyses concluded "[p]otential impacts to other water stakeholders …are not predicted ….elevated antimony concentrations remain within the Thacker Pass Project's permit boundary." 3-SER-0710–*11*.

[24] WWP erroneously asserts "no actual plan" exists.  AOB at 14.  The publicly available Appendix P plan stated that BLM would choose between three options, and each would "provide source control during backfilling." FEIS AR046682–83, and final mitigation requirements will be memorialized in the ROD mandated State WPCP, along with final monitoring locations.  3-WWPER-341.

[25] Lithium Nevada submitted an updated monitoring plan in December 2020.  3-SER-0741–61.  The updated plan includes more detailed discussion of potential monitoring and mitigation measures, including data collection from 39 monitoring wells, and flow and water quality data at 35 spring locations.  3-SER-0693.  BLM's Technical Advisory Group will develop mitigation triggers, and implement them as the ROD requires, incorporating input from federal and state water quality agencies.  3-WWPER-342.  Initial triggers require mitigation if a water quality standard

impacts," and is permissible under NEPA. *Protect Our Cmtys.*, 825 F.3d at 582 (9th Cir. 2022).

WWP argues that because EPA requested more "detail" for the mitigation options the Project caused UUD. AOB 40. BLM responded to these concerns noting monitoring "groundwater quality downgradient from the pit" and that Mitigation WR-3 detailed the "list of constituents to be monitored, sampling frequency, and reporting requirements." 2-SER-0438–39. BLM also analyzed "[t]wo additional fate and transport sensitivity models" to understand mitigation efficacy, 4-SER-0816–18, and expanded monitoring by a one-mile buffer. 3-SER-0719–20.[26] The model will be updated prior to mining and every five years, triggering mitigation strategies if the backfilled pit exhibits flow-through at low rates with minimal water quality degradation. 3-WWPER-341. EPA acknowledged BLM's updated

---

exceedance occurs. 3-WWPER-341. Mitigation such as pump back capture would be triggered if thresholds are exceeded. 3-SER-0777–81.

[26] WWP contends BLM cannot mitigate impacts without knowing which "options for blending/discharge" the mine will use, AOB 40, referencing the pump back system in Option 1 in the May 2020 Mitigation Plan. 3-SER-0704. Option 1 has four sub-options for managing the discharge, including blending discharge with fresh water. *Id.* BLM need not fully develop every option considered under adaptive management for impacts 65 years away. *W. Watersheds Project v. BLM*, 2011 U.S. Dist. LEXIS 50056, at *8–9 (D. Nev. Apr. 28, 2011); *aff'd* 443 F. App'x 278 (9th Cir. 2011); *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 983 (9th Cir. 2022).

mitigation approaches, noting mitigation continues to be developed to address antimony concerns. 3-WWPER-372–73.[27]

BLM sought EPA's input on later drafts of the mitigation plan, approving a plan in February 2021 only after EPA review and incorporating EPA's recommendation to obtain NDEP concurrence on additional mitigation. 3-WWPER-341. BLM considered EPA's concerns and approved a "flexible" and "conceptual" mitigation plan for future impacts "despite agency criticisms." *Carmel-By-The-Sea*, 123 F.3d at 1154. Continuing to develop adaptive management responses to possible future mitigation needs in 2065 is "reasonable … given the relatively low probability and temporal remoteness of adverse impacts to ground water" and prevents UUD. *Great Basin Res. Watch*, 844 F.3d at 1107; 2-SER-0438–39.

### 4. VRM Standards are Guidelines

WWP (and Bartell, AOB 53) argue VRMs are regulatory mandates, AOB 2, 33–36, but they are simply guidelines. BLM may approve a project that does not meet the RMP's visual-resource guidelines if BLM determines that the adverse visual effects are not significant enough to justify disapproving the project. *S. Fork*

---

[27] WWP contends that groundwater with elevated antimony will "flow uncontrolled from the backfilled pit," AOB 39, but cited to the explanation that any backfill in the groundwater "was predicted to *meet NRVs outside the backfill footprint*." 2-SER-0426 (emphasis added).

*Band Council of W. Shoshone of Nev. v. DOI*, 588 F.3d 718, 725 (9th Cir. 2009) (per curiam). The Court cannot second-guess BLM's expertise and experience in weighing of the compliant and noncompliant visual-resource areas. *Id.*; *accord* 40 C.F.R. § 1502.16(a)(5).

BLM reasonably determined that the Project's mitigation outweighed any deviations from the VRMs. Painting buildings to "blend with existing landscape, 2-SER-0468, a phased approach to "minimize visual impacts," concurrent reclamation and best-management practices will help reduce light pollution, and ultimately the Project results in minimal "permanent contrasts from the current view." 2-SER-0495, 2-SER-0498. BLM reasonably determined that any adverse visual impacts did not justify disapproval.

WWP relies on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), to argue that BLM erred in changing position that it would need to amend the RMP's visual-resources guidelines without explaining why. AOB 33, 35–36. But in *Fox*, the Court held that an agency cannot depart from prior agency policy without explanation. 556 U.S. at 515. This rule applies only when the agency undergoes a "policy change," *id.* at 514, and is inapplicable here where WWP identifies no generally applicable BLM "policy" akin to *Fox*. *Accord INS v. Yang*, 519 U.S. 26, 32 (1996). BLM did not err in changing its position on the discrete, one-off question of whether it needed to amend the RMP to approve the Project.

33

## B.     NEPA

### 1.     BLM took a "Hard Look" at Cumulative Impacts

NEPA's hard look requirement ensures "important effects will not be overlooked," but "other values [may] outweigh [identified] environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).  The FEIS demonstrates a robust review of "relevant past, present, and reasonably foreseeable future actions ["RFFAs"]."  3-WWPER-440–42; 2-SER-0471–87.  WWP contends BLM only identifies "cumulative effects study areas" ("CESA"), but the FEIS explains the RFFAs and provides the location and individual acreage of each one, qualitatively describing the developments where acreage was uncertain.  2-SER-0470.  WWP insinuates only two FEIS pages list "activities within the CESAs," but ignores the topical Cumulative Impacts sections addressing and quantifying RFFAs for each environmental impact.  *See e.g.*, 2-SER-0470–74; *cf. Great Basin Res. Watch*, 844 F.3d at 1105 ("The BLM made no attempt to quantify the cumulative air impacts ….").[28]

This analysis is not "cursory" or "general statements."  AOB 42–43.  BLM included "mine-specific or cumulative data," 844 F.3d at 1105, of impacts from

---

[28] *Great Basin* only included a monitoring plan and emphasized the "low probability" of impacts. 844 F.3d at 1107. The plan here discusses and refines mitigation approaches and applied the baseline data to create comprehensive mitigation options. 3-SER-0707–08 (discussing geochemical studies).

nearby operations. 3-WWPER-441; 2-SER-0474–76.[29] Ultimately, "[t]he scope and nature" of this "analysis is a matter committed to [BLM's] … sound discretion." *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1173 (D. Mont. 2010) (citing *Kleppe*, 427 U.S. at 413–14).[30] WWP faults BLM's selection of the PMU as the GSG CESA geographic area, AOB 45, but BLM's selection is entitled to deference. *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 960 (9th Cir. 2003). BLM chose the PMU because it provided the appropriate density of potentially impacted species, 3-WWPER-429; 3-WWPER-444, and BLM "is allowed to consider 'practical considerations of feasibility' in its selection of a geographic scope." *Selkirk Conservation*, 336 F.3d at 960.[31] Expanding the study area like

---

[29] The FEIS analyzes foreseeable harms, describes cumulative impacts, and identifies how the impacts will be mitigated. *Cf. Ctr. for Biological Diversity v. U.S. BLM*, No. 4:21-cv-00182-BLW, 2023 U.S. Dist. LEXIS 13961, at *12–14 (D. Idaho Jan. 24, 2023) (determining BLM failed to substantiate its claim that a nearby processing plant would continue operating with or without the contested project).

[30] WWP contends the list of projects is incomplete. But the FEIS does not discuss the McDermitt Lithium Drilling Project in Oregon because it is *outside the CESA*. 3-SER-0739 (map showing the Lone Willow PMU and the Hunt Unit 031 end at the Oregon border). Below, WWP did not request the Court consider their article referencing this project as extra-record evidence or appropriate for judicial notice; therefore, it is extra-record and should not be considered. Even if the Court did consider an Oregon drilling project, as discussed *infra*, the CESA reasonably stopped at the Oregon border.

[31] The BSU was developed in collaboration with several agencies to reflect GSG use of the region based on Nevada biologists' refined understanding of GSG interaction with the landscape, as compared with the earlier-designated PMUs. 5-SER-1239.

WWP urges could "skew the analysis" by improperly diluting the impacts over a larger area. *Id.* at 951.

WWP also challenges the use of NDOW Hunt Unit 031, which covers an area exceeding the boundaries of the Project area. 3-SER-0739 (Unit 031 boundaries roughly demarcated by mountain ranges). The pronghorn migration is likely limited by the mountain boundaries of Hunt Unit 031. *Id.* The Nevada Board of Wildlife Commissioners created Hunt Unit 031 boundaries in furtherance of their statutory duty to "[e]stablish policies for… [t]he management of big … mammals." NRS 501.181(3)(a), (c).[32] Where "the selection of one [area] made sense based on the geographic features contained therein," the Court "cannot say the decision to limit the scope of analysis to [Hunt Unit 031] was unreasonable." *Selkirk Conservation*, 336 F.3d at 960.

### 2. BLM Evaluated Mitigation and Adaptive Management

BLM appropriately relied on adaptive management to address uncertain future impacts. *Supra* Section I.A.2; I.A.3.b.; 40 C.F.R. §1502.14(f); *Great Basin Res.*

---

[32] WWP claims BLM's use of Hunt Unit 031 was "criticized," citing a single comment from an NDOW reviewer who was "unclear" why it was used. 4-WWPER-674, -682. NDOW cited the Hunt in DEIS and FEIS comments but never again raised an issue. 4-WWPER-694–702; 4-SER-1006–7; 3-WWPER-356–69. And WWP submitted a document with its comments that itself uses "hunt units" for calculating GSG population. 5-SER-1318.

*Watch*, 844 F.3d at 1107 (adaptive management appropriate where there is a "low probability and temporal remoteness of adverse impacts to groundwater").

### a. Dewatering Impacts

BLM's ongoing collection of water data will increase the water model's accuracy and ensure effective adaptive management when the Project encounters the water table in 2037. 3-WWPER-334; 2-SER-0419–21. WWP contends EPA wanted more detail, AOB 46, but BLM determined the FEIS' mitigation plan utilized the best data and science available at the time. 3-SER-0709–11, 2-SER-0438–40.[33] Lithium Nevada will conduct a further "geochemical investigation during operations" to continuously add to the suite of mitigation measures. 3-SER-0708.[34]

WWP argued BLM relies too heavily on state permits to provide mitigation, ignoring multiple other FEIS mitigation approaches, including a pump back system, hydrogeologic control pumping, and partially closing the backfill. 3-SER-0704–08. BLM considered EPA's comments 1-WWPER-44–45, but relied on its own "independent[] assess[ment]," *Steamboaters v. FERC*, 759 F.2d 1382, 1394 (9th Cir. 1985), and provided independent FEIS mitigation. *Cf. Calvert Cliffs' Coordinating*

---

[33] WWP misleadingly claims BLM's hydrologist acknowledged the lack of "groundwater extraction and treatment" but the email confirms "Yes, proposed mitigation includes active groundwater extraction and treatment." 3-WWPER-508.

[34] These mitigation measures are required in the ROD, not merely "option[al]." AOB 47; 3-WWPER-334 ("The environmental protections … that LNC has committed to, … in this ROD will provide environmental protection").

*Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971).

BLM's additional adaptive management approaches are adequate where the future

impacts are uncertain. *Okanogan Highlands*, 236 F.3d at 476–77.

WWP repeats its erroneous claim that "BLM never presented a [mitigation]

plan for public review," AOB 48, rebutted by the DEIS mitigation measures in

Chapter 4, 4-SER-0953, and the May 2020 mitigation plan in Appendix P. 4-SER-

0956–66; 1-WWPER-44. WWP complains the updated December 2020 monitoring

and mitigation plan was not available for public comment, AOB 49, but it "was not

substantially changed" from the May 2020 plan, 3-WWPER-333, providing "a

springboard for public comment" in compliance with NEPA. *Robertson*, 490 U.S.

at 349.

### b. Wildlife Impact

WWP cites to EPA and NDOW comments critiquing wildlife analyses. AOB

49. BLM considered those comments and then relied on its own expertise. *N. Plains*

*Res. Council, Inc. v. Surface Trans. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011). EPA

asserted information regarding mitigation measures was insufficient for wildlife, but

BLM laid out the Project's compliance with Special Species Status ("SSS")

protections. 2-SER-0454–57; 2-SER-0446 (SSS-1 "pre-construction" GSG

surveys); 2-SER-0451, (SSS-2 and -3 "exclusionary devises"); 2-SER-0455 (SSS-4

raptor monitoring plan); 2-SER-0455 (SSS-5 pygmy rabbit surveys); 2-SER-0456

(SSS-6 burrowing owl surveys); 2-SER-0449 (SSS-7 "develop artificial burrow systems"); 2-SER-0450 (SSS-8 "delineate potential bat roosting habitat"); 2-SER-0449 (SSS-9 "develop alternative roosting sites"). EPA specifically acknowledged in DEIS comments that BLM "address[ed] many of the recommendations that [EPA] provided earlier in the process, including" mitigation measures for species like the burrowing owl. 4-SER-0933. EPA acknowledged in DEIS comments that BLM "address[ed] many of the recommendations that [EPA] provided earlier in the process, including" mitigation measures for species like the burrowing owl. 4-SER-0933. Although EPA sought more specificity post-FEIS, BLM "was 'not obligated to defer to [EPA's] view.'" *S. Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1094 (9th Cir. 2010).

WWP cites NDOW's FEIS comments regarding GSG noise impacts, 3-WWPER-358, and DEIS noise and water comments, 3-WWPER-491–93, 495–96; 3-WWPER-493–94, contending BLM did not disclose mitigation plans. BLM responded to NDOW's DEIS noise concerns, 3-WWPER-493–94, prompting NDOW to "appreciate the inclusion of a noise monitoring plan" in the FEIS. 3-WWPER-493.[35] WWP's assertion no plan was provided is untrue. Like in

---

[35] BLM included its reasoning and responsive changes to NDOW's DEIS comments in the FEIS and therefore did not give "short shrift" the concerns. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011) (defining "short shrift"

*Japanese Village v. FTA*, BLM's monitoring and mitigation plans for water and noise incorporated scientific analysis and robust baseline data into detailed mitigation options. 843 F.3d 445, 461 (9th Cir. 2016); *see, e.g.*, 2-SER-0438–39; 3-SER-0734; 3-SER-0706; 4-SER-0819. CCS credits will additionally "offset impacts to GSG … habitat," 3-WWPER-429, and prevent "habitat degradation of springs in the Montana Mountains," 3-SER-0706, 3-SER-0730, despite some conflicting agency views. *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076–77 (9th Cir. 2003).

### c.    Air Impacts

BLM took the requisite "hard look" at Project air-quality impacts, including from the sulfuric-acid plant, and reasonably concluded the project would comply with federal and state air-quality standards without further mitigation. *Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. DOI,* 767 F.3d 781, 798 (9th Cir. 2014); 2-SER-0463. BLM conducted an emissions inventory, 2-SER-0459–61; 2-SER-0506–10, accounting for limits, controls, and rates of emissions for each unit, 2-SER-0527–3-SER-0585, inputting the data into an advanced dispersion model to assess ambient air pollutant concentration levels in the project area. 2-SER-0461; 2-SER-0512–26. The model showed that "the estimated maximum ambient

---

as "the BLM neither responded to their considered comments 'objectively and in good faith' nor made responsive changes").

concentrations for all pollutants" would not exceed state or federal standards, meaning "no mitigation is required." 2-SER-0462–63.

