**Nos. 23-15259, 23-15261, 23-15262**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

WESTERN WATERSHEDS PROJECT, et al.
*Plaintiffs-Appellants*,

and

BARTELL RANCH, LLC; EDWARD BARTELL
*Plaintiffs-Appellants*,

and

BURNS PAIUTE TRIBE
*Intervenor-Plaintiff-Appellant*,

v.

SAMUEL R.M. BURTON, et al;
*Defendants-Appellees*,

and

LITHIUM NEVADA CORPORATION,
*Intervenor-Defendant-Appellee.*

_____

On Appeal From the United States District Court for the District of Nevada
No. 3 :21-cv-00080-MMD-CLB (District Judge Miranda M. Du)

_____

**WESTERN WATERSHEDS PROJECT'S CONSOLIDATED REPLY BRIEF**

_____

i

Roger Flynn, (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

*Attorneys for Great Basin Resource Watch, Basin and Range Watch, and Wildlands Defense*

Talasi B. Brooks (ISB # 9712)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise, Idaho 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Attorney for Western Watersheds Project*

Christopher Mixson (NV Bar # 10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
c.mixson@kempjones.com

*Attorney for All Plaintiffs-Appellants*

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ..................................................................v

TABLE OF ACRONYMS AND ABBREVIATIONS ............................x

INTRODUCTION ................................................................................1

ARGUMENT ........................................................................................4

I.     Based on the Current Record, the Failure to Apply the
       RMP Standards Violates FLPMA. ..............................................4

A.     BLM and LNC Mischaracterize WWP's Case. ..........................6

B.     It Is Not "Premature" for This Court to Rule on WWP's
       RMP-Compliance Claims, as BLM Concedes It Did Not Have
       Legal Grounds to Approve the ROD ...........................................7

II.    BLM Did Not Apply the Sage-Grouse or VRM Requirements of the
       Winnemucca RMP, in Violation of FLPMA. ..............................9

A.     BLM Did Not Apply the ARMPA Provisions. ...........................10

       1.     The ARMPA Applies to the Project. ..................................10

       2.     The Project Does Not Comply with the ARMPA's Restrictions
              on Surface-Disturbing Activities .......................................14

       3.     The Mitigation Options Will Not Achieve a
              "Net Conservation Gain" ..................................................18

B.     The Project Violates the RMP's VRM Requirements. ...............22

III.   BLM Illegally Authorized UUD. ...............................................23

A.     The Project Is Predicted to Violate Water Quality Standards .............23

B.     The Unmitigated Impacts to Sage-Grouse Constitute UUD. .................27

**IV.**     **BLM Violated NEPA**.................................................................29

**A.**     **BLM's Checklist Cumulative Effects Analysis and Failure to Consider a Nearby Lithium Project Fails to Meet the Strict Ninth Circuit Standard.** ............................................29

**B.**     **BLM Relied on Inadequate, and in Critical Areas, Non-existent, Mitigation Plans.** ........................................34

       1.     Groundwater Pollution .........................................34

       2.     Air Quality.............................................................37

       3.     Sage-grouse ...........................................................39

**C.**     **The FEIS's Baselines and Impacts Analysis for Pronghorn and Sage-Grouse Were Inadequate.** ................................42

**D.**     **BLM Did Not Adequately Disclose Impacts to Pronghorn or Sage-Grouse.** ................................................44

**V.**     **<u>BLM Has Not Overcome the Presumption in Favor of Vacating an Illegal Agency Action, Especially in the Face of Immediate, Massive and Irreparable Damage.</u>** ..................................47

**A.**     **BLM's Errors Are Serious and the District Court Abused Its Discretion When it Remanded Without Vacatur.** ....................50

**B.**     **Remanding Without Vacatur Has Severe Environmental Consequences.** ..............................................57

**C.**     **The Temporary Disruptive Consequences of Vacatur Do Not Warrant Departure From the Presumptive Remedy For APA Violations.** ...............................................60

<u>CONCLUSION</u>................................................................62

CERTIFICATES OF COMPLIANCE AND SERVICE ............................63

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

<u>350 Montana v. Haaland</u>,
    2023 WL 1927307 (D. Mont. 2023) ...........................................................49

<u>Alliance for the Wild Rockies v. U.S. Forest Serv.</u>,
    907 F.3d 1105 (9th Cir. 2018) ...................................................................48

<u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n</u>,
    988 F.2d 146 (D.C. Cir. 1993) ...................................................................56

<u>Barnes v. U.S. Dept. of Transp.</u>,
    655 F.3d 1124 (9th Cir. 2011). ...................................................................38

<u>Bartell Ranch v. McCullough</u>, (*District Court Decision*)
    2023 WL 1782343 (D. Nev. 2023)..........................................................*passim*

<u>Camp v. Pitts</u>,
    411 U.S. 138 (1973) ...................................................................................47

<u>Center for Biological Diversity v. U.S. Fish and Wildlife Service</u>
<u>("Rosemont" Mine Decision)</u>,
    33 F.4th 1202 (9th Cir. 2022) .................... 1, 9, 10, 14, 22, 51, 53, 54, 55, 56

<u>Ctr. for Biological Diversity v. BLM</u>,
    833 F.3d 1136 (9th Cir. 2016) ...................................................................39

<u>Center for Biological Diversity v. FWS</u>,
    409 F. Supp. 3d 738 (D. Ariz. 2019) .....................................................55, 57

<u>Center for Food Safety v. Regan</u>,
    56 F.4th 648 (9th Cir. 2022) ...................................................................50, 57

<u>Ctr. for Biological Diversity v. U. S. BLM</u>,
    2023 WL 387609 (D. Idaho 2023) ..................................................30, 32, 33

Ctr. for Envtl. Health v. Vilsack,
　　2016 WL 3383954 (N.D. Cal. 2016) ............................................................48

Chevron v. Natural Resources Defense Council,
　　467 U.S. 837 (1984). ...................................................................................6

Chrisman v. Miller,
　　197 U.S. 313 (1905)................................................................................... 12

Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs,
　　466 F. Supp. 3d 1217 (W.D. Wash. 2020) ................................................ 48

Converse v. Udall,
　　399 F.2d 616 (9th Cir. 1968). .............................................................51, 52

Env'l Defense Ctr. v. Bureau of Ocean Energy Mgmt.,
　　36 F.4th 850 (9th Cir. 2022) ...................................................................... 38

F.C.C. v. Fox Television Stations, Inc.,
　　556 U.S. 502 (2009) ....................................................................................23

Friends of the Earth v. Haaland,
　　583 F. Supp. 3d 113 (D.D.C. 2022), *vacated as moot,*
　　2023 WL 3144203 (D.C. Cir. 2023) ..................................................... 48, 49

Great Basin Resource Watch v. BLM,
　　844 F.3d 1095 (9th Cir. 2016) ................................. 27, 33, 34, 37, 38, 39, 44

Great Basin Mine Watch v. Hankins,
　　456 F.3d 955 (9th Cir. 2006) .........................................................30, 33, 34

Great Basin Resource Watch v. U.S. Dept. of the Interior,
　　2023 WL 27444682 (D. Nev., 2023). ...................................................49, 55

Henault Min. Co. v. Tysk,
　　419 F.2d 766 (9th Cir. 1969) ......................................................................52

Humane Soc'y of the U.S. v. Locke,
　　626 F.3d 1040 (9th Cir. 2010) .....................................................................48

Idaho Farm Bureau Federation v. Babbitt,
 58 F.3d 1392 (9th Cir. 1995) ...................................................................49, 57

Ideal Basic Indus., Inc. v. Morton,
 542 F.2d 1364 (9th Cir. 1976) ...................................................................52

Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y.,
 725 F.3d 940 (9th Cir. 2013) ...................................................................50, 51

Japanese Vill. v. Fed. Transit Admin.,
 843 F.3d 445 (9th Cir. 2016). ...................................................................36

Klamath Siskiyou Wildlands Ctr. v. Grantham,
 642 Fed. Appx. 742 (9th Cir. 2016) ...........................................................49

League of Wilderness Defenders v. Connaughton,
 752 F.3d 755 (9th Cir. 2014). ...................................................................62

Lombardo Turquoise Mining & Milling v. Hemanes,
 430 F.Supp. 429 (D. Nev. 1977) *aff'd* 605 F.2d 562 (9th Cir. 1979) ...........52

Metcalf v. Daley,
 214 F.3d 1135 (9th Cir. 2000) ...................................................................50

Mineral Policy Center v. Norton,
 292 F. Supp. 2d 30 (D.D.C. 2003) .............................................................27

Motor Vehicles Manufacturers' Ass'n of U.S. v. State Farm Mutual Auto
Insurance Co.,
 463 U.S. 29 (1983) ...................................................................5, 22

Nat'l Fam. Farm Coal. v. EPA,
 960 F.3d 1120 (9th Cir. 2020) ...................................................................61

Nat. Res. Def. Council v. U.S. Env't Prot. Agency,
 31 F.4th 1203 (9th Cir. 2022). ...................................................................33

Neighbors of Cuddy Mountain v. U.S. Forest Service,
 137 F.3d 1372 (9th Cir. 1998) ...................................................................19, 35

N. Alaska Env't Ctr. v. Kempthorne,
    457 F.3d 969 (9th Cir. 2006) ..........................................................44

Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency,
    2018 WL 6524161 (D. Or. Dec. 12, 2018). ..................................48

Oregon Nat. Desert Ass'n v. U.S. BLM,
    625 F.3d 1092 (9th Cir. 2010) .......................................................22

Oregon Nat. Desert Ass'n v. Jewell,
    840 F.3d 562 (9th Cir. 2016) ............................................... 44, 48

Oregon Nat. Desert Ass'n v. Rose,
    921 F.3d 1185 (9th Cir. 2019) ..............................................37, 45

Organized Village of Kake v. U.S.Dep't of Agriculture,
    795 F.3d 956 (9th Cir. 2015). ........................................................23

Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation
v. California,
    813 F.3d 1155 (9th Cir. 2015) .......................................................50

Pollinator Stewardship Council v. E.P.A,
    806 F.3d 520 (9th Cir. 2015) ......................................... 47, 48, 57

Save the Yaak Comm. v. Block,
    840 F.2d 714 (9th Cir. 1988) ...................................................... 50

South Fork Band Council v. Dept. of Interior,
    588 F.3d 718 (9th Cir. 2009) .............................................. 36, 39

Te–Moak Tribe of W. Shoshone v. Dept. of Interior,
    608 F.3d 592 (9th Cir. 2010) ...................................................... 31

U.S. v. Coleman,
    390 U.S. 599 (1968)........................................................................51

Waskey v. Hammer,
    223 U.S. 85 (1912) ........................................................................52

Wildearth Guardians v. Bureau of Land Mgmt.,
    457 F. Supp. 3d 880 (D. Mont. 2020) ..........................................................56

W. Watersheds Project v. Bernhardt,
    543 F.Supp.3d 958 (D. Idaho 2021) ..................................................... 42, 43

W. Watersheds Project v. Kraayenbrink,
    632 F.3d 472 (9th Cir. 2011) ........................................................ 35, 36, 39

## **STATUTES**

Administrative Procedure Act (APA),
    5 U.S.C. §706(2) ............................................................... 1, 15, 60

Federal Land Policy and Management Act of 1976,
    43 U.S.C. §1732 (b) ........................................................... 4, 9, 10

## **REGULATIONS**

40 C.F.R. § 1502.5 ...................................................................................50

40 C.F.R. §1506.5(a) ...............................................................................38

43 C.F.R. §3809.5 ............................................................................. 27, 28

43 C.F.R. §3809.420 ....................................................................... 24, 27, 28, 29

50 C.F.R. §10.13 ................................................................................. 16

## **OTHER AUTHORITIES**

Nevada Code, NAC445A.424(1)(b)(1). ..................................................24