BLM adequately analyzed air-quality impacts from the sulfuric-acid plant. The record clearly establishes that sulfuric-acid plant emissions "will be controlled by a tail gas scrubber" in both Phases 1 and 2. 2-SER-0509–10; 3-SER-0622; 3-SER-0573. A tail gas scrubber dramatically reduces emissions based on manufacturer guaranteed emissions levels, 3-SER-0728, and BLM disclosed its sources of the tail gas scrubber emissions factors as "LNC 2019a (Chemetics 2018), (Rabe 2019)." 3-SER-0590; 2-SER-0540; 3-SER-0686–89. WWP provides no reasonable basis for questioning the authenticity or accuracy of these numbers.

WWP claims BLM never clarified mitigation for air impacts, ignoring the FEIS's identification of the tail gas scrubber as the control technology and Lithium Nevada's commitment to control emission levels. 2-SER-0509–10. The FEIS also identified the tail gas scrubber system's choice of reagent. 3-SER-0728. Where WWP cherry-picks BLM statements prior to the DEIS, AOB 51, it mischaracterizes BLM's extensive analysis. BLM reasonably relied on manufacturers' guidance to estimate emissions and model air impacts in a scientific judgment entitled to deference. *N. Plains Res. Council*, 668 F.3d at 1075, 1080.

Lithium Nevada is also subject to state air emission requirements from NDEP. 42 U.S.C. § 7410(a)(1), (2); 2-SER-0511; 3-SER-0690.[36]  NDEP conducted its environmental evaluation to confirm air quality standards compliance, NAC 445B.308, and enforces those standards during the Project.  3-SER-0728.  BLM similarly reasonably "assumed … that regulatory agencies charged with permit enforcement would ensure compliance." *Moapa Band of Paiutes v, BLM*, 2011 U.S. Dist. LEXIS 116046, at *19 (D. Nev. Oct. 6, 2011), which is not arbitrary and capricious.  *Kleppe*, 427 U.S. at 418.

### 3.  BLM Adequately Analyzed Baseline Wildlife Conditions

WWP's selective FEIS citations, misstatements, and a new argument raised for the first time on appeal do not demonstrate BLM failed to take a hard look at wildlife conditions.  The FEIS must include a succinct environmental description to understand project impacts.  40 C.F.R. § 1502.15.  WWP derides the Resource Summaries as being too brief, but the FEIS also includes detailed and voluminous baseline reports and data.  BLM adequately described the baseline conditions of each species affected and satisfied its NEPA obligations.

---

[36] NDEP approved Lithium Nevada's air permit and publicized an explanation which should be judicially noticed. *Thacker Pass Lithium Mine*, NDEP (accessed April 5, 2023), https://ndep.nv.gov/land/thacker-pass-project. *Japanese Vill.*, 843 F.3d at 454.

The FEIS discloses data and analysis of the pronghorn baseline, describing the habitat and seasonal range within the Project area, and providing an illustrative map. 3-WWPER-450, 3-WWPER-445. The FEIS describes the amount of winter range in the Project area in the context of the applicable hunt unit, 3-WWPER-424, noting the pronghorn population in Hunt Unit 31 remains stable. 3-WWPER-450. The FEIS discloses that two pronghorn movement corridors between habitats lie within the Project area, 3-WWPER-424, and NDOW acknowledged that BLM incorporated "its previous comments regarding … pronghorn" impacts. 3-SER-0736. BLM provided baseline information regarding the pronghorn. 1-WWPER-38–39.

WWP argued "there is little, if any" GSG baseline information. 1-SER-0171. WWP now admits that the FEIS discloses sage-grouse use "in the vicinity of the Project area." 5-SER-1160; AOB 55 (citing 3-WWPER-451, which incorrectly notes radio-marked GSG activity "within the Project area" when the cited document states the activity is "in the vicinity"; and cites to the Wildlife Baseline survey, which noted one GSG "detected audibly or visually within ¼ mile" of the Project area, 5-SER-1222–23); *id.* (citing 3-WWPER-458, which notes GSG leks outside the Project area). WWP now argues for the first time that the baseline discussion is deficient for (i) not providing "information on local population trends, habitat function and conditions, or the area's role in achieving population connectivity"; and

43

(ii) not providing sufficient baseline to understand project-related noise impacts.
AOB 55. The Court should reject these new arguments never raised before. *Kalispel Tribe of Indians v. U.S. DOI*, 999 F.3d 683, 694 (9th Cir. 2021).

But this new argument also fails. The FEIS discloses the location and environmental context of leks in proximity to the Project area (in text and on a map), the number of GSG documented in the Project vicinity; the fact that no lek has a direct line of sight to the Project; results of ambient noise monitoring at the four closest leks; the amount and quality of PHMA and GHMA in the Project vicinity; the status of the GSG population and habitat trends in the Project's PMU; and the amount of existing disturbance within the PMU. 3-WWPER-426–27, 3-WWPER-431–32, 3-WWPER-451, 2-SER-0502, 3-WWPER-453, 3-WWPER-465. This is adequate and in stark contrast to baseline in *Western Watersheds Project v. Berhardt* that WWP relies on, which merely identified the amount of habitat. 543 F. Supp. 3d 958, 986 (D. Idaho 2021).

### 4. BLM Took a Hard Look at Impacts to Wildlife

WWP suggests that BLM ignored NDOW wildlife concerns. BLM considered NDOW's comments but ultimately disagreed, which does not violate NEPA—wildlife impacts are "the sort of scientific matter on which the Court must defer to BLM." 1-WWPER-40.

WWP asserts that BLM did not analyze GSG lek abandonment or reductions in lek attendance due to Project noise. But the FEIS analyzes potential noise impacts on nearby leks and "[lek-]adjacent … habitats." 3-WWPER-432–33; 3-WWPER-428. Rather than ignoring NDOW's comments, BLM addressed them head-on, concluding that based on noise-modeling results and mitigation addressing noise impacts, lek abandonment was speculative. 3-WWPER-497.

WWP relies heavily on NDOW's comments on the *PDEIS* to argue NDOW took issue with BLM describing dewatering impacts to wildlife as minor. But BLM revised the analysis in response to NDOW and the FEIS recognizes the Project could impact water flow, "create a localized loss of wildlife drinking water sources," increased "competition for local water resources," and "a redistribution of wildlife." 3-WWPER-433. It specifically acknowledges that "impact to water quantity or quality could be a significant impact," which is why it is the focus of over 1000 pages of analysis.[37] *Id*.; 3-WWPER-430 (possible bat impacts); 2-SER-0453 (potential terrestrial wildlife impacts).

WWP argues the FEIS's analysis of dewatering impacts to wildlife was deficient, relying on NDOW FEIS comments. But those comments were consistent

---

[37] NDOW's DEIS comments "noted that many of our previous comments have been addressed and we appreciate the BLM's effort to continually improve the clarity of the Draft EIS…." 3-WWPER-491.

45

with the FEIS's acknowledgment that water is critical to surrounding species, 3-WWPER-433, and NDOW focused on post-ROD monitoring of water resources, not the FEIS's analysis of drawdown impacts to wildlife.  3-WWPER-356-58.

WWP again quotes NDOW PDEIS comments to argue the pronghorn impacts analysis was vague.  The FEIS analysis addressed those preliminary comments, disclosing the impacts of clearing 4,960 acres of pronghorn winter range and contextualizing the habitat-loss impacts for the relevant population.  3-WWPER-424.  The FEIS also acknowledges the Project will affect movement corridors, possibly increase pronghorn travel and competition for nutrition, displace pronghorn from disturbed sites, and may increase vehicle collisions.  3-WWPER-424–25, 3-WWPER-421.  While NDOW disagreed in the PDEIS that mobile species would successfully displace into adjacent habitat, 4-WWPER-699–700, the FEIS incorporated NDOW's input and recognized displacement "could lead to increased competition for resources," "potentially leading to population decline" in the Project area.  3-WWPER-423, 3-WWPER-431.  The FEIS also recognizes that "big game species may acclimate" but acclimation depends on a complex "range of patterns and factors."[38]  3-WWPER-425.  NDOW supported this analysis.  3-SER-0736 ("The current disclosure … is [] much more accurate"); 3-WWPER-491 (NDOW

---

[38] WWP's brief selectively omits the second half of this sentence.

noting many PDEIS comments were addressed). BLM thus approved the Project in compliance with NEPA and FLPMA.

## II.  Bartell Claims

Hydrogeologists collected over a decade of water data and installed additional water-gauging stations, piezometers, transducers, and monitoring wells. *See, e.g.*, 4-BRLER-510; 3-SER-0717; 3-SER-0691–92. The current water contractor, Piteau, developed a Workplan BLM approved and began collecting data in 2018, 4-BRLER-542, meticulously cataloging its measurements and observations. 5-SER-1208. The contractors incorporated the prior decade of measurements from 150 water-level target locations and 35 flux-target locations to create a robust validated water forecast model. 3-SER-0693. Piteau and prior contractors included photos alongside their measurements, which demonstrate their measurements accurately reflected the reality on the ground. *See, e.g.*, 4-BRLER-556. BLM carefully reviewed Piteau's work product, asked clarifying questions, directed the collection of further data, and ultimately approved Piteau's work product. 5-SER-1153. BLM properly utilized Piteau as a NEPA contractor, 40 C.F.R. § 1506.5(c), and did not waste taxpayer money re-doing Piteau's measurements.

Piteau developed and validated a water model, 3-SER-0724, that forecasted the Project impacts and BLM required a comprehensive monitoring plan for BLM and two state agencies to review and approve prior to project initiation. BLM even

47

expanded the monitoring plan with an additional one-mile buffer beyond projected effects to identify potential impacts. 3-SER-0695. Impacts are projected to peak in 2065 and be "fully recover[ed] within 25 years after pumping ceases." 2-SER-0420. Contrary to Bartell's allegations, Piteau did not knowingly trespass on Bartell's land and BLM made all information it relied upon available for public review, and even continued responding to Bartell's post-FEIS emails and demands beyond regulatory requirements. And Bartell's FLPMA claims overlook the lack of GSG habitat in the parts of the Project area he challenges. Lastly, BLM utilized a separate regulatory authorization to permit the waterline and powerline.

### A.    The Water Resource Baseline is Robust

Bartell's attacks on measurements from five of the 40 different springs (4-BLRER-639) included in the water model and a single groundwater measurement do not demonstrate pervasive measuring errors or violation of the protocol. Bartell argues that its "personal observations and expert['s] measurements," AOB 28 n.12, should supersede the NEPA contractor's. But the record demonstrates that Piteau's water model accurately forecasted water flows during the validation process. 3-SER-0724. And even if Bartell had identified inconsistencies, the mitigation plan requires constant monitoring and updating of the model across an area extending one-mile beyond expected impacts. AR0465973-SER-0695. If future flow is identified in the springs that Piteau correctly recorded as having no flow the past

48

several years, that information will be incorporated into the model and those areas monitored for impacts, which are not forecasted to peak until 2065.

Bartell's concerns are quintessential "flyspeck[ing]."  1-BRLER-40.

## 1.    There Was No Protocol Violation or Trespass.

BLM discussed and approved Piteau's proposed "baseline data program," 4-BRLER-546, which met BLM's "Data Adequacy Standards."  4-BRLER-542.[39] The approved Workplan did not mandate a specific protocol but instead adopted "elements for Level 1 inventory [Stevens et al., 2016] protocols," including photographs, location coordinates, water quality samples, and "[f]low measurements … where surface flow is occurring."  4-BRLER-544.[40]

Bartell claims Piteau violated the Stevens Level 2 recommendations for flow measurement. AOB 40.  But the recommendation only suggests "[s]pring flow

---

[39] Bartell incorrectly argues that prior contractors did not follow protocols, selectively quoting an email.  AOB 39 n.21.  That email observes that Lumos's "field work … was completed in May 2011" and one month later "BLM issued a new seep and spring survey protocol," and Lithium Nevada simply flagged that due to that timing "the Lumos report does not follow the entire protocol as outlined in the BLM's new survey protocol."  4-BRLER-508.

[40] The Stevens Protocols do not direct that any flow measurements be conducted in a Level 1 survey—flow measurements are only taken in Level 2 surveys.  4-BRLER-778 (Level 1 surveys only identify "the methods best suited to measure flow," not flow measurements).  To the extent Level 2 flow measurement techniques are incorporated the Stevens Protocols simply offer options while acknowledging "[f]low measurement techniques vary in relation to site and season."  5-BRLER-798.

should be measured at the point of maximum surface discharge, which is not likely to be at the source but rather some distance downstream," 5-BRLER-799, acknowledging "[f]low measurement techniques vary in relation to site and season." *Id.* The Protocols do not state flow at the source/orifice should never be measured.

Bartell contends that Piteau violated the Protocol for SP-048, because in March 2018 Piteau measured 23.9 gpm while a "culvert beneath the road … was 38.6 gpm" and thus did not measure at the maximum discharge. 4-BRLER-555. Bartell did not raise this claim in his DEIS comments and it is thus unexhausted and waived. *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991). And the record demonstrates each quarter SP-048's flow varied by the culvert's did not. *See* (Q1) *id.*; (Q2) 5-SER-1324, (Q3) 5-SER-1212, (Q4) 4-BRLER-561. Piteau reasonably measured downstream of the orifice where there were "good channel conditions" to record SP-048's flow, 4-BRL-555, and BLM's expert decision on where to measure flow is entitled to deference. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).

Bartell then argues, based on inadmissible post-ROD testimony, that Piteau did not measure SP-047 or SP-035 at the point of maximum discharge because those springs were measured near the orifice. AOB 40. First, the Protocols do not say maximum discharge cannot be at the orifice. 5-BRLER-799. Second, Bartell waived this argument by not raising it in his DEIS comments. *Havasupai Tribe*,

943 F.2d at 34. Lastly, SP-047 is located far outside the scope of Project impacts and Piteau made the reasonable scientific decision to measure at the "[s]pring orifice" to measure the maximum discharge, 5-SER-1210, and Bartell's expert's measurements, 3-BRLER-353, lose in a battle between experts. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

Regarding SP-035, BLM explained that Bartell's expert's measurement was of an "area … categorized separately from SP-035." 3-SER0721–22. Bartell argues Piteau mis-measured SP-035 as "zero flow," *see infra* Section II.A.3, but Piteau observed "[n]o surface flow was observed." 4-BRLER-553 (Q1 2018); 5-SER-1213 (Q2 2018); 4-BRLER-558 (Q3 2018); 4-BRLER-560 (Q4 2018, every quarter measuring "[n]o flow"). Piteau also explained the hydrogeological model would not change even if SP-035 and SP-042 measurements were omitted. 4-SER-0825. The Court defers to these scientific observations and decisions. *Native Ecosystems*, 697 F.3d at 1053.