65 Fed. Reg. 70053 (Nov. 21, 2000) .....................................................29

66 Fed. Reg. 54840 (Oct. 30, 2001) ......................................................29

## <u>TABLE OF ACRONYMS AND ABBREVIATIONS</u>

APA          Administrative Procedure Act

ARMPA      Approved Resource Management Plan Amendment

BLM          Bureau of Land Management

BSU          Biologically Significant Unit

CCS          Conservation Credit System

CESA        Cumulative Effects Study Area

DEIS        Draft Environmental Impact Statement

EIS          Environmental Impact Statement

EPA          Environmental Protection Agency

ER           Excerpts of Record

FEIS        Final Environmental Impact Statement

FER         Further Excerpts of Record

FLPMA      Federal Land Policy and Management Act

GHMA      General Habitat Management Area

GRSG       Greater sage-grouse

LNC          Lithium Nevada Corporation

MBTA       Migratory Bird Treaty Act

NDEP       Nevada Division of Environmental Protection

NDOW      Nevada Department of Wildlife

| | |
|---|---|
| NEPA | National Environmental Policy Act |
| NMA | National Mining Association |
| PHMA | Priority Habitat Management Area |
| PAC | Priority Area for Conservation |
| PMU | Population Management Unit |
| PoO | Plan of Operations |
| Project | Thacker Pass Lithium Mine Project |
| RDF | Required Design Feature |
| ROD | Record of Decision |
| Rosemont | *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 33 F.4th 1202 (9th Cir. 2022) |
| RMP | Resource Management Plan |
| SER | Supplemental Excerpts of Record |
| SETT | Sagebrush Ecosystem Technical Team |
| WWP | Western Watersheds Project |
| UUD | Unnecessary and Undue Degradation |

**INTRODUCTION**

BLM and LNC do not appeal from the district court's application of <u>Center for Biological Diversity v. U.S. Fish and Wildlife Service</u>, 33 F.4th 1202 (9th Cir. 2022)("<u>Rosemont</u>") to hold that BLM illegally assumed that LNC had valid rights to use and occupy lands for waste dumps under the 1872 Mining Law and FLPMA. BLM now acknowledges that the current record does not show LNC has discovered a valuable mineral deposit on each mining claim, the test for valid rights under the Mining Law. As such, LNC has no right to use and occupy public lands, and the resource-protection standards in BLM's Resource Management Plan (RMP) apply. BLM Resp. 21, 33-35.

There is no dispute that BLM did not apply critical RMP standards, adopted to prevent the sage-grouse from becoming a threatened or endangered species, to the Project. BLM also admits that the Project will not comply with the RMP's visual resources standards. Thus, the ROD violated FLPMA.

Although BLM now purports to have determined that LNC discovered lithium on some, but not all, of its waste dump claims, on a new record made over two years after it issued the ROD, it cannot use that new decision to justify the 2021 ROD. BLM has still not reviewed whether LNC has discovered valuable minerals on claims covering 4,245 acres of the Project area. The new facts regarding LNC's mineral "discovery" on the waste dump claims were not the facts

1

before BLM at the time of the ROD, and they are not the facts before this Court. Instead, the ROD at issue in this litigation approved the Project without requiring compliance with the RMP, even though BLM had never determined whether LNC had discovered valuable minerals conferring mining "rights" on any of its claims. Whether BLM's new partial claim validity determination is adequate is a different case for a different court.

BLM also violated FLPMA's mandate that it "take any action necessary to prevent unnecessary or undue degradation" (UUD) of public resources because the Project, as approved, would allow antimony to leach into groundwater in violation of state water quality standards and would not comply with the RMP's sage-grouse standards or visual resources classification—by definition, UUD. BLM also approved the Project without plans to mitigate for those serious impacts, which is UUD.

Indeed, BLM did not accurately disclose or analyze those impacts, or other impacts to the environment from the open pit mine. BLM violated NEPA by approving the Project without adequately considering impacts to water, air, and wildlife like sage-grouse and pronghorn, or mitigation measures to address those impacts. For air quality, BLM relied on unidentified "tail-gas scrubber" technology to achieve air emissions reductions anticipated in the FEIS when it did not know what the scrubber was, let alone how it would work. To comply with its

obligation to analyze cumulative impacts, BLM relies primarily on a list of acreages of nearby projects, with none of the detailed and quantified analysis required by Ninth Circuit NEPA precedent.

Lastly, BLM/LNC argue that the ROD should not be vacated and the company should be allowed to continue construction – with immediate and irreparable damage to public resources – despite the fact that the ROD violated FLPMA and the Rosemont precedent. They urge this Circuit to find the agency's serious errors in disregarding its obligations under FLPMA are no more than a simple procedural "fix," like the district court did. That flies in the face of this Circuit's Rosemont decision, which rejected the position that the approval of a mine based on an erroneous assumption of claim validity can simply be cured after the fact. A district court abuses its discretion when it misapplies the law in this way.

Although LNC and the amici stress the need for lithium to transition to a cleaner energy future, mineral needs—whether for public benefit or private gain— cannot excuse admitted violations of the law, especially when other valuable public resources are at stake. Congress has struck the balance between industrial development and the environment in FLPMA and NEPA and the Circuit should not second-guess that by leaving in place a Project that was approved unlawfully.

**ARGUMENT**

**I.**    **Based on the Current Record, the Failure to Apply the RMP Standards Violates FLPMA.**

It is undisputed that BLM approved the Project without requiring compliance with the RMP's sage-grouse and Visual Resource Management (VRM) standards.  This violated FLPMA.  LNC is presently taking actions that violate the RMP, since it has commenced ground clearing, stripping of vegetation, and road construction under the still-in-place ROD.  It is not "premature," as BLM asserts, for this Court to determine that BLM violated FLPMA based on this record.

Unless applying the RMP would "impair rights of any locators or claims under [the Mining Law]," actions authorized by BLM must comply with the RMP. 43 U.S.C. §1732(b).  BLM concedes this, as only "if BLM determines that the lands under the proposed waste rock and tailings facilities contain valuable minerals, then BLM would not need to apply the RMP/ARMPA provisions." BLM Resp. 33.   In other words, absent a finding that LNC's mining claims are valid under the Mining Law, there is no "right" and the RMP provisions apply. BLM wrongly assumed LNC held rights under the Mining Law that precluded it from requiring RMP compliance.

BLM's interpretation of the law, however, is not fully correct.  Even if all of LNC's claims were valid, to the extent RMP requirements do not "impair" rights to those valid claims, they still apply.  *See* 43 U.S.C. §1732(b).  BLM never

4

determined whether LNC held valid rights under the Mining Law, let alone

inquired whether rights would be impaired by RMP compliance. BLM's ROD,

which hinged on the unsupported assumption that LNC's "rights" essentially

eliminated its discretion to regulate LNC's activities, violated FLPMA and is a

clear "arbitrary and capricious" action under the APA. *See* <u>Motor Vehicles

Manufacturers' Ass'n of U.S. v. State Farm Mutual Auto Insurance Co.</u>, 463 U.S.

29, 43 (1983)(agency cannot "fail[] to consider an important aspect of the problem,

[or] offer[] an explanation for its decision that runs counter to the evidence before

the agency.").

 The district court properly held this violated the holding in <u>Rosemont</u>, as it

concerned the 1,300 acres of waste dumps. No party now disputes that BLM

violated the law when it allowed LNC to permanently occupy these public lands

with tailings and waste rock based on an unsupported assumption that LNC had

"valid rights" to use and occupy these lands. The district court properly granted

WWP's motion for summary judgment on its third claim for relief and no party

seeks review of the court's judgement as to that claim.[1] *See* Compl. ¶¶252-254, 2-

WWPER-325; *see also* Judgment, 1-WWPER-14.

---

[1] BLM characterizes this as a "threshold factual issue" but the district court held it
was a legal violation of FLPMA and the APA. Order 15, 1-WWPER-30.

**A.      BLM and LNC Mischaracterize WWP's Case.**

Contrary to BLM/LNC's arguments, WWP is not seeking relief from the district court's judgment in its favor.  The court did not reach WWP's claim that BLM violated FLPMA when BLM assumed LNC held "rights" under the Mining Law so as to limit BLM's duty to comply with the RMP.  *See* Order n.13, n.32, 1-WWPER-30, -62; Compl. ¶¶243-246 (first claim for relief), 2-WWPER-323.  The district court also rejected, without discussion, WWP's claim that BLM violated FLPMA because, as the FEIS admits, the Project violates the RMP's Visual Resource Management (VRM) standards, enacted to preserve the area's scenic character.  *See* Order, 1-WWPER-63 (arguments not discussed in Order "do not affect the outcome of the motions before the Court); *see also* Compl. ¶¶247-251 (second claim for relief), 2-WWPER-324-325.

WWP appeals from the district court's judgment denying WWP relief on these claims, as well as its other claims for relief under FLPMA and NEPA.  2-WWPER-93.  On appeal, WWP relies on arguments "rejected by the [district court] in support of the judgment, and may rely on any ground that finds support in the record."  Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842 n.7 (1984).

Further, WWP never limited its argument about RMP compliance solely to the waste dump lands.  WWP consistently argued that BLM unlawfully "exempted

6

the Project from compliance with the RMP based on an erroneous presumption that LNC holds "valid rights" under the 1872 Mining Law, entitling it to use and occupy the *entire Project area*…[when] BLM never substantiated this assumption, particularly as it pertains to the over 1,300 acres to be permanently buried under the tailings and waste rock dump facilities." WWP Summ. J Br. 1, 1-LNCSER-148 (emphasis added); *see also* Compl. ¶¶245, 250, 253, 2-WWPER-323-325 (same). Although WWP "focused" its argument on the waste dumping (tracking the <u>Rosemont</u> facts), it "joined Rancher Plaintiffs' counsel's argument" that the requirement to examine claim validity extends beyond waste rock and tailings lands. Order n.11, 1-WWPER-28.

**B.  It Is Not "Premature" for This Court to Rule on WWP's RMP-Compliance Claims, as BLM Concedes It Did Not Have Legal Grounds to Approve the ROD.**

BLM/LNC do not challenge the district court's holding that on the record in this case, the ROD's assumption that LNC held rights under the Mining Law to occupy the waste dump lands was made without the required evidentiary determinations. Based on this record, and under <u>Rosemont</u>, the agency had no legal support for assuming LNC held mining "rights" on any of its claims. Thus, BLM's decision not to require RMP compliance—based on rights it assumed existed—must also fail.

7

BLM argued in its Answering brief that because it had belatedly begun reviewing whether LNC had discovered locatable minerals on the tailings and waste dump claims, it would be "premature" for the Circuit to decide whether BLM had violated FLPMA by approving the entire Project without requiring RMP compliance. BLM Resp. 33-35. BLM now purports to have completed that review. *See* BLM's 28j letter (attaching BLM's new validity determination finding LNC had discovered lithium on some of its claims)(Dkt. 89). BLM acknowledges that the lawfulness of its new claim validity determination must be decided by "a district court in a justiciable action on the appropriate record." Id.

The question for this Court, though, is not whether BLM found, over two years after it issued the ROD, that LNC may have discovered lithium on some of its waste dump claims. WWP agrees with BLM that judicial review of the new purported claim validity determination is not for this appeal but must occur in a future case, on a new record.

Instead, this Court's review of the ROD is based upon the record when the agency approved the Project in 2021. That record does not support claim validity because BLM undisputedly never determined whether LNC had discovered valuable minerals on *any* of its claims. The factual evidence to support claim validity is not there.

Under <u>Rosemont</u>, based on the record here, LNC thus has no right *at all* to occupy the lands where it is presently bulldozing sagebrush and constructing facilities, during sage-grouse breeding season, without application of RMP protections for the bird. <u>Rosemont</u>, 33 F.4th at 1220 ("[D]iscovery of valuable minerals is essential to the right to any occupancy—temporary or permanent— beyond the occupancy necessary for exploration."). BLM and LNC essentially ask this Circuit to allow illegal use and occupation of public land in violation of FLPMA, until the district court, and likely this Circuit, determine whether it has "fixed" a separate legal error. But potential future compliance with the law cannot be used to rehabilitate the illegal ROD.

## II. <u>BLM Did Not Apply the Sage-Grouse or VRM Requirements of the Winnemucca RMP, in Violation of FLPMA.</u>

BLM concedes that without valid mining claims on the Project lands, FLPMA's RMP-compliance mandate applies. BLM Resp. 33-35. BLM does not try to argue that the Project complied with FLPMA and the RMP standards.