Piteau applied the Level 1 Protocol elements, recorded measurable flow, and verified its water model with supplemental measurements. 3-SER-0729, 3-SER-0724. The model will be continually updated with monitoring data from springs within the forecasted impact area and a one-mile buffer around that area. 2-SER-0439, 3-SER-0715–16. Piteau documented how it followed the Stevens Protocols' flow-measurement suggestions, in contrast to *Or. Nat'l Desert Ass'n v. Rose*, where

the EA at issue "contain[ed] virtually no references to any material in support of or in opposition to its conclusions." 921 F.3d 1185, 1191 (9th Cir. 2019). Piteau did not impermissibly use other measurements (even Bartell's expert's) as a "proxy." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 972 (9th Cir.2002). Bartell does not identify a gap; it identifies disagreements with recorded measurements; and in such cases the Court defers to BLM. *Earth Island Inst.*, 351 F.3d at 1301.[41]

BLM demonstrated data integrity by "identify[ing] any methodologies used" and citing "other sources relied upon." 40 C.F.R. § 1502.24 (2019). The FEIS cites its sources and Piteau's data is clearly available. 5-SER-1333. And Piteau did not knowingly trespass or take its measurements "secretively"—the field survey sheet photos are all in daylight. *See, e.g.*, 4-BRLER-518. When prior contractor SRK measured flows in 2012 it noted "right-of-way access is granted" on Bartell's land (and Bartell does not contend SRK trespassed). *Id.* (1Q 2012 SP-035 field sheet). The SRK survey records indicate it believed SP-035 was publicly accessible by "the right-of-way" from the road and it sought permission from a different landowner to access SP-028. 5-SER-1314.

---

[41] Even if there were discrete errors in Piteau's data (which there are not) agencies may rely on "available evidence even when it is imperfect, weak, and not necessarily dispositive." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).

Presumably relying on these records, in 2018 Piteau accessed SP-035 and SP-042.[42] When Bartell expressed concerns about trespass, Piteau explained it did not see "no trespassing" signs. 4-SER-0825. Piteau did not willfully go onto Bartell's property after having been warned not to trespass as required for "trespass." *McCall v. Las Vegas Metro. Police Dep't*, 2020 U.S. Dist. LEXIS 52264, at *5 n.1 (D. Nev. Mar. 23, 2020) *aff'd sub nom. McCall v. Jacobitz*, 2021 U.S. App. LEXIS 24635 (9th Cir. Aug. 18, 2021). The Protocols recommend landowner outreach to "ensure the security of the inventory data." 5-BRLER-775. Bartell never alleged the data was not secure.

Bartell's differing measurements do not affect the integrity of the water data and resulting model.

### 2. BLM Oversaw Piteau's Work

NEPA allows BLM to use contractors to collect environmental information such that "acceptable work not be redone, but that it be verified by the agency." 40 C.F.R. § 1506.5(b)(3). An agency "independently verif[ies]" contractor work when it "evaluated [the contractor's] report, proffered questions, and … request[ed] supplemental reports," and is then "not required to conduct a further study … or to

---

[42] Bartell does not contest measurements of SP-042, just SP-035, apparently believing Piteau trespassed to mis-measure SP-035 but *correctly* measured SP-042. 4-BRLER-553.

independently find possible sites overlooked by" the contractor. *Friends of Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986).[43]

Bartell no longer denies BLM's "review [of] Piteau's analysis." AOB 31–32. BLM's hydrogeologist Dan Erbes reviewed and commented on Piteau's November 2019 Report, observing it was "[e]xcellent," but still requested "[a] follow up memo … to confirm water resources impact predictions." 5-SER-1153. Erbes also requested and received "the additional model datasets … for review." *Id.*; 4-SER-0952. And other BLM employees worked with Piteau "to be sure we have the same fundamental understanding of the hydrology and modelling that LNC/Piteau is providing." 4-SER-1020; 4-SER-1021 (stating Erbes and Patrick Plumlee "have been working with Piteau and LNC" on baselines and the model); 4-BRLER-821 (BLM comments on Piteau's Report Addendums). Where, as here, BLM "requested reports and supplemental reports from [Piteau], consulted various federal and state resource agencies, analyzed the information, asked [Piteau] questions, requested yet additional report revisions, and rationally" approved the Project, BLM "fulfill[ed] its obligation" to independently evaluate data. *Friends of Earth*, 800 F.2d at 835.

---

[43] Bartell contends that "BLM rushed" its review, AOB 3,4,8–9, based on a single BLM email postulating that "[m]ore time to review the baselines and see the sites in the field would have been helpful." 5-BRLER-824. But the baseline and other water surveys were conducted over a decade 2-SER-0499, and largely completed before 2020. *See generally* 4-BRLER-551–59, 5-SER-1162; 5-SER-1256–63.

Bartell contends that BLM should have visited the springs to double-check Piteau's measurements. AOB 32. This demands BLM "duplicate" Piteau's measurements and is not required. *S.F. Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F. Supp. 2d 1001, 1013 (N.D. Cal. 2002). "Absent some indication that the [BLM] acted improperly, the Court will presume that the [BLM's] decision-making process was adequate and that it fulfilled its … duty of independent evaluation." *Id.* (citing *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000)). Bartell contends that surveys "were likely taken in the wrong locations"[44] but BLM had Piteau's measurements and the photos of their survey area as reliable evidence of the location, conditions, and seasonal variations. BLM reviewed this evidence, Piteau's data, and the water model, and in its hydrogeologist's expert opinion the product was "[e]xcellent." 5-SER-1153. BLM's careful review of Piteau's work meets the standard and "courts must defer to the informed discretion of the responsible federal agencies." *Earth Island Inst.*, 351 F.3d at 1301.

---

[44] Bartell misstates the single email quoted, which tentatively reasoned "the spring data was *potentially* collected from the wrong locations," and the employee making that statement arrived at that conclusion only by "skim[ming] through all *[Bartell's] comments*," not by "read[ing] the documents" from Piteau. 5-BRLER-824. Even that employee concluded "it is still useful data" and recommended against "a supplemental EIS," given impacts to water "are not anticipated … [until] the year 2055." *Id.*

Bartell contends BLM overly relied on Piteau when responding to his DEIS comments, ignoring that BLM may adopt data from a proponent after independent review. 40 C.F.R. § 1506.5(a)(3). When responding to Bartell's email that a comment response was "LNC's … view," BLM accurately noted that "[t]he comment response is BLM's point of view," 5-BRLER-832, because it reviewed and added to Piteau's responses. 4-SER-0820. BLM included its reviewed and refined responses as FEIS Appendix R and a comparison to Piteau's responses shows BLM's oversight. *Compare* 4-SER-0839 *with* 3-SER-0727.

### 3. The Baseline is Accurate.

Bartell's disagreements with certain measurements of five springs after over a decade of quarterly measurements are flyspecks. Bartell does not argue that the FEIS contradicts the baseline study, but instead that select measurements within those studies are wrong, based on his own interpretation. BLM's contractor prepared memoranda responding to Bartell's concerns (5-SER-1136–41, 4-SER-0821–48). BLM extensively reviewed, considered, and responded to Bartell's submitted comments and data. *See, e.g.*, 3-SER-0721-30.

This is not a case where BLM found no impact to an important resource without any basis—like in *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 567, 569 (9th Cir. 2016). The FEIS includes over 1,000 pages regarding water impacts,

concluded there will be some impact on water (and the wildlife that depends on it) and included mitigation to remedy them. 2-SER-0418–45.

### a. Spring Measurements

Bartell challenges certain SRK measurements from 2011–2013,[45] and Piteau's measurements at BLM-02, SP-010, SP-029, SP-035, SP-036. These hydrogeologists recorded flow where, in their professional opinion, flow could reasonably be measured. BLM disclosed SRK, Piteau, and others, as the "methodologies and scientific sources" it relied on in approving the water model, ensuring professional and scientific integrity. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1213 (9th Cir. 2004) (citing 40 C.F.R. § 1502.24).

Bartell claims that SRK and Piteau would assign a "zero" flow when it was "inconvenient to measure" AOB 7, arguing that SRK arbitrarily made "zero" measurements of BLM-02, BLM-03, SP-010, SP-023, SP-029, SP-030, SP-032, SP-033, SP-034, SP-035, SP-037, and SP-040 in June 2012. 4-BRLER-521–32.[46]

---

[45] Bartell never challenged SRK's measurements during NEPA or until its reply brief below, 1-SER-0059, so these claims are waived. *Havasupai Tribe*, 943 F.2d at 34.

[46] Bartell does not challenge, with this citation, the June 2012 "zero" flow measurement for SP-036, where the survey form depicts a grassy area that "may have been damp due to rainfall," 5-SER-1315, but *does* challenge the June 2012 "zero" measurement for SP-035, which presents almost the same photo (also taken on a rainy day). 5-BRLER-530. Where Bartell is arguing his differing interpretation of data that is difficult to measure, "[t]he agency plausibly explained that apparent differences" in the data arose from measurement locations, interpretation of negligible flow, and measurement methodology, it was not "arbitrary and capricious"

Bartell cherry-picked 11 springs out of the 36 measured to claim (without support) that all these springs should have measurable flow during summer. But the photos and descriptions demonstrate the reasonableness of SRK's measurements. *See, e.g.*, 4-BRLER-521 (BLM-02, damp ground visible but "[a] flow measurement was not taken because the water was not concentrated in one area,"); 4-BRLER-522 (BLM-03, damp ground visible, so "[n]either a flow measurement nor a sample were taken"); 4-BRLER-524 (SP-023 is a dry road with an artificial culvert—"flow measurement was not taken as water movement was minimal"); 4-BRLER-531 (SP-037 shows a damp area around a cluster of rocks, where "[w]ater has pooled in recent cattle tracks with minimal flow."). Bartell improperly invites this Court to review this information and decide whether SRK should have identified flow, "act[ing] as a panel of scientists that instructs" BLM how it must "choose[] among scientific studies" and data and fail to show BLM deference. *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011).

Bartell challenges that hydrogeologists averaged the "conditions observed and measured during field surveys," AOB 19, but this is consistent with Bartell's cited Stevens Protocols. 5-BRLER-799 (recommending "the average value calculated" from measurements). Bartell argues that SRK and Piteau allowed "heavy

---

in relying on its own data and discounting [Bartell's] alternative evidence." *Earth Island Inst.*, 351 F.3d at 1302.

vegetation" or muddy ground to prevent them measuring springs.  AOB 20.  But every survey form indicates water samples were taken and the surrounding conditions recorded.  *See, e.g.* 4-BRLER-553.  And the Stevens Protocols note that "dense vegetation cover" and "diffuse discharge … may not allow for direct measurement[s]."  5-BRLER-802.  Bartell contends SRK and Piteau should have "estimate[ed] flow" instead of recording zero flow.  AOB 19.[47]  But this is ultimately a scientific suggestion (involving damp ground and minimal unmeasurable trickling) that urges the Court to rely on Bartell's "contrary view" instead of BLM's "qualified experts."  *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008).

SRK and Piteau's measurements at each of the five challenged springs are reasonable given the data.  Bartell challenges the "zero" average flow for BLM-02,



4-BRLER-512

a spring outside even the one-mile buffer of the Project's projected 10-ft drawdown isopleth—meaning under the most conservative approach the Project will have no impact on it.  2-SER-0489.

---

[47] The photos of the spring Bartell cites demonstrate SRK's measurements were reasonable.  4-BRLER-512 (Dec. 2011 - BLM-02, depicting dead grass and rocks, no water visible so "[a] flow measurement was not taken"); 4-BRLER-525 (June 2021 – SP-029, depicting thick grass with possible mud underneath, all grass, possibly mud underneath, so "[n]either a flow measurement nor a sample were taken").

Bartell contends SRK's four "zero" measurements from September 2011 through June 2012 were contradicted by the photos. But those photos depict no visible water. 4-BRLER-510 (Sept. 2011 – depicts plants, no visible water); 4-BRLER- 512 (Dec. 2011 – depicts wet rocks around dry grass, no visible water); 4-BRLER-515 (Mar. 2012 – depicts dry rocks and grass); 4-BRLER-521; (June 2012 – depicts rocks with no visible water). Bartell misuses SRK's observations noting wetness but the photographs demonstrate there was no measurable flow.

Bartell next challenges SP-010's "zero" baseline, another spring outside the one-mile buffer beyond Project impacts. 2-SER-0489. Bartell notably does not challenge the May 18, 2011 measurement of SP-010 as "<1 gpm", where a prior contractor estimated some flow but noted it was "influenced by Thacker Creek" and the flow "is obviously … generated from the snow melt." 5-SER-1317; 5-SER-1316. But, Bartell challenges other measurements where SRK observed some channelized water but similarly noted "snow present near the spring origin," causing doubt as to the impetus of the flow. 4-BRLER-516 (grass is reflected in the water in the photo, demonstrating no flow). Even the photo Bartell highlights as showing "significant" flow reflects muddy water in thick vegetation. AOB 25. This does not justify the Court "substitut[ing] [its] scientific judgment for that of the agency." *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 924 (9th Cir. 2018).

Bartell challenges SP-029 measurements, a spring outside the forecasted drawdown contour. 2-SER-0489. But because SP-029 falls within the one-mile buffer it will be continuously monitored and mitigated if impacts occur. 3-SER-0715–16. And the photos demonstrate there was no "significant flow." 4-BRLER-356 (Mar. 2013, depicts grass and notes "flowing water was not heard or seen"); 4-BRLER-517 (Mar. 2012, depicts grass and any "water observed was muddy and filled with clover"); 4-BRLER-525 (June 2012, depicts grass, mud); 4-BRLER-524 (Dec. 2012, "flow … could not be obtained due to the presence of heavy reed grass"); 4-BRLER-528 (June 2013, depicts dead grass and noting "water … pool[ed] in the cattle tracks').

Bartell argues that SP-035 and 036 on its land were mismeasured. SP-035 is far outside even the one-mile buffer, meaning it will not be impacted by the Project even 100 years after the mine is closed. 2-SER-0489, 3-SER-0713. Bartell selectively quotes survey forms to suggest Piteau could have measured flow, but the photos validate there was no measurable flow. 4-BRLER-518 (Mar. 2012, brown grassy field); 4-BRLER-530 (June 2012, grassy field); 4-BRLER-540 (Aug. 2013 report describing SP-035 as "a riparian area of seasonal grasses and bulrushes"); 4-BRLER-556 (May 2018, shows green grass and no water but does note the location

61

is "NE of [a] large reed pond," not that the spring creates a pond); 5-SER-1211 (Oct. 2018, "No flow discharged. Spring contained to reed patch only").[48]

Bartell argues that Piteau inaccurately measured Pole Creek[49] tributary SP-036, ignoring the explanations BLM provided since 2020. SP-036 falls within the one-mile buffer BLM extended monitoring to, beyond the area of predicted impacts to include any streams within one mile of the 10-foot drawdown contour. 3-SER-0715–16. Therefore, this spring will continue to be monitored. Moreover, Piteau's analysis demonstrated that the "[p]redictive simulations are conservative

---

[48] Bartell contends in an unreviewable new argument, *Marsh*, 194 F.3d at 1052, that Piteau's measurements are untrustworthy because in December 2018, Wildlife Resource Consultants estimated SP-035's "springhead" and "mid" flow at "M" or "[m]oderate flow, moves fine particles" when looking for springsnails. 5-BRLER-548. The photos included show no flow, only that some water is present. 5-BRLER-550. This unnumbered estimate by a contractor for a different analysis simply demonstrates what Bartell's disagreement reflects: that "what constitutes the 'best scientific data available' belongs to the agency's 'special expertise.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

[49] Bartell contends that Pole Creek's connectivity to Crowley Creek is vital for LCT. But Piteau's observations from 2018–2020 demonstrated "[t]here is no observed year-round baseflow in Pole Creek across the Thacker Pass Project," and confirmed these observations in supplemental surveys. 3-SER-0714; 2-SER-0387 (FWS BA notes only "a perennial stretch of Pole Creek" supports LCT habitat 2 to 4 miles north of the Project area); 2-SER-0388 (BLM map illustrating the same). This also demonstrates BLM's thorough vetting of Piteau's work. After receiving DEIS comments BLM required "[a]dditional stream surveys of Pole Creek ... in February, June, and September 2020." 3-SER-0723–24. These surveys confirmed that while "[t]he Upper and Middle reaches of Pole Creek were flowing during each visit," the "entirety" of Pole creek cannot support LCT because "[a] perennially dry segment resided between the Upper and Middle reaches." *Id.*

with respect to drawdown extent" and "[e]ven under the simulated conditions the predicted impacts to springs and flow in Pole Creek are minor and less than measurement error." 3-SER-0695. While Bartell does not contest Piteau's March 2018 measurement of 4.6 gpm, 5-SER-1209, Bartell contends that Piteau failed to measure SP-036 when "[f]low [was] significantly higher" in May 2018. 4-BRLER-557.