LNC's assertions that "WWP concedes [A]RMPA directives cannot prevent locatable mineral projects," LNC Resp. 28, and "acknowledged that the [A]RMPA does not apply where it would prevent a project," LNC Resp. 18, n.10, are completely unfounded.

Again, LNC misunderstands what this case is about. WWP's primary argument throughout the entire case was that FLPMA requires BLM to comply with the RMP, unless LNC showed it had valid rights under the Mining Law that would be impaired by that compliance– something the record does not show here.

**A.    BLM Did Not Apply the ARMPA Provisions.**

    1.    <u>The ARMPA Applies to the Project.</u>

LNC continues to argue that BLM cannot apply the ARMPA to the Project because its mining claims confer valid existing rights. *See,* LNC Resp. 16. This Circuit roundly rejected that notion. "A mining claim is valid only if valuable minerals have been found on the claim." <u>Rosemont</u>, 33 F.4th at 1215.

BLM, for its part, asserts that, **if** the claims are judged to be valid, then all of the RMP provisions categorically are inapplicable. BLM Resp. 33-35. That is contrary to FLPMA. As noted, even if LNC holds rights under the Mining Law, BLM must apply the RMP/ARMPA unless it would "impair" those rights. 43 U.S.C. §1732(b). Thus, compliance with each RMP/ARMPA provision would depend on the facts. As noted, some provisions are subject to "valid existing rights" under the Mining Law (which has not been shown on this record). Other provisions, though, apply regardless of whether there are "valid existing rights." And others, such as RDFs designed specifically for those projects, could likely be applied without unduly impairing any rights. *See* FEIS N-1, 3-WWPER-462.

10

For instance, "whether in accordance with a valid existing right nor not," BLM must avoid effects of human activities on sage-grouse by first, locating projects outside of PHMA/GHMA, and second, if that is not possible, then locating the project in non-habitat areas first, then in the least suitable habitat for sage-grouse. MD SSS-1, ARMPA 2-6, 4-WWPER-749. The ARMPA requires BLM to "limit project-related noise, seasonally or annually (see MDs SSS 2 and SSS 3), in GRSG habitat where it would be expected to reduce functionality of habitats that support associated GRSG populations." MD SSS 7, ARMPA 2-11, 4-WWPER-754. To this end, among "required design features" (RDFs) designed for locatable minerals projects, the ARMPA requires: "Install noise shields to comply with noise restrictions (see Action SSS 7) when drilling during the breeding, nesting, brood-rearing, and/or wintering season. Apply GRSG seasonal timing restrictions when noise restrictions cannot be met (see Action SSS 6)." RDF LOC 1, 4-WWPER-828.

In Nevada, BLM must also consult with the SETT to ensure that "a net conservation gain of GRSG habitat is achieved in mitigating human disturbances in PHMAs and GHMAs (see Appendix F) on all agency-authorized activities." MD SSS 9a, ARMPA 2-11, 4-WWPER-754. Although these and other ARMPA provisions potentially apply, even to Projects with mining rights, BLM just assumed they did not.

11

Trying to assert that it holds rights prohibiting BLM from applying the ARMPA standards, LNC insists that WWP somehow conceded that LNC discovered valuable minerals conferring rights to pit claims, or else that the sage-grouse ARMPA categorically does not apply to locatable minerals projects, or that applying the ARMPA would be tantamount to an unlawful mineral withdrawal.

Each argument fails. WWP never conceded that LNC holds any rights to the pit claims. Indeed, the core of WWP's argument is that BLM never determined whether LNC held "valid existing rights." *See, e.g.,* WWP Summ. J. Br. 1, 1-LNCSER-148.

LNC tries to paint WWP's acknowledgment that there is some lithium mineralization in the pit area as a concession regarding claim validity.[2] LNC Resp. 15 n. 5. WWP made no such concession and has consistently argued, on the basis of long-established law, that "[t]he mere indication or presence of gold or silver is not sufficient to establish the existence of a lode. The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and extraction of the mineral." WWP Summ. J. Reply 12, 2-WWPER-147, quoting Chrisman v. Miller, 197 U.S. 313, 322 (1905). As WWP has consistently alleged,

---

[2] That WWP is not challenging "any prior authorizations" or the concurrently-approved plan of exploration also does not mean WWP concedes LNC's mining claims are valid. *See* LNC Resp. 15 n.15, citing 1-WWPER-27.

and BLM admits, BLM never made this determination prior to approving the ROD.

As discussed, WWP and BLM agree that the ARMPA does not categorically exempt locatable mineral projects, and that claim validity must be determined in order for BLM to even consider exempting the Project from some RMP standards. LNC's reliance on a contrary statement from the 2015 FEIS supporting the ARMPA—which is not part of the ARMPA decision—to make this argument, is unavailing. The FEIS identifies 38 ARMPA provisions that potentially apply to locatable minerals projects. FEIS N-1, 3-WWPER-462. Many of these directives apply "consistent with" or "subject to" "valid existing rights" and "applicable laws and regulations, such as the 1872 Mining Law," or else apply only to "discretionary" actions. *See, e.g.,* ARMPA 2-8, 2-30-2-31, 4-WWPER-751, 4-WWPER-773-774. It would make no sense for BLM to have adopted these directives if they could *never* apply.

As these standards illustrate, even if BLM *had* determined LNC had discovered valuable minerals in the pit, the ARMPA would apply—it would just apply in different ways to areas where LNC held "rights" and those where it did not. If BLM were to determine LNC had any rights, in a future case, BLM could then determine whether compliance with each applicable ARMPA standard would "impair" LNC's rights. The ARMPA would apply without question where LNC

13

held no rights.  Requiring compliance with the ARMPA could provide protection for sage-grouse while also allowing for LNC to use and occupy any valid mining claims it may be determined to hold.

LNC argues that applying the RMP standards to restrict its ability to permanently occupy the waste dump and tailings lands could hinder the overall Project development.  That is essentially the same argument this Circuit rejected in Rosemont when it held that "rights" to even valid claims in the mine pit do not extend to other lands, unless those lands were covered by valid claims.  "The validity of a claim cannot be established by a discovery of valuable minerals nearby." Rosemont, 33 F.4th at 1210.  LNC cannot occupy claims without any right under the Mining Law.

The solution for LNC is to have BLM amend the RMP to eliminate the ARMPA standards.  But until that happens, without valid rights on these lands, LNC cannot avoid complying with the RMP.

2.     The Project Does Not Comply with the ARMPA's Restrictions on Surface-Disturbing Activities.

Neither BLM nor LNC contends that BLM applied the ARMPA standards. However, LNC argues that the Project nevertheless "complies with the 2015 RMPA directives" because of "applicant-committed mitigation."  LNC Resp. 17. This misses the point—BLM unlawfully approved the Project without requiring

14

compliance with the ARMPA standards, and LNC's voluntary mitigation cannot fix this FLPMA violation. Moreover, far from demonstrating ARMPA compliance, the authorities LNC cites only confirm that the Project does not comply with the ARMPA.[3]

First, LNC faults WWP for not identifying ARMPA violations specific to the waste rock and tailings dump lands. But the violations WWP identified apply to all lands in the Project area. For example, lek buffers would apply within the entire Project area, since the entire Project area is within 3.1 miles of a lek. *See* 3-WWPER-458; ARMPA Appx. B, 5-LNCSER-1240-1241(lek buffers). Likewise, the 3% disturbance cap is exceeded in the entire Project area.

Second, LNC contends the Project complied with the 3% disturbance cap "to the extent possible," but that is false. LNC Resp. 18. The Project does not comply with the cap. BLM Answer. ¶79, 2-WWPER-260. LNC ignores the exception to the 3% cap in Nevada, which is allowed if BLM convenes a technical team to determine whether the Project can be modified to a "net conservation gain" to the species. BLM admitted that it "did not convene the "technical team." Id.[4]

---

[3] If LNC already *did* comply with the ARMPA, LNC's complaint that applying the ARMPA would prohibit the Project altogether would make even less sense.

[4] This further undermines LNC's argument that compliance with this ARMPA standard would categorically "prevent the Project." LNC Resp. 18.

Third, LNC's conditional promise to "to comply with the Migratory Bird Treaty Act" (MBTA) by preventing destruction of "bird nests" from May 1 to July 15 "[i]f possible," apparently does not apply to greater sage-grouse since the species is not protected under the MBTA. 2-LNCSER-500; *see* 50 C.F.R. §10.13 (List of migratory birds).

Even if it did, it cannot substitute for ARMPA compliance. The ARMPA's strict restrictions limit surface-disturbing activities "[i]n breeding habitat within 4 miles of active and pending GRSG leks from March 1 through June 30," in "[b]rood-rearing habitat from May 15 to September 15," and in "[w]inter habitat from November 1 to February 28." ARMPA 2-8-2-9, 4-WWPER-751-52; *see* FEIS Fig. N.1, N.2, N.3, 3-WWPER-478-480 (showing habitats in Project area).[5] The entire Project area is within 3.1 miles of a lek. *See* 3-WWPER-458.

---

[5] LNC falsely contends that it "complied with the RDFs for Locatable Minerals Projects…." LNC Resp. 19 n.11. LNC cites to a page of the FEIS describing "recommended" "best management practices" to be applied "where feasible" to demonstrate it installed noise shields—but there is no mention of noise shields or commitment by LNC to strictly comply with the recommendations. FEIS 4-98, 2-LNCSER-464. LNC's "options analysis" does not show that LNC minimized the footprint of the Project, it shows it sited it in the most convenient location. *See* 5-LNCSER-1161. The cited pages do not say reclamation will concurrently occur throughout operations. 2-LNCSER-0466–67. LNC's assurances that it will "limit" standing water and use "appropriate exclusionary devices" do not comply with RDFs 3, 4, and 7, which contain specific direction to "[r]emove or re-inject produced water" or else use specific steps supported by science to limit favorable mosquito habitat. 4-WWPER-828.

Fourth, Project noise is so loud that it will disturb sage-grouse on leks a mile, or more, away. LNC argues counterfactually that "the Project is not anticipated to exceed 10 decibels above ambient sound levels," LNC Resp. 21, when the FEIS discloses that "noise increases above the 10 dBA ARMPA guidance would occur at the Montana-10 lek, and potentially the Pole Creek-01 lek." FEIS N-18, 3-WWPER-477. NDOW specifically rejected LNC's suggestion that the project would not exceed the ARMPA noise limits. NDOW FEIS comments, 3-WWPER-367.

ARMPA standard MD-SSS-7 requires noise reduction wherever noise "would be expected to reduce functionality of habitats that support associated GRSG populations," such as in the Thacker Pass Project area,[6] not solely within 0.25 miles of a lek, as LNC seems to believe. 4-WWPER-754. Although LNC may purchase conservation credits to offset impacts from the Project's loud noise, these do not address impacts from lek abandonment—a serious impact NDOW anticipates, since noise will exceed the threshold "indicating potential risk for noise effects to GRSG." FEIS R-184, 3-LNCSER-734. LNC had not committed to purchase the credits at the time of the ROD, developed a noise monitoring plan, or committed to any noise mitigation. *See* id. (LNC "is working with the SETT";

---

[6] The limits in MD-SSS-3 apply "**at least** 0.25 mile from active and pending leks." 4-WWPER-753(emphasis added).

17

development of a noise monitoring plan "would" further reduce potential for effects); *see also* FEIS 4-98, 2-LNCSER-464 ("recommended mitigation and monitoring" includes developing such a plan). Noise impacts are unaddressed.

Fifth, lek buffers must be applied unless they are inconsistent with valid existing rights. Since BLM has not determined whether LNC holds these rights, the ARMPA requires BLM to apply buffers to restrict roads and other linear features, infrastructure, and surface disturbance within GHMA and PHMA in the Project area. *See* ARMPA Appx. B, 5-LNCSER-1240-1241.