Bartell ignores that "[d]uring peak flows the baseflow from SP-036 cannot be discerned from surface water flow that is derived further upstream." 3-SER-0724. The goal was to measure "baseflow conditions." At "peak flow" the "flow … was surface channel flow and not representative of baseflow conditions." 3-SER-0725. "[T]he actual contribution from SP-036"—as opposed to other identified reaches of the spring— to the baseflow being measured "is masked during this period." 3-SER-0724. Furthermore, not identifying a measurement for this quarter in the monitoring period made a negligible difference in the "annual flow rate." 3-SER-0725. Revising the flow rate at SP-036 by removing 2018 Q2 monitoring data produces an average flow rate of 1.5 gpm versus 1.1 gpm. *Id.* Bartell's "disagree[ment] with the methodology does not constitute a NEPA violation." *Native Ecosystems Council*, 697 F.3d at 1053.[50]

---

[50] Nor does this disagreement indicate that "BLM [is] unaware of the impacts of the Mine," AOB 26–27, because Bartell's criticisms have no impact on the robust water model, even if true. And BLM did not "conceal these impacts from public

BLM tested the calibration of the model when it performed supplemental surveys of Pole Creek and the observed "[b]aseflows in Pole Creek match flow rates predicted by the numerical groundwater model," meaning "the groundwater model and predicted impacts appear to have been verified by continued data collection." 3-SER-0724. Although this gave BLM confidence that the Project will not impact Pole Creek because "[n]o measurable impacts to groundwater discharge in the Upper and Middle Reaches of Pole Creek were simulated," BLM will still collect "additional stream flow data … [from] Pole Creek as part of the comprehensive monitoring program." *Id.*

Bartell's final salvo is to claim unexplained inconsistencies between the surveys and his own January 2019 spreadsheet. It is unclear what differences he disparages between 4-BRLER-639 and 4-BRLER-643–45, but it appears Baseline report summarized certain flows for springs SP-015, -017, and -018 as "zero" in 2019 but recorded minute flows at .5gpm in the May 2020 Water Quality Assessment. 4-BRLER-643. Given Bartell argues for greater specificity, it is

---

disclosure," *id.*, the impacts Bartell predicts are contrary to over a decade of data and a vetted water model. The mitigation plan's continued monitoring will ensure that if spring flow resurges in these areas it will be incorporated into the model and mitigation provided.

unclear what he contests.[51]  Bartell's personal analysis of the survey forms cannot lawfully be credited over BLM's expert.

### b.    Groundwater Measurements

Bartell argues that because NDWR once measured a location within Section 33 at 6.7ft the Stringham report's groundwater depth range of 14–30ft is incorrect. The purpose of the Stringham report is relevant to understanding why 14–30ft is a conservative measurement.  The Stringham report evaluates the impact of forecasted drawdown on vegetation, 4-SER-09217, like the basin wildrye, with a rooting depth of 3–12ft.  *Id.*  Had Dr. Stringham relied solely on NDWR's single shallower depth-to-groundwater measurement of 6.7ft to characterize the entire 640 acres within Section 33, she would have determined that the 5ft drawdown from the Project (which in Bartell's scenario would increase depth-to-groundwater from 6.7 to 11.7ft) would mean the basin wildrye's 12ft roots could still reach the groundwater.  4-SER-0927.  Instead, the 14–30ft depth-to-groundwater range means that a 5ft drawdown could "have a negative impact on basin wildrye production," resulting in monitoring

---

[51] Bartell (for the first time on appeal) challenges a single measurement of SP-048 recorded in the January 11, 2019 spreadsheet as 66.6 gpm, 4-BRLER-568, but the survey form indicates 38.6 gpm (meaning Bartell challenges this measurement as too high).  4-BRLER-561.  But the survey notes demonstrate that Piteau measured the flow out of the culvert at 38.6 gpm, separately measured SP-048's flow, and then inadvertently input the culvert's flow as the spring flow on the form.  *Id.*  Piteau caught this error in quality control and included the correct measurement of SP-048's flow as 66.6 gpm in the spreadsheet and later the water model.  4-BRLER-568.

that Bartell's measurement would miss. *Id.* The Stringham report concludes "[m]onitoring is advised" and Lithium Nevada should mitigate potential Project impacts through "water spreading [to] insure the continuing production of this unit." 4-SER-0929.[52]

The Stringham depth-to-groundwater range is reflected by other NDWR measurements in the record. Piteau observed that the Ranch Well (at 6.7 ft below ground surface) was at "a steep gradient from the spring," and recorded that in a "~200 ft" distance the water levels deepened by almost 8 feet. 4-SER-0916 (noting the "[s]teep hydraulic gradient across [the] alluvial fan," measuring a depth difference of 7.79ft between the referenced spring (Drive Point #2) and the Home Ranch Well). This change over a short distance demonstrates "[t]he depth to groundwater is highly variable over the potentially affected area," 3-SER-0719, and emphasizes the error in using a single measurement to characterize a Section.[53] The other NDWR measurements Stringham cited further illustrate this: comparing Piteau's map at 4-SER-0916 to the Stringham's map at 4-SER-0928, NDWR

---

[52] Stringham noted that Section 33's vegetative growth benefited from irrigation, which Bartell's FEIS comments do not dispute—while Bartell argues that no irrigation occurred in Section 33 in 2020, Bartell acknowledges "the years that irrigation water reaches section 33, it does improve the water table." 5-BRLER-674.

[53] Bartell cites to its own comments, AOB 29 n.13, its own photos, AOB 30, and cites to its expert's comments, AOB 29 to attack Piteau's measurements. When a party attempts to create a "battle of the experts" the Court defers to BLM. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1244 (9th Cir. 2005).

measured the Home Ranch well depth at 4177ft amsl. The three closest NDWR wells measured in the same Section, 4162, 4163, and 4193ft amsl, showed a difference in depth of 15ft, 14ft, and 26ft respectively. 4-SER-0928 With Dr. Stringham's analysis and Piteau's data BLM "conservatively identifie[d] all perennial surface water resources within the projected drawdown area (plus an additional one-mile buffer area) and has specified monitoring and mitigation measures to protect these [vegetative] resources." 3-SER-0720.

### 4. BLM Approved an Effective Mitigation Plan.[54]

Based on his challenge of selected measurements for five springs Bartell argues the entire baseline (comprised of hundreds of other measurements) is incorrect. But BLM and the Stringham Report reasonably relied on Piteau's measurements made using applicable protocols. Where, as here, "there was no reliable evidence that showed their results were incorrect ... we cannot say that the [agency's] reliance on the surveys was arbitrary or capricious." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014). BLM required ongoing monitoring under the mitigation plan beyond the area of impacts to include

---

[54] In its vacatur argument, Bartell contends BLM should conduct a Supplemental EIS and present "a new mitigation plan that the public has a chance to review and comment on prior to BLM making a new decision." AOB 59. But Bartell does not contest the court's finding that "there are two groundwater quality monitoring and mitigation plans described in the FEIS" and provided to the public for comment. 1-BRLER-33.

springs within one mile beyond the 10-foot drawdown contour, demonstrating that the "[p]redictive simulations are conservative …. Even under the simulated conditions the predicted impacts to springs and flow in Pole Creek are minor and less than measurement error." 3-SER-0695. The Court cannot "second-guess methodological choice made by an agency in its area of expertise." *Inland Empire v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993). The groundwater monitoring network provides an early warning system for drawdowns and, if impacts occur, they would be mitigated primarily through replacement water. 2-SER-0439; 3-SER-0706.

Bartell contends that this monitoring plan will not be effective where certain baselines are set at zero. But with the consistent quarterly monitoring in the mitigation plan (which Bartell does not challenge) beginning "prior to the commencement of mining," 3-SER-0702, BLM will continuously add data to increase its understanding of the hydrogeology and refine the model's inputs and outputs in coordination with the TAG. 2-SER-0437; 3-SER-0717. This adaptive management approach can incorporate "data …provided by other sources … [in]to the database." 3-SER-0725–26. Where BLM identifies impacts and establishes a monitoring and mitigation plan—even if it does not entirely eliminate impacts to water—BLM satisfied its requirement to "consider[] extensively the potential effects

and mitigation processes." *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000).[55]

### 5. BLM Made Adequate Information Publicly Available

Bartell argues that BLM should have provided more detailed answers to his post-FEIS requests and disclosed a related consultation that BLM did not rely on in the FEIS. Because Bartell's cited requests are post-FEIS, BLM had no obligation to continue responding. 40 C.F.R. §§ 1503.4, 1503.1(a)(2)(v) ("[a]fter preparing a [DEIS] and before preparing a [FEIS] the agency shall …. [r]equest the comments of … [t]he public.").

Bartell cites his post-FEIS December 4, 2020 request that BLM "provide [him] with all data, models, studies and documents, in any way related to the Final EIS that are not provided online." 5-BRLER-826. BLM provided the files requested. 2-SER-0413. Bartell raised more questions and BLM responded. 2-SER-0384–86 (explanation from Mr. Loda on December 21, 2020 responding to Bartell question). BLM answered Bartell's subsequent December 14 request on December 21, 2020. 2-SER-0386.

---

[55] Bartell contends the court ignored its mitigation argument. AOB 43. The district court did not address Bartell's arguments with the particularity that Lithium Nevada applies because the court found it clear that Bartell's contentions of inadequate baseline (which correspondingly would allegedly prevent effective mitigation) were flyspecks. 1-BRLER-40.

Bartell also contends that because Piteau changed the elevation of a single sensor (PZ17-01) used for the Project's pump test, his entire analysis of the pump test was incorrect. AOB 44. This concern is overwrought and extensively addressed in the FEIS's Appendix R. This sensor is one of hundreds of groundwater monitoring locations, and "[i]t is not unexpected that a program with over 100 groundwater monitoring locations will require occasional correction." 3-SER-0723. This adjustment did "not affect drawdown calculations" and "[t]he correction has effectively no bearing on the groundwater impacts predicted." *Id.*

Bartell's assertion that BLM violated NEPA by not describing the separate ESA consultation or making the BA publicly available is wrong. BLM satisfied NEPA by disclosing the impacts of the Project on the environment, including species listed as threatened and endangered under the ESA.[56] The only ESA-listed species in the baseline evaluation area is the LCT. The FEIS describes the LCT's habitat needs, its potential for occurrence in the Project area, and its known presence in the vicinity of the Project and identifies occupied stream reaches on a map. 2-SER-0504–05; 2-SER-0489. It also discloses that the Project is not anticipated to affect LCT because there are no forecasted impacts to LCT-occupied stream reaches,

---

[56] BLM did not rely on the BA in the FEIS, so it was not an underlying document that NEPA required be publicly available. And the ESA Section 7 consultation process has no public-participation component. *Jewell*, 747 F.3d at 649. BLM had no obligation to make the BA consultation process publicly available. 4-SER-0955.

implementing water management best practices would avoid impacts to water quality, and any construction or maintenance activities at Crowley Creek would be during no- or low-flow periods and use fish-friendly culverts. 2-SER-0451–52; 3-SER-0732; 3-SER-0737. This information was available for public review. Thus, Bartrell's assertion that it was unable to knowingly comment on LCT impacts is unsupported.

### B. The Court Did Not Abuse Its Discretion In Rejecting Bartell's Extra-Record Testimony

#### 1. The court correctly declined to consider post-ROD extra-record testimony

Bartell argues the court abused its discretion in rejecting extra-record testimony, arguing a court may consider *information* available while the record was developed even if the extra-record *document* the information is within post-dates the ROD. AOB 45. Bartell misstates the court's ruling and the law. *Fox v. Vice*, 563 U.S. 826, 839 (2011) (a district court abuses its discretion when it commits legal error); *Tri-Valley CAREs v. U.S. DOE*, 671 F.3d 1113, 1124 (9th Cir. 2012) (this Court reviews a decision on extra-record evidence only for abuse of discretion).

The court correctly observed that "post-decisional information," not just documents, are inadmissible extra-record evidence. 1-BLRER-59 (citing *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. Zinke*, 889 F.3d 584, 600–01 (9th Cir. 2018)). The court noted specifically that the "[t]he hearing

*and its contents* … were not available to BLM at the time BLM issued the ROD." *Id.* (emphasis added). Because Bartell's motion urged the court to consider information not available to BLM when it issued the ROD, the court correctly concluded that it could not do so.

Extra-record material is inadmissible when it is used to "advance[] a new rationalization … for attacking an agency's decision." *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 450 F.3d 930, 944 (9th Cir. 2006). To the extent the testimony purportedly uncovers heretofore unknown errors (which Lithium Nevada contests), Bartell cannot provide that extra-record evidence "to determine the correctness … of the agency's decision." *Nw. Env't Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1132 (9th Cir. 2006).

And because Bartell was able to make its arguments on these topics without using this testimony, the extra-record information is "cumulative of those already in the agency record" and "it was not an abuse of discretion for the district court to strike cumulative and unnecessary documents." *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998); *Cachil* 889 F.3d at 600 (declining to supplement the record with information relating to "a problem that the [agency] considered," because it meant the agency already "considered all relevant factors"). The arguments Bartell makes with the proffered testimony, AOB 50–51, can be made with documents in the record. AOB 40 (disputing maximum discharge

measurements); *id.* at 38–42 (disputing application of the Stevens Protocols); 18–28 (claiming misrepresentation); 34–38 (contending trespass); 31–34 (contesting BLM's review).[57]  The court acted within its discretion in declining to supplement the record with cumulative information.

### 2. The Testimony is Inadmissible under *Lands Council* Factors One and Four[58]

Bartell argues under the first exception set out in *Lands Council v. Powell*, 379 F.3d 738, 747 (9th Cir. 2004), *amended by* 395 F.3d 1019 (9th Cir. 2005) that the testimony is necessary to determine if BLM considered several arguments raised throughout its brief.  AOB 50.  But the record (and this brief) show that BLM did consider all these issues and the extra-record testimony would be cumulative.

Bartell first contends Piteau "admitted" that it failed to measure certain springs at maximum discharge, but as discussed *supra* Section II.A.1, the Stevens Protocols suggested surveyors could find "maximum discharge" at a spring's orifice,

---

[57] *Alliance for the Wild Rockies v. Marten* emphasizes this point, as that court noted that regardless of the date of the information, the information itself must also be needed to determine "the agency's consideration of 'relevant factors.'" 585 F. Supp. 3d 1252, 1262 (D. Mont. 2021).  Bartell fails to demonstrate the extra-record testimony is "necessary" to make the arguments it asserts, AOB 45, meaning the testimony is still inadmissible.