In PHMA, which covers most of the Project area, BLM cannot simply waive the buffers if an applicant purchases conservation credits: "BLM may approve actions within PHMA that are within the applicable lek buffer distance *only if*… BLM … determines … that a buffer distance *other than the distance identified above* offers the same or greater level of protection to GRSG and its habitat…." ARMPA B-2, 5-LNCSER1241 (emphasis added). BLM admits it never applied or even considered imposing any lek buffers.

3.  The Mitigation Options Will Not Achieve a "Net Conservation Gain."

BLM did not require mitigation to achieve a net conservation gain, as the ARMPA requires. The primary discussion of sage-grouse mitigation options is three paragraphs in an FEIS appendix and both NDOW and the SETT informed BLM that the options would not fully mitigate impacts. *See* FEIS N-25, 3-

18

WWPER-483 (describing mitigation options).  As detailed in WWP's Opening

Brief (at 29-33), the ROD does not require LNC to purchase conservation credits,

the potential future credits offset only temporary impacts and do not offset impacts

to water resources, and the second mitigation option was described in only three

sentences.  Such "broad generalizations and vague references to mitigation

measures" would not satisfy NEPA, let alone FLPMA.  <u>Neighbors of Cuddy

Mountain v. U.S. Forest Service</u>, 137 F.3d 1372, 1381 (9th Cir. 1998).

     The conservation credit mitigation option cannot achieve a "net conservation

gain" because, as LNC admits, the credits only offset "temporary" impacts from

the Project, even though the Project will have permanent impacts.  LNC Resp. 24.

LNC defends the lack of permanent conservation credits by saying, without

support, that there will be little sage-grouse habitat lost.  That ignores the plain fact

that most of the Project lands, including the mine pit and waste/tailings dumps, will

never become viable habitat, regardless of the minimal "reclamation" that will

occur decades in the future.

     Further, as the multi-agency Sagebrush Ecosystem Technical Team (SETT)

stated, "the CCS does not account for potential impacts to riparian and water

resources that may not be realized until after the 41-year mine life…."  SETT

comments, 3-WWPER-513.  That is why "the SETT recommends additional

mitigation measures to offset potential loss of riparian habitat that has implications

for a multitude of wildlife species and flora." 4-WWPER-655. LNC never committed to undertake any such "additional mitigation measures" and the ROD contains none.

In addition, the number of CCS credits is inadequate because it was assigned based on the LNC-commissioned SWCA report, which erroneously classified virtually the entire area as non-habitat. 5-LNCSER-1218; 4-WWPER-715-17. But the FEIS itself shows the Project area contains "high" quality breeding, brood-rearing, and winter habitats. 3-WWPER-478-480. LNC cannot collaterally attack the ARMPA's PHMA designation covering most of the Project site, as well as the FEIS maps. In fact, at least 30 radio-marked sage-grouse have been documented using the area. FEIS G-18, 3-WWPER-451. WWP never "concede[d]" that the potential to purchase an inadequate number of credits to offset some impacts from the mine constituted a "net conservation gain." LNC Resp. 24.[7] The FEIS does not state that it does, either.

The second mitigation option is described in three sentences. In an effort to salvage that vague description, to which there is no commitment in the ROD, LNC nevertheless points to the FEIS' *groundwater* monitoring and mitigation discussion. These are not the same thing: the FEIS states only that the second

---

[7] WWP's comments addressed BLM's failure to mitigate to a net conservation gain standard and WWP did not "waive" any argument about the accuracy of the habitat quantification maps. *See* WWP comments, 3-WWPER-527.

option involves "[h]abitat enhancements" which "could include noxious weed treatments, pinon-juniper removal, water developments, sagebrush and forb seeding, and wildfire prevention fuel breaks." FEIS N-25, 3-WWPER-483.

As NDOW found: "[t]he FEIS and [water monitoring plan]…does not include specifics on thresholds that will trigger mitigation such as flow augmentation." 3-WWPER-365. Monitoring would simply trigger "one of several proposed mitigation strategies," 3-LNCSER-716, and the FEIS does not disclose when "contingency mitigation measures (including flow augmentation and guzzlers)" would be triggered. FEIS 4-46, 2-LNCSER-450. There is simply not enough information about the second option to determine whether it could achieve a net conservation gain.[8]

LNC next suggests that the lack of a mitigation plan for sage-grouse impacts is evidence of an adaptive management approach. But LNC fails to refute NDOW and EPA's findings that the wildlife monitoring and mitigation plans lacked essential details to implement adaptive management. As NDOW stated, "[t]he lack of disclosure on how BLM and LNC will be implementing monitoring, mitigation, **and adaptive management** leaves out the tremendous importance and efforts toward collectively conserving the greater sage-grouse and is contrary to the on-

---

[8] As WWP details below, the CCS credits do not account for unmitigated impacts to water quantity and quality that will have permanent effects on sage-grouse and other wildlife.

going efforts of the BLM to manage for this species." 3-WWPER-358 (emphasis added). BLM cannot rely on nonexistent potential mitigation loosely outlined in a few paragraphs, and this Court cannot "defer to a void." <u>Or. Natural Desert Ass'n v. BLM</u>, 625 F.3d 1092, 1121 (9th Cir. 2010).

## B.      The Project Violates the RMP's VRM Requirements.

Curiously, BLM's brief contains no defense of its failure to comply with the RMP's VRM classification. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." <u>State Farm</u>, 463 U.S. at 50. *See also* <u>Rosemont</u>, 33 F.4th at 1219 (agency may only be sustained "on the grounds that the agency evoked when it took the action."). The record contains no explanation for BLM's approval of an action it admits would not comply with the VRM standards. FEIS 1-5, 3-WWPER-409.

Thus, LNC's speculation about why BLM did not comply with the standards must fail. BLM did not determine that adverse impacts to visual resources were insignificant or fully mitigated by painting buildings brown. BLM's Deputy State Director recognized that "[u]nless somehow this lithium pit mine during operations (apparently 40 years estimated) can somehow meet the current VRM Class 2… **an RMP Amendment will be necessary to enable Plan conformance for this project**…." R. Morales email, 4-WWPER-705 (emphasis added). Thus, contrary to LNC, these are not mere "guidelines" but enforceable standards.

22

The record is devoid of evidence to substantiate BLM's sudden about-face to ignore the VRM standards, or refute its acknowledgment that it needed to amend the RMP to legally approve the Project. *See* 4-WWPER-649-653. BLM has not "articulate[d] a satisfactory explanation for its action" authorizing a Project that does not comply with the RMP. FCC v. Fox Television, 556 U.S. 502, 513 (2009), quoting State Farm, 463 U.S. at 43. Contrary to LNC, Fox Television does not apply only to rulemaking changes. This Circuit has applied it where a ROD rested on factual findings that contradicted earlier factual findings by the same agency, the case here. *See* Organized Village of Kake v. U.S. Dep't of Agriculture, 795 F.3d 956, 966-67 (9th Cir. 2015).

As with the sage-grouse ARMPA, the solution for LNC and BLM was for BLM to amend the VRM standards in the Winnemucca RMP. Under FLPMA, BLM is not free to simply ignore the standards, especially when it admits the Project will violate them.

### III.    **BLM Illegally Authorized UUD.**

### A.    **The Project Is Predicted to Violate Water Quality Standards.**

BLM advances two principal arguments to defend its approval of the Project, which it predicts will violate state groundwater standards, thus causing UUD. First, BLM contends that because the ROD required compliance with state standards, BLM did not authorize UUD. Second, BLM contends that the Project

will not violate state law because the pit backfill water will only exceed drinking water quality standards in the future. Both fail.

BLM cannot avoid its own prediction that the Project will violate state groundwater standards by simply saying that LNC must comply with standards. The Project as approved would violate the Nevada Code, which provides that "[a] facility, may not degrade the waters of the State [which includes groundwater] to the extent that: … (b) For groundwater: (1) The quality is lowered below a state or federal regulation prescribing standards for drinking water." NAC445A.424(1)(b)(1). BLM and LNC both admit this will occur. *See* BLM Resp. 36-37 (antimony concentrations are predicted to exceed drinking water standards); LNC Resp. 29-30 ("modeling does predict pore water in the pit may exceed drinking water standards for antimony").[9] Nobody is contending the pit is currently intended to be a source of drinking water, but allowing a Project that would cause groundwater pollution above the drinking water standard is UUD. 43 C.F.R. §3809.420(b)(5).

BLM's hydrogeologist notified LNC's contractor that because of this groundwater degradation, "all three model scenarios as proposed without a source

---

[9] Although the contamination is predicted to remain within the Project boundary, it will nevertheless occur up to one mile outside the pit. That is why NDEP informed LNC it would "enforce Profile I or the demonstrated background water quality immediately outside the pit boundary" since it "does not allow degradation of waters of the State." NDEP letter, 3-WWPER-505.

control component could be considered to cause [UUD] pursuant to federal surface management regulations." D. Erbes comments, 1-WWPFER-130. Yet, BLM never required any "source control" to prevent the generation of the contamination and its release into the groundwater.

Although LNC touts that NDEP approved the water pollution control permit, that is misleading. NDEP expressly prohibited "mining into the regional water table, as originally proposed" because the plan to mine below the water table would "have the potential to degrade water quality, in violation of Nevada water pollution control law." https://dcnr.nv.gov/news/division-of-environmental-protection-issues-air-water-mining-permits-for-thacker-pass-mine (accessed May 5, 2023). *See* NDEP letter, 3-WWPER-505 (same, noting that NDEP could not legally approve LNC to mine below the water table due to the predicted pollution).

It is thus not true, as LNC suggests, that NDEP "agreed" that BLM monitoring and mitigation options would effectively mitigate antimony seepage, as NDEP refused to approve the full Project, rejecting the plan to intercept the water table due to the predicted antimony pollution. *See* LNC Resp. 29 n.22. Actually, NDEP agreed with BLM's hydrogeologist and found that the Project as proposed, and approved by BLM, would violate state water quality standards. That is, by definition, UUD.

Further, BLM approved the Project without any plan to prevent this groundwater contamination. The ROD only requires *monitoring* water quality and states only that if it looks like degradation will occur, "LNC *will* adopt mitigation strategies" sometime in the future. ROD 11, 3-WWPER-341 (emphasis added). The so-called "mitigation plan" to which LNC points only consists of monitoring, along with mitigation "options." *See* 2-LNCSER-438-439; 3-LNCSER-703-707.

To the extent these mitigation options can be called a plan, the proposed mitigation is inadequately described and, as NDOW commented, "it was difficult to understand what [monitoring and mitigation] items would be implemented." NDOW FEIS comments, 3-WWPER-356. As EPA found:

> While the Final EIS includes three conceptual options that have the potential to mitigate antimony groundwater contamination (Appendix P Part 1 p. 154-159), the plans are not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated.

EPA FEIS comments, 3-WWPER-372. While LNC relies on a later post-ROD mitigation plan finalized in February 2021, this was not discussed in the FEIS and EPA commented that the plan included "a new potential future mitigation option for groundwater quality impacts that was not discussed in the Draft or Final EIS…." Id. And, this "mitigation" approach would only detect antimony pollution *after* it had already occurred. By allowing unmitigated water pollution in violation of standards, BLM violated FLPMA by authorizing UUD.

"[P]utting off an analysis of possible mitigation measures until after a project has been approved, and after adverse environmental impacts have started to occur, runs counter to NEPA's goal of ensuring informed agency decisionmaking." Great Basin Resource Watch v. BLM, 844 F.3d 1095, 1107 (9th Cir. 2016). While the court approved BLM's plan for the pit lake in that case, the facts were very different, as there was only a "low probability" of adverse impacts to water quality, the mine pit lake was not predicted to release its pollutants into groundwater (i.e., it was a ground water "sink") and, importantly, NDEP raised no concerns for that mine, as it does here. Id.

**B.** **The Unmitigated Impacts to Sage-Grouse Constitute UUD.**

To prevent UUD, BLM must comply with Performance Standards, which include ensuring all operations comply with the land use plan (here, the RMP/ARMPA). 43 C.F.R. §§3809.420, 3809.5. LNC concedes that "BLM prevents UUD by ensuring compliance with the applicable land use plan." LNC Resp. 17 n.8, citing Mineral Policy Ctr. v. Norton, 292 F.Supp.2d 30, 49 (D.D.C. 2003).