[58] Factor four, the "bad faith" exception, is not met here.  Lithium Nevada rebutted Bartell's accusations of trespass, *supra* Section II.A.1, misrepresentation, *supra* Section II.A.3, and withholding information, *supra* Section II.A.5, and Bartell does not provide new information on those issues in this argument.

but did not mandate that location for measurement.  Piteau used its expert judgment to choose where to measure each spring.  *Id.*  Bartell then references a claim, not advanced on appeal, that Piteau should have "follow[ed] the Stevens Protocols for recording spring data" on hand-drawn sketchmaps and field data sheets.  AOB 50; 3-BRLER-361–62,-370.  Piteau demonstrably used field data sheets (Bartell cites to Piteau's "Spring Survey Forms" to challenge the measurements, *see, e.g.*, AOB 19–28), and a digital map including all monitored streams and reference points is in Piteau's 2020 Water Quantity and Quality Impacts Report, fulfilling this Protocol. 3-BRLER-791 (digital sketchmaps in the Protocol); 3-SER-0712.  Bartell argues the testimony shows Piteau trespassed by not first asking for permission to access certain springs, but Section II.A.1 explains Piteau believed access was granted.  Finally, Bartell contends the testimony reveals "BLM could not have inquired about Piteau's adherence to survey protocols or … specific … measurements."  AOB 50.  But the record demonstrates BLM reviewed the data collected and caselaw demonstrates BLM was not required to re-take each measurement.  *Supra* Section II.A.2.

Bartell contends because its extra-record testimony is "probative" of arguments it already makes that it is admissible.  AOB 51.  But this Court requires extra-record evidence be "necessary" to understand relevant issues, not just "probative."  And nothing in the testimony "suggest[s] that the agency made an incomplete or unreasoned review of the evidence before it" such that the extra-record

testimony was necessary; BLM "was entitled to rely on the reasonable opinion of its experts." *United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1117 (9th Cir. 2007).

## C. BLM Complied with FLPMA

Bartell confines its arguments to alleging that the water and powerlines will harm GSG habitat because he claims the GSG RMPA provisions were not satisfied. AOB 52.[59] This water and powerline area is so degraded (and an existing powerline already runs through it) that it is almost exclusively "**non-habitat**," even according to the 2015 GSG RMP maps. *Compare* 4-BRLER-492 (Bartell's challenged area); 2-SER-0488 (depicting the location of the existing powerline and planned water/powerlines) *with* 2-SER-0492 (the Eastern portion of the Project is primarily non-habitat). There is no PHMA within the water and powerline area. *Id.* Furthermore, Lithium Nevada complied with the GSG RMPA protections and demonstrated avoidance of habitat and mitigation of impacts. *Supra* Section I.A.1–

---

[59] Bartell contests BLM's approval of the Project's water and power lines, arguing the underlying mining claims are "located outside the caldera, … devoid of known mineralization." AOB 55–56. The RMPA explicitly exempts locatable mineral projects from its directives, 1-SER-0137, and Bartell does not assert the RMPA should apply to Lithium Nevada's discovery of valuable lithium in the pit. AOB 54. Bartell cites the geology report, AOB 54, which specifically documented that "sedimentary rocks drilled in the Thacker Pass basin contain high lithium contents." 4-BRLER-621. The mine pit has a valuable mineral deposit and the Project area show widespread mineralization. 2-SER-0493; 5-SER-1319; 5-SER-1238; 5-SER-1228.

2.  Thus, Bartell's argument that this Court should extend *Rosemont* to the water and powerlines area is both incorrect (based on the regulations) and immaterial (based on the Project's compliance with the RMPA) and he fails to carry his burden of showing any harm given the lack of GSG habitat.  Finally, Bartell's argument that BLM failed to follow the RMPA's VRM guidelines overlooks that this Court determined those are advisory, not mandatory.

### 1.  Bartell's GSG RMP Claims are Moot

Bartell does not specify the harm the Project will cause GSG other than claiming it will "devastat[e] … wildlife habitat" where the water and powerlines will be located.  AOB 51.  But in its motion for an injunction pending appeal, Bartell argued that alleged harm would arise from "clear[ing] this ecosystem" of sage brush in the water/powerline corridor, which would be "irreversible destruction."  ECF 4 at 12, 17.  Because the clearing of that area to begin laying the pipeline is already completed,[60] Bartell's GSG claims that the water and powerlines will cause UUD by clearing the sagebrush are moot.  *Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012, 1015 (9th Cir. 1989)(FLPMA claim was moot given timber was cut).

---

[60] *Lithium Americas Commences Construction at Thacker Pass ["Construction Presser"]*, LITHIUM AMERICAS (Mar. 2, 2023), https://www.lithiumamericas.com/news/lithium-americas-commences-construction-at-thacker-pass ("Construction, including site preparation, geotechnical drilling, water pipeline development and associated infrastructure, has commenced.").

The sage brush cannot be "uncleared." *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir. 1988)("we cannot order that the Plans be 'unmined.'").

## 2. The Project Complies with RMPA GSG Protections

Were the Court to consider Bartell's RMPA arguments, they still fail.[61] The three directives Bartell cites are all "[s]ubject to valid existing rights and applicable law." 5-BRLER-626–28.[62] Furthermore, the Project complied with these directives. The Project avoided high-quality habitat under MD-SSS-1, *supra* Section I.A.1, and provided net conservation gain under MD-SSS-2B, *supra* Section I.A.2. It is unclear how the water and powerline would impact GSG habitat to cause UUD. There is no noise over 10 dba from water or powerlines, 5-BRLER-630, visually the water line is below ground and the powerline runs next to an existing line.[63] And the challenged

---

[61] As the court noted, this argument is waived. Bartell, like WWP, focused on the Storage Areas when urging the court to extend *Rosemont*. 1-BLRER-17. Only in its summary judgment reply did Bartell argue obliquely that "water and power transmission lines" were on invalid mining claims. 2-BRLER-225. A "single-sentence argument … did not sufficiently raise to the … court the argument" and "waive[s] th[e] argument." *Mortg. Store v. Field (In re Mortg. Store)*, 2013 U.S. Dist. LEXIS 54825, at *27 (D. Haw. Apr. 16, 2013); *see BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 825 (9th Cir. 2000)).

[62] The RMPA's "3 percent disturbance cap," 5-BRLER-627, cannot "preclude a locatable mineral resource project," *id.*, because that would functionally withdraw the land from mineral entry in violation of FLPMA, 43 C.F.R. § 2310.1-3.

[63] Bartell contends the water and powerline will go through an existing lek. AOB 10. This is false even if Bartell was challenging the entire length of the water/powerlines, as opposed to only the Eastern portion it challenges on appeal. Per 2-SER-0488, the proposed water and powerline are above the state highway, and the closest "historic" lek is only touched by the *existing* powerline—it is below the

portion of the water and powerlines is almost entirely in non-habitat—even under BLM's 2015 maps.  2-SER-0492.

### 3. *Rosemont* Does Not Apply to the Water and Power Lines

Bartell focuses on the "parts of the mine … located outside the caldera" and claims that under *Rosemont* BLM should not authorize a water line or powerline without verifying the mineralization of underlying claims.  AOB 54–55.  First, Bartell cannot "proffer[] a case to support [its] argument that *Rosemont* extends beyond land for proposed burial under" Storage Areas 1-BRLER-17, because *Rosemont* is "a novel finding" rather than "long-settled law."  1-SER-0011,-0013.  Thus, none of Bartell's cited cases are relevant—all simply affirm that validity determinations are necessary to patent mine claims or defend them when challenged by the U.S. government.  *Union Oil Co. v. Smith*, 249 U.S. 337, 347 (1919) ("obtaining … a patent"); *Davis v. Nelson*, 329 F.2d 840, 844-45 (9th Cir. 1964) ("prosecut[ing] [vested rights] to patent"); *Barrows v. Hickel*, 447 F.2d 80, 81 (9th Cir. 1971) ( "an administrative proceeding … to contest the validity of the claim"); *United States v. Rice*, 1989 U.S. App. LEXIS 23812, at *4 (9th Cir. Sep. 1989) (an administrative proceeding "re-examin[ing] for validity" a contested claim); *Bohmker v. Oregon*, 903 F.3d 1036, 1048 (9th Cir. 2018) (noting FLPMA cannot

---

highway and untouched by the planned additions.  *Compare* 2-SER-0491 *with* 2-SER-0488.

"materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto"). None of these cases require a patent-style validity examination to confirm "a discovery of valuable minerals before a project proponent could permanently occupy" land with Storage Areas. 1-BRLER-11. And *Rosemont* recognized, the agency must first consider such an issue; it would be premature for the Court to determine. 33 F.4th at 1208.

Second, while clearing the sagebrush for the water and powerline permanently changes the landscape, neither water nor powerlines permanently occupy the area. *Penfold*, 857 F.2d at 1318. Here "[a]reas that would be reclaimed include the powerline and pipeline construction corridor." 2-SER-0465. This is distinct from the storage areas, which the *Rosemont* Court emphasized "will occupy that land forever." *Rosemont*, 33 F.4th at 1221. Bartell contends that "any occupancy" under the Mining Law requires a verification of mineralization, AOB 54,[64] ignoring that *Rosemont* itself observes "[t]he Mining Law allows the owner of a valid mining claim on land containing valuable minerals to obtain possessory rights to other land

---

[64] Bartell's citation to the *Rosemont* majority's aside that "discovery of valuable minerals is essential to the right to *any* occupancy" is dicta. 33 F.4th at 1220. The Court there made repeated reference to the extent and permanency of the "1.9 billion tons of waste rock" on nearly every page of the opinion in determining the legality of Rosemont's permanent occupancy of its mining claims. *Id.* at 1207, 1211, 1212, 1216, 1217, 1218, 1219, 1220, 1221, 1222, 1223, 1224 (mentioning "permanent" or "1.9 billion tons"). The facts are different here and *Rosemont* did not decide such a temporary use issue that was not before it.

for use as a 'mill site[,]'" and may stake "multiple mill sites" that "need not contain valuable minerals" for "reasonably necessary" uses. *Id.* at 1210. Mill sites provide legal rights to use these lands for such ancillary use even if they're not mineralized, so any BLM error is harmless given Lithium Nevada's undisputable rights for such use. *United States v. Shumway*, 199 F.3d 1093, 1105 (9th Cir. 1999). Thus, there is no error (or at best, harmless error)[65] in authorizing the water and powerlines. *Rosemont*, 33 F.4th at 1217 (acknowledging mill sites would be an option for challenged storage areas if the amount of waste was smaller).

The ROD authorized the Project activities under both 43 C.F.R. §3809 and §3715. 3-WWPER-334. Activities and structures "reasonably incident" to the mine pit that "[c]onstitute substantially regular work" and are "reasonably calculated to lead to the … beneficiation of minerals" may be permitted under 43 C.F.R. § 3715.2. The water and powerline are "reasonably incident" to the mine pit and will be used to "develop" the mine, and the "procurement of supplies" like water and power constitutes "[s]ubstantially regular work" that will lead to the beneficiation of the mine pit. 43 C.F.R. § 3715.0-5. Where sufficient mining operations exist, the "level of activity" necessary to "me[e]t the requirements of 43 C.F.R. § 3715.2" includes

---

[65] Because BLM could authorize the activity under either regulation, any perceived error "clearly had no bearing on the procedure used or the substance of decision reached" and was harmless. *Cal. Wilderness Coal. v. U.S. DOE*, 631 F.3d 1072, 1090 (9th Cir. 2011).

"water impoundments and delivery" like the water and powerline in this case. *Terry Hankins*, 162 IBLA 198, 216–17 (July 22, 2004). BLM therefore has authority to "approv[e]" the water line, pipeline, and related "reasonably incident" activities "under the applicable regulatory sections within subparts … 3715." 3-WWPER-334. Unlike *Rosemont*, this occupancy is not permanent, 2-SER-0465, and the same use could also be confirmed under mill sites. 43 C.F.R. § 3832.34(a)(2), (5) (explaining proper uses of mill sites include for "electrical plants" and "[a]ny other use that is reasonably incident to mine development and operation").

Mining requires additional use of lands to develop the valuable minerals discovered in the pit, including for delivery of water and power. Section 3715 allows such temporary use to develop the lithium Appellants concede was discovered in the pit. As a result, the pipelines, water lines, "are ancillary to mining … [and] necessary to extracting the valuable minerals." *Shumway*, 199 F.3d at 1099. Because Lithium Nevada is working its mining claims within the mine pit, it is entitled to access water and power incident to extracting that lithium. *Id.* at 1103. In 1955, Congress amended the Mining Law while taking care to preserve the broad rights under Section 22 when it enacted the Surface Use Act to prohibit non-mining use of mining claims and occupation of lands open to mineral entry for activities and facilities unrelated to mining. 30 U.S.C. §§ 611–15. Congress confirmed legitimate mining activity to include "prospecting, mining or processing operations *and uses*

*reasonably incident thereto*." *Id.* § 612(a) (emphasis added). The House Report recognized that the "Federal mining law has been designed to encourage individual prospecting, exploration, and development of the public domain" acknowledging the necessary use of public lands or active claims for all mining related activities. H.R. Rep. No. 84-730, reprinted in 1955 U.S.C.C.A.N. 2474, 2476, 2483. Ancillary activities under § 3715 are essential to support lawful mining of discovered valuable minerals and BLM had full authority to approve the water and power line under § 3715 or §3809.

## III.  Burns Tribe Claims

BPT contends that BLM should have consulted it on the Project. Years ago, BLM authorized extensive drilling, exploration, and a clay mine in the Project area, completing tribal consultation for each. A local tribe, FMT responded to consultations, 4-BPTER-513–14, 608–11, asked questions, 5-SER-1246–47, and was a major focus of BLM's and Lithium Nevada's outreach efforts leading to the ROD. 4-SER-1008–10; 5-SER-1155–57. BPT, in contrast, never objected to extensive prior disturbance near and in the Project area, did not provide BLM notice of its traditional territory, and expressed affirmative disinterest in the ROD and the Project. Yet BPT now contends that BLM should have known that it held the Thacker Pass area sacred. BLM reasonably relied on BPT's actions and followed the law. Moreover, BPT has no standing to raise other tribes' interests and cannot

raise its new NEPA argument for the first time on appeal. BLM correctly took a "hard look" under NEPA in any event.

### A. BLM Reasonably Did Not Consult with BPT

#### 1. BPT Did Not Give BLM Notice of Its Traditional Territory

BPT argues that BLM was aware of the "scope of the Tribe's traditional territory," citing a map in a declaration never provided to BLM until after the ROD issued. 2-BPTER-70. The first time it sent this map to BLM was in June 2021, and the district court refused to consider it because it was "sent after the ROD issued." 1-BPTER-38; 2-SER-0318–19. BPT does not challenge that ruling. 1-BPTER-38. But it argues that BLM should have considered this information anyway. BPT's reliance on the 2021 declaration is a concession that before June 2021—months after the ROD issued—BPT never notified BLM of its traditional territory or of any interest in the Project area.[66]

BPT also asserts that a map in BLM's 2006 ethnographic report demonstrates that BPT included Thacker Pass within its territory. But that map places BPT's area of interest within central Oregon. 3-BPTER-442,-444. And although BPT says it has "utilized the mine area since time immemorial," it never objected to the prior "authorized, extensive ground disturbance that has already occurred within the

---

[66] To the extent BPT raises its Aboriginal Territorial Protection Policy on reply, it too was provided six months after the ROD issued and is not part of the record. *Hintz*, 800 F.2d at 829.

Project area," 1-SER-0207, including over 50,000 pounds of waste rock moved during previous projects. 3-SER-0697.