LNC argues that this mandate does not apply because application of the RMP must be "consistent with the mining laws." Under Rosemont, however, requiring RMP/ARMPA compliance would be fully "consistent with the mining laws" here, since BLM approved the Project without determining whether LNC

27

had any rights under those laws.  Even if it did, as discussed above, BLM could still require RMP/ARMPA compliance.  Yet, BLM approved the Project even though it would not comply with the RMP/ARMPA sage-grouse protections and therefore, by regulatory definition, authorized UUD.

BLM/LNC argue that, because the ARMPA also requires the Project to achieve a "net conservation gain" for sage-grouse, violating the other standards cannot constitute UUD.  BLM Resp. 39; LNC Resp. 28.  That view contradicts the plain language of BLM's performance standards at 43 C.F.R. §3809.420, which require that "operations… must comply with the applicable BLM land use plans," with no exception for land use plan standards intended to achieve a conservation gain.  A violation of the performance standards in §3809.420 is, by BLM's own definition, UUD.  *See* 43 C.F.R. §3809.5.  Indeed, requiring compliance with a land use plan standard intended to achieve environmental protections to avoid UUD is fully consistent with the definition of UUD, which includes "fail[ing] to attain a stated level of protection or reclamation required by specific laws in [protected] areas…."  Id.

BLM also argues that its duty to mitigate adverse impacts to sage-grouse to prevent UUD only applies to threatened and endangered species and accuses WWP of overlooking BLM's mining regulations.  BLM Resp. 38.  In fact, WWP's argument that BLM must mitigate adverse impacts is *based* on the mining

regulations which state in preamble, "[a]n impact that can be mitigated, but is not, is clearly unnecessary." *See* WWP Br. 37, citing 65 Fed.Reg. 69997, 70053 (Nov. 21, 2000). When the regulations were amended in part in 2001, BLM expressly

> retain[ed] the general performance standards (paragraphs (a)(1) through (a)(5) from the 2000 rule because they provide an overview of how an operator should conduct operations under an approved plan of operations and clarify certain basic responsibilities, **including the operator's responsibility to comply with applicable land use plans and BLM's responsibility to specify necessary mitigation measures.**

66 Fed.Reg. 54835, 54840 (Oct. 30, 2001)(emphasis added). Indeed, the performance standard directly following land use plan compliance requires that operators "must take mitigation measures specified by BLM to protect public lands." 43 C.F.R. §3809.420(a)(4). *See also* 43 C.F.R. §3809.5 (defining "mitigation"). The mining regulations thus do not solely apply the mitigation requirement to threatened and endangered species. BLM authorized UUD by approving the Project without mitigating for impacts to sage-grouse.

**IV.** **BLM Violated NEPA.**

**A.** **BLM's Checklist Cumulative Effects Analysis and Failure to Consider a Nearby Lithium Project Fails to Meet the Strict Ninth Circuit Standard.**

BLM/LNC assert that because BLM arbitrarily cut-off its cumulative effects study area (CESA), BLM may overlook the cumulative impacts of the adjacent

McDermitt lithium project in the same caldera, just across the Oregon border.[10]  It is unsurprising that BLM and LNC rely on the CESA since the list of acreages disturbed within each CESA is largely the extent of the FEIS' cumulative effects analysis.

BLM cannot use its discretion to define the CESA to avoid disclosing and analyzing foreseeable cumulative impacts of another BLM mining project—BLM must take a "hard look" at those impacts.  "Vague and conclusory statements" cannot constitute a hard look and failure to discuss other mining projects in an area, without explanation, is evidence of arbitrary and capricious action.  Great Basin Mine Watch v. Hankins, 456 F.3d 955, 973 (9th Cir. 2006); *see also* Ctr. for Biological Diversity v. United States Bureau of Land Mgmt., No. 4:21-CV-00182-BLW, 2023 WL 387609, at *11 (D. Idaho Jan. 24, 2023)(inadequate cumulative impacts analysis where analysis failed to discuss nearby mining project on sage grouse).

WWP did not waive this argument, either.  WWP raised the issue of BLM's failure to take a hard look at cumulative impacts in comments on the DEIS, for example, notifying the agency that "BLM failed to consider the cumulative impacts from all past, present, and reasonably foreseeable future activities" and

---

[10] BLM admits the CESA only included "the southern portion" of the caldera. BLM Resp. 71.

30

needed to review "the cumulative impacts from all other residential and

commercial development, **mining**, grazing, recreation, energy development, roads,

ORV use, etc., in the region."  WWP comment, 3-WWPER-565 (emphasis added).

A plaintiff is not required to list every single project in the area that has

cumulative impacts to assert that a cumulative impacts analysis is inadequate –

especially for projects such as McDermitt that operate on BLM land.  That

argument was rejected by the Ninth Circuit in another BLM mine case when it held

that "plaintiffs met their burden in raising a cumulative impacts claim under

NEPA, despite failing to specify a particular project that would cumulatively

impact the environment along with the proposed project."  Te-Moak Tribe v. U.S.

Dept. of the Interior, 608 F.3d 592, 605 (9th Cir. 2010).

BLM does not really seek to defend its analysis, and relies on unavailing

efforts to factually distinguish Great Basin Mine Watch and Great Basin Resource

Watch.  To show that BLM took the required "hard look," LNC points to "the

topical cumulative impacts sections," but these largely consist of acreage lists in

narrative form.  For mining activities, the FEIS lists other projects in the general

area and the number of acres disturbed, and then discloses by how many acres the

Project would increase that disturbance.  FEIS 5-3-5-4, 2-LNCSER-470-471.  The

same is true of resource-specific discussions; for wildlife, the FEIS just states that

there are 1,209 acres of disturbance, which would increase to 7,192 acres under the preferred alternative. FEIS 5-8, 2-LNCSER-475.

But BLM cannot simply lump all wildlife together and ignore the cumulative impacts to sage-grouse. "[T]he FEIS lack[s] any analysis or discussion of the cumulative impact on sage-grouse of the past, present, and future projects. Further, to the extent the cited portions of the FEIS discuss cumulative impacts on wildlife, all wildlife species are lumped into a single, generalized discussion, and there is no discussion of the cumulative impacts on sage-grouse." Ctr. for Biological Diversity, 2023 WL 387609, at *11.

The FEIS provides no quantified, detailed information about the status of sage-grouse populations or habitats within the Lone Willow PMU (the CESA) or the Western Great Basin PAC, or the anticipated cumulative effects to sage-grouse from the Project in combination with other actions at either scale. Even its acreage list review was artificially cut-off at the nearby Oregon border. This contradicts BLM's ARMPA, which specifically recognizes the need for a broader analysis. 2015 ARMPA 2-13, 4-WWPER-756 (requiring actions based on triggers in PACs and BSUs).

The same is true for pronghorn and other wildlife, where any purported "cumulative effects analysis" was confined to Hunt Unit 31, which is again cut off at the Oregon border. LNC offers a post-hoc rationalization for this arbitrary

32

boundary, speculating that "[t]he pronghorn migration is likely limited by the mountain boundaries of Hunt Unit 031," but even the map it cites does not support this. LNC Resp. 36, citing 3-LNCSER-739. BLM offers no reason why Hunt Unit 31 was chosen and NDOW found that the unit is "not related to all species/populations."[11] 4-WWPER-682. In any event, LNC cannot now manufacture a basis for BLM's arbitrary state-line cut-off for cumulative impacts, as "courts do not accept appellate counsel's post-hoc rationalizations for agency action." Nat. Res. Def. Council v. U.S. Env't Prot. Agency, 31 F.4th 1203, 1207 (9th Cir. 2022)(cleaned up).

The FEIS's simple "identification," without the detailed and quantified analysis of the impacts from other projects, falls far short of BLM's NEPA duties. See Great Basin Resource Watch, 844 F.3d at 1104-06; Great Basin Mine Watch, 456 F.3d at 973-74. "The agency must discuss and analyze the impacts of the projects in sufficient detail to assist the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." Ctr. for Biological Diversity, 2023 WL 387609, at *10. "A calculation of the total number of acres to be impacted by other projects in the watershed is a necessary component of a cumulative effects analysis, but is not a sufficient description of the actual

---

[11] Using a Hunt Unit for a state-led population study is not the same as using it for a cumulative effects analysis.

environmental effects that can be expected." <u>Great Basin Mine Watch</u>, 456 F.3d at 973.

**B.     BLM Relied on Inadequate, and in Critical Areas, Non-existent, Mitigation Plans.**

1.     <u>Groundwater Pollution</u>

BLM tries to defend its decision not to analyze and disclose mitigation measures to prevent or address groundwater pollution—as NEPA requires—by pointing to what it terms a "primary groundwater monitoring and mitigation plan" described in FEIS Appendix P.  BLM Resp. 74.  The so-called plan is mostly a plan to monitor the pollution once it starts, not a plan to prevent the pollution from occurring.  It also does not describe either groundwater monitoring or actual mitigation in adequate detail:  The mitigation component consists of three "conceptual options" discussed in three pages, and BLM signed the ROD without ever analyzing or disclosing the "comprehensive groundwater quality monitoring plan" BLM touts in briefing.  *See* BLM Resp. 75.

Both the public and EPA comments alerted BLM that more was required, but BLM ignored them.  Appellant Great Basin Resource Watch specifically requested that BLM provide a mitigation plan for groundwater pollution.  FEIS R-122, 3-WWPER-485 (GBRW comment P572: requesting that BLM "Present a

34

model for an alternative closure option for the backfilled pits that prevents the release of pollutants in a groundwater plume…."").

So did EPA. EPA FEIS comments, 3-WWPER-372. In response, BLM stated only that "options for blending/discharge and active treatment 'have not been evaluated, and therefore may not be feasible for consideration as mitigation for the Final EIS' (Appendix R-180)." Id. As a consequence, EPA determined that the mitigation options "not developed with an adequate level of detail to assess whether or how groundwater quality downgradient from the pit would be effectively mitigated." Id.

BLM argues that it does not have to agree with EPA's concerns about the lack of an actual plan to prevent the groundwater pollution, as long as it "considered" them. BLM Resp. 77. *See also* EPA FEIS comments, 3-WWPER-372. While it is true that BLM is not strictly bound by EPA's findings, it must discuss mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated." Neighbors of Cuddy Mountain, 137 F.3d at 1380 (cleaned up). As EPA's comments showed, BLM did not do that here.

In the face of that violation of NEPA, BLM cannot simply say "thanks for your comments" and dismiss expert agency comments that the mitigation plan is not adequately developed. That would give "short shrift" to the "serious and considered comments by experts." W. Watersheds Project v. Kraayenbrink, 632

F.3d 472, 493 (9th Cir. 2011)(cleaned up). BLM thus did not adequately "assess the effectiveness of mitigation measures relating to groundwater," including by determining whether the antimony pollution "could be avoided." South Fork Band Council v. Dept of Interior, 588 F.3d 718, 727 (9th Cir. 2010). BLM's determination based on the FEIS that the impacts would be "effectively mitigate[d]" was thus unsupported.[12] FEIS 4-14, 3-WWPER-421.

This case is thus unlike Japanese Vill. v. Fed. Transit Admin., on which BLM relies, where the plan there contained detailed mitigation measures for the subsidence issue plaintiffs were concerned about, and those measures were consistent with expert recommendations in a study that was in the record. 843 F.3d 445, 460-61 (9th Cir. 2016). Here, there is no plan to prevent the groundwater pollution. As discussed above, because of the lack of such a plan, NDEP refused to approve LNC's mining into the water table – which BLM's ROD allows.

At best, LNC relies on a post-ROD mitigation plan that was not discussed in the FEIS. EPA commented that the plan included "a new potential future mitigation option for groundwater quality impacts that was not discussed in the Draft or Final EIS…." EPA FEIS comments, 3-WWPER-372. "Such late analysis, 'conducted without any input from the public,' impedes NEPA's goal of giving the

---

[12] LNC claims that EPA's concerns were addressed in "later drafts" of the mitigation plan, but there is no way to verify this from the record. LNC Resp. 32.

public a role to play in the decisionmaking process and so 'cannot cure deficiencies' in a [NEPA document]." <u>Oregon Natural Desert Ass'n v. Rose</u>, 921 F.3d 1185, 1192 (9th Cir. 2019), quoting <u>Great Basin Resource Watch</u>, 844 F.3d at 1104.