Although BPT expresses concern regarding protecting Northern Paiute "habitation sites", 3-BPTER-470, none of the ethnographic report's references to the 27 tribes and tribal bands of the Northern Paiute and Western Shoshone demonstrate that BLM needed to consult with the Burns Tribe in particular. 3-BPTER-444–46; 3-BPTER-447; 6-SER-1339. And because BPT did not provide evidence of its interests to BLM before the ROD, BLM reasonably did not consult with BPT.[67]

### 2. Burns Tribe Expressed Affirmative Disinterest

BLM must "consult with any Indian tribe … that attaches religious and cultural significance to historic properties that may be affected by an undertaking," 36 C.F.R. §800.2(c)(2)(ii), and must "make a reasonable and good faith effort to identify any Indian tribes … that might attach religious and cultural significance to historic properties in the area of potential effects." *Id.* § 800.3(f)(2).[68] BLM made

---

[67] BPT cites to "Paiute oral history" that Thacker Pass (generally, with no indication of the Project area specifically) was the site of an intra-tribal massacre. 2-BPTER-72. The referenced oral history allegedly arises out of oral histories within the FMT, which did not join BPT in challenging the Project. And the few individual members proffering this history were dismissed from the suit for lack of standing. 2-SER-0317; 1-SER-0194–95.

[68] BPT's citation to a 2000 regulation "mandating" consultation "regardless of the location" discusses a regulatory change requiring BLM to consult with tribes even "when the project is not on *reservation* land" or "off tribal land." 65 Fed.Reg. 77698; *id.* 77699–700, 77702 (Dec. 12, 2000). NHPA incorporated this regulation and requires BLM consult regarding projects on tribal lands under § 800.3(d) and

that reasonable and good-faith effort here.

BLM sought BPT's consultation on a Winnemucca Geothermal Project in 2002. 3-BPTER-468. Despite BPT's non-response, BLM tried consulting BPT anyway for the 2005 RMP. 4-BPTER-520. After BLM sent five letters to and left three voicemails for BPT, BPT's Cultural Resource Representative responded. 4-BPTER-585.[69] She stated that BPT "would defer consultation to the tribes that had reservations closer to the study area" and noted "it would not be necessary to keep the tribe on the mailing list for the RMP/EIS," declining future contact about the area. 4-BPTER-520.

---

make a "good faith effort to identify [interested] Indian tribes" for all other projects under § 800.3(f). That's what BLM did here.

[69] Ms. Snapp was the designated "Cultural Resource Representative" and consultation with her fulfilled BLM's duty. 36 C.F.R. § 800.2(c)(2)(B) (directing that "the agency official shall consult with a representative designated by such Indian tribe"). The ethnographic report identified each tribal contact for consultation by its tribe-specific title, demonstrating BPT provided Ms. Snapp's title to BLM. 4-BPTER-520–21. Ms. Snapp was also designated as a tribal contact for environmental consultations on other projects. *See, e.g. Malheur National Forest (N.F.), Flagtail Fire Recovery Project - EIS*, U.S. FOREST SERVICE (Feb. 6, 2004), https://bit.ly/3I42VlP (identifying Ms. Snapp as the "Tribal Contact" for BPT's "Cultural Res. Program"). BPT's belated declaration from Ms. Snapp on summary judgment did not dispute BLM's record of her statement and no such extra-record declaration should be admitted. *Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. DOI*, 2012 U.S. Dist. LEXIS 162860, at *6 (S.D. Cal. Nov. 14, 2012) (extra-record materials are unnecessary where "the facts and documents referenced in the [extra-record material] are already in the administrative record.").

BPT contends that, even though its representative declined to consult on the RMP, BLM still should have consulted BPT here. But a fundamental purpose of an RMP is to identify areas of tribal interest. 4-BPTER-520–21; *see* 4-BPTER-669–733 (Places of Cultural and Religious Importance drawn from consultation with tribes). BPT contends that the existence of the RMP consultation list implies that BLM should have consulted with more than four tribes on the Project. AOB 24. But BPT's cases address RMP consultation (covering over 10 million acres under the RMP), not the appropriate breadth of consultation for specific projects (here covering only 18,600 acres). *Compare San Juan Citizens All. v. Norton*, 586 F. Supp. 2d 1270, 1292 (D.N.M. 2008) (RMP consultation including "51 different tribal governments and 29 other tribal officials") *with W. Org. of Res. Councils v. U.S. BLM*, 2018 U.S. Dist. LEXIS 49635, at *38 (D. Mont. Mar. 26, 2018) ("projects [are] narrower in scope and of a more discrete nature than the RMPs at issue here."). Moreover, under the ACHP that BPT cites, BLM could reasonably rely on the ethnography report to determine that BPT was not a tribe "that must be invited to consult" on projects within the RMP area. AOB 22.[70]

---

[70] ACHP, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook ("ACHP Guidance")* at 18 (June 2021), https://www.achp.gov/sites/default/files/2021-06/ConsultationwithIndianTribes Handbook6-11-21Final.pdf.

BPT also says it was reluctant to consult because no specific project was authorized under the RMP, or that it may have been too busy to communicate its interests. AOB 38. That still leaves a blank record. BPT never provided BLM its traditional territory map (although filed it publicly in court), cannot point to any record evidence supporting its interest, and declined to seek consultation on previous projects in the RMP area. *Supra* Statement of the Case § I.C–D. Critically, because a BPT tribal representative *did* call BLM, *declined* consultation, and *denied* interest in the RMP consultation area, BLM reasonably believed BPT did not wish to consult on future projects like the Project.[71]

---

[71] *See also* BLM Handbook H-1780-1 Improving and Sustaining BLM-Tribal Relations ("Handbook") at III-16 (Dec. 15, 2016), https://www.blm.gov/sites/blm.gov/files/uploads/H-1780-1__0.pdf (after telephone calls and letters if "the tribe chooses not to participate or provide comments, the BLM can consider its efforts sufficient and proceed with the decisionmaking"). BPT argues BLM should continue consulting, but neither case cited addresses whether BLM may rely on responses to RMP consultations in identifying interested tribes for projects within the RMP. BPT's cases simply establish that lawsuits challenging general resource management plans are not ripe when more specific project EISs create a "more imminent and more certain" harm. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733–34 (1998); *Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). And *United Keetoowah* addresses a completely different tribal-consultation process, which notably specifies that when a "Tribe does not timely respond to the Commission [within 15 days] … 'the applicant's pre-construction obligations [are] discharged with respect to that Tribal Nation.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 748–49 (D.C. Cir. 2019) (citation omitted) (describing process when tribes require applicants for FCC license "to pay for Tribes' [consultation] responses" and then refuse to provide responses without payment). BPT's failure to respond to BLM's

Without citation, BPT contends that, even if rebuffed, BLM still must make additional "periodic" efforts at consultation. AOB 26. Not true. But BLM *did* continue to follow up with the tribe. 4-BPTER-585; 4-BPTER-561. BPT did not respond. BLM therefore could have relied on BPT's lack of interest in the Project area followed by its nonresponse to reasonably decide not to consult with BPT.

### 3. BLM Reasonably Relied on the Burns Tribe's Disinterest

BPT acknowledges that BLM reached out to it again in 2013. But that consultation was not for a project. Instead, "human remains and associated funerary objects" were removed from a cave about 50 miles from the Project area. 78 Fed. Reg. at 59959. BLM consulted with BPT under NAGPRA, not NHPA. *Id.* As the district court noted, "BLM could reasonably cast a wider net for notification of tribes under NAGPRA than it would under NHPA because NAGPRA focuses on 'known lineal descendants,' 43 C.F.R. § 10.5(a)." 1-SER-0204.

BPT does not address this or acknowledge that consultation for NAGPRA consultation is broader than NHPA consultation, asserting instead this revealed BLM knew of its interest in the area. AOB 23. But BPT "invited to consult, *but did not respond*" when informed that remains of their ancestors may have been located within the RMP area. Notice, 78 Fed. Reg. 59958, 59959 (Sept. 30, 2013) (emphasis

---

eight contact attempts under the RMP would have been enough to fulfill BLM's consultation obligations under this standard.

added). BPT's failure to respond in 2013 also reasonably indicated that it was uninterested in the Project area and did not expect remains of its ancestors to be present in the area—again, despite now claiming to "routinely visit Thacker Pass." AOB 38.[72]

The district court acknowledged that BLM notified the Nevada SHPO of the tribes it selected for consultation, and the SHPO did not identify BPT as an additional consulting party. 1-BPTER-42. On appeal, BPT argues that BLM did not *request assistance* in identifying tribes, like the agency did in *Center for Biological Diversity v. U.S. Army Corps of Engineers ("Army Corps")*, 2015 U.S. Dist. LEXIS 199747, at *63 (C.D. Cal. June 30, 2015), implying that SHPO would have identified BPT as a consulting party if BLM had first done so. But the briefing in that case demonstrates that, just like in this case, BLM "work[ed] with the SHPO" and the

---

[72] The cases that the Burns Tribe cites to support this "justified expectation" are inapposite to the present NHPA consultation, as they deal with the hiring and firing of tribal employees under the agency's trust responsibilities. *See Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395, 399 (D.S.D.1995) (regarding consultation before impacting trust resources); *Winnebago Tribe v. Babbitt*, 915 F. Supp. 157, 167-68 (D.S.D. 1996) (determining that where the agency "has a policy of prior consultation with the tribes on general personnel programs," tribal personnel expected consultation before the agency eliminated positions). Here, "unless there is a specific duty that has been placed on the government with respect to Indians, this [trust] responsibility is discharged by the agency's compliance with general regulations and statutes" *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998). Because BLM fulfilled its tribal-consultation duties under statute to consult about the Project with known interested tribes, it fulfilled its trust responsibility to BPT.

"SHPO concurred that the [agency] had complied with 36 C.F.R. § 800.4(b)(1)." *Id.*, Case No. 2:14-cv-01667-PSG-CW, ECF 103 at 45; *see* 5-SER-1158–59. And nothing in the record suggests that the SHPO had reason to identify BPT as a consulting tribe either. BLM notified SHPO of its ongoing consultation with the four identified tribes, and SHPO was not obligated to and did not identify BPT as an additional consulting tribe. *See* 5-SER-1154; 5-SER-1158.

BPT contends that because BLM reached out to the Inter-Tribal Council of Nevada ("ITCN") during RMP consultation, 4-BPTER-517, it also could have done so for this Project. But because BPT is an Oregon tribe and is not a member of ITCN—notifying ITCN for this specific Project would not have resulted in identification of BPT. *See ITCN Member Tribes*, ITCN, https://itcn.org/?page_id=2927 (last accessed Apr. 28, 2023). BPT's failure to respond to consultation requests regarding the RMP area in 2005 or to a specific consultation attempt in the vicinity of the Project in 2013 demonstrates that it is reasonable that BLM did not consult with BPT on this Project in 2019. 1-BPTER-42.

### 4. BLM Reasonably Identified Consulting Tribes

BPT also challenges BLM's process for identifying tribes generally. BLM is not required to create a record for every interim decision that precedes its decision of which tribes to consult. The record is clear which tribes were identified and how BLM consulted them. BLM's tribal-identification process in the email BPT cites is

there to help the recipients understand how tribal-consultation decisions were made, not as some excuse.  4-SER-1011.

The court evaluated the email and the record evidence and both supported BLM's decision not to consult BPT.  1-BPTER-43.  The email is written in the past tense, demonstrating that the process described applied to prior decisions to select consulting tribes in preparation for this Project.  *Id.*

And although BPT cannot say that it had raised previous concerns or demonstrated historic ties to the Project area, on appeal BPT raises new issues with BLM's consideration of tribes for consultation based on geography.  *See* 1-BPTER43–44.  This Court presumes such new arguments are "forfeited" on appeal.  *Doe v. Garland*, 17 F. 4th 941, 950 (9th Cir. 2021).  Even if reviewable, the cited regulations and guidance do not prevent BLM from considering geographic proximity when identifying tribes for consultation.  36 C.F.R. § 800.2(c)(2)(ii)(D) (consult with known tribes attaching cultural significance to "properties off tribal lands"); *AHCP Guidance* at 18 (same).[73]  BPT never communicated that it attached cultural significance to Thacker Pass before this lawsuit, so BLM had no reason to know BPT valued the area.  Where BPT "effectively did the opposite" of expressing interest "by opting out of consultation on projects in the geographic area of the

---

[73] This 2021 guidance does not apply to BLM's pre-2021 process.

Project," BLM reasonably did not invite BPT to consult. 1-BPTER-44. When BLM is unaware of a tribal cultural interest, it is reasonable that BLM would double-check for interest from only those tribes geographically close to the project area. 1-BPTER43–44.

BPT also argues that the process BLM used to contact consulting tribes was insufficient. AOB 29.[74] BPT has no standing to challenge a process it did not participate in and attempting to do so again for the fourth time before courts in this circuit is another attempt to raise claims on behalf of the consulted tribes. 1-BPTER-38. The district court did "not address any arguments" based on this premise. *Id.* This Court shouldn't either. And BPT's argument that BLM failed to follow its "own policy" is meritless—BLM did not simply send a letter and call it consultation; it sent scoping letters (5-SER-1155–57), the DEIS (4-SER-0967–70), the HPTP (4-SER-0946–47), and the FEIS (3-SER-0804–05) to the consulting tribes for comment and consultation. The FMT raised no concerns and "welcomed vital employment

---

[74] BPT contends that BLM failed to follow guidance in determining which tribes to consult, but that guidance defers to the agency and only provides suggestions. *ACHP Guidance* at 18 (suggesting that "it might be useful to check with other federal agencies" which "Indian tribes to contact"). That BLM did not follow every suggestion in this guidance does not demonstrate that it failed to reasonably identify tribes for consultation. *Ctr. for Biological Diversity*, 2015 U.S. Dist. LEXIS 199747, at *64 (concluding that "Plaintiffs' assertion that the Corps could have done more by following all of the guidance in ACHP's reference handbook or consulting with other Corps offices or 'sister agencies' in the identification process does not render the process that the Corps did carry out unreasonable").

and training opportunities the project would provide community members." 4-SER-1012.[75]

Finally, BPT misconstrues the district court's Order—neither BLM nor the district court "found that a notice in the Federal Register … met the BLM's NHPA obligations." AOB 28. This was not a reference to any argument made by BPT—rather, public notice "render[ed] unpersuasive *RSIC's argument* that BLM provided insufficient public notice of the NHPA process." 1-BPTER-41 (emphasis added). BPT may not advance its misunderstanding of its co-party's argument on appeal. *Morrison-Knudsen Co. v. CHG Int'l, Inc.*, 811 F.2d 1209, 1214 (9th Cir. 1987). Even if BPT could advance this claim, that BLM provided timely public notice directly contradicts BPT's (repetition of RSIC's) claim on appeal that "there is no evidence in the record to suggest that the Tribe knew about or had reason to know about the project." AOB at 29. "Publication in the Federal Register is <u>legally sufficient notice</u> to all interested or affected persons regardless of actual knowledge

---

[75] The fact that no tribe raised concerns during the consultation process clearly distinguishes this case from *Pueblo of Sandia*, where "the tribes did communicate to the agency" information that should have prompted the agency "to engage in further investigations." 50 F.3d 856, 860 (10th Cir. 1995); *Handbook* at III-17 (noting the "[t]he take away from [*Pueblo*] is that writing letters … is not enough if information provided by the tribe indicates the presence of" historic properties). BPT never provided information asserting it had an interest in the Project area until after the ROD published. Furthermore, *Confederated Tribes & Bands of Yakima Indian Nation v. FERC* is clearly inapposite, as the agency there "issued the license before …. the consultation process took place." 746 F.2d 466, 475 (9th Cir. 1984).

or hardship resulting from ignorance." *Jones v. BLM*, 121 F.3d 1327, 1330 (9th Cir. 1997) (emphasis added) (citation omitted). BPT has no legal basis to suggest that it lacked notice of the Project.