2.    <u>Air Quality</u>

BLM contends that, even though it did not know how LNC would achieve air emissions reductions projected in the FEIS, its conclusion that air quality impacts would be mitigated by the "tail gas scrubbing system" was adequately supported.  But BLM could not rationally conclude that this emissions control/mitigation would be effective, as BLM's Project lead, Ken Loda, admitted the agency did not have the technical expertise to understand how the scrubber would work.  K. Loda email, 4-WWPER-703.

BLM contends Mr. Loda meant that "technical details about [the air scrubbing] system's engineering were unnecessary to evaluate its effectiveness." BLM Resp. 80.   But that is not what Mr. Loda said, and what the scrubbing system would be is more than just a technical detail—it is critical information to determine whether the scrubbing system can be effective.  BLM cannot possibly have taken a "hard look" without this information.  *See* <u>Great Basin Resource Watch</u>, 844 F.3d at 1106 (when assessing agency's review of mitigation, the court must be satisfied that the agency took a "hard look").  BLM admits that it did not

37

know how the "scrubbing system" to achieve those reductions would work.  FEIS

Appx. K 6-7, 3-WWPER-459-460.

Without the technical capacity to understand air quality mitigation—or

knowledge of what it was—BLM simply deferred to LNC's contractor's

representations, without verifying its accuracy.  LNC asserts that BLM can simply,

without analysis or question, "rel[y] on manufacturers' guidance to estimate

emissions and model air impacts." LNC Resp. 41.

This violates NEPA, which requires BLM "to independently evaluate the

information in [its NEPA document] and [be] responsible for its accuracy." Barnes

v. U.S. Dept. of Transp., 655 F.3d 1124, 1131 (9th Cir. 2011), citing 40 C.F.R. §

1506.5(a).  Mr. Loda admitted BLM could not fulfill these NEPA obligations.

BLM/LNC also rely heavily on the fact that NDEP, which is not subject to

NEPA, would issue an air quality permit.  But this Circuit does not "[allow] federal

agencies to rely on state permits to satisfy review under NEPA."  Env'l Defense

Ctr. v. Bureau of Ocean Energy Mgmt., 36 F.4th 850, 874 (9th Cir. 2022).  The

Circuit has repeatedly rejected BLM's reliance on Nevada state air permitting as a

substitute for full public review of mining projects under NEPA: "'[a] non-NEPA

document ... cannot satisfy a federal agency's obligations under NEPA'. … and the

reference to the Project's Clean Air Act permit did nothing to fix that error." Great

Basin Resource Watch, 844 F.3d at 1104, quoting South Fork Band, 588 F.3d at
726.

3.    Sage-grouse

Similarly, mitigation for impacts to sage-grouse is largely non-existent, for
as shown above, BLM was under the legally-erroneous view that it had no
discretion over the Project due to LNC's purported "mining rights."

BLMs determination, after reviewing the FEIS comments, that it had
"applied all reasonable and feasible mitigation within its regulatory authority," 3-
WWPER-340, does not show BLM "did indeed consider and respond to criticisms
and concerns raised by other agencies, as well as those from the general public."
Ctr. for Biological Diversity v. BLM, 833 F.3d 1136, 1150 (9th Cir. 2016).
Instead, the blanket dismissal shows BLM gave those concerns "short shrift;" it
"neither responded to their considered comments objectively and in good faith nor
made responsive changes to the proposed [action]." Kraayenbrink, 632 F.3d at 493
(cleaned up).

For example, BLM contends that it addressed NDOW's concerns about
noise because it corrected its own original mistaken calculation showing no
impacts would occur at the Montana-10 and Pole Creek-01 leks, LNC was working
with the SETT to offset noise impacts through the CCS, and "[d]evelopment of a

39

noise monitoring plan…would further reduce the potential noise-related effects." FEIS R-190, 3-WWPER-497.

That sidesteps NDOW's concerns that Project noise could cause lek abandonment with unacknowledged population-level effects and that plans to monitor and mitigate for that noise were inadequately developed. BLM did not give noise monitoring and mitigation additional direction in the ROD as NDOW requested. Instead, BLM said that it "applied all reasonable and feasible mitigation within its regulatory authority." BLM Resp. 81. That is not surprising because BLM misinterpreted the scope of its "regulatory authority" over mining projects as barring it from requiring any significant mitigation. *See, e.g.,* FEIS at N-8-N-9, 3-WWPER-468-469. Under this mistaken limitation of its authority, BLM relies on "applicant-committed environmental protection measures," but it does not disclose how, or whether, they would be effective in mitigating impacts to sage-grouse, especially from noise. *See, e.g.*, FEIS N-18, 3-WWPER-477.

BLM and LNC also rely on LNC's pledge to "use the Nevada [CCS] to offset effects of the proposed Project on sage-grouse and their habitat." BLM Resp. 46 (cleaned up). But nowhere does BLM respond to WWP's detailed arguments showing that LNC's mitigation is only for the "anticipated temporary effects during the life of the Project," and not for long-term impacts, including impacts to water quantity and quality. FEIS 4-45, 3-WWPER-429. As the NDOW

wildlife experts determined, the *long-term* "predicted impacts to ground and surface water resources may have the most significant implications for wildlife." NDOW comments, 4-WWPER-654. And further, the credits do "not account for the loss of sage-grouse leks" from noise, another critical issue NDOW raised repeatedly. NDOW FEIS comments, 3-WWPER-358, 3-WWPER-367.

Regarding BLM/LNC's reliance on the CCS credits, BLM cannot refute the numerous findings from the state agencies in charge of the CCS, expressly informing BLM that the CCS cannot fully mitigate for the Project's impacts on sage-grouse. *See* WWP Opening 31-32. As NDOW stated: "The CCS does not account for effects to GRSG from loss of surface water. … Given that hydrologic impacts are still present at 300 years, there are significant and permanent impacts that would not be mitigated under the CCS." 4-WWPER-695.

BLM also ignored the finding by the Program Manager for the Nevada Sagebrush Ecosystem Program (in charge of the SETT mitigation program that provides the CCS credits) that, due to "potentially permanent impacts to riparian resources that are not directly within the project footprint are not accounted for in the CCS analysis … **an assumption that these impacts will be mitigated for using the CCS is incorrect.**" K. McGowan email, 4-WWPER-656 (emphasis added). The Program Manager expressly recommended that: "Additional mitigation measures should be taken to account for the potential temporary or

41

permanent loss of riparian resources not only for sage-grouse but for other wildlife as well." Id.

If BLM is going to rely on the state CCS and SETT credits to satisfy its mitigation obligation under NEPA and FLPMA, it cannot at the same time ignore the findings of NDOW and the SETT itself that the credits are insufficient.

## C. The FEIS's Baselines and Impacts Analysis for Pronghorn and Sage-Grouse Were Inadequate.

BLM/LNC try to defend the Project's failure to adequately consider the baseline conditions of affected resources by reconstructing and supplying information missing from the FEIS. For pronghorn, BLM's brief contains more baseline discussion than the entire FEIS. The FEIS omits critical species and habitat information, such as what proportion of the pronghorn population uses the Project area and how that population contributes to the larger population, and the baseline is not adequate. See W. Watersheds Project v. Bernhardt, 543 F.Supp.3d 958, 985 (D. Idaho 2021)(baseline inadequate where it did not provide critical species and habitat information).

NDOW never changed its conclusion that destruction of 4,960 acres of pronghorn winter range is a significant loss, yet BLM now tries to portray that as a minor impact. See BLM Resp. 41. Without understanding how pronghorn use the area, how many pronghorn use the area, and how those pronghorn contribute to the

overall pronghorn population, among other things, the extent of impacts to pronghorn cannot be determined.

For sage-grouse, LNC argues that sage-grouse do not use the Project area, and that there is no sage-grouse habitat that may be affected by the Project, reprising a misrepresentation that its contractor was forced to retract. Ecological Risk Assessment 9, 1-WWPFER-86 (omitting greater sage-grouse from assessment based on assumption they do not use the Project area). In fact, "[g]reater sage-grouse have been observed *within* the Thacker Pass project boundary and should be assumed that they inhabit the project area." NDOW Ecological Risk Assessment comments, 1-WWPFER-65.

BLM/LNC do not deny that the FEIS does not disclose the current, or even estimated, population of sage-grouse in the affected area or how those sage-grouse use the area. This case is thus similar to Western Watersheds Project v. Bernhardt, 543 F.Supp.3d 958 (D. Idaho 2021). There, too, the BLM failed to consider the local sage-grouse populations or sage-grouse seasonal habitat use within the project areas. *See* id. at 986-87.

Without information about sage-grouse use and occupancy of the affected lands, and how those sage-grouse and habitats contribute to populations at a larger

scale, "effects on sage-grouse can [not] be meaningfully gauged." Id. at 987.[13]

"[W]ith the impacts on sage grouse not properly established, the BLM did not

know what impacts to mitigate, or whether the mitigation proposed would be

adequate to offset damage…." Oregon Nat. Desert Ass'n v. Jewell, 840 F.3d 562,

571 (9th Cir. 2016).

As a result, the lack of adequate baseline necessarily undermines BLM's

limited analysis of the Project's impacts to sage-grouse and pronghorn. "[W]ithout

establishing the baseline conditions which exist before a project begins, there is

simply no way to determine what effect the project will have on the environment,

and consequently, no way to comply with NEPA." Great Basin Res. Watch, 844

F.3d at 1101 (BLM failed to analyze baseline air quality in FEIS for mine).

**D.      BLM Did Not Adequately Disclose Impacts to Pronghorn or Sage-grouse.**

BLM never detailed what the actual effects to any species would be would

be. "A 'hard look' should involve a discussion of adverse impacts that does not

improperly minimize negative side effects." N. Alaska Env't Ctr. v. Kempthorne,

457 F.3d 969, 975 (9th Cir. 2006).

---

[13] WWP raised BLM's failure to provide baseline information about sage-grouse population function and conditions, population and habitat trends, and connectivity throughout its briefing, Complaint, and comments and is not making a "new argument." *See, e.g.,* Compl. ¶¶25, 32, 33, 35, 36, 2-WWPER-267-270.

For example, for sage-grouse, while the FEIS admitted that "noise increases above the 10 dBA ARMPA guidance would occur at the critical Montana-10 lek, and potentially the Pole Creek-01 lek," FEIS N-18, 3-WWPER-477, the FEIS did not disclose that the noise increases could cause abandonment of the Montana-10 and Pole Creek-01 leks, or analyze potential population-level impacts to sage-grouse from those increases. *See* FEIS 4-52-4-53, 3-WWPER-431-432.

NDOW determined that the FEIS failed to disclose that "noise levels will be high enough to potentially cause the loss of two sage-grouse leks and significant PMU-level effects." NDOW FEIS comments, 3-WWPER-368. NDOW's experts informed BLM that "[c]urrent research indicates that as noise levels reach 10 dBa,…sage-grouse lek attendance declines and lek abandonment often occurs." NDOW FEIS comments, 3-WWPER-358. This was essentially ignored by BLM, labeling NDOW's concerns speculative, without explanation, although BLM recognized that noise *would* exceed the limit.[14] *See* NDOW FEIS comments, 3-WWPER-367; FEIS N-18, 3-WWPER-477; 3-WWPER-497. BLM's "ipse dixit assessment of environmental impacts over contrary expert opinion and data" fails. Rose, 921 F.3d at 1191.

---

[14] Because BLM did not recognize lek abandonment as a potential impact, the CCS credits will not offset impacts from the loss of the Montana-10 and Pole Creek-01 leks.