### B. BPT's NEPA Arguments Are New on Appeal

BPT argues on appeal that NEPA required BLM to consult with BPT. This Court should "not consider arguments that are raised for the first time on appeal." *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). Were the Court to review this argument, it's meritless.

BPT cites three new regulations that only "apply to any NEPA process begun after September 14, 2020." 85 Fed. Reg, 43304, 43372 (July 16, 2020). BLM could not and did not apply the 2020 regulations to this Project when NEPA scoping began in 2019. 5-SER-1155. And even if applicable, the regulations do not direct BLM to do anything differently than NHPA—BLM should "consult[] early with appropriate … Tribal[] … governments … when their involvement is *reasonably foreseeable*." 40 C.F.R. § 1501.2(b)(4)(ii) (2020) (emphasis added). These regulations do not make BPT's "involvement" any more foreseeable such that BPT "may be affected by the proposed action," 40 C.F.R. § 1503.1(a)(2)(iii) (2020), and does not help BPT's argument that it should have been consulted for this Project.

## C.    BLM Fulfilled the "Hard Look" NEPA Standard[76]

BPT also incorrectly claims that BLM failed to fulfill the "hard look" NEPA

standard because it only considered "archaeological sites," not "current uses by [its]

tribal members."  AOB 33.  BLM comprehensively reviewed all documented prior

uses of the Project area and observed that no consulted tribe raised the current

cultural uses BPT now alleges.  3-BPTER-216.  Furthermore, the FEIS incorporated

the "Class III Inventory of 12,962 Acres for Lithium Nevada's Thacker Pass," which

explained how the Project area "was used by bands of Northern Paiutes" from "the

19th century through present," not until 1936 as BPT states.  1-BPTER-45; *see also*

3-BPTER-309 (noting few new roads "in the current project area [after 1976],

reflecting … the lack of any important destinations"); *id.* (observing Jeep trails

created in 1959–61); 3-BPTER-315 (cataloging uranium exploration in the 1980s).

A Class III survey is the "most in-depth survey conducted on a project," constituting

"an 'intensive … pedestrian survey of an entire target area ... intended to locate and

---

[76] BPT's assertion that the FEIS failed to discuss "current uses of the Project area by tribes" other than itself "runs afoul of the Court's ruling that" BPT cannot raise claims on behalf of non-party tribes.  1-BPTER-45.  BPT asserts in its appellate briefing that BLM should have consulted with itself "(and others) before finalizing the EIS" and contends that BLM failed to consult "with all the Tribes … most affected by this Project," clearly and continually raises claims on behalf of other non-parties to this litigation.  AOB 37–38.  The Court cannot "allow[] [BPT] … to disregard the Tribe's right to be the final arbiter … violat[ing] the regulatory requirement to recognize the tribe as a sovereign authority."  *San Juan Citizens All.*, 586 F. Supp. 2d at 1293 (citation omitted).  This Court should disregard all such claims.  1-SER-0194.

record all historic properties and that provides … a complete record of cultural properties.'" *Battle Mt. Band v. U.S. BLM*, 2016 U.S. Dist. LEXIS 115093, at *8–9 n.6 (D. Nev. Aug. 25, 2016) (citation omitted). Crucially, "[i]f a Class III survey is conducted on a project it is presumed that the federal agency complied with the requirements of Section 106 of the NHPA." *Id.*.[77]

The Inventory is more than "a two-page historic description of Tribal use in the area ending in 1936," AOB at 33–34: the point of the Survey was to "document[], investigat[e], and understand[] the relatively recent human interest in Thacker Pass." 3-BPTER-351; *see* 3-BPTER-318 (identifying "refuse scatters" or "dumps from … urban centers," stating that one goal of the survey was to understand "the nature of the Thacker Pass[] … populations' … lifeways"). The Inventory exhaustively cataloged any evidence of any cultural interest or resources, ultimately identifying about "1000 cultural resource sites, including 56 eligible for inclusion on the

---

[77] BPT newly argues that the BLM's decision not to consult with BPT means BLM's analysis is *de facto* insufficient because BLM did not analyze the Project's significance under 40 C.F.R. § 1508.27. AOB 28. But 40 C.F.R. § 1508.27 simply requires that BLM understand the impact of the project on "significant … cultural[] or historical resources," and BLM clearly does so in its intensive Class III cultural survey. *Supra* Section III.C. BPT's cited case does not address consultation under NEPA—it evaluates a tribe's claims that an agency "allegedly failed to take a hard look at the environmental consequences" under Section 1508.27. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 123 (D.D.C. 2017) *vacated in part* 985 F.3d 1032 (2021). Here, BLM reasonably analyzed all known consequences of the Project on identified cultural properties and consulted with all tribes with documented interests in the Project area, fulfilling the Section 1508.27 standard.

National Register of Historic Places." 1-BPTER-46. And the two-paged "ethnographic background" that BPT cites is just that—a summary background to orient the reader. 3-BPTER-274–75.[78]

Finally, BPT argues that BLM's ethnographic report for the RMP "recognize[d] the significance of the [RMP] area to [other] Tribes and [their] concern with mining and its impacts," meaning that BLM should have known "Tribes" considered parts of the RMP area "culturally significant." AOB 34–35.[79] If BPT is raising claims on behalf of other tribes, it lacks standing. 1-SER-0194–95. The tribes that responded to consultation under the RMP identified the areas they considered significant and no consulting tribe under the RMP or this Project identified any "resource collection area" of importance within the Project area. BPT cannot now claim that BLM should have known of BPT's interests when it refused multiple opportunities to consult and to provide BLM with information.

---

[78] To the extent BPT attempts to raise on reply that its co-party identified an 1865 attack site just outside the Project's Indirect Area of Potential Effects ("APE"), that argument is barred under this Circuit's caselaw. *Morrison-Knudsen Co.*, 811 F.2d at 1214. BLM conducted over 28 prior cultural-resource inventories in the Indirect APE, fulfilling its reasonable-identification responsibilities. 36 C.F.R. § 800.4(b)(1). Identification of this site would not lead BLM to seek out BPT for consultation in any event.

[79] BPT avers that "BLM's archaeologist called for … an analysis" of current tribal use of the Project area, but the cited email reveals the opposite: although Mr. Whetstone contemplated incorporating a "tribal-produced ethnographic background," he doubted that such a process was needed "[s]ince [FMT] [ha[s]en't – spelling?] raised any concerns so far." 2-BPTER-161.

Thus, this case differs from *Center for Biological Diversity v. BLM*, where the plaintiff tribe "attended at least six meetings" with BLM, participated in interviews for an ethnographic assessment, and discussed historic uses of the project area. 2017 U.S. Dist. LEXIS 137089, at *53–56 (D. Nev. Aug. 23, 2017). BPT rejected two consultations and did not respond to public notice or significant ground disturbance in an area they claim to frequent. BLM's thorough consultation and analysis of identified cultural properties without reference to BPT was therefore reasonable under the applicable statutes.[80]

## IV. The District Court Did Not Abuse Discretion in Remanding Without Vacatur

WWP argues the court erred in remanding without vacatur because it concluded that BLM erred, under *Rosemont*, by failing to review Lithium Nevada's Mining Law rights to use Storage Area land. AOB 3, 60–63. That argument fails. The record supports the court's finding that there is at least a serious possibility that BLM can justify its decision on remand. The court based its decision on proper analysis under *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), and rationally connected its decision to factual findings. 5 U.S.C. § 706(2)(A).

---

[80] BPT does not mention its arguments below as to vacatur, and to the extent they raise them on reply they're unreviewable. *Thompson v. Commissioner*, 631 F.2d 642, 649 (9th Cir. 1980).

Courts considering whether to remand without vacatur "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[81] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). A court can remand without vacatur when there is a serious possibility the agency can reach the same decision on remand. *Id.* Remand without vacatur is reviewed for abuse of discretion. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010).[82]

### A. There is at least a serious possibility that BLM will reach the same decision on remand.

The court acted within its discretion because it found that "there is at least a serious possibility" that BLM will substantiate its decision on remand, 1-WWPER-26, and the disruptive consequences of vacatur would severely harm Lithium Nevada and the public.

---

[81] Applying this balancing test, the court in its discretion remanded without vacatur, in part, because the disruptive consequences of even a temporary delay would be severe for Lithium Nevada, the local communities near the Project, and national and global interests. *Infra* Section IV.B.

[82] Bartell attempts to incorporate by reference its prior motion for an injunction pending appeal ("IPA"), AOB 60, violating Circuit Rule 28-1(b): "[p]arties must not … incorporate by reference briefs submitted to … this Court in a prior appeal, or refer this Court to such briefs for the arguments on the merits of the appeal." This Court should not review those arguments.

### 1. The record shows widespread mineralization throughout the Project area.

As the court found, the record shows widespread lithium mineralization throughout the Project area—including underlying the Storage Areas. 1-WWPER-26. For example, lithium clay "comprises 40 to 90 percent" of the sedimentary section under the entire caldera lake beneath the Project, including the Storage Areas. 2-SER-0493. A "crucial" distinction between this case and *Rosemont* is evidence of mineralization "throughout the Project area." 1-WWPER-26 (citing 3-SER-0740, 5-SER-1224, 5-SER-1319); *see also* 2-SER-0493, 2-SER-0416 (lithium in the caldera); 5-SER-1319 (McDermitt caldera "among the world's most highly mineralized calderas"); 5-SER-1237–38 (lithium "throughout the caldera"); 5-SER-1226–28, 5-SER-1225 ("the Li-enriched interval is laterally extensive throughout the southern portion of the caldera"). One Project geological report shows that mineralization is "laterally extensive throughout the … caldera." 5-SER-1227. And "[t]he clay within the Project area contains mineralization of up to 9,000 parts per million (ppm) … and the rocks drilled contain anomalously high lithium contents (greater than 100ppm)." 2-SER-0494; 2-SER-0503. Other geologic analyses consistently describe high lithium mineralization within the Project area. *See, e.g.*, 5-SER-1319. This information convinced the court of a "serious possibility" that the mining claims underlying the Storage Areas would support BLM's further approval of Lithium Nevada's use under the Mining Law. 1-WWPER-26–27.

The record supports the court's finding that there is at least a serious possibility that on remand, BLM will determine that Lithium Nevada has discovered valuable minerals underlying the Storage Areas. And if BLM makes that determination, Lithium Nevada's mining rights to use those acres will be confirmed, and BLM will ratify its prior decision. 1-WWPER-9.

WWP contends that the court's serious-possibility conclusion was flawed because determining whether valuable mineral deposits underlie the Storage Areas "is a demanding and fact-intensive inquiry" they say cannot be made "on the very limited record in this case." AOB 62.[83] WWP incorrectly claims that the record contains no extraction costs, and on that basis asserts that the court was merely speculating that there is a serious possibility that underlying valuable minerals exist. This is wrong. The record confirms the "project economics are robust" to develop the lithium and includes an economic analysis and cost information. 5-SER-1341;-1338–42. And as the court recognized, rejecting this argument, "[t]here need not be certainty of sufficient mineralization in the waste dump and mine tailings land … only be a serious possibility." 1-WWPER-8. The record shows extensive mineralization throughout the Project area, and WWP cites no authority to support

---

[83] WWP did not raise this until *after* the court's summary-judgment order. This Court "will not consider arguments … raised for the first time on appeal." *Smith*, 194 F.3d at 1052. The Court need not address WWP's argument and, the argument fails for the above reasons.

BLM cannot consider additional information on remand. The court acted within its discretion finding at least a serious possibility that valuable minerals underlie the Storage Areas. *Id.*

WWP argues[84] that BLM's remand determination must follow a patent-style claim-validity examination. This too is wrong. BLM has applied that process only for patents, claims contests, trespassers, and evaluating proposed mines on lands withdrawn from mineral entry. The requirement that BLM review mining claims to permit development of a discovered valuable mineral deposit on lands open to mineral entry is of first impression. The "hundred years of precedent" WWP references is built only on those other, wholly inapposite contexts. In fact, WWP's single cited case on validity determinations involved a controversy between two mineral claimants, not the FLPMA permitting of a discovered valuable mineral deposit evaluate use of nearby lands for Storage Areas. *See Chrisman v. Miller*, 197 U.S. 313, 323 (1905). BLM has never reviewed mining claims in a situation like this one, involving a FLPMA permitting review of development of an acknowledged valuable mineral deposit. BLM is charged with implementing the Mining Law: it must determine what processes to apply in the first instance. *Grand Canyon Tr. v. Provencio*, 26 F.4th 815, 827 (9th Cir. 2022).

---

[84] WWP never raised this argument until after the district court's order and, therefore, it is waived.

The Court should decline WWP's invitation to dictate BLM's process of evaluating Lithium Nevada's mining claims to substantiate ancillary uses on the Storage Area lands.[85]  Instead, as in *Rosemont*, the Court should let BLM determine the appropriate approach.  33 F.4th at 1210, 1224 (it would be premature to opine on agency's interpretation of its regulations when agency has not interpreted and applied them).  Thus, "[i]n the absence of such decisions by [BLM], any ruling by [this] court would be premature."  *Id.* at 1218.  *Rosemont* did not require the patent-style claim-validity examination that BLM conducts in other contexts.  Rather, that Court left undisturbed the district court's conclusion that an agency need only develop "a 'factual basis on which [it] could form an opinion' on surface rights,"—a very different standard than WWP suggests.  *Id.* at 1229, 1222 (acknowledging BLM validity determination was irrelevant because undisputed record showed no mineralization).  It is for BLM to implement the Mining Law and determine its process on remand, not this Court.[86] *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 657-58 (2007) (courts must not "deprive the Agency … its administrative avenue" in "complex administrative decisions.")

---

[85] Bartell's Opening brief does not explain its reference to an "extensive" claim-validity process.  AOB 59.

[86] The *Rosemont* court did not decide BLM's claim validity process, because on that record, it was irrelevant. The undisputed evidence there showed that land underlying the proposed waste-rock acreage lacked any mineralization.  33 F.4th at 1222.  That is not this case.  Here, there is evidence of widespread mineralization.

WWP also argues that the court's serious-possibility determination was wrong because a pre-feasibility study suggested that lithium mineralization does not extend to the Storage Areas. AOB 62. WWP misunderstands that study. It used a definition of mineralization that is limited to Canadian securities laws. The study itself recognizes that this definition differs from whether valuable minerals underlie the land, and underscores that there is, in fact, "continuous high[-]grade sub[-]horizontal … lithium across the project area." 5-SER-1224.

Even if the study is interpreted to suggest that valuable minerals don't underlie the Storage Area, the court considered this evidence and still found, based on voluminous record evidence, *see* 1-WWPER-26, that there is at least a serious possibility that valuable minerals underlie those acres. 1-WWPER-26–27. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 944 (9th Cir. 2013) (court abuses discretion only if ruling rests on clearly erroneous evidentiary assessment).[87]

---

[87] Bartell contends that BLM's errors were serious because they will require "a new study of the water resources" and the attendant impacts and mitigation, and "extensive new evidence" to determine "claim validity." AOB 59. As discussed above, the water baseline is accurate and robust. Bartell also implies it did not have a "chance to review" the current mitigation plan. Not so; Bartell *commented on* the mitigation plan. 2-SER-0383; 3-SER-0698.