Similarly, BLM says that it addressed impacts to springs and seeps by considering impacts within the predicted drawdown area and a one-mile buffer. BLM Resp. 47-48. Yet, "[t]he Thacker Pass Water Quantity and Quality Impacts Report clearly predicts impacts to surface water discharge **outside [the] 1-mile buffer**." NDOW FEIS comments, 3-WWPER-360-361(emphasis added). Use of the one-mile buffer for analysis purposes cannot accurately capture impacts to the many wildlife species that depend on those springs and seeps in Nevada's water-strapped landscape because it does not consider or disclose the projected impacts from losses to any water resources outside of the buffer.

Nor does BLM's correction of some of the DEIS's misrepresentations about the likely magnitude of those impacts make the FEIS's analysis and disclosure of wildlife impacts legally adequate. For example, the description that loss of springs and seeps within the drawdown area and 1-mile buffer could cause "longterm impacts to GRSG" does not disclose or analyze what the impacts would be. FEIS 4-54, 3-WWPER-433. More detail is required.

For pronghorn, the FEIS' vague and generalized discussion does not adequately disclose or analyze impacts to pronghorn from destroying 4,960 acres of winter range and severing movement corridors. When pronghorn that use the Project area are displaced and that portion of the population is reduced or destroyed, what will the effects to the local pronghorn population be? The FEIS is

46

silent on this question.  WWP does not disagree with BLM's characterization that the Project will have "severe" impacts to pronghorn.  BLM Resp. 42.  But BLM cannot then fail to analyze the baseline conditions and analyze the severity of those admitted impacts.

## V.  BLM Has Not Overcome the Presumption in Favor of Vacating an Illegal Agency Action, Especially in the Face of Immediate, Massive and Irreparable Damage.

BLM/LNC erroneously argue that WWP bears the burden to show that BLM's admittedly illegal ROD should be vacated.  Vacatur is the presumptive remedy for violations of the APA.  Once a legal violation has been found, BLM must justify why its illegal approval, with its resulting massive and irreparable harm to public land values, should remain in force.  This is especially true here, given the fundamental nature of BLM's illegal assumption that LNC held mining "rights," which improperly governed its entire review and presumed lack of discretion over the Project, which BLM/LNC do not appeal.

If an agency's decision "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [the agency] for further consideration." Camp v. Pitts, 411 U.S. 138, 143 (1973).  The Ninth Circuit has authorized remand without vacatur only in "limited" or "rare" circumstances, and only when the agency opposing vacatur can show that "equity demands" a departure from the presumptive APA remedy.  Pollinator

47

Stewardship Council v. U.S. EPA, 806 F.3d 520, 532 (9th Cir. 2015)("limited

circumstances");  Humane Soc'y of the U.S. v. Locke, 626 F.3d 1040, 1053 n.7

(9th Cir. 2010)("rare circumstances");  Jewell, 840 F.3d at 575 (same).

Because vacatur "is the ordinary remedy," the agency "bears the burden of

demonstrating vacatur is inappropriate."  Nw. Envtl. Advocates v. U.S. Envtl. Prot.

Agency, No. 3:12-cv-01751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018).

*See also* All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d 1105, 1121-22

(9th Cir. 2018)(recognizing agency burden); Coal. to Protect Puget Sound Habitat

v. U.S. Army Corps of Eng'rs, 466 F. Supp. 3d 1217, 1219 (W.D. Wash.

2020)("Because the APA creates a 'presumption of vacatur' if an agency acts

unlawfully, the presumption must be overcome by the party seeking remand

without vacatur."); Ctr. for Envtl. Health v. Vilsack, No. 15-cv-01690-JSC, 2016

WL 3383954, at *13 (N.D. Cal. June 20, 2016)("Given that vacatur is the

presumptive remedy for a procedural violation […], it is Defendants' burden to

show that vacatur is unwarranted.").

Although a court has discretion to depart from that presumptive remedy,

"the availability of that discretion does not shift the burden for showing whether

[departure from vacatur] is warranted, which remains on the Defendants."  Friends

of the Earth v. Haaland, 583 F. Supp. 3d 113, 157 (D.D.C. 2022), *vacated as moot,*

2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).  "Because vacatur is the default

remedy, the party opposing it has the burden to show that it is unnecessary." 350

Montana v. Haaland, No. CV 19-12-M-DWM, 2023 WL 1927307, at *1 (D. Mont.

Feb. 10, 2023).

That was the case this year, on very similar facts and legal arguments from

BLM, where the District of Nevada vacated BLM's approval of a large mine (even

bigger than the Thacker Pass Project). Applying Rosemont, the court rejected

BLM's same assumption that the Project proponent held "valid mining rights"

(without finding or inquiring into whether the mining claims were valid) to

eliminate its discretion to protect public resources under FLPMA. Great Basin

Resource Watch v. U.S. Dept. of the Interior, No. 3:19-cv-00661, 2023

WL27444682 (D. Nev. March 31, 2023). The court vacated the ROD, over BLM's

objections, and "remand[ed] to the agency so that it can conduct the proper [claim

validity] analysis in the first instance." Id. at *5. That is also the proper result

here.

In environmental cases, the "rare circumstance" supporting non-vacatur

occurs when leaving the unlawful agency action in place will prevent serious

environmental harm—the opposite of the situation here. See Idaho Farm Bureau

Federation v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995)(leaving unlawful ESA

listing rule in place to protect imperiled snail until new listing rule is completed);

Klamath Siskiyou Wildlands Ctr. v. Grantham, 642 Fed. Appx. 742, 745 (9th Cir.

2016)(leaving decision in effect while agency completed a new NEPA analysis where vacatur of the challenged decision to issue grazing permits would result in reinstating prior permits containing terms less protective of National Forest); Center for Food Safety v. Regan, 56 F.4th 648, 668 (9th Cir. 2022)("Remand without vacatur here maintains the enhanced protection of the environmental values covered by [the registration] because sulfoxaflor has a more favorable toxicological profile compared to alternatives.").

Without vacatur, remand allows an agency to engage in a new review simply "'to rationalize or justify decisions already made.'" Save the Yaak Comm. v. Block, 840 F.2d 714, 718 (9th Cir. 1988), quoting 40 C.F.R. § 1502.5. Vacatur ensures a fresh decision and not "a classic Wonderland case of first-the-verdict, then-the-trial." Metcalf v. Daley, 214 F.3d 1135, 1146 (9th Cir. 2000).

## A. BLM's Errors Are Serious and the District Court Abused Its Discretion When it Remanded Without Vacatur.

While this Court reviews the district court's decision to remand without vacatur for abuse of discretion, "[a] misapplication of the correct legal rule constitutes an abuse of discretion." Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California, 813 F.3d 1155, 1163 (9th Cir. 2015). A district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Inst. of Cetacean

Research v. Sea Shepherd Conservation Soc'y., 725 F.3d 940, 944 (9th Cir. 2013).[15]

The district court misapplied the law here when it treated BLM's responsibility to determine whether LNC had discovered valuable minerals on each mining claim it plans to permanently occupy with waste rock and tailings as a simple procedural error that could be easily "fixed." *See* Order, 1-WWPER-61-62. It is "undisputed" that BLM never determined whether LNC had discovered valuable minerals. Order, 1-WWPER-26. This is a serious error because BLM approved the entire Project based on the erroneous assumption that LNC had valid existing rights under the Mining Law, which eliminated BLM's discretion over the Project. Establishing the existence of valuable minerals is a fact-intensive, substantive inquiry that cannot be done on this record.

A locatable mineral, like lithium, is not "valuable" unless it is shown that it can be "extracted, removed, and marketed at a profit." Rosemont, 33 F.4th at 1209, quoting U.S. v. Coleman, 390 U.S. 599, 602 (1968). "[T]he finding of some mineral, or even of a vein or lode, is not enough to constitute discovery – their extent and value are also to be considered." Converse v. Udall, 399 F.2d 616, 619

---

[15] LNC erroneously asserts that that case stands for the proposition that a "court abuses discretion *only* if ruling rests on clearly erroneous evidentiary assessment." LNC Resp. 104 (emphasis added). That is a mischaracterization of precedent.

(9th Cir. 1968). "[P]rofit over cost must be realizable from the material itself and it is that profit which must attract the reasonable man." <u>Ideal Basic Indus., Inc. v. Morton</u>, 542 F.2d 1364, 1369 (9th Cir. 1976).

The district court held that "some evidence" of general mineralization in the Project area established a "serious possibility" that BLM will be able to "substantiate" its decision on remand. Order, 1-WWPER-61-62. That is not the test under the Mining Law for BLM to determine whether all the claims contain the requisite "discovery of s valuable mineral deposit."

Valuable minerals must be discovered on each claim and "[a] discovery without the limits of the claim, no matter what its proximity, does not suffice." <u>Waskey v. Hammer</u>, 223 U.S. 85, 91 (1912). Evidence of "general mineralization" thus cannot meet the marketability test. "Each lode claim must be independently supported by the discovery of a valuable mineral within the location as it is marked on the ground." <u>Lombardo Turquoise Mining & Milling v. Hemanes</u>, 430 F.Supp. 429, 443 (D. Nev. 1977) *aff'd* 605 F.2d 562 (9th Cir. 1979). *See also* <u>Henault Min. Co. v. Tysk</u>, 419 F.2d 766, 768 (9th Cir. 1969)(valuable mineral deposit requirement cannot be met on one claim by relying on minerals on other claims).[16]

---

[16] LNC continually, and erroneously, argues that WWP "conceded" that LNC has "discovered a valuable mineral deposit" in the mine pit. LNC Resp. 6, 15, 18. This argument highlights LNC's misreading of what constitutes a "valuable mineral deposit" under controlling law, including <u>Rosemont</u>, as mere "mineralization" does not qualify as a "valuable mineral deposit."

LNC argues this this long-established precedent only applies when a claimant is seeking a patent or proposing to mine in a withdrawn area (like a National Monument). LNC Resp. 102. That is not true. As Rosemont held, to have any right to occupy a mining claim post exploration, a claimant must show they have discovered "valuable minerals" on that claim. These cases all define what qualifies as a "valuable" mineral deposit. Rosemont dealt with the same situation here – requiring that the claimant show that all of its claims are valid before having any rights under the Mining Law and federal public land law to use and occupy those claims. Like here, the Rosemont mine was proposed on non-withdrawn lands open to claiming.

LNC also posits various theories that its claims are valid, or that it may file "millsite claims" that might support its assertions of the "valid rights" it needs to avoid most of the RMP provisions. LNC Resp. 100-101, 125-26. But as BLM concedes, any adjudication or review of the validity of LNC's claims and purported "rights" under the Mining Law is for a future case on a future record.[17]

---

[17] The National Mining Association (NMA), in its amicus brief, largely argues that this Circuit got it wrong in Rosemont when it found that post-exploration use and occupancy rights on mining claims can only be based on valid claims under the Mining Law. Dkt. 71. But neither BLM nor LNC appeal the district court's application of Rosemont to this record, and thus NMA's arguments are inapplicable to this case.

The question is not, as BLM frames it, whether the evidence "foreclose[s]" existence of valuable minerals on each claim to be occupied by waste rock and tailings, it is whether it *establishes* their existence. BLM Resp. 105. BLM/LNC rely heavily on the fact, that in Rosemont, there was no evidence that valuable minerals had been found on the claims. But as the Circuit recognized, "that is legally irrelevant. The question is whether valuable minerals have been 'found' on the claims, not whether valuable minerals might be found." 33 F.4th at 1222.

Here, just as in Rosemont, "[i]t is undisputed that no valuable minerals have been found." Id.; *see* BLM Ans. ¶119, 1-WWPFER-30 (admitting that BLM has not determined whether waste dump claims contain valuable minerals, as alleged in ¶119 of WWP's Complaint). "[D]iscovery of valuable minerals is essential to the right to any occupancy—temporary or permanent—beyond the occupancy necessary for exploration." Rosemont, 33 F.4th at 1220. The district court thus misapplied Rosemont in its decision not to vacate the illegal ROD.