**2. There is a serious possibility BLM will substantiate its decision on remand even if BLM finds inadequate mineralization.**

Even if BLM finds inadequate mineralization underlying the Storage Areas, BLM could still lawfully authorize use of those lands. As *Rosemont* recognized, the "Mining Law allows the owner of a valid mining claim containing valuable minerals to obtain possessory rights to other land for use as a 'mill site.'" 33 F.4th at 1210. "[L]and under a mill site need not contain valuable minerals," and under BLM regulations, valid mill-site uses include waste-rock storage and "[a]ny other use that is reasonably incident to mine development and operation." *Id.* "[A]lthough the Mining Law limits [each] individual mill site to five acres, current regulations, unchallenged in this suit, allow owners of mining claims to stake multiple mill sites if 'reasonably necessary' for their mining operations." *Id.*[88] WWP did not challenge BLM's mill-site regulation here. So, it is undisputed that even if BLM found inadequate mineralization to support mining claims under the Storage Areas, BLM still could authorize the same use conditioned on Lithium Nevada's locating mill

---

[88] Some of the same Appellants here unsuccessfully challenged this regulation in the District of Columbia. *Earthworks v. U.S. DOI*, 496 F. Supp. 3d 472, 494–95 (D.D.C. 2020), *appeal docketed*, No. 20-5382 (D.C. Cir. Dec. 30, 2020) (holding that 43 C.F.R. § 3832.32 is a reasonable construction of section 42 of the Mining Law because section 42 is silent as to the number of mill sites that can be located per claim, and BLM's regulation is a "permissible construction" of the mill-site provision that is thoroughly justified by "drawing on the statutory text, Supreme Court precedent, [BLM's] view of the congressional policy behind the Mining Law, and longstanding BLM practice").

sites on those acres.[89]  *Thus, on remand, there would be no different outcome and no different environmental analysis.*  No one disputes Lithium Nevada's right to place waste rock and tailings on mill sites, as *Rosemont* confirms.[90]

WWP might argue that Lithium Nevada cannot use mill sites on lands overlying mineralization.  But BLM's regulations make clear that mineralization either supports a "discovery" of a valuable mineral deposit and use of mining claims or, if not, by definition, the lands are not mineral in character for mill site use.  43 C.F.R. § 3830.5.  WWP's hypothetical, where no right to use any lands for waste-rock storage exists, would result in an absurdity and frustrate Congress's mandate to facilitate and encourage domestic mineral development.  The Mining Law encourages "[t]he development of economically sound and stable domestic mining ... industries, and the orderly, and economic development of domestic mineral

---

[89] *Rosemont* did not address whether BLM could cure the error by conditioning land use for waste rock and tailings on locating mill sites for that use.  In this appeal, there is a serious possibility that BLM could substantiate its decision on remand by authorizing use of the Storage Areas conditioned on location of mill-site claims if the agency finds inadequate mineralization of the mining claims underlying those lands.  There's nothing speculative about BLM's ability on remand to condition authorization on Lithium Nevada locating mill sites or Lithium Nevada's ability to locate mill sites as needed on any lands BLM determines to be nonmineral in character (which under BLM's regulations at 43 C.F.R. § 3830.5 means they are inadequately mineralized to support mining claims).

[90] For these same reasons, BLM's sole noted error under *Rosemont* was also harmless.  *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (challenger has "[t]he burden of showing harmfulness").

resources, reserves … to help assure satisfaction of industrial, security and environmental needs." *Krueger v. Morton*, 539 F.2d 235, 240 n.14 (D.C. Cir. 1976) (quoting 30 U.S.C. § 21a (1970)).  The Supreme Court instructs that "[w]e should not lightly conclude that Congress enacted a self-defeating statute."  *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) (rejecting interpretation that would "thwart the stated goals" of statute).  Hence, the Court should not read the Mining Law to defeat its congressional purpose—a result to which WWP's argument inevitably would lead.

### 3. There is a serious possibility BLM will substantiate its decision on remand because the Project complies with the RMPA

WWP also contends that BLM's failure to determine if Lithium Nevada had discovered valuable minerals under the Storage Areas led BLM to erroneously exempt the Project from the RMPA so the agency did not apply certain GSG conservation requirements. AOB 5, 18–19.  This argument fails.

First, regardless of whether BLM determines that Lithium Nevada has discovered valuable mineral deposits under the Storage Areas, the RMPA provisions do not apply to prohibit lithium development.  The RMPAs themselves provide that they "do not apply to locatable mineral development" unless the subject lands "are

withdrawn from mineral entry."[91]  No one disputes that the lands here have not been withdrawn from mineral entry.  So, under their own terms, the RMPA provisions WWP relies on do not prohibit development of the valuable lithium Appellants concede exists in the pit area.

Second, WWP's argument rests on a faulty factual premise: the Project mitigation complies with the RMPA requirements, resulting in a net conservation gain to GSG habitat.  *Supra* Section I.A.2–3.a.  This is another reason why there's *at least* a serious possibility that BLM will be able to substantiate its decision on remand, and remand without vacatur was proper.  Because Lithium Nevada already complied with all RMPA provisions and mitigated all GSG impacts, there is no change to the environmental analysis regardless of the remand determination.

Third, WWP does not show how allowing Lithium Nevada to use the Storage Areas would violate the RMPA.  WWP fails to identify any conflicts between the RMPA's requirements and the Storage Areas, failing to carry their burden to show UUD or that BLM's authorization was arbitrary and capricious.  And they seemingly concede that because Lithium Nevada holds valid mining claims in the pit area, the RMPA's requirements do not apply to those claims and Lithium Nevada's

---

[91] 1-SER-0137–38 ("development of locatable mineral deposits are nondiscretionary actions allowed under the General Mining Law of 1872 on all BLM administered land").

development of the minerals in them. AOB 25–26 (acknowledging RMPA's standards must yield to "valid existing rights" and "applicable laws and regulations, such as the 1872 Mining Law").

### B. The district court did not abuse its discretion in determining that the seriousness of BLM's error did not compel vacatur

WWP does not address the seriousness factor under the *Allied–Signal* test for remand without vacatur, conceding the court did not abuse its discretion in concluding that the seriousness of BLM's *Rosemont* error did not compel vacatur.

As the court observed, BLM's error was but one misstep; in all other respects, "BLM substantially complied with the applicable legal requirements here, which supported the Court's decision to remand without vacatur." 1-WWPER-62; *accord* 1-WWPER-9. BLM's failure to undertake an inquiry into mineralization under the Storage Areas did not infuse the entire ROD and EIS with error. 1-WWPER-8. Far from it. Plus, as the court explained, "the ROD approved two different plans of operations, and the Court only found that BLM erred as to the portion of the ROD approving the mining plan of operations that covered the waste dump and mine tailings land." *Id*. Indeed, without the *Rosemont* decision's issuance during briefing, the court would have affirmed the ROD entirely.

WWP argues BLM's error was serious because it contradicted the Mining Law under *Rosemont*. AOB 9. The court correctly rejected that argument. That BLM had to review Lithium Nevada's mining claims at the Storage Areas became

clear only *after* the *Rosemont* decision—a year *after* BLM issued the ROD. Given this timing, the court acted within its discretion in concluding that "it would be inequitable to remand with vacatur based on *Rosemont* because BLM was following longstanding regulations when it decided not to evaluate claim validity and *Rosemont* was not even published until after the merits briefing began in this case." 1-WWPER-7.

Some courts measure the seriousness of agency error by assessing how egregiously the error contravenes the relevant statutory purpose. *See, e.g.*, *Or. Nat. Desert Assoc. v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017). But BLM's longstanding practice before this case hardly contravened statutory purpose. Congress for decades declared it national policy to facilitate and encourage private development of domestic minerals. *See, e.g.*, 30 U.S.C. § 21(a) (declaring national interest to "foster and encourage… development of…sound and stable domestic mining"). Congress reaffirmed that policy many times. *See, e.g.*, 30 U.S.C. § 1602(7), (8) (directing executive agencies to "facilitate" development and production of domestic resources to meet critical mineral needs and minimized delays in issuance of permits to develop and produce critical minerals); *id.* §1605 (requiring immediate action by executive branch to act immediately to promote development of domestic mining). Most recently, for critical minerals—including lithium—Congress charged executive agencies to create permitting efficiencies

because permitting delays hinder domestic-mineral development. 30 U.S.C. § 1607 (codifying provisions from Infrastructure Investment and Jobs Act of 2021). BLM's historical practice did not contravene these congressional purposes and national policies encouraging mineral development; it aligned with them.

### C. The court did not abuse its discretion in determining that environmental impacts did not compel vacatur.

WWP erroneously argues the court erred in remanding without vacatur because that will permanently damage valuable public lands. AOB 63. This Court has no per se rule that vacatur is mandatory where there is environmental harm; instead it has clarified that risk of environmental harm is only one factor to consider. *NRDC v. EPA*, 38 F.4th 34, 51–52 (9th Cir. 2022). It's not determinative. This Court and others allow remand without vacatur *even when doing so will lead to environmental or other impacts* (and, here, impacts will be mitigated). *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012); '*Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1102 (9th Cir. 2006); *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804-05 (D.C. Cir. 2022). As explained above, WWP fails to show any environmental harm would occur pending remand given the Project's compliance with the RMPA.

**D.** **The court did not abuse its discretion in remanding without vacatur given the severe consequences from vacatur.**

Vacating the ROD would have delayed the Project, and the court correctly found that "[f]urther delay of the project will harm Lithium Nevada." 1-WWPER-11. The massive cost of delay is quantifiable. Delaying the Project would mean delaying "annual revenue of the project … expected to be approximately $1.5 billion," and delay "could jeopardized Project financing, including both the second tranche of funding from GM ($330M) and the DOE funding, ultimately putting the Project at risk or making its construction and operation far more costly." ECF 18 at 38. What's more, "Lithium Nevada has [already] invested over $150 million in pre-construction permitting, equipment acquisition, securing contractors, and other expenses." 1-SER-0027. And the impacts have unquestionably increased since the IPA briefing, because construction began. It is both inappropriate and insufficient for WWP to simply refer back to assertions from that briefing. Sagebrush clearing for "site preparation, geotechnical drilling, water pipeline development and associated infrastructure" construction has commenced, meaning the initial quoted Lithium Nevada costs have risen dramatically. *Construction Presser* at 1. Courts remand without vacatur when much less is at stake—and those discretionary decisions have been upheld. *See Vecinos para el Bienestar de la Comunidad Costera*

*v. FERC*, 6 F.4th 1321, 1332 (D.C. Cir. 2021); *Gulf Restoration Network*, 47 F.4th at 804-05; *Cal. Cmtys. Against Toxics*, 688 F.3d at 993-94.[92]

The delay created by vacatur also would have had severe consequences on society's transition to electric vehicles and global demand for lithium. The court held that Lithium Nevada's arguments regarding the "disruptive impact of vacatur" had "some support in binding precedent" because this is the only "Project that provides the scale, grade, or timeline to" electrify transportation and uphold our "national security." 1-WWPER-62. This remains true. Every day the mine does not produce lithium is equivalent to preventing production of about 4,100 electric vehicles that day. ECF 10-1 at 12; ECF 18 at 39. Indeed, battery storage is "vital to combatting climate change and very lithium dependent." 1-SER-0258.

The delay created by vacatur also would severely cripple the global and national supply of lithium. Global demand is forecasted to triple by 2025 and to outstrip supply as transportation electrification intensifies. The current U.S. demand for lithium is approximately 18,000 tons per year of lithium carbonate equivalent ("tpa LCE"). ECF 18 at 39–40. By 2025, the U.S. will require approximately

---

[92] Bartell contends that even if the Court affirms the district court's decision on the merits, the court abused its discretion overstating the disruptive consequences. AOB 59–60. Bartell asserts, contrary to the extensive declarations on remedy, that Lithium Nevada will simply be "inconvenience[d]" by "possible financial harm" and cites to its prior briefing. *Id.* Untrue, as discussed above.

100,000 tpa LCE, increasing to about 350,000 tpa LCE by 2030. 2-SER-0282. President Biden's Executive Order on August 5, 2021, aimed at making half of all new vehicles sold in the U.S. electric by 2030, increased this demand. And right now, most of the lithium used in the U.S. comes from or through China. ECF 18 at 39–40.

Thacker Pass is the only domestic project currently positioned to help meet these rising global and national lithium demands. 1-SER-0026. The U.S. currently produces less than 5,000 tpa LCE—and from just one facility. 1-SER-0255. At a proposed capacity of 60,000 tons per year LCE at full buildout, the Project will become a cornerstone of the U.S. lithium supply. 1-SER-0026. There are no other U.S. alternatives to Thacker Pass. 1-SER-0258; 1-SER-0034–35; 1-SER-0026.

The delay from vacatur also would create severe community consequences. The Project's operation will add "$650 million … to the local economy." Its construction will employ over 1,300 people (including FMT members, some of whom are currently working at the site). And it will ultimately net "$6.7 billion in Federal, state, and local taxes." ECF 18 at 40.

The delay from vacatur would also have severe consequences for other national interests. Lithium is a mineral critical to U.S. "manufacturing sectors, medicine, and national defense systems." 1-SER-0020. President Biden's Supply Chain Disruption Task Force concluded that the U.S. must "invest immediately in

scaling up a secure, diversified supply chain for high-capacity batteries." 1-SER-0025; *see also* 1-SER-0020 ("lithium is 'essential' to U.S. economic security and 'critical' to national security"); 30 U.S.C. § 1602 (Congress emphasized need for a "stable supply of [critical minerals] necessary to maintain national security"). Vacating the ROD and EIS, and thereby delaying the Project would have inhibited the country's ability to address national-security threats and to advance the nation's interests.

In sum, vacating the ROD and EIS would have led to severe adverse consequences: costing Lithium Nevada millions, hampering lithium production necessary to the country's war on climate change, undermining the global environment, furthering U.S. dependence on China and other countries for its energy, jeopardizing national security, and other domestic interests, and weakening the economy. Because vacatur would have led to these severe consequences, the district court acted within its discretion by remanding without vacatur.

## CONCLUSION

For all these reasons, as well as the reasons discussed in BLM's Answering Brief, the Court should affirm the District Court's summary judgment order.

DATED April 28, 2022.

Respectfully submitted,

*/s/ Laura K. Granier*
Laura K. Granier
Jessica L. Coberly
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
Tel: 775-327-3011
Fax: 775-786-6179
lkgranier@hollandhart.com
jlcoberly@hollandhart.com

Mark D. Gibson
Andrew C. Lillie
Holland & Hart LLP
555 17th Street
Suite 3200
Denver, CO 80202
Tel: 303-295-8121
mdgibson@hollandhart.com
aclillie@hollandhart.com

*Attorneys for Defendant-Intervenor—*
*Appellee, Lithium Nevada Corp.*

## STATEMENT OF RELATED CASES

Lithium Nevada is not aware of any related cases filed in this Court.  There is a related case pending before the district of Nevada, *Reno-Sparks Indian Colony et al. v. Deb Haaland et al.*, No. 3:23-cv-00070-LRH-CLB.

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*/s/ Laura K. Granier*
Laura K. Granier

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Answering Brief is in compliance with Federal Rule of Appellate Procedure 27(d)(2)(A).  The total word count is 26,871, excluding those portions excepted by FRAP 32(f), and exceeds the limitations of Circuit Rule 32-1 and Circuit Rule 32-2 regarding responses to multiple briefs and is therefore accompanied by a motion to file a longer brief pursuant to Circuit Rule 32-2(a).  The undersigned relied on the word count of the word processing system used to prepare this document.  I certify that this brief complies with the word limit of Cir. R. 32-1 and Circuit Rule 32-2 pursuant to the parties' consent as described in the motion to file a longer brief under Circuit Rule 32-2(a).

*/s/ Laura K. Granier*
Laura K. Granier

21392866_v2