Indeed, if any minerals exist on the waste dump/tailings claims, they cannot be credibly considered "valuable." LNC made the economic decision to permanently bury them under 190 million tons of waste rock and tailings, essentially eliminating any future potential for mining. *See* LNC SJ Reply at 4, 2-WWPER-103. That was the situation in both Rosemont (Ninth Circuit and district court) and the recent Great Basin Resource Watch decision, 2023 WL 27444682,

54

as the courts relied on the mining company's plans to bury the waste dump lands as evidence that they did not contain valuable minerals: "As a threshold matter, Rosemont's proposal to bury its 2,477 acres of unpatented mining claims under 1.9 billion tons of its own waste was a powerful indication that there was not a valuable mineral deposit underneath that land." Center for Biological Diversity v. U.S. Fish and Wildlife Service, 409 F. Supp. 3d 738, 748 (D. Ariz. 2019). *See also* Great Basin Resource Watch, 2023 WL 27444682, at *5 (noting company's plans to dump waste on its mining claims "suggests that the land does not contain the requisite valuable mineral deposits."). On this record, and on these directly-relevant court rulings, LNC cannot rebut the presumption that its claims are invalid under the Mining Law, based on its own plans to forever bury these lands under 190 million tons of waste.

BLM's new and rushed claim validity determination cannot cure BLM's error because BLM does not deny that it was required determine whether LNC held valid existing rights *before* approving the Project. In Rosemont, this Circuit rejected the argument that an agency may determine whether a mining claimant holds valid existing rights *after* authorizing the claimant to occupy federal lands. *See* Rosemont, 33. F.4th at 1221 (rejecting argument that "the court erred in holding that the Service must assess the validity of Rosemont's mining claims before approving Rosemont's mining plan."). Allowing BLM to backfill its ROD

conflicts with <u>Rosemont</u>, and is another way in which the district court abused its discretion when it decided not to vacate the illegal ROD.

Where there is an "absence of analysis," rather than a "flawed analysis," by the agency, "the Court cannot determine whether there exists a serious possibility that the [agency would] be able to substantiate its decision on remand." <u>Wildearth Guardians v. Bureau of Land Mgmt.</u>, 457 F. Supp. 3d 880, 897 (D. Mont. 2020) (citing <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 988 F.2d 146, 151)(D.C. Cir. 1993)(internal quotation marks omitted).

The existing record does not support claim validity and LNC's "rights," especially due to the presumption that LNC's decision to cover 1,300 acres with 190 million tons of waste shows that the claims do not contain the requisite discovery of valuable minerals. The district court thus abused its discretion when it ignored controlling federal caselaw, and the facts of this case, in believing that BLM could easily substantiate the unlawful ROD.

The district court also failed to recognize the on-the-ground and practical nature of BLM's errors. BLM could not lawfully approve a mine Project with no legally-valid plan for disposing of waste rock and tailings. The ROD's approval of blasting, ground clearing, facility construction and other operations (in addition to the 1,300 acres of the waste and tailings dumps) is premised on approval of a full and complete mine Plan of Operations (PoO) authorized pursuant to rights under

the Mining Law.  But, as BLM admits, the ROD was legally invalid.  The district

court correctly held LNC had no legal right to use or occupy these 1,300 acres. As

such, the ROD essentially approved what is now an incomplete and illegal mine.

As the Rosemont district court held, "the Forest Service accepted, without

question, that those unpatented mining claims were valid.  This was a crucial error

as it tainted the Forest Service's evaluation of the Rosemont Mine from the start."

Center for Biological Diversity, 409 F. Supp. 3d at 747 (emphasis added).   The

same is true here, where BLM based its decision not to apply the ARMPA, as well

as its overall review of the Project, on its illegal and unsupported assumption that

BLM's discretion over the Project was severely limited because LNC held

statutory rights to occupy all of public lands at the site.  The district court's

decision not to vacate the decision was deeply flawed, legally and factually.

**B.      Remanding Without Vacatur Has Severe Environmental Consequences.**

When determining whether to leave an illegal agency action in place, this

Circuit looks to harm to the environment, and selects outcomes that provide greater

environmental protection.  *See* Pollinator, 806 F.3d at 532; Regan, 56 F.4th at 655-

56; Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995).

Here, though, the district court, in deciding not to vacate the unlawful ROD,

did not consider harm to the environment at all.  Only in response to WWP's

emergency motion for injunction pending appeal did the district court clarify that

"[t]he alternative, acceptable reason for remand without vacatur that Environmental Plaintiffs highlight in their Motion—environmental harm—did not apply to the Court's analysis…" Order, 1-WWPER-9.

However, the harm to the environment from the Project is severe. The Project will replace the priority sagebrush ecosystem—which provides vital habitats to sage-grouse, pronghorn and a wealth of other species—with a large open pit, waste dumps, and industrial facilities covering over 5,000 acres. In denying WWP's emergency stay motion the district court acknowledged that the Project would "disrupt the sagebrush ecosystem within the Project area" and that LNC would "soon begin ripping out sage brush that will not grow back for a very long time." Order, 1-WWPER-8. Indeed, LNC has already begun "[s]agebrush clearing for 'site preparation, geotechnical drilling, water pipeline development and associated infrastructure' construction." LNC Resp. 112.

This "clearing" is removing sagebrush that "the species depends upon…for every part of its life cycle." Braun Decl. ¶17, 2-WWPER-244. The ARMPA contains restrictions to avoid disruptions to sage-grouse during sensitive lifecycle periods, yet LNC is bulldozing sagebrush with reckless disregard for those. *See* ARMPA 2-8, 4-WWPER-751 (requiring restrictions on surface disturbing activities). LNC's actions will cause—and are causing— "increased avoidance by, displacement of, and disruption of life-history requirements of GRSG individuals

58

or groups from suitable habitat … due to lighting, vibration, noise, dust, or human presence." FEIS 4-44, 3-WWPER-428. The longer this is allowed to occur, the more severe its impacts will be.

Project noise alone will cause serious harm to sage-grouse. According to retired NDOW Director Terry Crawforth, "Disturbance to sage-grouse from noise impacts can interfere with lekking, when noise interference may prevent hens from locating dominant males." Crawforth Decl. ¶22, 2-WWPER-89. Noise increases above 10 dBA, like those from the Project, "are known to increase the likelihood of lek abandonment and cause decreases in juvenile recruitment (Blickley et al. 2013)." Braun Decl. ¶34, 2-WWPER-249.

Abandonment of the Montana-10 lek from noise impacts is likely and loss of that lek would have population-level impacts for sage-grouse. *See* Braun Decl. ¶¶35-39, 2-WWPER-249-250, Crawforth Decl. ¶33, 2-WWPER-91; NDOW FEIS comments, 3-WWPER-368. Ultimately, the Project will destroy the area for sage-grouse for at least 40 years and will have "permanent ramifications" for sage-grouse and other wildlife far outside of the Project area.[18] NDOW FEIS comments, 3-WWPER-356,-368.

---

[18] BLM/LNC fault WWP for failing to identify specific environmental harms from destruction of the waste dump lands; however, those lands are in mapped sage-grouse PHMA, within 3.1 miles of a lek, and are being developed without application of the ARMPA's restrictions. *See* 3-WWPER-458. As the FEIS acknowledges, birds will not only be displaced from habitats directly subject to

Nevertheless, LNC argues no environmental harm would occur pending remand "given the Project's compliance with the ARMPA." LNC Resp. 111. As WWP demonstrated, however, the Project does not comply with the ARMPA, and LNC is presently bulldozing sage-grouse habitat without application of buffers, seasonal restrictions, noise shields, or other ARMPA protections.[19] *See* FEIS Figs. N.1-N.3, 3-WWPER-478-450 (maps of sage-grouse habitats); 2-WWPER-75 (Project disturbance map showing "site" to be cleared along with locations of West Waste Rock Storage Facility, Clay Tailings Filter Stack, and Coarse Gangue Stockpile, for which construction is underway).

Moreover, BLM and LNC ignore the fact that the ARMPA's protective standards were established to prevent the sage-grouse from being listed under the Endangered Species Act. *See* ARMPA 1-1, 4-WWPER-728. BLM's non-compliance with the ARMPA risks severe consequences for the greater sage-grouse, especially by causing loss of the Montana-10 lek. *See* NDOW FEIS comments, 3-WWPER-368. "Impacts to sage-grouse in the Montana mountains would be significant enough to place the species on a sure path to listing under the

---

development and disturbance, but also "proximate" habitats, i.e, the entire Project site and beyond.

[19] WWP filed two expert declarations in the district court that explain the impacts of disturbance on sage-grouse in more detail. *See* Braun Decl., 2-WWPER-239-251; Crawforth Decl., 2-WWPER-81-92.

60

Endangered Species Act since abundance of grouse in that area is exceptional."

Crawforth Decl. ¶33, 2-WWPER-91-92.  Harm to the environment from the

Project is severe and indeed, irreparable.

## C.     The Temporary Disruptive Consequences of Vacatur Do Not Warrant Departure From the Presumptive Remedy For APA Violations.

LNC and the various amicus stress that the nation needs lithium to help the

transition to a cleaner energy future.  Our nation's need for minerals cannot justify

noncompliance with the express direction of Congress in FLPMA and NEPA,

however.  BLM must comply with the law when authorizing the use of our public

lands, whether for public benefit or private profit.

BLM/LNC argue that regardless of which violations of law this Court might

identify, vacatur would be still be inappropriate because it would have "disruptive

consequences."  LNC complains about the economic costs of delaying the Project.

Temporary economic harms, however, do not rise to the level contemplated by this

Circuit to warrant remand without vacatur. Nat'l Family Farm Coal. v. EPA, 960

F.3d 1120, 1144-45 (9th Cir. 2020)(vacating despite substantial economic

consequences).

Any delay in the Project, if the illegal ROD is vacated, will not be lengthy, if

BLM's new validity decision correctly applies the Mining Law and FLPMA.

BLM's new claim validity determination is subject to challenge, and thus the issue

of whether the RMP applies (based on whether BLM's new decisions correctly apply the Mining Law and FLPMA) will be soon determined by the District of Nevada. But for now, as BLM admits, the ROD violates FLPMA.

Thus, the sky-is-falling pronouncements of amicus regarding the world-wide supply of lithium, the U.S. economy, etc., based on this one mine, are unfounded. When balancing equities, permanent and irreparable harm to public lands and the the environment outweighs any brief "temporary delay" in implementing the challenged project, if the agency has complied with the law. League of Wilderness Defenders v. Connaughton, 752 F.3d 755, 766 (9th Cir. 2014). If BLM has not not complied, neither LNC nor amicus can credibly argue that our Nation's bedrock public land laws should be suspended to allow the illegal approval of a massive mine to stand.

## **CONCLUSION**

This Court should find that BLM violated FLPMA and NEPA, and vacate the illegal ROD and FEIS.

Respectfully submitted this 26th day of May, 2023.

*/s/ Roger Flynn*
Roger Flynn, (Colo. Bar #21078)
Jeffrey C. Parsons, (Colo. Bar #30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540

(303) 823-5738
[wmap@igc.org](mailto:wmap@igc.org)

Attorneys for Plaintiffs GBRW, BRW, and WD

*/s/ Talasi Brooks*
Talasi B. Brooks (ISB #9712)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
(208)336-9077
tbrooks@westernwatersheds.org

Attorney for Plaintiff WWP

*/s/ Christopher Mixson*
Christopher Mixson (NV Bar#10685)
KEMP JONES, LLP
3800 Howard Hughes Parkway, Suite 1700
Las Vegas, Nevada 89169
702-385-6000
[c.mixson@kempjones.com](mailto:c.mixson@kempjones.com)

Attorney for All Plaintiffs

**Certificate of Compliance Pursuant to FED. R. APP. P. 32 (a)(7)(C) AND CIRCUIT RULE 32-1**

I certify that: Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, and WWP's unopposed motion to exceed these page limits, the attached opening brief is:

Proportionately spaced, has a typeface of 14 points or more and contains 13,983 words.

*/s/ Talasi Brooks*                5-26-23

**<u>CERTIFICATE OF SERVICE OF ELECTRONIC FILING OF BRIEF</u>**

I also certify that on May 26, 2023, I electronically filed the foregoing brief, along with the Supplemental Excerpts of Record (ER) with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all of participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Talasi Brooks*